I44AAHUN1                        Jury Trial

 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      UNITED STATES OF AMERICA,
 3
                  v.                        13 CR 521 (RA)
 4
      JOSEPH MANUEL HUNTER, ET AL.,
 5
                      Defendants.
 6    ------------------------------x

 7                                          New York, N.Y.
                                            April 4, 2018
 8                                          9:30 a.m.

 9    Before:

10                        HON. RONNIE ABRAMS,

11                                          District Judge

12                            APPEARANCES

13
      GEOFFREY S. BERMAN
14         Interim United States Attorneys for the
           Southern District of New York
15    REBEKAH A. DONALESKI
      EMIL BOVE
16    PATRICK EGAN
           Assistant United States Attorney
17
      CESAR DE CASTRO
18    VALERIE A. GOTLIB
           Attorneys for Defendant Hunter
19
      DAVID M. STERN
20    JEREMY SCHNEIDER
           Attorneys for Defendant Samia
21
      ROBERT W. RAY
22    BRITTNEY M. EDWARDS
           Attorneys for Defendant Stillwell
23
      ALSO PRESENT:  JAMES STOUCH, Special Agent, DEA
24    MARGARET SHIELDS, Paralegal
      STELLA LEUNG, Paralegal
25    MAYERLIN ULERIO, Paralegal

1

2                    (Trial resumed; jury not present)

3                    THE COURT:  Good morning, everyone.  You can be

4      seated.

5                    So we'll talk about the admissibility of the video in

6      a minute but I wanted to call to your attention the issue with

7      respect to a juror.  One of the jurors -- it's Juror No. Eight,

8      Ms. Warner -- approached Ms. Cavalas and stated that she fears

9      for her personal safety by virtue of sitting on this jury and

10     wants to be excused.  I haven't spoken with her yet.  And all

11     Ms. Cavalas said is that she will raise it with me.  I would

12     like to bring her in now and talk to her and so the question is

13     what setting would you like to do that in?  Would you like to

14     do it in the robing room just with the lawyers?  Would you like

15     to do it a here in court?  Obviously, each of the defendants

16     has a right to be present but it's up to you what you think is

17     best.

18                   MR. SCHNEIDER:  Judge, I think it should be done if

19     the robing room with my client present.

20                   MS. DONALESKI:  Judge, it's an open courtroom.  We

21     would object to that.  We would suggest doing it at the side

22     bar.

23                   MR. DE CASTRO:  I'm fine with the robing room.

24                   THE COURT:  OK.  We'll do it -- given that she has

25     expressed fear, I think it's important for her to be able to be

I44AAHUN1                    Jury Trial

1    forthcoming, so I am going to do it in the robing room.  All

2    right?  The defendants have waived their presence.  So we'll

3    bring in the court reporter.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Robing room)

2            (Juror present)

3            THE JUROR:  I'm sorry.

4            THE COURT:  No.  Don't be sorry.  We have the lawyers

5    here and the court reporter but just tell me how you are

6    feeling.

7            THE JUROR:  All right.  So yesterday when I was

8    sitting like in the, as opening statements were happening I

9    started to have like a lot of, like my heart was rushing.  And

10   I do have a seizure disorder but I take medication to hold back

11   a seizure but the feelings that I was having yesterday were all

12   the precursors that I would feel if I was going to have a

13   seizure, kind of like a panic attack that just won't stop.  And

14   my concern is that I'm just like, I feel like a sense of I

15   guess potential fear or whatever.

16           I feel like these people if they're innocent, fine.

17   That's no problem.  But if they were guilty, then I would be

18   afraid to say something like that because they know my name.

19   They know where I live.  They know I have kids, those types of

20   things.  And so by the end of the day I felt like overwrought.

21   So I would like to do my duty.  I don't mind doing jury duty.

22   I've done it before.  But yesterday was more stressful than I

23   think I was prepared for.

24           THE COURT:  Do you think that stress would continue

25   throughout the trial?

1          THE JUROR:  I think that the situation isn't going to

2    change.  Like if I was going to feel concern for my family,

3    then that's a -- I think that that's the thing that I couldn't

4    get over.  And then I started to, I tried to calm myself down.

5    But then in calming myself down, then I wasn't really paying

6    proper attention and so I asked that I could please speak to

7    somebody.

8          THE COURT:  All right.  Thank you for telling me that.

9    I'm just going to ask you to step out for a minute and we'll

10   get back to you.

11         THE JUROR:  OK.  Good.  Thanks.

12         (Juror not present)

13         THE COURT:  You know, bring her back in for a minute.

14         (Juror present)

15         THE COURT:  I'm sorry.  Just before I have you step

16   out, did you talk to any other jurors about this at all?

17         THE JUROR:  No.  I just waited and spoke to her.

18         THE COURT:  Please don't.

19         THE JUROR:  No, I know.

20         (Juror not present)

21         THE COURT:  I think I have to excuse her.  I don't

22   know if anyone feels differently or wants me asking additional

23   questions.

24         (All agreed)

25         THE COURT:  Why don't you bring her back?

1      COURTROOM DEPUTY:  In terms of the other jurors if

2  they ask questions, do I say anything?

3      THE COURT:  I think you should if they ask just say

4  you know, she had to be excused for personal reasons.

5      MR. RAY:  It's a personal issue.

6      THE COURT:  Is everyone comfortable with that?

7      (Yes)

8      (Juror present)

9      THE COURT:  All right.  So I am going to excuse you.

10  And Ms. Cavalas is just going to kind of walk you out and I am

11  going to ask you not to talk to any the other jurors and we're

12  going to just --

13      THE JUROR:  I'm sorry.

14      THE COURT:  No.  I understand and I sincerely believe

15  you that you are willing to serve and I'm glad you brought this

16  to our attention.  It's very important that jurors are honest

17  and forthcoming with us.  So I appreciate you coming forward.

18      All right.  So I will excuse you.

19      MR. RAY:  Thank you for your service.

20      (Juror not present)

21      THE COURT:  Why don't we go back to the courtroom and

22  address the other issues.

23      (Continued on next page)

24

25

1          (In Open Court)

2          THE COURT:  All right.  So why don't we now address

3     Mr. Hunter's motion.

4          Mr. De Castro, is there anything you want to add to

5     your letter?  One thing I do want you to address is how this

6     affects the reasonableness of the search.

7          MR. DE CASTRO:  Well, that's the only thing I was

8     going to say, judge, was that primarily the government's main

9     opposition throughout this litigation, at least on this issue

10     has been that this was reasonable.  And a linchpin to all of

11     their arguments has always been this has been really a law

12     enforcement operation by the Thai police.  We sort of were on

13     the sidelines, was assisted, it was a joint parallel

14     investigation.  But this was really them.  I think yesterday's

15     testimony changes that.  I think it changes that saying we --

16     and part of their argument was that and the basis for us saying

17     that is, look, they installed it.  We just gave them the funds

18     or maybe we gave them the equipment.  We just they did it.

19          That's not what happened here.  What happened

20     according to the testimony yesterday was that the DEA tasked

21     this particular DEA employee --

22          THE COURT:  Do you used language about working with

23     the DEA.  He worked for the DEA.

24          MR. EGAN:  Correct.

25          MR. DE CASTRO:  And they tasked him to go and engage

1      in this surveillance/ruse at the house, to tell the maid that

2      they were an internet company, to go in and see the place and

3      then go in and install this material.  Furthermore, they were

4      "they" meaning the DEA was downloading this material every

5      single day.  There was no testimony because I don't think this

6      witness would be the person reviewing it.  So I haven't made

7      that argument but I think it changes the reasonableness prong

8      of this and everything the government has been saying since

9      2015 in their motion responses regarding the installation and

10     just that this was a Thai operation really assisted by the DEA.

11            THE COURT:  Mr. Egan, who is Jaroon, the man who

12     assisted Mr. Pakchan, is he a DEA employee, Thai law

13     enforcement?

14            MR. EGAN:  He's the foreign service national who works

15     in the U.S. Embassy.  So he is also U.S. Government.

16            THE COURT:  What is the legal basis for him entering

17     the house?  Why do you need to pretend that he was an employee

18     of the internet company if he had a consent to search?

19            MR. EGAN:  Because as I said, the search was that the

20     maid who they don't have any control over or know, who she

21     reports would say something to the occupants of the house.  And

22     indeed, that is what ended up happening.  The occupants of the

23     house asked her when they noticed something, was anybody in

24     here recently?  And she said oh, just some people from the

25     internet company installing the Internet.  And that tipped them

1    off that something was up and they actually then discovered

2    cameras.  Their concern was that whether they had legal

3    authority.  Their concern was operational concern which is we

4    don't want anybody who is in this house who isn't the person

5    who gave us the consent.  We don't want anybody else knowing

6    that these have been installed because they could say

7    something.  So the occupants even casually --

8          THE COURT:  Why were the statements that were

9    previously made to the Court as outlined by Mr.  -- not

10   inconsistent with Mr. Pakchan's testimony yesterday that the

11   role of DEA versus the role of the Thai law enforcement.

12         MR. EGAN:  As an initial matter with the statements

13   that were made were based on our best understanding of what it

14   was at the time that the statements were made.  So it is true

15   it says in there previously that Thai law enforcement had

16   installed -- Thai law enforcement as Picciano said was present

17   at the installation.  I think it's a false dichotomy that he

18   set it up just as protection.  This witness is not the witness

19   who we would obviously have at a hearing.  He doesn't know

20   these things.  This was part of an investigation that as we

21   said in our motion papers had begun with DEA and Thai law

22   enforcement, all information coming out of sort of LeRoux's

23   cooperation and information he had in Thailand that started

24   with there are drugs in Thailand and this group worked together

25   on those two prongs and indeed while they were in Phuket they

I44AAHUN1                        Jury Trial

1    were doing this investigation and another piece of the

2    investigation, the Thai narcotics investigation.  But the point

3    is the Court said it does not change the reasonableness

4    analysis.  And Mr. De Castro is misconstruing, is saying that's

5    the thrust of the government's argument.  Point one of the

6    government's opposition was this was reasonable and the

7    reasonableness only comes in play if it is entirely a DEA

8    operation.  The reasonable analysis is the one that the Court

9    undertakes if you say this is a search of a U.S. citizen abroad

10   by U.S. law enforcement an it was only an alternative is that

11   we made the argument they were not acting as agents.  But the

12   reasonableness part is the analysis that the Court undertakes

13   when this is a DEA operation.  So even if the facts were as

14   Mr. De Castro said and I think part of it is this witness just

15   doesn't know.  He was tasked by DEA because he is a DEA

16   employee.

17        THE COURT:  He is the DEA employee who is installing

18   the cameras when we had previously been advised that it was

19   Thai law enforcement that installed the security cameras, so he

20   has some information.  I recognize.  He may not know whether

21   this was authority to search but he has some information and

22   has testified in a way that is inconsistent with some of the

23   statements that were made to the Court as early as this year in

24   the opposition to the motion.

25        MR. EGAN:  No.  I understand that.  But my point is

I44AAHUN1                    Jury Trial

1   that the fact that he is DEA does not undermine the holding

2   that it is admissible evidence, nor would it undermine the good

3   faith exception by plainly holds that the exclusionary rule is

4   not a remedy when there has been good faith reliance which

5   nothing Mr. Pakchan said has undermined that either.  The

6   Picciano affidavit makes it clear that he relied on Thai law

7   enforcement authority to get access to the house.  They had

8   authority.  They went and did it.

9           THE COURT:  With respect to good faith I will tell you

10  that in light of these inconsistencies at the very least I

11  would want to have a witness.  Whether I can rule on

12  reasonableness I think is a separate issue but I'm not

13  suggesting that you to have faith in any particular agent but I

14  think enough questions have been raised by the inconsistencies

15  present to the Court that a before relying on good faith basis

16  I would want to hear the appropriate witness testify.  So, I'll

17  say that.

18          MR. EGAN:  OK.  And again that was, in our view that

19  was not even our primary argument.  And like I said to Mr. De

20  Castro's point even acting as a Thai agent our argument is this

21  was fundamentally reasonable for all the reasons that the Court

22  said this was a limited intrusion on someone who had a

23  diminished expectation of privacy in a house where he was a

24  guest and a compelling law enforcement interest on the other

25  side was that these were members of, as the Court said, an

1    international criminal organization that was involved at the

2    very least in drug dealing and murder and that balancing those

3    two things this was a reasonable certainly and if this is a

4    reasonable search as the Court found that it was, then this

5    evidence is admissible whether it was DEA who installed it

6    whether it was a Thai police who installed it if it is a

7    reasonable certain it is admissible underneath of those

8    circumstances and there is nothing that Mr. Picciano said that

9    goes to the reasonableness analysis or any of the things hat

10   Court relied to final it reasonable.

11           THE COURT:  I am going to go back and question.  I

12   think it's, fair point, is the question I started with this

13   morning which is how does any of this change the reasonableness

14   analysis that I relied on previously?

15           MR. DE CASTRO:  Well, I think first just to address --

16   first of all everything that the Court has been relying on has

17   seemingly been influx.  What the government is saying, yes, we

18   gave you facts that may or may not have been accurate at the

19   time.  I'm not really sure.  This started, if the Court

20   remembers, with them saying this was a consent search.  There

21   was no mention at all of legal authority.  You just asked the

22   government what the basis was Mr. Pakchan there?  Under what

23   basis?  Did he have a warrant whatever?  They never answered

24   that question as they have never answered a question really

25   throughout the litigation.  They've never said there was an

actual warrant and actual law.  They've said it and they've

never produced anything.  I've never said their only response

at one point was the defendant is not entitled to that as

discovery.  I get it.  Produced it to the Court.  Look at in

camera to actually show that there was a Thai law enforcement

investigation/case.  They started this by saying it was a

consent of Mr. LeRoux.  Mr. LeRoux consented to home in which

it is illegal for him to own in the way that they said that he

owned it.  If the information, how would Thai law enforcement

have gotten the information to go get a warrant or have a

criminal investigation but for the DEA who is controlling this

cooperator?  They would have said our cooperator who is not

Thai, his name is Paul LeRoux, he gave consent to search the

house.  Well, it's a criminal offense in Thailand to own

through a nominee from our understanding.  Non Thai citizens

can't own property.  So the natural question would have been,

well, who owns it?  He can't.  Who can give consent?  He can't.

        Then there had to have been a conversation.  Yet the

government produces an affidavit to you from the agent that is

very precise and that tells you very little.  It says I had a

conversation with an NSB person, no name, when was it?  You are

telling me that there is no report of that, of that

conversation, that the DEA didn't memorialize something this

important?  I doubt that.  But they have never made a

representation.  Yesterday's testimony was very clear.  The DEA

1    conducted surveillance of the house.  This witness said he

2    surveilled the house.  The DEA installed the security cameras.

3    The DEA set up the equipment.  The DEA seized the information

4    every single day.  The testimony was also very clear regardless

5    of the government saying today that they think he was not

6    telling the truth that the Thai police were there for

7    protection.  That means -- and he said I think outside.  They

8    were outside.  They had nothing to do with this operation other

9    than protection.  I think this was completely unreasonable.

10   And the government doesn't want to give you enough facts if it

11   was to decide it.  And I think that is the biggest problem that

12   we have been saying all along.  We don't want to give you the

13   facts to decide it and I have to presume that they don't exist.

14         MR. EGAN:  Your Honor, first of all, this is why it's

15   insignificant that this is framed a motion for reconsideration.

16   You asked about reasonableness.  And every fact that he just

17   pointed to was a fact that was before the Court.  When the

18   Court made its initial decision the Court was correct to say

19   that the law -- it is not -- the law doesn't require.  It is

20   inappropriate for the Court to second guess Thai law

21   enforcement's decision.  They had legal authority.  The Court

22   had an affidavit stating that he had legal authority and none

23   of what he said goes to the reasonableness of the search, which

24   is the fundamental point that the Court led with in terms of

25   its admissibility ruling.  Everything that he just said is

stuff that was before the Court when the Court made its initial

decision and for a motion for reconsideration there has to be

something in Mr. Picciano's testimony that goes to that issue

that he's saying.  He just pointed to there was an award that

was produced even though the Court said in its ruling that

they're not required to go behind the court of Thai law

enforcement authority and that nothing that was said yesterday

which would be the basis for a motion for reconsideration

undermines that.

          MR. DE CASTRO:  Judge, just briefly, Mr. Egan said

reasonableness matters if this was a DEA operation.  What was

not before the Court in the prior motion practice which was

before the Court yesterday was that this is and was a DEA

operation.  That's the difference.

          MR. EGAN:  Which only moves it more into the

reasonableness category which makes reasonableness the entire

analysis then.  And that's without even conceding whether there

is an appropriate description other than the fact that he works

for the DEA and did the installation but that would just, even

if that were the case, even if that were the testimony, that

would just move to the Court's analysis, was this reasonable?

That's the determination the Court has already made.

          THE COURT:  Mr. De Castro, what facts are there that

you think you don't have that would bear on reasonableness of

this search?

1            MR. DE CASTRO:  It's hard to say because that's why we

2       did the chart because I was trying to figure out -- I don't

3       know.

4            THE COURT:  All these facts go to whether it was DEA

5       or Thai law enforcement or both that were driving this effort

6       that were behind the installation of cameras, the review of

7       videos and the like.

8            So again, is there any fact you think I don't have

9       before me that would weigh in on reasonableness?

10           MR. DE CASTRO:  I think if I were the Court I would

11      want to know what legal basis they had in Thailand.  I would

12      want to know that the warrant affidavit from the agent

13      specifically says this was a Thai investigation, a Thai

14      investigation and I think that was --

15           THE COURT:  Well, I don't think any of the testimony

16      yesterday calls into question whether the Thai authorities had

17      an investigation and whether any charges were brought or for

18      drug crimes.

19           Isn't that right?

20           MR. DE CASTRO:  I agree.  That's correct, judge.  Of

21      course I didn't cross-examine him on it.  I don't know.

22           THE COURT:  He may not know.

23           MR. DE CASTRO:  I don't know the answer to that

24      question.  I would think that if he was there to find a way

25      into the house, give this ruse to the maid or whatever it was,

1    I think they were prepared to know what their authority was

2    they had to, I don't know.  I would think that it's a dangerous

3    situation they are putting this person in.  It's almost

4    something an agent would be doing.  They are describing him as

5    a technician but in my experience agents do these things.  It

6    seems implausible.

7            And the other issue, judge, is if they had consent,

8    this was a consent search then why the ruse at all?  I

9    understand what he's saying.  We're worried that somebody is

10   going to be tipped off by it but they already had contact.

11           THE COURT:  I think Mr. Egan answered that about the

12   concern with the housekeeper disclosing who they were and why

13   they were there.

14           MR. DE CASTRO:  I think that's right but we haven't

15   heard from an agent about these circumstances.  I think this is

16   just, it's a representation they're making.  I'm not doubting

17   necessarily that but we've got so many different

18   inconsistencies I don't know what to think at this stage.

19           THE COURT:  Who is your next witness after that?

20           MR. EGAN:  Sergeant Massey.

21           THE COURT:  Could you call him next?  Could we go out

22   of order?

23           MR. EGAN:  He is present but in terms of like

24   interrupting his testimony --

25           THE COURT:  Yes.

I44AAHUN1                        Jury Trial

1      MR. EGAN:  -- our concern is only that he is due to

2  fly out shortly and needs to --

3      THE COURT:  This afternoon?

4      MR. EGAN:  No, I don't think it's this afternoon but I

5  think it's tomorrow morning.

6      THE COURT:  OK.  And how long is the sergeant?

7      MR. EGAN:  The sergeant is probably less -- on direct

8  he is probably half an hour.

9      THE COURT:  Are you going to rely at all on the video?

10  Was the sergeant who testified in any way related to video?  Do

11  you need video for purposes of his testifying?

12      MR. EGAN:  No, not for purposes.

13      THE COURT:  Give me a minute and I'll be right back

14  out.

15      (Recess)

16      THE COURT:  Everyone can be seated.

17      I think that in light of the discrepancies in the

18  information provided to the Court and in the motion papers and

19  in yesterday's testimony what I'm going to do is allow defense

20  counsel the opportunity to question both Mr. Picciano if they

21  want to do it outside the hearing of the jury about his

22  knowledge that he had abilities to enter and what it was based

23  on.

24      And Special Agent Picciano, is he here?

25      MR. EGAN:  Yes, your Honor.

1           THE COURT:  So that's what I'm going to do and then

2     I'll rule after that.  So when the question is how should we do

3     this in terms of trying not to waste the jurors' time, could

4     you move forward without portions of the case and do we deal

5     with this at the end of the day or a little bit over lunch?

6     What would you propose?

7           MR. EGAN:  I think we would propose probably doing it

8     over lunch.  I think it needn't be long but I think we can move

9     forward with other evidence and then when we get to the lunch

10    break, do that.

11          THE COURT:  OK.  And I'll give you some time for

12    lunch.  I'll just tell the jury we are going to take a longer

13    lunch than we would otherwise.  Does that work for everybody?

14          MR. EGAN:  That's fine.

15          So we have one very long witness who we expect to get

16    on the stand today.  Where ever we are, even if things go

17    quicker this morning I think our view would be we should get

18    this done before a witness gets on the stand because that

19    witness will be on the stand for a considerable amount of time.

20          THE COURT:  OK.  Why don't you tell me when you think

21    we need to take a break, all right?  And if need be, we'll take

22    an early lunch break and I'll just tell them we're going to

23    take an early lunch break.

24          Two minor issues.  One of the jurors asked -- I don't

25    know if it was one of the alternate jurors who asked -- if he

1    or she was an alternate.  If someone asks if they are an

2    alternate juror, does anyone have a problem with my informing

3    the jury that the two jurors, Numbers 13 and 14 are alternate

4    jurors?

5           MR. SCHNEIDER:  We don't mind but we'd like you to

6    give them a little speech about paying attention.

7           THE COURT:  Absolutely.

8           It's actually Ms. Singer who asked about that who is

9    not an alternate.  But then with respect to Juror No. Eight who

10   is now gone, Ms. Cavalas has not said anything to them.  Do you

11   want me -- because they're going to be changing seats, they're

12   obviously going to notice.  Should I just tell them, I want you

13   to know that Juror Number Eight was excused from the jury for

14   personal reasons.  Does anyone have any objections?

15          MR. RAY:  No objection and that should be done.

16          THE COURT:  So with that, I'm going to bring the jury

17   in and tell them for scheduling reasons we're going to hear

18   from a different witness now.  We are going to take things a

19   little bit out of order and then we'll conclude with --

20          MR. EGAN:  "Pakchan".

21          THE COURT:  -- Pakchan a little bit later.

22          Thank you.  We'll bring in the jury now.

23          Do you all think we should take a longer lunch?

24          MR. DE CASTRO:  It's not going to be lengthy.

25          THE COURT:  I'll say an hour and a half and hopefully

I44AAHUN1                       Jury Trial

1    we'll finish in an hour and you will can grab a bite in the

2    second half hour.

3                (Jury present)

4                THE COURT:  Good morning, everyone.  Everyone can be

5    seated.

6                First of all, sorry to keep you waiting.  We usually

7    start promptly but we had some issues to discuss.  The first

8    thing I wanted to tell you --

9                COURTROOM DEPUTY:  They're not all here.  Sorry.

10               (Pause)

11               THE COURT:  All right.  Again, good morning.  Sorry to

12   get started late.  We usually do start promptly.  The first

13   thing you've probably noticed is that Juror No. Eight is no

14   longer here.  Just for personal reasons I excused her.  And

15   what we're going to do is we're going to have everybody move

16   over one seat.  So Juror No. Nine will now be Juror No. Eight

17   and Juror No. 13 will now be Juror No. 12.

18               I understand that someone also asked about alternates.

19   It is true that Juror No. 13 and Juror No. 14 are alternate

20   jurors.  It's really important for you to pay as much attention

21   as all of the other jurors.  As you can see at any time for

22   personal or other reasons someone may need to be excused and

23   you'll be the one deliberating.  So I didn't want there to be

24   any mystery there.

25               The last thing that I wanted to tell you is that

I44AAHUN1                    Jury Trial

1    sometimes during that trial and for scheduling reasons we need

2    to take witnesses out of order a little bit.  So instead of

3    hearing the remainder of Mr. Pakchan's testimony now we're

4    going to hear from another witness and then he will complete

5    his testimony later on.  But there's nothing official about

6    that.

7              All right.  You may proceed.

8              MR. EGAN:  Thank you, your Honor.

9              Your Honor, before the government calls its next

10   witness the government would like to read what's been marked as

11   Government Exhibit 106 which is a stipulation between the

12   parties.

13             THE COURT:  Yes, of course.

14             MR. EGAN:  It is hereby stipulated and agreed by and

15   among the United States of America by Jeffrey S. Berman, United

16   States Attorney for the Southern District of New York, Emil J.

17   Bove, III, Rebecca Donaleski and Patrick Egan, Assistant United

18   States Attorneys, of counsel, Defendant Joseph Manuel Hunter,

19   by and through his attorneys, Cesar De Castro, Esquire and

20   Valerie Gotlib, Esquire, defendant Adam Samia by and through

21   his attorneys David Stern, Esquire and Jeremy Schneider and

22   Rachel -- and defendant Carl David Stillwell by and through his

23   attorneys Robert W. Ray Esquire and Brittney N. Edwards:

24             One, that on September 25, 2013 Thai law enforcement

25   personnel including members of the Royal Thai Police arrested

I44AAHUN1                        Jury Trial

defendant Joseph Manuel Hunter in the vicinity of Phuket

Thailand.  Thai law enforcement personnel seized the cellular

telephone marked as Government Exhibit 200-N87B from Hunter in

connection with that arrest.

On September 25, 2013 after Hunter was arrested Hunter

executed Government Exhibit 2001 which is a consent to search

form authorizing a search of a house in the vicinity of Phuket

Thailand known as the Phuket house that Hunter was occupying at

the time of his arrest.

Three, after Hunter signed a Government Exhibit 2001

law enforcement personnel conducted a search of the Phuket

house and seized the U.S. passport marked as Government Exhibit

202.  The U.S. passport marked as Government Exhibit 203 and

the identification documents marked as Government Exhibits

204-1 through 204-11.

On September 27, 2013 Thai law enforcement personnel

transferred custody of Hunter to agents from the U.S. Drug

Enforcement Administration and provided the DEA agents with the

government exhibits described in the preceding paragraphs.  The

DEA agents then escorted Hunter and the government exhibits on

a flight that landed in White Plains, New York.

After Hunter arrived in the Southern District of New

York, DEA personnel lawfully searched a cellular telephone

marked as Government Exhibit N287B.  Government Exhibit

3000-N87B is a report that fairly and accurately reflects the

1    contents of Government Exhibit 200-N87B as revealed by the

2    search.  It's dated March 29 and signed by all the parties.

3            The government would ask that Government Exhibit 1006

4    Government Exhibit 200, 201, 202, 203, 204-1 through

5    204-1120 -- sorry -- N87B and 300-N87B as well as the

6    stipulation be received in evidence.

7            THE COURT:  Yes, they'll be received.

8            MR. EGAN:  Ms. Shields, if we could publish Government

9    Exhibit 201.  And just for the record this is a document that

10   at the top is marked consent to search and refers to a property

11   at 30-34 Moo5 Vicet Song Cram Road Kathu, Phuket 83120 and has

12   been signed at the bottom.

13           If we can pull up, Ms. Shields, Government Exhibit

14   202.

15           (Pause)

16           MR. EGAN:  And scroll to the first page.

17           If we can pull up Government Exhibit 204-1.  It's a

18   Kentucky driver's license that reads:

19           Joseph M. Hunter and address is Owensboro, Kentucky.

20           If we can pull up Government Exhibit 204-2.  For the

21   record a United States uniformed services ID card in the name

22   of Hunter, Joseph Manuel.

23           We can pull up Government Exhibit 204-3.  This is an

24   international driver's license in the name of Fernando Santana

25   providing an address in the Philippines.  If we can pull up

Government Exhibit 2004-4.  This is a drive as license from the Philippines in the name of Santana, Fernando Joseph.

You can pull that down, Ms. Shields.

At this time the government would also like to read another stipulation.  It's been marked as Government Exhibit 1007.  It is hereby stipulated and agreed by and among the United States of America by Jeffrey S. Berman, United States Attorney for the Southern District of New York, Emil G. Bove the third, Rebecca Donaleski and Patrick Egan, Assistant United States Attorneys, of counsel, defendant Joseph Manuel Hunter by and through his attorneys Cesar De Castro, Esquire and Valerie Gotlib, Esquire, defendant, Adam Samia, by and through his attorneys David Stern, Esquire and Jeremy Schneider, Esquire and Rachel -- and defendant Carl David Stillwell through his attorneys that:

One, on October 27, 2013 law enforcement personnel conducted a lawful search of a house located in the vicinity of Owensboro, Kentucky which was occupied at various times at least approximately between at least approximately 2008 and approximately 2012 by among other people, defendant, Joseph Manuel Hunter.

Two, during the search of the Owensboro house on October 27, 2013, law enforcement personnel seized the two passports marked as Government Exhibits 205 and 206.

Three, the parties further agree that this stipulation

1   as well as the government's exhibits referenced in this

2   stipulation may be received in evidence as Government Exhibits

3   at trial.  It's dated March 29 and signed by all the parties.

4              The government would ask to admit Government Exhibits

5   205, 206 and 1007 along with this stipulation.

6              THE COURT:  Yes, they'll be admitted.

7              (Government's Exhibits 205, 206 and 1007 received in

8   evidence)

9              MR. EGAN:  Ms. Shields, if we could go back to

10  Government Exhibit 2002 and if we could pull up the second page

11  and move that over the left side of the screen.

12             (Pause)

13             MR. EGAN:  And then if we could pull up the cover of

14  Government Exhibit 205 the cover reads, "Zimbabwe passport".

15             If we could turn to page two of that.  Again, inside

16  sheet revealing Government of Zimbabwe passport.  If we could

17  turn to page 27, Ms. Shields.

18             (Pause)

19             MR. EGAN:  Along the side is a photo.  And for the

20  record, the name of last name Robinson, first name "Frank".

21  Nationality, Zimbabwean and defining a birth place as Hawari.

22             If we can keep Government Exhibit 202 up on the side

23  and pull up Government Exhibit 206, Ms. Shields.

24             (Pause)

25             MR. EGAN:  The cover says, "Passport Republic of South

I44AAHUN1                    Jury Trial

1   Africa".

2             And if we could go to page 18.  It you are able to

3   blow that up, Ms. Shields.  Thank you very much.

4             Provides a surname under "Hunter", begin name,

5   "Andrew", nationality "South African", place of birth "GBR".

6             And Ms. Shield ifs we could please turn to page 21 of

7   that document.  And are we able to blow that up?

8             This is an ID card that provides surname of "Hunter"

9   first name of "Andrew" and a birth place of England.

10            You can pull those down, Ms. Shields.  Thank you very

11   much.

12            Government calls Sergeant Mark Massey.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    MARK MASSEY,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. EGAN:

6    Q.  Good morning, Mr. Massey.

7    A.  Good morning.

8    Q.  Where do you work?

9    A.  I work for the Person County Sheriff's Office in Roxboro,

10   North Carolina.

11   Q.  Where is, within North Carolina, Person County?

12   A.  We're the central, northernmost county adjacent to

13   Virginia.

14   Q.  I'm going to ask you to swing that mic a little bit.  There

15   we go.

16          What, if any, major cities are in Person County?

17   A.  We have one small city in Person County and that's Roxboro,

18   North Carolina.

19   Q.  Population-wise, how big is Roxboro?

20   A.  Roxboro is about six square miles, 8,000 people.

21   Q.  How long have you worked for the Person County Sheriff's

22   Department?

23   A.  10 years.

24   Q.  Before that, where did you work?

25   A.  I worked with the City of Roxboro Police Department.

1   Q.   As a police officer?

2   A.   That's correct.

3   Q.   How long did you serve in that job?

4   A.   I was there for seven years.

5   Q.   Prior to that, where did you work?

6   A.   Prior to that, I was in the United States Air Force.

7   Q.   What's your title or rank at the Person County Sheriff's

8   Office?

9   A.   I'm a sergeant.

10  Q.   Are you assigned to a particular unit or squad within that

11  unit -- within that organization?

12  A.   Currently?

13  Q.   Yes.

14  A.   Currently, I'm now in the civil division.

15  Q.   How long have you been in the civil division?

16  A.   Two months.

17  Q.   Prior to the civil division, were you in any other units or

18  squads in that office?

19  A.   I was.

20  Q.   What was that?

21  A.   I was in the operation -- operations division of the

22  sheriff's office.

23  Q.   Back in 2015, is that the unit you were assigned to?

24  A.   That's correct.

25  Q.   What does that squad do?

1   A.  We do any type of investigations that are going to take

2   lengthy amount of time, more detailed than what our regular

3   patrol guys can do.  We run narcotics investigations, a little

4   bit of everything.

5   Q.  Were you a sergeant while you were serving in that unit as

6   well?

7   A.  I was.

8   Q.  What were your duties and responsibilities and as a

9   sergeant in the special operations division?

10  A.  Any investigation that we did, I would supervise.  I have

11  guys under me.  I also did my own cases and things like that.

12  Q.  I want to direct your attention to July 22, 2015.  Did you

13  participate in an arrest that day?

14  A.  I did.

15  Q.  Who was arrested?

16  A.  Adam Samia.

17  Q.  Was anybody else arrested?

18  A.  Yes.

19  Q.  Who else?

20  A.  Carl Stillwell.

21  Q.  Do you see Adam Samia in the courtroom today?

22  A.  I do.

23  Q.  If you could, point to him and identify an article of

24  clothing that he's wearing.

25  A.  He's over there in the corner, in, it looks like a black

1    jacket and white dress shirt.

2              MR. EGAN:  Indicating the defendant.

3              THE COURT:  The record shall so reflect.

4    Q.  Do you see Carl David Stillwell in the courtroom today?

5    A.  Yes.

6    Q.  If you can point to him and indicate an article of clothing

7    he's wearing?

8    A.  He's over there, appears to be a gray jacket, white shirt.

9              MR. EGAN:  Indicating the defendant, your Honor.

10             THE COURT:  Yes.

11   Q.  Were these arrests part of the Person County Sheriff's or

12   were you working with other agents?

13   A.  I was working with other agents.

14   Q.  From what agency?

15   A.  From the Drug Enforcement Administration, special

16   operations division.

17   Q.  What was your role in this operation?

18   A.  This particular day my role was a liaison working with the

19   agents, anything they might need, kind of supervising the guys

20   that we had involved there.  From guys that were -- I'm

21   familiar with from Person County.

22   Q.  Did the Person County Sheriff's Office and DEA develop a

23   plan for how they were going to carry out these arrests on that

24   day?

25   A.  That's correct.

1   Q.  Generally speaking, what was that plan?

2   A.  Our plan was we formulated a ruse to have Mr. Samia come up

3   to the law enforcement center, which is our office in order to

4   have a check done on his concealed carry permit.  The sheriff's

5   office manages concealed carry permits and we had an admin lady

6   who handles those things.  She actually called Mr. Samia and

7   that's why he thought he was coming in.

8   Q.  And what was the plan with respect to Carl David Stillwell?

9   A.  We were going to conduct surveillance on his residence and

10  when Mr. Stillwell left his residence, we were going to conduct

11  a traffic stop on him utilizing the deputies with the sheriff's

12  office.

13  Q.  Why did you come up with this plan?

14          MR. SCHNEIDER:  Objection.

15          THE COURT:  Overruled.

16          You can answer.

17  A.  We came up with the plans because for a law enforcement

18  purposes, in our opinion, it was a much safer way to effect the

19  arrest.

20  Q.  What was the first step that you took that day?

21  A.  The first step was I was conducting a surveillance on

22  Mr. Samia's residence, and coordinating with our admin person

23  to make that phone call.

24  Q.  Your "who" person?

25  A.  Or admin person, about the conceal carry.

1  Q.  At some point did you direct the admin person to make the

2  call you described?

3  A.  That's correct.

4  Q.  At approximately what time is that?

5  A.  I believe it was on or about roughly 9:00, somewhere around

6  that time frame.

7  Q.  And describe what happened after that?

8  A.  We spoke on the phone and she told me that he stated he

9  would come in order to in reference to that concealed carry

10 permit.  She stated that he told her he'd be up, and while

11 doing surveillance, a witness Mr. Samia leave his residence to

12 head that way, would appeared to be he was driving that

13 direction to head back to our office.

14 Q.  So once you saw him heading in the direction of your

15 office, what did you do?

16 A.  I then took an alternate route from his residence to our

17 office and I actually got to our office before he did and I

18 waited for him to come inside of the law enforcement center.

19 Q.  What happened then when he came inside the law enforcement

20 center?

21 A.  We -- or I introduced myself, told him who I was and

22 escorted him around.  We have like a common area in the front

23 of our office and we have areas where only law enforcement can

24 go, so I escorted him around through there and around through

25 our interview room.

1   Q.  At that time, what happened?

2   A.  At that time, walking him to the interview room, the drug

3   enforcement agents met him and greeted him, let him know that

4   he was under arrest, and I conducted a frisk of Mr. Samia.

5           MR. EGAN:  May I approach, your Honor?

6           THE COURT:  Yes.

7   Q.  Handing the witness what's been marked for identification

8   as Government Exhibits 247, 248 and 249, if I can ask you to

9   just take a look at those.

10          Do you recognize those items?

11  A.  I do.

12  Q.  What are they?

13  A.  Starting in order, 247 --

14  Q.  Just generally speaking, what are they?

15  A.  These are items that were retrieved from Mr. Samia.

16  Q.  Are they in the same or substantially the same condition as

17  when they were recovered?

18  A.  They are.

19          MR. EGAN:  The government offers Government Exhibits

20  247, 248 and 249.

21          MR. SCHNEIDER:  No objection.

22          THE COURT:  They'll be admitted.

23          (Government Exhibits 247-249 received in evidence)

24          MR. EGAN:  Ms. Shields, please pull up Government's

25  Exhibit 247 and publish it for the jury.

1    Q.  If you can turn to the first page in that.  Can you read,

2    Sergeant Massey, who that's a passport for?

3    A.  It appears to be a passport for Adam George Samia.

4            MR. EGAN:  Ms. Shields, if we could please turn to

5    page 6.  We see there are four boxes on that page, if we could

6    blow up the upper-left-hand box.  That's fine.

7    Q.  Do you see in that upper-left quadrant where there's a red

8    stamp?

9    A.  Yes, sir.

10   Q.  Saying "Filipina arrival"?

11   A.  Yes, sir.

12   Q.  What is the dated there?

13   A.  September 9, 2008.

14   Q.  On the stamp below that.

15   A.  You're -- January 9, 2012.

16   Q.  And if we can turn to page 9.  If you could, read the

17   departure date on that.

18   A.  March 6, 2012.

19   Q.  Thank you.

20           MR. EGAN:  Ms. Shields, if you could pull up

21   Government Exhibit 248.

22   Q.  Sergeant Massey, if you could just describe what that is?

23   A.  This is a business card.

24   Q.  For what group?

25   A.  Grandfather Oak Training Group.

1    Q.   And what are the names at the bottom?

2    A.   David Baker and David Stillwell.

3    Q.   Ms. Shields, if we could briefly pull up Government Exhibit

4    249.

5             And if you could just read what is on that page?

6    A.   Its first line is Adam, and second line,

7    alphasierra55@yahoo.com and greenman800.

8             MR. EGAN:   Thank you.   You can pull that down,

9    Ms. Shields.

10   Q.   Did there come a time when Stillwell was brought in?

11   A.   Yes, that's correct.

12   Q.   Was that before or after Samia?

13   A.   That was after Samia.

14   Q.   Sitting here today, are you aware of who brought him in?

15   A.   No, sir.

16   Q.   What did you do next after you had conducted a pat-down

17   search of Samia that you described?

18   A.   I then knew that at roughly about that time Stillwell was

19   also arrested, and then I went out to 1200 Hugh Woods Road,

20   which was the residence of Samia.

21   Q.   1200 Hugh Woods Road?

22   A.   That's correct.

23   Q.   And why were you going there?

24   A.   To execute a search warrant.

25   Q.   How many agents approximately participated in that search?

I44BHUN3                    Massey - Direct

1    A.  Approximately 10 to 15.

2    Q.  And what was your role?

3    A.  My role was to, again, being from Person County and knowing

4    Person County, a liaison between myself and all the outside

5    agencies that were there, and to supervise our guys, the Person

6    County guys that were there.

7    Q.  So as you approached the house, if you could describe for

8    the jury what the house looks like, generally.

9    A.  It's a multi-story, very nice, very well-kempt house, brick

10   home, almost farm-like.  It has multiple entrances, has a nice

11   deck on the backside.

12            MR. EGAN:   Your Honor, if I could approach.

13            THE COURT:  You may.

14   Q.  I'm handing the witness what has been marked for

15   identification as Government Exhibits 133-1 through 133-9.

16            MR. SCHNEIDER:  Your Honor, I couldn't hear.

17            MR. EGAN:  133-1 through 133-9.

18            MR. SCHNEIDER:  Thank you.

19   Q.  Do you recognize those?

20   A.  Yes, sir.

21   Q.  What are they, generally?

22   A.  These are items that were recovered from the 1200 Hugh

23   Woods Road residence.

24   Q.  And what about 133-8 and 133-9?

25   A.  This is a -- photos, appears to be aerial photos of that

1    residence.

2    Q.  Do those photos fairly and accurately depict the either

3    location or the items that they depict?

4    A.  Yes, sir.

5            MR. EGAN:  The government would ask to admit

6    Government Exhibits 133-1 through 133-9.

7            MR. SCHNEIDER:  No objection.

8            THE COURT:  They'll be admitted.

9            (Government Exhibits 133-1 through 133-9 received in

10   evidence)

11           MR. EGAN:  Ms. Shields if you could please pull up

12   Government Exhibit 133-9.

13   BY MR. EGAN:

14   Q.  Sergeant Massey, what are we looking at here on the screen?

15   A.  It's not up here.  Now I got it.  This is the residence at

16   1200 Hugh Woods Road.

17   Q.  Is that the front or the back of the residence?

18   A.  That's the front.

19   Q.  If we could pull up Government Exhibit 133-8.

20           So what are we looking at here?

21   A.  This is an aerial photo, more directed towards the rear of

22   the residence.

23   Q.  And can you describe what you did -- using this picture,

24   describe what you did when you arrived at the property?

25   A.  When I arrived there, we had multiple officers there.  We

1    knew that Mr. Samia was in custody, so we -- I approached

2    this -- it's a screen door to the right side of the double-car

3    garage that you see.

4    Q.  Again, just for purposes of the record, you're pointing to

5    at the bottom of the picture, the side of that house facing the

6    bottom, there are two white squares.  What are those?

7    A.  That's the garage doors.

8    Q.  There is a small door immediately to the right of those.

9    Is that the screen door you're referring to?

10   A.  That's correct.

11   Q.  Describe what happened when you went to that door?

12   A.  The screen door was closed and locked.  However, the door

13   was open and we heard music coming from inside, so I knocked on

14   the door and was greeted by an elderly lady.

15   Q.  An elderly lady?

16   A.  Yes.

17   Q.  What happened next?

18   A.  She didn't want to let us inside.  We explained to her why

19   we were there.  And again, we spoke with her, didn't want to

20   barge in or startle her anymore.  So just talked to her for a

21   few minutes until we came it a conclusion that she would call

22   her -- Mr. Samia's father and wife to come to the house to be

23   with us to -- before we went forward with the search warrant

24   and once we found out she was the only one there.

25   Q.  Did there come a time when those people arrived at the

1    house?

2    A.   Yes.

3    Q.   Approximately how long after?

4    A.   It took them maybe 15 minutes to get there.

5    Q.   Did you wait to enter until they arrived?

6    A.   That's correct.  We -- well, we waited around in the inside

7    area, once you go inside there, we waited with the elderly

8    lady.

9    Q.   So describe what happened once Mr. Samia's father arrived?

10   A.   Once he arrived, we explained to him again why we were

11   there.  He -- then guided us and told us, no problem.  He was

12   very cooperative.  He told us where Mr. Samia's room was and a

13   game room containing some things of interest.

14   Q.   So he directed you to the areas that Mr. Samia used?

15   A.   That's correct.

16   Q.   Were those -- did you confine your search to those areas?

17   A.   That's correct.

18   Q.   Generally, what types -- generally speaking, what types of

19   evidence did you recover from this house relevant to this

20   investigation?

21   A.   We recovered notes and miscellaneous documents,

22   electronics.

23   Q.   When you say "electronics," what type of stuff do you mean?

24   A.   Computers, flash drives, things like that.

25          MR. EGAN:  Ms. Shields, if we could pull up Government

1    Exhibit 133-3.

2    Q.  Do you see what's there?

3    A.  Yes.

4    Q.  What are we looking at?

5    A.  These are items that were recovered from the home.  A cell

6    phone, a CD in case, and an eMachine computer.

7    Q.  If we can pull up Government Exhibit 133-4.

8           If you can describe what we're looking at there.

9    A.  The two items to the right are cell phones and there is a

10   camera, the first one on left.

11   Q.  So these are additional cell phones that you found and a

12   camera?

13   A.  That's correct.

14   Q.  If we can pull up Government Exhibit 133-7.  We can zoom in

15   on that.  What is that?

16   A.  It's a notepad with a name on it.

17   Q.  And what's the name that's written on it?

18   A.  Mr. LeRoux, Paul Calder.

19   Q.  If we can pull up Government Exhibit 133-5, and then if you

20   can pull up Government Exhibit 133-6.

21          What is that?

22   A.  This one here is -- appears to be currency from another

23   country.

24          MR. EGAN:  May I approach, your Honor.

25          THE COURT:  You may.

1              MR. EGAN:  I'm handing the witness what's been

2     previously marked as Government Exhibit 244-N212, Government

3     Exhibit 244-N207, and Government Exhibit 244-N203.

4     Q.  Taking a look at those items, do you recognize those?

5     A.  Yes, sir.

6     Q.  What do you recognize them to be?

7     A.  Again, these are items that were seized from the --

8     Mr. Samia's residence.

9     Q.  How do you recognize them?

10    A.  I recognize them from going over them, ensuring that these

11    were the items that -- a few nights ago when I got in town.

12    Q.  Are they in the same or substantially the same condition as

13    they were when they were recovered?

14    A.  Yes, sir.

15             MR. EGAN:  The government would ask to admit

16    Government Exhibits 244-N203, Government Exhibit 244-N207, and

17    Government Exhibit 244-N212.

18             MR. SCHNEIDER:  No objection.

19             THE COURT:  All right.  They'll be admitted.

20             (Government Exhibits 244-N203, 244-N207, and 244-N212

21    received in evidence)

22    BY MR. EGAN:

23    Q.  Just looking at Government Exhibit 244-N203.  If you can

24    look at that.  Ms. Shields, if you can pull up Government

25    Exhibit 133-3.

1           Is the laptop in that bag the same as the one that's

2    pictured in this photo?

3    A.  Yes, sir.

4           MR. EGAN:  If you could Ms. Shields, pull up

5    Government Exhibit 133-4.

6    Q.  Is that the same camera that's contained in Government

7    Exhibit 244-N212?

8    A.  Yes, sir.

9    Q.  You mentioned two items -- two locations that you had been

10   directed to in the house, from which of those areas were these

11   items recovered?

12   A.  These were recovered from Mr. Samia's bedroom, which the

13   father told us was his bedroom.

14          MR. EGAN:  Your Honor, if I may approach again?

15          THE COURT:  You may.

16          MR. EGAN:  I'm handing the witness Government Exhibits

17   207 through 243.

18          MR. SCHNEIDER:  243?

19          MR. EGAN:  243.

20   BY MR. EGAN:

21   Q.  If you can take a moment, I know there are a bunch to just

22   look through those.  Let me know when you've had an opportunity

23   to look through them.

24   A.  OK.

25   Q.  Sergeant Massey, do you recognize those items?

1   A.   Yes, sir.

2   Q.   What are they?

3   A.   These are also items that were recovered from Mr. Samia's

4   residence.

5   Q.   Where in the residence?

6   A.   In his bedroom.

7   Q.   How do you recognize them?

8   A.   Again, Monday night when I flew in, reviewed the items to

9   ensure that these were the ones recovered.

10  Q.   You were present in the location when they were recovered?

11  A.   That's correct.

12  Q.   Are they in the same condition or substantially the same

13  condition as when they were recovered?

14  A.   Yes, sir.

15            MR. EGAN:  The government would ask to admit

16  Government Exhibits 207 through 243.

17            MR. SCHNEIDER:  No objection.

18            THE COURT:  They'll be admitted.

19            (Government Exhibits 207 through 243 received in

20  evidence)

21            MR. EGAN:  Ms. Shields, if we could pull up Government

22  Exhibit 210.

23  BY MR. EGAN:

24  Q.   Sergeant Massey, if you can read the name of the company

25  and the name on that card?

1    A.  The name of the company says Echelon Associates, John

2    O'Donoghue.

3    Q.  And the address is from what country?

4    A.  The Philippines.

5         MR. EGAN:  Can you pull up, please, Government Exhibit

6    211.

7    Q.  If you can briefly describe who is this a card for?

8    A.  David Stillwell, Grandfather Oak Custom Carry, LLC.

9    Q.  From what company -- oh, sorry.

10   A.  From that company, Grandfather Oak Custom Carry.

11        MR. EGAN:  If we can pull up Government Exhibit 212.

12   Q.  What is this from?

13   A.  Hotel Pacha 786.

14   Q.  Does it indicate at the bottom there what city and country

15   that's located in?

16   A.  It looks like Kinshasa, RD, Congo.

17        MR. EGAN:  If we can pull up Government Exhibit 213.

18   Q.  What are the first two lines?

19   A.  Lima Mike.  It has a series of numbers.  Would like for me

20   to read the numbers?

21   Q.  No.

22        Then what does it say at the end there?

23   A.  Sat 5.

24   Q.  And below that, what does it say?

25   A.  Juliet Hotel.

1   Q.  Then there's another series of numbers.  What does it say
2   at the end?
3   A.  Sat 7.
4          MR. EGAN:  Ms. Shields, if we can pull up Government
5   Exhibit 222.  If you can zoom in on the top where it says,
6   "Passenger data."
7   Q.  Who were the passengers listed there, Sergeant Massey?
8   A.  It says, Mr. Adam George Samia and Mr. Joseph Manuel
9   Hunter.
10  Q.  If we can zoom in on the flight data.  This lists a
11  departure date of when?
12  A.  The 15th of June, 2008.
13  Q.  And that lists the departure city as Kinshasa?
14  A.  That's correct.
15  Q.  And below that, a departure date of when?
16  A.  16th of June, 2008.
17  Q.  And that's a departure from Lubumbashi?
18  A.  That's correct.
19         MR. EGAN:  If we could now, Ms. Shields, pull up
20  Government Exhibit 224.
21  Q.  What is that item either by looking at that or looking at
22  what you have up there?
23  A.  It appears to be a metro map of Manila.
24  Q.  In the Philippines?
25  A.  That's correct.

1    Q.  And if we could pull up Government Exhibit 228, and again,

2    where it says "travelers," if we could zoom in on that.  The

3    two names listed under "travelers," if you could read those

4    out.

5    A.  It looks like John Pearce O'Donoghue and Adam Samia.

6            MR. EGAN:  And if we can go to the second page of

7    that, Ms. Shields and zoom in on the flight information.

8    Q.  The departure city -- first of all, the date at the top?

9    A.  13 August, 2008.

10   Q.  And not the airport, but what is the departure city?

11   A.  Manila.

12   Q.  And the arrival city?

13   A.  Port Moresby.

14           MR. EGAN:  You can pull that down.  Thank you.

15           If we can pull up Government Exhibit 233.  Again, if

16   you can zoom in on the traveler.

17   Q.  What's the name there?

18   A.  Adam Samia.

19           MR. EGAN:  And if we can then zoom in on the flight

20   details.

21   Q.  So starting with the flight at the top, what is the date of

22   that flight?

23   A.  The 8th of January of 2012.

24   Q.  And that's a flight from where to where?

25   A.  From Raleigh Durham, North Carolina to Newark, New Jersey.

I44BHUN3                    Massey - Direct

1    Q.  And beneath that, if you can give the information for that

2    flight, the date and the departure and destination city.

3    A.  The 8th of January, 2012; from Newark, New Jersey to Tokyo,

4    Japan.

5    Q.  And then below that?

6    A.  The 9th of January, 2012, from Tokyo, Japan to Manila,

7    Philippines.

8    Q.  Then looking at the return flight, what is the date listed

9    on the flight below that?

10   A.  The 6th of March 2012, from Manila, Philippines to Guam.

11   Q.  And then the flight below that?

12   A.  The 7th of March 2012, from Guam to Houston, Texas.

13   Q.  And then the flight below that?

14   A.  And then the 7th of March, 2012 from Houston, Texas back to

15   Raleigh Durham, North Carolina.

16          MR. EGAN:  Ms. Shields, if we can pull up Government

17   Exhibit 236.

18   Q.  What is this item?

19   A.  This is a boarding pass.

20          MR. EGAN:  And if you focus on the far right side,

21   Ms. Shields, where it says, "depart and arrive."

22   Q.  Where is this?  Below where it says, "departing flight,"

23   from where to where?

24   A.  Departing flight from Raleigh Durham to Newark.

25          MR. EGAN:  Then if we can pull up Government

1    Exhibit 237 and focus on the same area.

2    Q.   Where is this a flight from and where is it arriving?

3    A.   From Newark to Tokyo.

4    Q.   And then if we can do the same with Government Exhibit 238

5    and focusing again on the departure city and the arrival city.

6    A.   This one's from Tokyo and arriving in Manila.

7    Q.   Again, at the very top, what is the date there, if we

8    can -- it's a little --

9    A.   Monday the 9th of January, 2012.

10   Q.   Thank you very much.

11        MR. EGAN:   Ms. Shields, if we can pull up Government

12   Exhibit 240.

13   Q.   If you can briefly just describe what this document is?

14   A.   It appears to be a lease agreement.

15   Q.   If you read where it says, "Rowena A. Waterhouse," if you

16   can read that.  It's an agreement between Rowena --read the

17   entire thing.

18   A.   "Rowena A. Waterhouse, Filipina of legal age with postal

19   address at Mayfield Park Residences, Daroma No. 509, Imelda

20   Avenue, Barangay Rosario, Pasig City, hereinafter referred to

21   as lessor and Adam Samia 1200 Hugh Wood Road, North Carolina,

22   Roxboro 27574, hereinafter referred to as the lessee."

23        MR. EGAN:   Ms. Shields, if we can zoom out of that.

24   Just briefly scroll to the second page and then the third page

25   and focus where it says names.

1   Q.  Who are the two names there?

2   A.  Rowena A. Waterhouse and Adam George Samia.

3        MR. EGAN:  Thank you.  If we can pull that down.

4   Q.  Sergeant Massey, up there you have Government Exhibit

5   2007 -- 207, sorry.

6   A.  Yes, sir.

7        MR. SCHNEIDER:  Getting it confused.

8   Q.  If you can take a look at that.  Describe the contents of

9   Government Exhibit 207.

10  A.  It's keys.

11  Q.  If you could just hold those up and show those to the jury.

12  A.  (Indicating).

13  Q.  Is anything written on either of those key chains?

14  A.  Yes, sir, there is.

15  Q.  What's written here?

16  A.  On the key chain with the black tag.  Written on it is

17  HKAPT.

18  Q.  Is anything else written on any of the other keys?

19  A.  No, sir.

20  Q.  You can put that down.

21        MR. SCHNEIDER:  May I see that, please.

22        MR. EGAN:  Sure.

23  Q.  After the search at Samia's house, where did you go next?

24  A.  I then went to the residence of Mr. Stillwell.

25  Q.  And where is that located?

1    A.   76 Grandfather Oak.

2    Q.   Also in Roxboro?

3    A.   That's correct.  He's got a Roxboro address.

4    Q.   Why were you heading there?

5    A.   To execute another search warrant.

6    Q.   When you arrived, can you describe the property?

7    A.   Smaller home, mobile home style, very unkempt, several

8    things all out in the yard, had a storage building to the right

9    of the residence, some dirt gravel driveway and road leading to

10   it.

11              MR. EGAN:  If we can just for the witness,

12   Ms. Shields, pull up Government Exhibits 134-1 through 134-5.

13   Q.   I'd just ask the witness to look at those as they come up

14   on your screen.

15              Do you recognize the photos that you've just been

16   shown?

17   A.   I do.

18   Q.   What are they?

19   A.   They were items that were recovered from Mr. Stillwell's

20   home and pictures of his home.

21   Q.   And do they fairly and accurately depict the locations and

22   those items?

23   A.   They do.

24              MR. EGAN:  The government would ask to admit

25   Government Exhibits 134-1 through 134-5.

1        MR. RAY:  No objection.

2        THE COURT:  It will be admitted.

3        (Government Exhibits 134-1 through 134-5 received in

4   evidence)

5        MR. EGAN:  If we can publish Government Exhibit 134-5.

6   Q.  If you could describe what we're looking at here.

7   A.  It's an aerial view of the residence.

8   Q.  There's a building marked with a "P" there.  What is that?

9   A.  That's the storage building.

10  Q.  And the main house is the one that's in the center of the

11  picture there?

12  A.  That's correct.  To the right of that.

13  Q.  Were there any vehicles on the property?

14  A.  Yeah, there was like a motorcycle-style vehicle.  There was

15  a, I guess, like an amphibious utility vehicle.

16  Q.  Cars or trucks or anything?

17  A.  I don't recall.

18  Q.  And if we can look at 134-4.  What are we looking at there?

19  A.  That's the entranceway into the home of the residence.

20  Q.  Is that how you entered?

21  A.  That's correct.

22  Q.  So you described the sort of state of the interior.

23  Approximately how many rooms were there?

24  A.  There was, if I remember correctly, a kitchen, like a

25  little sun room, a living area, two or three bedrooms.

1   Q.  And describe again, generally, what property relevant to

2   the investigation -- what types of property were recovered from

3   inside that house?

4   A.  There was electronics, computers, things like that, thumb

5   drives, flash drives.

6           MR. EGAN:  Ms. Shields, if we can pull up Government

7   Exhibit 134-1.

8   Q.  Do you recognize that?

9   A.  I do.

10  Q.  What part of the house is that showing?

11  A.  One of the bedrooms inside the residence.

12          MR. EGAN:  If we could pull up Government Exhibit

13  134-2.

14  Q.  Where is that?

15  A.  The same.  That's a room inside the residence of

16  Mr. Stillwell.

17  Q.  The same room as the other computers were in?

18  A.  No.

19  Q.  It's a different room?

20  A.  Yes.

21          MR. EGAN:  Your Honor, if I may approach?

22          THE COURT:  You may.

23          MR. EGAN:  I'm handing the witness what has been

24  marked for identification as Government Exhibit 251-N166,

25  Government Exhibit 251-N185, and Government Exhibit 251-N176.

1   Q.  If you can take a look at those items.  Do you recognize

2   them?

3   A.  I do.

4   Q.  What are they?

5   A.  These are also items recovered from Mr. Stillwell's

6   residence.

7   Q.  Are they in the same or substantially the same condition as

8   when they were recovered?

9   A.  They are.

10          MR. EGAN:  The government would ask to admit

11  Government Exhibits 251-N166, Government Exhibit 251-N176, and

12  Government Exhibit 251-N185.

13          THE COURT:  Any objection?

14          MR. RAY:  No objection.

15          THE COURT:  They'll be admitted.

16          (Government Exhibits 251-N166, 251-N185, and 251-N176

17  received in evidence)

18          MR. EGAN:  Ms. Shields, pull up Government Exhibit

19  134-1.

20  BY MR. EGAN:

21  Q.  Do you see the computer in the front there?

22  A.  I do.

23  Q.  That the same computer as you have up there as Government

24  Exhibit 251-N166?

25  A.  It is.

1   Q.  And were the three items you have there all of the

2   electronics that were found in the house?

3   A.  No.

4   Q.  What other types of items were there?

5   A.  The same.  Flash drives, other tablets and devices.

6   Q.  Following the search of Stillwell's residence, did you

7   participate in any other interviews or searches as part of this

8   investigation?

9   A.  I did.

10  Q.  What did you do?

11  A.  A short time after that I went with task force officers to

12  a local gun shop called the Arsenal to recover some items where

13  Mr. Stillwell worked.

14  Q.  So if you can explain a little bit more about why you were

15  going to that location?

16  A.  Due to the fact that Mr. Stillwell had been arrested and

17  there was items in there that some of the owners wanted us

18  to --

19  Q.  More generally speaking, is that a location where

20  Mr. Stillwell worked?

21  A.  That's correct.

22  Q.  He had an office there?

23  A.  Yes.

24          MR. EGAN:  Your Honor, if I may approach.

25          THE COURT:  You may.

1          MR. EGAN:  Handing the witness Government Exhibits

2     132-1 through 132-10.

3  Q.  I'll ask you to take a look at those.  Do you recognize

4     those?

5  A.  I do.

6  Q.  What do they depict?

7  A.  These are photos of the Arsenal gun shop.

8  Q.  Do they fairly and accurately depict the Arsenal gun shop?

9  A.  They do.

10          MR. EGAN:  The government would ask to admit and to

11     Government Exhibits 132-1 through 132-10.

12          MR. SCHNEIDER:  No objection.

13          THE COURT:  They'll be admitted.

14          (Government Exhibits 132-1 through 132-10 received in

15     evidence)

16          MR. EGAN:  Ms. Shields, if we can pull up 132-1.

17  Q.  If you can describe what we're looking at here.

18  A.  That's the front entrance of how you would access the gun

19     shop.

20  Q.  And if we can pull up Government Exhibit 132-10.  What are

21     we looking at here?

22  A.  That's the inside of the gun shop.

23  Q.  And in this area, are you able to -- where is the area that

24     Mr. Stillwell worked?

25  A.  Upstairs.

1   Q.  Do you go up the stairs and then --

2           MR. EGAN:  If we can pull up Government Exhibit

3   132-08.

4   Q.  What are we looking at there?

5   A.  This is the area where Mr. Stillwell worked.

6   Q.  At the time that you were there, was there stuff in there?

7   A.  There was -- yes, several items in there.

8   Q.  What kind of items?

9   A.  More cluttered.  Like holsters, other computers.

10  Q.  And did you recover any property from that location?

11  A.  I did.

12  Q.  What kind of property?

13  A.  A laptop.

14          MR. EGAN:  The last time, your Honor, if I could

15  approach?

16          THE COURT:  You may.

17          MR. EGAN:  Handing the witness what's marked as

18  Government Exhibit 253-N226.

19  Q.  Take a look at that.  Do you recognize that item?

20  A.  I do.

21  Q.  What is it?

22  A.  It's the laptop.

23  Q.  Is it the same condition or substantially the same

24  condition as when you recovered it?

25  A.  That's correct.

I44BHUN2                         Massey – Cross

1              MR. EGAN:  The government would seek to admit

2      Government Exhibit 253-N226.

3              MR. RAY:  No objection.

4              THE COURT:  It'll be admitted.

5              (Government Exhibit 253-N226 received in evidence)

6              MR. EGAN:  I have no further questions, your Honor.

7              THE COURT:  Cross-examination?

8              MR. DE CASTRO:  I have none.

9              THE COURT:  Go ahead.

10     CROSS-EXAMINATION

11     BY MR. SCHNEIDER:

12     Q.  Good morning, sergeant.

13     A.  Good morning.

14     Q.  Are you enjoying your time up here in New York?

15     A.  Not so far.

16     Q.  Hopefully you'll be out of here soon.

17     A.  Sounds good.

18     Q.  Now, prior to the date of July 22, 2015, there had been

19     surveillance of Mr. Samia around North Carolina, right?

20     A.  That's correct.

21     Q.  And you and other agents had watched him to see where he

22     went, what he did, and any pattern, conduct, right?

23     A.  That's correct.

24     Q.  In fact, you do knew that every day basically if you needed

25     to find him he would be having lunch at La Cocina Restaurant

1   with Mr. Stillwell, right?

2   A.  Yeah, we've seen him before.  Yes, sir.

3   Q.  And you knew where he lived?  Meaning, Mr. Samia, you knew

4   where he lived?

5   A.  Yes, sir.

6   Q.  And that was prior to July 22, right?

7   A.  That's correct.

8   Q.  And the fact is the home there, that was a family-owned

9   farm; isn't that right?

10  A.  Yes, sir.

11  Q.  It was based on, you learned that from either your own

12  investigation or from conversations that you had with his

13  father, correct?

14  A.  Prior -- prior to that I hadn't spoke with his father, but

15  yes, I've learned that through the investigations.  Yes, sir.

16  Q.  And you learned that the father was the owner of that

17  family farm, correct?

18  A.  Correct.

19  Q.  You had also learned during your investigation that

20  Mr. Samia worked with Mr. Stillwell, correct?

21  A.  That's correct.

22  Q.  And he worked with him in helping him make specialized

23  holsters, right?

24  A.  Correct.

25  Q.  And as far as you knew, those holsters, they would sell

1   them at legitimate gun shows, correct?

2   A.  Correct.

3   Q.  And you knew that Mr. Samia had been involved in making

4   these holsters as part of his business working with

5   Mr. Stillwell, right?

6   A.  I did learn that they worked together.  Yes, sir.

7   Q.  And in any of the time that you had knowledge of Mr. Samia

8   or the home or the farm, did you ever have any complaints about

9   him specifically?

10  A.  No, sir.

11  Q.  I assume you never arrested him before July 22, 2015?

12  A.  No, sir.

13  Q.  You never had any reason to go either to the home or to

14  respond to him, meaning Mr. Samia, as having a complaint about

15  any illegal conduct?

16  A.  No, sir.

17  Q.  Now, let's talk a little bit, if we can, about July 22, OK?

18  A.  Sounds good.

19  Q.  There was a time there was a plan, I think you said it was

20  a ruse, right?

21  A.  That's correct.

22  Q.  You did that for safety concerns you wanted to get -- to

23  see if Mr. Samia would leave his home and come into the

24  sheriff's office as requested, right?

25  A.  Correct.

1    Q.  And that would be probably the safest way to get involved

2    in arresting him, then later on searching the family home?

3    A.  Due to the things we've learned through investigation, yes,

4    sir.  That was the safest way.

5    Q.  Exactly.  In order do that, you had I think you said your

6    admin, was it a woman?

7    A.  Yes, sir.

8    Q.  You had her call Mr. Samia to speak to him under a pretense

9    to get him down to the sheriff's office, right?

10   A.  Yes, sir.

11   Q.  Now, I think you said the sheriff's office handles the

12   paperwork for concealed weapons permits, right?

13   A.  That's correct.

14   Q.  Are you guys very, very busy in North Carolina?

15   A.  She's very busy these days.  Yes, sir.

16   Q.  Is that because a lot of people have legitimate, legal

17   concealed firearms in North Carolina, your county?

18   A.  Yes, sir.

19   Q.  And it's not unusual for someone to have one or even two

20   firearms on them legitimately and legally in North Carolina?

21   A.  Correct.

22   Q.  Now, when this administrator called Mr. Samia, again, it

23   was a ruse, but the statement was basically, come on down to

24   deal with some of the paperwork to renew your carrying permit

25   or words to that effect?

191

1   A.  Correct.

2   Q.  Then as far as you knew, your administrator told you that

3   she spoke to Mr. Samia and he said he'd be right down?

4   A.  That's correct.

5   Q.  And, in fact, he came right down in less than an hour?

6   A.  That's correct, shortly thereafter.

7   Q.  Now, is it fair to say that when Mr. Samia came into the

8   sheriff's office, whenever you asked him to do something, he

9   complied with any of your requests?

10  A.  Yes, sir.

11  Q.  He was cooperative and compliant in anything you asked him

12  to do?

13  A.  Yes, sir.

14  Q.  He didn't try to run away, as far as you know?

15  A.  No, sir.

16  Q.  In fact, had he tried to run away, you had a plan to follow

17  him, chase him, and catch him, if he tried?

18  A.  That's correct.

19  Q.  That's why there were a lot of agents, they had a tactical

20  plan ahead of time just in case he tried to do anything

21  dangerous?

22  A.  Yes, sir.

23  Q.  To try to escape or anything like that, right?

24  A.  That's correct.  We would have handled that.

25  Q.  And luckily you didn't have to use that plan, did you?

1    A.   No, sir.

2    Q.   Because he came down and volunteered whatever you asked him

3    to do, he did it willingly?

4    A.   Yes.

5    Q.   Now, you took from him, when he was arrested at the

6    sheriff's office, his wallet, certain documents, right?

7    A.   That's correct.

8    Q.   And did he have his passport with him?

9    A.   That's correct.

10   Q.   I'll get to that in a minute, but in addition to some

11   documents, he had a weapon him at the time he went to the

12   sheriff's office, correct?

13   A.   He did.

14   Q.   You asked him to give it up and he gave it up?

15   A.   Correct.

16   Q.   Now, you also found in his wallet a badge; is that right?

17   A.   That's correct.

18   Q.   And the bag was for a reserve deputy sheriff in Wooster

19   County, right?

20   A.   Yes, sir.  He stated he had a badge.

21   Q.   He stated he had a badge?

22   A.   Yes.

23   Q.   Did he, in fact, have a badge?

24   A.   He did.

25   Q.   That was for up in Massachusetts, right?

1    A.  Correct.

2    Q.  By the way, did either you or anybody else check with

3    Massachusetts to see if, in fact, he was a reserve deputy

4    sheriff up there?

5    A.  I'm not sure if they checked or not.

6    Q.  But you had no reason to think it was kind of a fake badge?

7    It looked like a legitimate badge or a legitimate ID as far as

8    you could tell?

9    A.  That's correct.

10   Q.  Now, at some point after he is taken into custody in the

11   sheriff's department, that's when you and the other agents, 10

12   or 15, whatever it is, go to the house try to get in the house,

13   right?

14   A.  That's correct.

15   Q.  And you were very polite, you knocked on the door, right?

16   A.  That's correct.

17   Q.  An elderly lady, which turned out to be his grandmother

18   kind of wouldn't let you in, right?

19   A.  That's correct.

20   Q.  To your credit, you didn't say, we're coming in, we're

21   busting in, you waited until same came, right?

22   A.  That's correct.

23   Q.  At some point later on Mr. Samia's father came?

24   A.  That's correct.

25   Q.  And he was the owner of the home?

1    A.  Correct.

2    Q.  And he also was gracious and cooperative and let you into

3    the home, right?

4    A.  He was, yes.

5    Q.  And directed you to where Mr. Samia's bedroom was?

6    A.  Yes, sir.

7    Q.  And in all of the searches that -- not all of the documents

8    that were recovered, they were not hidden away, were they?

9    A.  Some were in drawers, but --

10   Q.  In regular drawers.  They weren't like secret drawers, were

11   they?

12   A.  That's correct.

13   Q.  They weren't secret compartments, were they?

14   A.  No.

15   Q.  They were not in any locked safety deposit box or any safe?

16   A.  No.

17   Q.  Or they were either in drawers or in almost in plain view

18   in his bedroom to be found?

19   A.  Yes, sir.

20   Q.  And is it fair to say that pretty much all the documents

21   that you found were in his name, Adam Samia?

22   A.  Yes, sir.

23   Q.  And whatever address, whatever time they -- wherever the

24   document required an address, it had his home address, right?

25   A.  Correct.

1  Q.  And there were airline documents and itineraries and

2  confirmation documents all in his own name, right?

3  A.  Yes, sir.

4  Q.  Now, Government Exhibit 247 is the passport that was

5  recovered from -- that you looked at before, right?

6  A.  Yes, sir.

7  Q.  That was a legitimate, valid passport with his name, right?

8  A.  Yes, sir.

9  Q.  Did you find any other passports with any other names in

10 Mr. Samia's home?

11 A.  I don't believe so.

12 Q.  Did you find any other identification with Mr. Samia's

13 photograph with a different name?

14 A.  I don't believe so.

15 Q.  And there was a lease that was found.  It was Government

16 Exhibit 242, I believe.  You looked at a lease?

17 A.  Yes, sir.

18 Q.  And that lease had Mr. Samia's name, first and last, right?

19 A.  That's correct.

20 Q.  And it had the address?

21 A.  Yes, sir.

22 Q.  In fact, it had his Roxboro address, didn't it?

23 A.  Yes, sir.

24 Q.  And the home you were actually in?

25 A.  Correct.

1   Q.  So if somebody wanted to find out where he lived, it's

2   right on that lease, which was for a Philippines apartment,

3   right?

4   A.  Correct.

5   Q.  Now, the keys that you had looked at, Government Exhibit

6   207, those are two sets of keys on two separate key chains;

7   isn't that right?

8   A.  Yes, sir.

9   Q.  You didn't move any of those keys.  That's exactly how you

10  found them, on two separate key chains?

11  A.  Correct.

12          MR. SCHNEIDER:  May I have one moment, please, your

13  Honor?

14          THE COURT:  Sure.

15          I'm sorry?

16          JUROR:  I have to use the restroom.

17          THE COURT:  You have to use the restroom.  Do you want

18  to take one moment?  If anyone needs to stand and stretch, you

19  can do so.

20          MS. DONALESKI:  Your Honor, perhaps now is a good time

21  for a midmorning break.

22          THE COURT:  I was trying to decide if we should skip

23  the midmorning break.  It depends how much is left with this

24  witness.

25          MR. SCHNEIDER:  I'm done.

I44BHUN2                           Massey - Cross

1             THE COURT:  Let's just ask Mr. Ray.

2             Why don't I see the lawyers at sidebar just about

3    scheduling.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  I just want to talk about scheduling.  So

3    deciding whether we should have a morning break or if should

4    skip the morning break, have a early lunch, it depends how long

5    your cross is, if you have another short witness, or you just

6    have a lengthy witness.

7           MR. EGAN:  No, we've got two short witness before the

8    lengthy witness.

9           THE COURT:  Should we just take a morning break now

10   and just have a longer lunch and a shorter afternoon session

11   with no break?

12          MR. EGAN:  I think that makes sense.

13          MR. SCHNEIDER:  Whatever you want that's fine.  I'm

14   fine with that.

15          MR. RAY:  We're all fine with that.

16

17

18

19

20

21

22

23

24

25

I44BHUN2                    Massey – Cross

1              (In open court)

2              THE COURT:  Ladies and gentlemen, upon reflection,

3    we're going to take our morning break now.  So we're going to

4    take a break for no more than 15 minutes to just use the

5    restroom if you need to.

6              Just remember, don't discuss the case, keep an open

7    mind.  We'll go until lunch, then we'll have a slightly longer

8    lunch break today.

I44BHUN2                      Massey – Cross

1              THE COURT:  Is there anything we need to talk about?

2              I'll see you in a couple minutes.

3              (Recess)

4              THE COURT:  Is everyone ready to proceed?  We'll bring

5    jury back and you'll have those two witnesses available during

6    the lunch hour.

7              Thanks.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Everyone can be seated.  Do you have

3    anything else, Mr. Schneider?

4          MR. SCHNEIDER:  No further questions.

5          THE COURT:  Mr. Ray.

6          MR. RAY:  May I?

7          THE COURT:  You may.

8    CROSS-EXAMINATION

9    BY MR. RAY:

10   Q.  Good day, Sergeant Massey.  My name is Robert Ray.  I

11   represent Mr. Stillwell.  I just have a few questions.

12          Sergeant Massey, I think you testified on direct

13   examination that you had been and have been serving with the

14   Person County sheriff's office for the last ten years, correct?

15   A.  Yes, sir.

16   Q.  Then prior to that, in a city within Person County you were

17   with the police department for Roxboro for the preceding seven

18   years?

19   A.  That's correct.

20   Q.  So in the community, in your law enforcement capacity, you

21   know the Roxboro and surrounding area quite well over the span

22   of 17 years; is that fair to say?

23   A.  Yes, sir.

24   Q.  Also, I don't know whether it was clear on direct

25   examination, but did you come to Roxboro after leaving the

1    United States Air Force?

2    A.   That's correct.

3    Q.   So that was your first job following your military service?

4    A.   Yes, sir.

5    Q.   My son serves in the Air Force.  Thank you for your

6    service.

7            Now I have some questions relevant to the

8    investigation.  Were you previously familiar with David

9    Stillwell prior to July of 2015?

10   A.   I knew of him.  Yes, sir.

11   Q.   That was why I asked the questions concerning your 17 years

12   in the community.  I take it that you're familiar in a city of

13   about 8,000 people, not that you know everybody, but over 17

14   years, you know the area, the residents, the businesses, and so

15   on and so forth?

16   A.   That's correct.

17   Q.   In what capacity did you become familiar with

18   Mr. Stillwell?

19   A.   I knew of him working in the Arsenal making holsters.

20   Q.   And that connection, just so it's clear and the jury is

21   clear on this, you have no reason to doubt that the Arsenal, at

22   or around July of 2015 and the period of time when you became

23   familiar with that business was a legitimate business in the

24   Roxboro community and in Person County, North Carolina,

25   correct?

1    A.   That's correct.

2    Q.   And your familiarity with that particular business comes as

3    the result of the fact that the Arsenal conducts, among other

4    things, training with regard to firearms?

5    A.   I didn't know in particular that, but I knew they sold

6    firearms there.

7    Q.   As well as equipment associated with firearms?

8    A.   That's correct.

9    Q.   Including holsters?

10   A.   That's correct.

11   Q.   Had you frequented the business prior to July of 2015?

12   A.   Yes, sir.  I had been in there a few times.

13   Q.   Had you made purchases at the Arsenal?

14   A.   I believe so.

15   Q.   And that would also be true to your knowledge of other

16   people that you have served with in the sheriff's department

17   and also in the police department with in Roxboro?

18   A.   Yes, sir.

19   Q.   Would that be fair to say?

20   A.   Yes, sir.

21   Q.   It wouldn't be just limited to yourself and a few other

22   people but there would be several people that would be familiar

23   with the Arsenal, the business?

24   A.   Correct.

25   Q.   As the result of their law enforcement activities?

1    A.  Correct.

2    Q.  Now, I also wanted to, if I could just briefly direct your

3    attention back to the search of Mr. Stillwell's residence.  Do

4    you recall that?

5    A.  Yes, sir.

6    Q.  In that regard, I think you testified that the residence

7    that you encountered while there, you described as a mobile

8    home?

9    A.  That's correct.

10   Q.  Or mobile home-like?

11   A.  That's correct.

12   Q.  Although you testified about what transpired with regard to

13   meeting individuals at the premises in connection with

14   Mr. Samia's -- or search of Mr. Samia's residence, in

15   connection with Mr. Stillwell's residence, just so it's clear,

16   you ultimately encountered another individual, Mr. Stillwell

17   having been arrested, but someone who was at the residence at

18   or around time that the search was conducted; is that fair to

19   say?

20   A.  His wife.

21   Q.  And you had came to identify her as Andrea Stillwell?

22   A.  Correct.

23   Q.  I take it also that you presented either her or members of

24   your team presented her with a copy of the search warrant?

25   A.  I believe so.

1   Q.  Was she there when the search commenced or did she come at

2   a later time during that day in July of 2015?

3   A.  During the day.

4   Q.  During the day.

5        And you did not encounter any resistance from her in

6   connection with the execution of the search warrant?

7   A.  No, sir.

8   Q.  Were you aware at that time that in addition to having

9   obtained a search warrant, that law enforcement also had

10  obtained Mr. Stillwell's consent to search his residence?

11  A.  I was not aware of that.

12  Q.  And do you know whether the same question with regard to

13  the Arsenal, whether you became aware as to Mr. Stillwell's

14  consent to the search of the Arsenal, the business location?

15  A.  No, sir.  I was not aware.

16  Q.  But in any event, you believe you had appropriate authority

17  by way of a search warrant to conduct searches at both of those

18  locations?

19  A.  Yes, sir.

20  Q.  One of the things that you mentioned on direct examination

21  that you confined your search to those areas of the premises --

22       Let's start first with the residence of Mr. Stillwell.

23  I think your words were things of interest or items relevant to

24  this investigation; is that correct?

25  A.  Yes, sir.

1  Q.  Now, when you first entered the location, the premises, you

2  did, however, though, I would imagine, conduct a security sweep

3  of the residence?

4  A.  Yes, sir.

5  Q.  Which means that you would have gone into the various rooms

6  and into the closets and into any place where potentially a

7  person might be concealed; is that fair to say?

8  A.  That's fair to say.

9  Q.  And along the way, I take it that you were in

10  Mr. Stillwell's bedroom or at least what you could identify

11  based upon your own observation was Mr. Stillwell's bedroom?

12  A.  Yes, sir.

13  Q.  I take it also that you were in his closet.  You viewed his

14  clothes, you were in his drawers to see whether there was any

15  items concealed inside a bureau or anything that would be in

16  your words "things of interest or relevant to this

17  investigation," correct?

18  A.  Yes, sir.

19  Q.  In other words, the search was thorough; is that fair to

20  say?  And that's your job?

21  A.  Correct.

22  Q.  And in connection with that thorough search, this search

23  was conducted not just over several minutes but took several

24  hours.  Is that also fair to say?

25  A.  Yes, sir.

1    Q.  Now, inviting your attention to the items that you

2    encountered along the way, I just want to ask about specific

3    things.  Did you see articles of clothing that you would have

4    concluded belonged to Mr. Stillwell during the course of your

5    search of the premises?

6    A.  Yes, sir.

7    Q.  Would those articles of clothing include things like

8    shirts, pants, socks, all the things we normally associate with

9    clothing?

10   A.  Several things in there, yes, sir.

11   Q.  And you found those in Mr. Stillwell's bedroom among other

12   places; is that fair to say?

13   A.  Correct.

14   Q.  Also, did there come a time when you encountered what I

15   will describe as a baseball cap headwear or headwear that would

16   be similar to what we would generally associate as a ball cap?

17   A.  I don't -- I don't recall.

18   Q.  No specific recollection of those types of things?

19   A.  No, sir.

20   Q.  Would that have stuck out in your mind at the time if you

21   had seen those types of items?

22   A.  At the time, no, sir.

23   Q.  During the course of your search, did you have occasion to

24   view what one would characterize as eyewear, glasses,

25   protective ware, anything that would shield the eyes?

1   A.  Not that I recall, sir.

2   Q.  And further, anything that -- other than ball caps that

3   would be worn about the head, do you recall any of those items?

4   A.  No, sir.

5   Q.  But in any event, would it be fair to say that whether you

6   had seen those items or not, those were not among the items

7   that you would have seized and removed from the premises

8   pursuant to your execution of the search warrant; is that

9   correct?

10  A.  Correct.

11  Q.  And the reason that you would not have removed any of those

12  items from the residence, is it fair to say, is because those

13  were not things of interest or relevant to this investigation,

14  at least as you understood it at the time that the search

15  warrant was executed, is that fair to say?

16  A.  Yes, sir.

17  Q.  Now, there was a couple things that you reviewed, one of

18  which came in connection with the search of the Samia residence

19  and if I could, with the government's assistance, invite you

20  your attention to an exhibit already in evidence.  It's

21  Government Exhibit 240, which you've previously identified as a

22  lease agreement.

23       MR. RAY:  If I could have that for the jury too that

24  would be great, since it's in evidence.

25  Q.  Do you recall this?

1    A.  Yes, sir.

2    Q.  This was one of the exhibits among a group that you

3    identified as papers and effects that were seized incident to

4    the execution of the search warrant on the Samia residence,

5    right?

6    A.  Yes, sir.

7    Q.  And if we could flip over to -- actually, let's start

8    there.  Could you just read at the top, I don't know if you

9    identified this previously, but is this contract of lease

10   dated?

11   A.  I believe there's a date at the top.

12   Q.  If you could just read that for the jury.  What's the date

13   of the lease?

14   A.  22nd of January, 2012.

15   Q.  Then right below it, we'll leave this highlighted as it is,

16   there's only a single individual there who is the lessee on the

17   lease; is that correct?

18   A.  That's correct.

19   Q.  And it just reads, "Adam Samia" and his address in Roxboro?

20   A.  Yes, sir.

21   Q.  And not to belabor the obvious, but Mr. Stillwell was not

22   on this lease, correct?

23   A.  Correct.

24   Q.  Then if we could just go to the signature page at the end.

25   And just, again, I guess we're on page 3 now, if I could just

1    confirm for me that it appears to be only Mr. Samia's signature

2    that is on this lease, correct?

3    A.  Yes, sir.

4    Q.  In other words, Mr. Stillwell's signature does not appear

5    anywhere on this lease?

6    A.  Correct.

7    Q.  Did you come to have an understanding prior to July of 2015

8    as to the nature of Mr. Stillwell's business, specifically

9    within the Arsenal?

10   A.  Other than knowing that he made holsters, no, sir.

11   Q.  And the office that you testified to that was on the second

12   floor of the premises, the Arsenal, that office was in a

13   different condition at the time of the search in July of 2015

14   than it was when that photograph was taken, correct?

15   A.  Yes, sir.

16   Q.  In other words, that photograph was taken well after the

17   search had already been conducted?

18   A.  Correct.

19   Q.  And at the time, just so it's clear to the jury, that the

20   photograph was taken, and I think that is Government Exhibit

21   132-08 if I'm not mistaken.  If I could have that one.  I may

22   not have that right.  I think I have that right.  Let's just

23   see.  I have it right.

24          That's the office space on the second floor that I'm

25   referring to and that you encountered when you executed the

I44BHUN2                    Massey - Cross

1    search warrant against the Arsenal, correct?

2    A.  Yes, sir.

3    Q.  At the time you were able to conclude based upon the items

4    that were taken from there that that was Mr. Stillwell's office

5    in or about July of 2015?

6    A.  Correct.

7              MR. RAY:  Your Honor, if I can just have one moment.

8    I'm almost finished.

9    Q.  In connection with the conclusion of the search of

10   Mr. Stillwell's residence, were you aware that his wife Andrea

11   Stillwell signed a search inventory for the items that were

12   taken from the premises during that day?

13   A.  That's our practice, but I'm not -- wasn't aware of her

14   doing that in particular.

15             MR. RAY:  Your Honor, I have nothing further.

16             Thank you.

17             THE COURT:  Any redirect?

18             MR. RAY:  Thank you, Sergeant Massey.

19             MR. EGAN:  No, your Honor.

20             THE COURT:  You can step down.  Thank you.

21             (Witness excused)

22             THE COURT:  The government can call its next witness.

23             MR. EGAN:  The government calls special agent Eric

24   Stouch.

25    ERIC STOUCH,

1          called as a witness by the Government,

2          having been duly sworn, testified as follows:

3     BY MR. EGAN:

4     Q.  Good afternoon, Mr. Stouch.

5     A.  Good afternoon.

6     Q.  Are you employed?

7     A.  Yes, I am.

8     Q.  And by whom?

9     A.  The United States Drug Enforcement Administration.

10    Q.  How long have you been with the Drug Enforcement

11    Administration?

12    A.  A little over 19 years.

13    Q.  That's also known as the DEA?

14    A.  Yes, it is.

15    Q.  Are you assigned to a particular unit or squad within the

16    DEA?

17    A.  Yes, I'm assigned to our special operations division in

18    Virginia.

19    Q.  Are what does the special operations division do?

20    A.  It's a multi-agency coordination center that supports

21    domestic and international drug investigations.

22    Q.  When you say "multi-agency," what do you mean by that?

23    A.  Well, it's headed by the DEA, but there's over 10, 15 other

24    agencies that are there in that center.

25    Q.  Does it also have an enforcement component?

I44BHUN2                      Massey - Cross

1    A.  It does.

2    Q.  Describe that.

3    A.  Well, actually, I'm assigned to a special investigations

4    unit that is tasked with conducting investigations of

5    foreign-based criminal organizations that are involved in

6    crimes that the United States has jurisdiction over.

7    Q.  How long have you been with the special operations

8    division?

9    A.  Nine years.

10   Q.  Did you participate in the investigation of the murder of

11   Catherine Lee in the Philippines?

12   A.  I did, yes.

13   Q.  As part of that investigation, did you interview Carl David

14   Stillwell?

15   A.  Yes.

16   Q.  Do you see Mr. Stillwell in the courtroom today?

17   A.  Yes, I do.  Seated next to counsel in a gray suit, black

18   tie.

19          MR. EGAN:  Indicating the defendant.

20          THE COURT:  The record so shall reflect.

21   Q.  When did that interview take place?

22   A.  July 22, 2015.

23   Q.  Where did it take place?

24   A.  Person County Sheriff's Department, Roxboro, North

25   Carolina.

1    Q.   What were the circumstances?

2    A.   Mr. Stillwell had just been arrested and escorted to a

3    interview room at the Person County Sheriff Department and

4    myself and Supervisor Special Agent Tom Cindric were in the

5    interview room.

6              MR. EGAN:  May I approach, your Honor?

7              THE COURT:  You may.

8    Q.   Handing you what's been marked for identification as

9    Government Exhibit 250-N173.  I ask you to take a look at that.

10             Do you recognize that?

11   A.   Yes, I do.

12   Q.   What do you recognize it to be?

13   A.   A cell phone recovered from Mr. Stillwell at the time of

14   his arrest.

15   Q.   Other than any modifications that have been made for the

16   purpose of analysis, is that phone in the same or substantially

17   the same condition as it was that day?

18   A.   Yes, it is.

19             MR. EGAN:  The government would seek to admit

20   Government Exhibit 250-N173.

21             THE COURT:  Any objection?

22             MR. RAY:  No objection.

23             THE COURT:  It will be admitted.

24             (Government Exhibit 250-N173 received in evidence)

25   Q.   You mentioned another agent was present for the interview

1   as well?

2   A.   Yes.

3   Q.   Who is that?

4   A.   Tom Cindric.

5   Q.   How did you begin the interview?

6   A.   Well, formally advised Mr. Stillwell he was under arrest

7   and then also advised him it was important that he understood

8   his rights.

9   Q.   And did you advise him of his rights?

10  A.   Yes.

11  Q.   Did you do that orally or in writing?

12  A.   Orally, and what we did is placed a advice of rights form

13  in front of him.  I read off the advice of rights form as he

14  looked at it and I asked him to verbally acknowledge after each

15  right was read whether or not he understood his right.

16  Q.   Did he indicate that he did understand them?

17  A.   Yes, he did.

18          MR. EGAN:  Ms. Shields, if you could pull up

19  Government Exhibit 606 just for the witness.

20  Q.   Do you recognize that?

21  A.   Yes, I do.

22  Q.   What is that?

23  A.   That is a advice of rights form that was read to

24  Mr. Stillwell.

25  Q.   How do you recognize it to be that form?

I44BHUN2                          Massey - Cross

1  A.  My signature is on the form.

2  Q.  And what's the date?

3  A.  July 22, 2015, at 11:25 a.m.

4          MR. EGAN:  The government asks to admit Government

5  Exhibit's 606.

6          THE COURT:  Any objection?

7          MR. RAY:  Your Honor, I object as to relevance and the

8  witness has already testified to the advice of rights that has

9  been given.  My objection is based upon relevance and it's

10  duplicative.

11          THE COURT:  Overruled.

12          (Government Exhibit 606 received in evidence)

13          MR. EGAN:  If you can publish that for the jury

14  quickly.

15  Q.  So this is the form that you read from?

16  A.  Yes.

17  Q.  At the bottom where it says, "acknowledge your rights and

18  waiver of rights to an attorney and to remain silent," there's

19  a name written immediately under that.  What's that name?

20  A.  Carl David Stillwell.

21  Q.  And the signature beneath that is whose?

22  A.  Mr. Stillwell's.

23  Q.  And beneath that is whose name and signature?

24  A.  My name and signature.

25  Q.  And again, what is the date on that?

1    A.  July 22, 2015.

2    Q.  Was this signed by him after he was informed of his rights

3    or at the beginning before he was informed?

4    A.  After he was informed.

5         MR. EGAN:  Ms. Shields, you can pull that down.

6    Q.  During your interview, at some point did you ask

7    Mr. Stillwell about any email accounts that he used?

8    A.  Yes.

9    Q.  Did he identify any accounts that belonged to him?

10   A.  He identified two.

11   Q.  What were those two accounts?

12   A.  Stillwell20@gmail.com. The second one was

13   CDS@Grandfatheroak.com.

14   Q.  During your interview, did you ever ask Mr. Stillwell

15   whether he had ever been out of the country?

16   A.  Yes.

17   Q.  What did he say?

18   A.  He said he had been overseas once.

19   Q.  Did he indicate where he had gone?

20   A.  The Philippines.

21   Q.  Did he say when?

22   A.  Yes.

23   Q.  When was that?

24   A.  Late 2011 or 2012.

25   Q.  Did you ask him how long he stayed?

1    A.  Yes.

2    Q.  What did he say?

3    A.  Approximately one month.

4    Q.  Did Mr. Stillwell indicate whether he had gone alone or

5    with someone else?

6    A.  He stated that he had met somebody else over there.

7    Q.  Did he describe where he and the person that he met over

8    there stayed while in the Philippines?

9    A.  Yes, he explained that he and the other person initially

10   stayed at a hotel, but then moved to what he described as a

11   condo or apartment-type complex in the old capital area of the

12   city.

13   Q.  And he stated that they lived together?

14   A.  Yes.

15   Q.  Stayed in the same place?

16   A.  Yes.

17   Q.  To his knowledge, did the person that he was with in the

18   Philippines ever carry a firearm?

19   A.  Yes.

20   Q.  Did he describe what kind of firearm it was?

21   A.  He described it as a full-size, four-inch gun of some

22   nature, but could not recall whether it was a nine millimeter,

23   .22, or .45 caliber.

24   Q.  Did he notice any other features of the firearm?

25   A.  Yeah, he recalled that it had a threaded barrel.

1    BY MR. EGAN:

2    Q.   What is a "threaded barrel"?

3    A.   What he explained is that it would be to attach a flash

4    suppresser.

5    Q.   What is a "flash suppresser"?

6    A.   It's also known as a "silencer".  It would suppress gunshot

7    noise or a muzzle flash.

8    Q.   Did he recall ever seeing a flash suppresser?

9    A.   No.

10   Q.   Was there a particular occasion that he remembered that

11   individual having that gun in their possession?

12   A.   Yes.

13   Q.   When was that?

14   A.   He described a time when he and that other individual had

15   traveled outside of Manila to view a property and that he had

16   observed a gun then.

17   Q.   And at any point during the interview did you ask him about

18   the murder of Catherine Lee?

19   A.   Yes.

20   Q.   Did he have information about that murder?

21   A.   Yes.

22   Q.   What did he say about it?

23   A.   He stated, "I did not kill anybody gentlemen but I was

24   there and things I may have done led to that."

25   Q.   Did he say where she was when she was killed?

1    A.  Yes.  He described a time when the other person he was with

2    pulled the trigger on that woman in a van that he and

3    Mr. Stillwell was driving.

4    Q.  Did Mr. Stillwell indicate whether he was paid for his role

5    in it?

6    A.  Yes.

7    Q.  What did he say?

8    A.  Explained after the murder he was handed money which he

9    described to be 20 to $30,000.

10   Q.  At any point during the interview did you ask him about

11   money transfers made back to the United States?

12   A.  Yes.

13   Q.  What did he say about that?

14   A.  He acknowledged that he had sent money back to the United

15   States via Western Union.

16   Q.  Did he send it all at once or in pieces?

17   A.  In pieces.

18   Q.  Did he describe why he did that?

19   A.  Yes.  He acknowledged that it was no accident that it was

20   sent in increments less than $10,000 and acknowledged that it

21   was to hide it from the U.S. Government, and also gave another

22   explanation he was trying to hide money from his wife.

23            MR. EGAN:  Nothing further, your Honor.

24            THE COURT:  Cross-examination?

25            MR. RAY:  Thank you, your Honor.

1    CROSS-EXAMINATION

2    BY MR. RAY:

3    Q.  Good day, Agent Stouch.  How are you?

4    A.  Good.  Thank you.

5    Q.  As you know, my name is Robert Ray and I represent

6    Mr. Stillwell.  Your testimony begins with your prior

7    experience with the Drug Enforcement Administration.  And I

8    believe you've testified that you have been with the DEA for a

9    number of years, correct?

10   A.  Yes.

11   Q.  And that experience has included I take it not, just your

12   current assignment?

13   A.  That's correct.

14   Q.  During the course of your 19 year career you haven't always

15   been assigned to the Special Operations Division in Virginia;

16   would that be fair to say?

17   A.  Yes.

18   Q.  You've served I imagine in several different capacities

19   from the moment that you joined the DEA?

20   A.  Correct.

21   Q.  The foreign based criminal activity that you referred to as

22   part of your experiences with the Operations Division, those

23   are investigations that are international in scope obviously,

24   given the term "foreign", right?

25   A.  That's correct.

I44AAHUN3                         Stouch - Cross

1   Q.  They only to a very limited degree would those

2   investigations involve the United States; would that also be

3   fair to say?

4   A.  No.  The goal of every investigation is to connect it to

5   the United States.  Our job is to investigate and present cases

6   to the prosecutors' office in which there would be jurisdiction

7   over.

8   Q.  Would it be fair to say though in that regard that the

9   connection to the United States is an important part of

10  investigations that involve, generally speaking, foreign based

11  criminal activity?

12  A.  Yes.

13  Q.  In other words, you know going into an investigation that

14  at least one of the things that you need to be concerned about

15  from a law enforcement perspective is that with regard to

16  overseas activity you are looking for a connection with the

17  United States in order to present a case to a prosecutor that

18  can be prosecuted in the United States, correct?

19  A.  That is our goal.

20  Q.  I think you said the Special Operations Division -- I was

21  having trouble hearing -- but I think what you said is actually

22  located in Virginia?

23  A.  Yes.

24  Q.  And that's where you are currently assigned?

25  A.  Yes.

1   Q.   The post-arrest interview that you conducted of

2   Mr. Stillwell, notwithstanding, the fact that you testified on

3   direct-examination in a relatively brief amount of time, that

4   was an interview that lasted not just several minutes but

5   actually several hours, would that be fair to say?

6   A.   I don't recall the exact amount of time that it lased.

7   Q.   You are familiar -- you have reviewed --

8           MR. EGAN:  Objection, your Honor.

9           THE COURT:  Sure.  Side bar.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (side bar)

2          MR. EGAN:  There's obviously been an extensive amount

3    of litigation over what he is able to testify to both in terms

4    of Bruton and what the government's -- to elicit the length of

5    the statement and to suggest to the jury that there is

6    sufficient -- that they are not being presented with suggests

7    that somehow he is doing something improper in terms of what he

8    is not telling and that the only purpose of the question is to

9    suggest that there is a whole bunch of material that he has not

10   testified to that the jury won't know about an invite a

11   question that has already been litigated and decided.

12         MR. RAY:  I don't think I was suggesting anything

13   other than the length of the interview was considerably longer

14   than his testimony.  That's all.

15         THE COURT:  All right.  I think the government's

16   right, so I would just move on.  I'm not going to instruct them

17   unless you want me to.

18         MR. SCHNEIDER:  Speaking of instruction, when he is

19   finished with his testimony if you can instruct the jurors that

20   this testimony is only admissible against Mr. Stillwell and not

21   to be considered against Mr. Samia and Mr. Hunter?

22         THE COURT:  Yes.

23         MR. SCHNEIDER:  Thank you.

24         (Continued on next page)

25         (In Open Court)

I44AAHUN3                      Stouch – Cross

1    BY MR. RAY:

2    Q.  Now Agent Stouch, you testified on direct examination to a

3    number of admissions that Mr. Stillwell made during the course

4    of your interview with him.  Do you recall that?

5    A.  Yes.

6    Q.  And just to review them, you've testified that

7    Mr. Stillwell admitted or acknowledged that the person that he

8    was with was carrying a firearm, correct?

9    A.  Yes.

10   Q.  And the time period that you had directed Mr. Stillwell's

11   attention to was a period of time that Mr.  Stillwell was with

12   this other person in the area of Manila, Philippines, correct?

13   A.  The time was when they traveled outside Manila to view a

14   property.

15   Q.  And you further testified that in connection with

16   Mr. Stillwell's admissions that during the time that they were

17   viewing property outside of Manila that he told you, among

18   other things, that the other person that he was with pulled the

19   trigger, correct?

20   A.  While they were in the van he is driving.

21   Q.  And Mr. Stillwell acknowledged to you that he was the drive

22   of that van?

23   A.  Yes.

24   Q.  In other words, he acknowledged to you that he was present

25   when Catherine Lee was killed?

I44AAHUN3                          Stouch - Cross

1    A.  Yes.

2    Q.  And Mr. Stillwell further acknowledged that after the

3    murder he was paid, correct?

4    A.  Yes.

5    Q.  And I think you indicated that he told you that it was

6    between 20 and $30,000, right?

7    A.  Correct.

8    Q.  And he further acknowledged that after being paid he made

9    transfers of funds to the United States, correct?

10   A.  Yes.

11   Q.  And did he identify for you to whom the transfers were

12   made?

13   A.  His wife and I believe the other individual was Mr. Baker.

14   Q.  So in other words, there was more than just a single

15   transfer.  There were multiple transfers?

16   A.  Yes.

17   Q.  Now you've testified to also that Mr. Stillwell told you

18   that while he himself did not kill anybody he, did acknowledge

19   that he was there, correct?

20   A.  Yes.

21   Q.  And then he further said -- I think your testimony was that

22   even though he didn't kill anybody, he did participate and that

23   things that he did led to the killing of Catherine Lee,

24   correct?

25   A.  Correct.

I44AAHUN3                    Stouch - Cross

1   Q.  So he made all of these admissions to you during the course

2   of your interview with him following his arrest in North

3   Carolina in July, July 22 of 2015, correct?

4   A.  Yes.

5   Q.  You've testified to a series of admissions, at no time are

6   you testifying here today that Mr. Stillwell admitted to you

7   that he knew that prior to the time he left the United

8   States --

9               MR. EGAN:  Objection.

10  Q.  -- the purpose of the trip was to --

11              MR. EGAN:  Objection.

12              THE COURT:  Let's have a side bar.  OK?

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (side bar)

2          MR. EGAN:  Again, this was the subject of litigation.

3    I think this is the same soliciting statement that he -- just

4    phrased --

5          MR. RAY:  Your Honor, I believe I can ask whether or

6    not he's testifying to such an admission without going any

7    further.  I understand that I can't ask whether a question was

8    asked or what Mr. Stillwell's response was.  But I believe I

9    can point out through the question as to whether or not the

10   witness is testifying to any admission made by Mr. Stillwell

11   relative to that subject matter and I'll move on but I do

12   believe I can ask that question.  This is not asking what

13   Mr. Stillwell said and it's not asking what the question

14   inquired about.

15         MR. EGAN:  This is simply an argument -- he can stand

16   up and argue, you heard no testimony from Special Agent Stouch

17   that he -- he does not need to -- cause that is getting an

18   answer he never did that.

19         THE COURT:  I'm sustaining the objection for the

20   reasons that I've ruled for previously.

21         (Continued on next page)

22

23

24

25

1          (In Open Court)

2          THE COURT:  The objection is sustained.  You don't

3    have to answer.

4    BY MR. RAY:

5    Q.  Now, during the course of your investigation, Agent Stouch,

6    you have on a number of occasions inquired as to -- I'm not

7    talking about this interview of Mr. Stillwell.  I'm asking in

8    general in connection with your investigation, you have

9    inquired of a number of individuals with regard to the question

10   about whether or not any of the defendants in this case knew

11   before they left the United States?

12         MR. EGAN:  Objection.

13         THE COURT:  Sustained.

14   Q.  Well, it was an important part of this investigation, was

15   it not, for you to determine whether or not, for example, my

16   client, Mr. Stillwell, had knowledge before he left the United

17   States traveling from North Carolina to the Philippines --

18         MR. EGAN:  Objection.

19         THE COURT:  Sustained.

20   Q.  Agent Stouch, in addition to taking the post-arrest

21   statement of Mr. Stillwell in this case, would it be fair to

22   say that your involvement in connection with the investigation

23   was not just simply limited to the arrest?

24   A.  That's correct.

25   Q.  In other words, in this investigation just so I have a

1    better picture of your role, your role here was substantially

2    more than just that.  In other words, the events that

3    transpired in July of 2015, correct?

4    A.  Yes.

5    Q.  You have been involved with this investigation now for a

6    number of years stretching back even prior to July of 2015?

7    A.  Yes.

8    Q.  And you have been assigned to this investigation in and

9    have worked this investigation since -- correct me if I'm

10   wrong -- at least 2013?

11   A.  That's correct.

12   Q.  To the present date?

13   A.  Yes.

14   Q.  And all during that time your role has not just simply been

15   as a what we'd otherwise refer to as a line agent on the

16   investigation.  You're the case agent on this case, right?

17   A.  One of them.

18   Q.  And in that capacity you have an overall sense of the

19   entirety of the investigation, not just any one particular

20   aspect, for example, the search of a residence or a post-arrest

21   statement or things that are discrete assignments, correct?

22   A.  Yes.

23   Q.  And one of the roles of the case agent is to become

24   familiar with all aspects of the investigation, even those that

25   you don't personally participate in; is that fair to say?

I44AAHUN3                          Stouch – Cross

1    A.  Yes.

2    Q.  And I think in that regard it would also be fair to say

3    that you have spent a significant amount of investigation

4    activity as a co-case agent with regard to matters in this

5    investigation that would involve a U.S. based connection to an

6    otherwise foreign based activity?

7              MR. EGAN:  Objection.

8              THE COURT:  One second.  Why don't we have a side bar.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I44AAHUN3                         Stouch - Cross

1          (side bar)

2          THE COURT:  Can you explain that question to me.

3          MR. RAY:  Obviously, Mr. Stillwell's defense concerns

4     the question about whether the government can prove or not

5     prove a jurisdictional element in this case which has been, we

6     have discussed now for weeks.  I think I should be permitted to

7     inquire of the case agent on the investigation concerning what

8     investigative steps were taken in order to be able to prove

9     that element.  I understand what I can -- and I'm not going to

10    do with regard to this witness concerning post-arrest statement

11    of Mr. Stillwell to inquire what was asked and what was

12    responded to -- involving hearsay.  But I think I should be

13    permitted to ask the witness concerning steps that he took in

14    order to attempt to determine whether or not there's a U.S.

15    based connection sufficient to perfect the investigation.

16         MR. EGAN:  This is well outside the scope of direct.

17    Direct was focused entirely on the statements.

18         THE COURT:  He is going to call the case agent anyway.

19    Just respond direct to the point Mr. Ray made.

20         MR. EGAN:  Your Honor, I think that he is trying to

21    again backdoor in through something that is outside what was

22    talked about on direct information that has not been the

23    subject of direct-examination.  I don't know the material that

24    he is referring to -- talk to him about but he seems to be well

25    outside the subject of his direct testimony.

1          (Pause)

2          MR. EGAN:  I think that's what I remember when I'm

3    saying we don't know what it is.  There is he is soliciting his

4    views as to what if this is testimony about specific

5    investigative steps but there is no admissible -- solicit his

6    views as to whether there is jurisdictional -- of what his

7    views are what he --

8          THE COURT:  I don't think he is asking the equivalent

9    of his testimony.  But he is asking as I understand what steps

10   did you take in this investigation to essentially prove up the

11   extraterritorial component, jurisdictional component of this

12   case and the question is what's the problem with him asking

13   what he did?  Put aside the scope issue.

14         MR. EGAN:  The nature of evidence -- it could run into

15   here -- could run it into other evidentiary problems.

16         THE COURT:  I don't think that's a basis.  Look, I'll

17   ask you to ask him, generally, I think that question was

18   confusing.  But I don't want you to treat him essentially as an

19   expert or someone who is going to weigh in on the ultimate

20   question regarding jurisdiction.  It is not for him to

21   determine.  It's for the jury to determine -- met the

22   jurisdictional component or not.  If you want to ask him about

23   his investigation specific questions, I'll give you a little

24   leeway to do that.  OK?

25         MR. RAY:  OK.

I44AAHUN3                          Stouch – Cross

1                    (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          (In Open Court)

2    Q.   Agent Stouch, I will withdraw the previous question.  Let

3    me just ask it this way more simply.

4          Did you take investigative steps in connection with

5    this investigation involving these three defendants including

6    my client, Mr. Stillwell, in order to develop and to the extent

7    that you were able, uncover evidence connecting conduct to the

8    United States?

9    A.   Yes.

10   Q.   And in that regard did you interview witnesses during the

11   course of your investigation with regard to that general

12   subject matter?

13   A.   Yes.

14   Q.   And a number of the witnesses that you interviewed were,

15   for example, friends and relatives of the defendants, correct?

16   A.   Yes, some of them.

17   Q.   Specifically, in connection with this case you interviewed

18   among others Mr. Stillwell's wife, Andrea Stillwell, in

19   connection with that issue.  In other words, in an effort to

20   try to establish a connection of Mr. Stillwell's conduct to the

21   United States, correct?

22   A.   No.  I don't recall any in depth conversation with

23   Mrs.~Stillwell about that subject.

24   Q.   Do you recall having discussions with Andrea Stillwell,

25   Mr. Stillwell's wife?

1   A.  No, I don't recall.

2   Q.  Did you ever interview her during the course of the

3   investigation?

4   A.  No not, no.

5   Q.  Do you recall whether or not you were present when other

6   people interviewed other agents or investigators serving with

7   the investigation Andrea Stillwell, Mr. Stillwell's wife?

8   A.  No.

9   Q.  My question also with regard to defendant Joseph Hunter,

10  did you have occasion to meet with or discuss?

11          MR. EGAN:  Objection.

12          THE COURT:  Sustained.

13  Q.  Well, without getting into which others -- in other words

14  there were other people including friends and relatives of the

15  defendants that you interviewed?

16          MR. SCHNEIDER:  I would object.  I would ask this be

17  limit his client, to Mr. Stillwell.

18          THE COURT:  I agree.  Just to be clear, the testimony

19  thus far from the special agent is only admissible as to

20  Mr. Stillwell and not as to Mr. Samia and Mr. Hunter.  I hope

21  that's clear.

22  BY MR. RAY:

23  Q.  Agent Stouch, were you present during the search of

24  Mr. Stillwell's residence on July 22, 2015?

25  A.  Yes, for a period of time.

1   Q.  And did you encounter and agree to kill Stillwell at the

2   residence during the period of time that you were there?

3   A.  Yes.

4   Q.  But you don't remember any conversation that you may have

5   had with Andrea Stillwell at that time?

6   A.  It was an overwhelming event for her.  She was clearly

7   upset.  We weren't going to approach her and try to get into a

8   discussion about something like that.

9   Q.  So your answer is you don't recall any discussions specific

10  as to my question which was whether you discussed with her her

11  knowledge with regard to any connection involving

12  Mr. Stillwell's conduct in the United States?

13  A.  No.

14  Q.  If I might, could I invite your attention to 3517-04 on

15  page four.

16          MR. RAY:  I just need a 3500 exhibit binder.

17          THE COURT:  I have one.

18          (Pause)

19          THE COURT:  I am just going to ask you to stay away

20  from what someone else said to the extent it's hearsay and

21  exception clause.

22          MR. RAY:  Objection.

23          (Pause)

24  Q.  So Agent Stouch, it may take you a second to turn to the

25  right page but I'm looking at 3517-04 and it's on page four of

1    six and then further at paragraph 15 and it's the last, I guess

2    it's the last two sentences of that paragraph.  Without reading

3    it to the jury, just read it to yourself.  The simple question

4    is, does that refresh your recollection as to whether or not

5    you had a conversation with Andrea Stillwell that occurred at

6    or around the time that the search warrant was executed on

7    July 22, 2015?

8    A.  It does, yes.

9    Q.  Without telling us what Ms. Stillwell said, do you recall

10   inquiring of Ms. Stillwell concerning the purpose of David

11   Stillwell's trip --

12            MR. EGAN:  Objection.

13            THE COURT:  Sustained.

14   Q.  But your review of 3517-04 in paragraph 15, that does

15   refresh your recollection that you did have a conversation with

16   Ms. Stillwell?

17   A.  Yes, I'm not denying that there was a conversation with

18   Ms. Stillwell.  We just did not get into an interview type

19   conversation asking her in depth details about her husband.

20   Q.  Well, aside from the characterization of an interview,

21   would it be fair to say that you asked questions without

22   getting into what the questions were, did you ask Ms. Stillwell

23   a question or questions on July 22, 2015?

24   A.  We had a conversation.  I don't remember the specifics of

25   what question was asked.  But we did have a conversation.  She

1   was upset.  She was outside.  We were trying to calm her down

2   and just tried to explain the process that was taking place.

3   Q.  You would acknowledge that there were one or more questions

4   that you asked?

5   A.  I'm sure there was.

6   Q.  All right.  Now, as the case agent in this case, did there

7   come a time when you interviewed Paul LeRoux?

8                MR. EGAN:  Objection.

9                THE COURT:  Why don't we have one more side bar.

10  Thank you.

11               (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (side bar)

2          MR. RAY:  I intend to ask this witness to explain why

3    his reports and notes do not reflect the fact that there is

4    Brady material with regard to these statements of Paul LeRoux

5    in which she acknowledged when questioned that he was unaware

6    and did not believe that Mr. Samia and Mr. Stillwell knew

7    before they left the United States the purpose of their trip to

8    the Philippines.

9          And specifically, it's impeachment material with

10   regard to this witness because no where in the notes does that

11   information appear.  And I don't want -- but I'm trying to

12   establish with this witness whether or not he was the one that

13   took notes and prepared the report in connection with the

14   interview of Paul LeRoux.  And we're not sure because the

15   government hasn't been able to identify it for us whether this

16   topic was discussed.  It's going to be the subject of

17   cross-examination of Mr. LeRoux, I know but Agent Stouch is

18   here now and I want to try to determine from the case agent why

19   the agents were agent or agents did not record the fact that

20   Mr. LeRoux provided Brady material.

21         MR. EGAN:  It would be based on a hearsay statement.

22   The whole line of questioning is based on a presumption.  The

23   hearsay statement from LeRoux that LeRoux had something or said

24   something that's not in the record, not recorded, isn't offered

25   basis for impeachment.  There is opinion, no foundation made

1   for this.  If the witness asked is Paul LeRoux, it's Paul

2   LeRoux's views on this, if he then wants to re-call the special

3   agents -- that was a big deal why -- we could have a

4   discussion.

5            THE COURT:  I agree with that.

6            MR. RAY:  Just as long as it's clear, I'm totally fine

7   with that but if we don't raise things like that and the agent

8   clears off the stand I want it to be understood we are reserve

9   on a statement -- come back to when it's relevant.

10           MR. EGAN:  We are reserving our ability to object.

11           THE COURT:  Understood.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   (In Open Court)

2      BY MR. RAY:

3      Q.  Agent Stouch, you indicated that there came a point in time

4      when you traveled to the Stillwell residence on July 22, 2015.

5      Did you also have occasion to travel to the location of the

6      second search location relative to Mr. Stillwell which was the

7      arsenal on that day?

8      A.  On that day?  I don't recall if it was that day.

9      Q.  You do have or did come to have during the course of the

10     investigation experience with based upon a personal sight visit

11     to the location of business, the arsenal that's been previously

12     identified?

13     A.  I was there once for a brief period of time.

14     Q.  Any reason to doubt that the arsenal was a legitimate

15     business in the state of North Carolina so far as you knew?

16     A.  I don't know.  It appeared to be.

17     Q.  OK.  Fair enough.  And your understanding as a result of

18     this investigation is that Mr. Stillwell worked there, correct?

19     A.  Yes.

20     Q.  And then among other things that he worked there in the

21     trader business of manufacturing and providing holsters for

22     firearms?

23     A.  Yes.

24     Q.  And nothing from your investigation to indicate that

25     anything about that activity was unlawful?

1  A.  No, not that I was aware of.

2  Q.  Did you come to learn that Mr. Stillwell was a licensed

3  firearms instructor?

4  A.  Yes.

5  Q.  And given your familiarity with the business known as the

6  arsenal, is it your understanding that the arsenal among other

7  things, in addition to sales, also conducts training at that

8  location?

9  A.  I wasn't aware of that.

10  Q.  Did you become familiar during the course of your

11  investigation that Mr. Stillwell as part of his activities

12  trained other people in the safe and proper use of firearms?

13  A.  Yes.

14  Q.  And indeed, you came to learn that Mr. Stillwell's in fact

15  a certified instructor in that regard, correct?

16  A.  Yes, that was my understanding.

17  Q.  The arrest of Mr. Stillwell was occasioned as the result of

18  a traffic stop I believe we heard through the testimony of

19  another witness; do you recall that?

20  A.  Yes.

21  Q.  Were you present for that traffic stop?

22  A.  No.

23  Q.  So you actually first met Mr. Stillwell in connection with

24  the arrest once he had been transported to the Person County

25  Sheriff's Office?

1   A.  Yes, in the interview room.

2   Q.  He was also there when you walked in?

3   A.  No.  He was escorted in the room.  We were there first.

4   Q.  When you say "we" it was you together with the group

5   supervisor?

6   A.  Correct.

7   Q.  That's Special Agent Cindric?

8   A.  "Cindric".

9          MR. RAY:  Thank you.  On Government Exhibit 606 which

10  you testified to on direct-examination, I believe it's the

11  Advise of Rights form.

12          If we could have that for the witness.

13          (Pause)

14  Q.  Now you testified on direct examination that you identified

15  the name "Carl David Stillwell" and his signature on the line

16  underneath.  Do you see that in Government Exhibit 606?

17  A.  I do, yes.

18  Q.  Who is the witness?

19  A.  I am.

20  Q.  And that's your signature below it?

21  A.  Yes.

22  Q.  The handwriting below which says "date/time" in typewritten

23  form, then this indicates "7", whose handwriting is that?

24  A.  That is mine.

25  Q.  That matches the handwriting that's at the top of form

1   right to the left of the Advise of Rights which is typewritten

2   there's written in 11:25 a.m. is that your handwriting as well?

3   A.  It is.

4   Q.  And you wrote the date and the time on this document at the

5   point at which your interview of Mr. Stillwell commenced; is

6   that fair to say?

7   A.  I don't recall exactly when I wrote that date and time on

8   there but I know it's accurate.

9   Q.  OK.  But just so that it's clear between beginning, middle

10  or end of the interview, what's your best sense of what that

11  time represents?  Does is represent closer to the beginning,

12  the middle or the end?

13  A.  That represents when he was advised of his rights.

14  Q.  Is it your testimony that he was advised of his rights at

15  the beginning rather than the middle or the end of the

16  interview?

17  A.  Yes.

18  Q.  The advise of rights that you say that you gave, that would

19  be you reading as you testified on direct-examination, those

20  rights to Mr. Stillwell?

21  A.  Yes.  As he looked and read the form as well.

22  Q.  OK. Mr. Stillwell however, did not sign this document until

23  the end of the interview; is that correct?

24  A.  I believe that is correct.

25            MR. RAY:  I have no further questions.

1          Thank you, your Honor.

2          THE COURT:  All right.  Any redirect or any other

3  defendants?

4          MR. RAY:  I should say I have no further questions at

5  this time.

6          Thank you.

7          MR. EGAN:  Nothing further.

8          THE COURT:  All right.  You can step down.

9          Thank you.

10         THE WITNESS:  Thank you.

11         THE COURT:  Should we take our lunch break now?  Does

12  that make sense?  OK.

13         Ladies and gentlemen, as I said earlier, we are going

14  to take a slightly longer lunch break.  Why don't you come back

15  at 2:15.  OK.  We'll resume then.  Just remember keep an open

16  mind and don't discuss the case.  OK?

17         Thank you.

18         (Jury not present)

19         MS. DONALESKI:  Judge, we'd like to explain what we

20  intend to do after the lunch break.  We intend to call first

21  Mr. Pakchan and Special Agent Picciano and then do a direct of

22  each of them which would be brief and focus on the issues your

23  Honor highlighted this morning and then assume.  Mr. DeCastro

24  will have an opportunity to cross.

25         THE COURT:  Good.  Thanks.  I'm ready now or does

1    anyone need a break?

2              (Interpreter sworn)

3              THE COURT:  I am just going to remind both the

4    interpreter and Mr. Pakchan that you are still under oath and

5    you are under oath to translate fairly and accurately.

6              Thank you.

7     PANYA PAKCHAN,

8          called as a witness by the Government,

9          having been PREVIOUSLY sworn, testified as follows:

10   CONTINUED DIRECT EXAMINATION

11   BY MR. EGAN:

12   Q.  Mr. Pakchan, you testified yesterday about installing video

13   cameras in a house in Phuket; do you remember that?

14   A.  Yes, I remember.

15   Q.  Prior to installing that camera, did you ever inquire as to

16   whether there was or what the legal authority to allowing to

17   you install those cameras was?

18   A.  Yes.

19   Q.  You didn't have a conversation?

20   A.  Yes.

21   Q.  With who?

22   A.  With the agent.

23   Q.  Sitting here today do you know what the nature of the legal

24   authority was for you to install cameras in that house?

25   A.  It's an order that came coordinating with the police

1    department.

2    Q.  Did you see a copy of that order?

3    A.  No, I did not see it.

4    Q.  Did you ask about the nature of that order?

5    A.  No, I did not ask.

6    Q.  Typically in your job when you do these surveillance, is it

7    your job to seek the legal authority required to do it?

8    A.  No, I don't have to.

9    Q.  So when you testified that you knew what you knew was that

10   someone told you that there had been an order in connection

11   with the police to allow you to do this?

12   A.  That's correct.

13   Q.  Did you know the basis of that authority?

14   A.  That's right.

15   Q.  Well, did you -- let me ask you this, did you know who the

16   owner of the house was?

17   A.  No, I don't.

18   Q.  Did you have any information prior to the installation

19   whether the owner had consented or not consented to this

20   operation?

21   A.  I don't know.

22   Q.  You also testified that there was the capacity to both

23   download information and monitor the information; is that

24   right?

25   A.  That's right.

1    Q.  Were you involved with the monitoring of this?

2    A.  Only testing the equipment.

3    Q.  Where did you test the equipment?

4    A.  Another rented house that belonged to our team.

5    Q.  Your team.  So your team while this operation was going on

6    was staying in a rental house?

7    A.  That's right.

8    Q.  Where they were able to monitor -- so what device did they

9    used to monitor to test the equipment?

10   A.  From the computer laptop.

11          THE COURT:  When you say your team, are you talking

12   about all DEA employees.

13          MR. EGAN:  I was going to get to that.

14          THE COURT:  Sorry.  I don't want to take it out of

15   order.

16   A.  Yes, DEA and also police authority, police department in

17   Thailand.

18   Q.  So in this house approximately how many members of the team

19   were there?

20   A.  Please ask me again.

21   Q.  In this house --

22          THE COURT:  Clarify which house.

23   Q.  Sorry.  The house where the team was staying,

24   approximately, how many members of the team were staying there?

25   A.  At the house there were about five or six.  I don't

1    remember exactly.

2    Q.   And among those five or six there were agents from the DEA?

3    A.   Yes.

4    Q.   And there were also agents from the narcotics police in

5    Thailand?

6    A.   That's right.

7    Q.   And that's where you set up this computer to allow them to

8    monitor?

9    A.   That's right.

10   Q.   Did you stay in that house?

11   A.   No.

12   Q.   Did you participate in any further monitoring of it other

13   than the downloading you testified to?

14   A.   No.

15            MR. EGAN:  Nothing further, your Honor.

16            THE COURT:  All right.  Go ahead.

17   CROSS-EXAMINATION

18   BY MR. DECASTRO:

19   Q.   Good afternoon.

20            Now, your primary job was as a technician for the DEA,

21   correct?

22   A.   That's correct.

23   Q.   Prior to that you had been in the military, correct?

24   A.   That's right.

25   Q.   And you would describe these operations as potentially

1    dangerous, right?

2    A.   That's right.

3    Q.   And did you receive training from the DEA on these types of

4    operations?

5    A.   That's right.

6    Q.   How much training?

7    A.   Once at the Office of Technology for the video system and

8    I'm so used to many tiles over with this type of job.

9    Q.   So just to clarify, was your training involving the

10   electronics involved or was your training also related to how

11   to conduct this type of operation?

12   A.   It's about equipment.

13   Q.   Now, in this particular operation you received your

14   assignment I think you said from a DEA agent, correct?

15   A.   That's right.

16   Q.   Who was it?

17   A.   My boss.

18   Q.   What is his name?

19   A.   Patrick.

20   Q.   Does he have a last name that you remember?

21   A.   Picciano.

22   Q.   So Mr. Picciano or Agent Picciano, asked you or told you

23   that you were going to install this equipment in this house in

24   Phuket?

25   A.   That's right.

1   Q.  And you asked him what the authority was, right?

2   A.  No.  I never asked.

3   Q.  He told you that they had received the required authority?

4   A.  Yes.  The order was just for me to go install the camera.

5   Q.  When you say "the order", do you mean an order from a court

6   or do you mean a DEA order telling you what to do?

7   A.  Verbally.

8   Q.  So you mean he just gave you the order to do it?

9   A.  That's right.

10  Q.  He didn't tell you what the DEA's authority was to enter

11  this home?

12  A.  It's not my job to ask.

13  Q.  So is the answer that he did not tell you?

14  A.  No.  I have no authority to ask.

15  Q.  So you didn't know when you went to this house whether

16  there was authority to even enter it?

17  A.  I went with the police.

18  Q.  You went with the police who were there for your

19  protection, right?

20  A.  That's right.

21  Q.  None of those police told you that they received the

22  authority to go into this house?

23  A.  No.

24          THE COURT:  What did the police do when they were

25  there?

1              THE WITNESS:  The police would cover the outside.

2              THE COURT:  How many Thai police were present?

3              THE WITNESS:  Five or six.

4    Q.  And were they inside or outside the gates?

5    A.  They were outside.

6    Q.  That makes sense, right, because you didn't want the made

7    to know that you were police?

8    A.  That's right.

9    Q.  Because you were involved in a covert operation and you

10   were going to lie to her right?  This was a covert operation

11   and you were going to lie to the maid to gain access?

12   A.  I did not lie to her.  I just don't want her to know too

13   much.

14   Q.  Did you tell her that you were from the Internet company?

15   A.  Yes.

16   Q.  Was that the truth?

17   A.  That's true.

18   Q.  You were from the Internet company?

19   A.  That was a job to have a secret operation.

20   Q.  That was a lie so that she didn't know you were the DEA,

21   correct?

22   A.  I don't find it's a lie.

23   Q.  So your testimony is that you worked for a legitimate

24   internet company?

25              MR. EGAN:  Objection, your Honor.

1          MR. DECASTRO:  I haven't finished the question.

2          MR. EGAN:  The whole line of questioning it's clear

3     there's a misunderstanding as to what "lie" means.

4          THE COURT:  I'll let you clear it up on redirect.

5          You can ask your question, Mr. DeCastro.

6     Q.  Let me put it this way.  So is it your testimony that you

7     told her the truth when you spoke to the maid?

8     A.  My duty and my operation, I don't have to tell anything

9     because it's an undercover operation.

10    Q.  So you didn't tell her the truth?

11    A.  I just said I'm here to install the Internet.

12    Q.  You were here and told by your boss -- withdrawn.

13         You were there and told by your boss what to do and

14    how to do it?

15    A.  That's right.

16    Q.  And Agent Picciano told you to tell the person if you were

17    asked that you were from an Internet company?

18    A.  No.

19    Q.  So you did that on your own?

20    A.  It's just my duty to have it covered because of my job.

21    Q.  Your job was to make sure it was secret, that this was a

22    DEA operation, correct?

23    A.  That's right.

24    Q.  And that's why you also wore clothing that reflected you

25    were from some Internet company, correct?

1    A.  That's right.

2    Q.  You didn't wear clothing that identified the Drug

3    Enforcement Administration as your employer, correct?

4    A.  That's right.

5    Q.  And you did not show her a warrant or any other type of

6    document authorizing your entry into the home, correct?

7    A.  It's not my duty.

8    Q.  But you didn't have it to show it to her, correct?

9    A.  It's not my job to do it.

10   Q.  Did you have a document authorizing you to enter the house?

11   A.  No.

12   Q.  You installed three cameras, correct?

13   A.  That's right.

14   Q.  Not two cameras, correct?

15   A.  No just --

16   Q.  And you installed separate microphones as well, right?

17   A.  That's right.

18   Q.  And those microphones tied into the camera, correct?

19   A.  Please answer me again.

20   Q.  Were those microphones wirelessly connected to the DVR box

21   or were they actually wired to the cameras or the box?

22   A.  Microphone was directly connected to the DVR.

23   Q.  So for this operation you needed a DVR box?

24   A.  Yes.

25   Q.  Actually, let me just ask you what equipment did you need

1   for this operation; can you just list it for us?

2   A.  It's -- yes.  DVR box.

3   Q.  What else?

4   A.  And hidden camera and hidden microphone and internet box.

5   Q.  Anything else?

6   A.  That's it.

7   Q.  Cables, did you need cables for it as well?

8   A.  The cables already came with the camera.

9   Q.  So it was a DVR box, three cameras, an Internet box, cables

10  and microphones?

11  A.  That's right.

12  Q.  How many microphones?

13  A.  Two.

14  Q.  Where did you get the equipment?

15  A.  I make list to my boss.

16  Q.  You made a list of items you would need for Agent Picciano?

17  A.  That's right.

18  Q.  And do you know where he got the -- did he give you those

19  items that you requested?

20  A.  That's right.

21  Q.  Do you know where he got them?

22  A.  I only know it was local.

23  Q.  Could you repeat the answer?

24  A.  I only know that it was picked out from the local, from

25  Bangkok.

1   Q.  You mean it was purchased in Bangkok?

2   A.  That's right.

3   Q.  You know that because you saw the receipt?

4   A.  No, I didn't see.

5   Q.  So, how long after you spoke to Agent Picciano did he give

6   you the equipment?

7           THE INTERPRETER:  One more time please.

8   Q.  How long between your conversation with Agent Picciano in

9   which you requested the equipment and from when he actually

10  gave you the equipment?

11  A.  Less than a week.

12  Q.  Now you testified that the team was in this rented house

13  nearby, correct?

14  A.  Rented house.  Wasn't near.

15  Q.  Excuse me.  It was not near?

16  A.  I don't know how far apart.

17  Q.  But the team was in a rented house to monitor the video,

18  correct?

19  A.  That's right.

20  Q.  And did the DEA pay for that house?

21  A.  I don't know.

22  Q.  You don't know who paid the rent?

23  A.  That's right.

24  Q.  You said there were five to six agents in that house,

25  correct?

1   A.  Yes, five or six, not so sure.

2           THE COURT:  How many officers from the Thai police

3   were in that house?

4           THE WITNESS:  About three or four Thai police, not so

5   sure.

6   Q.  You were only there once I think you said?

7   A.  Where do you mean?

8   Q.  You were only at the rented house one time, I think you

9   said, to set up the monitoring equipment; is that correct?

10  A.  That's right.

11  Q.  Now, after installing the equipment you were in charge of

12  maintaining it, correct?

13  A.  That's right.

14  Q.  For example, to make sure that there was enough space on

15  the DVR to continue recording, correct?

16  A.  That's right.

17  Q.  And you did that by downloading the content every single

18  day?

19  A.  That's right.

20  Q.  Did you do that from your DEA office in Bangkok?

21  A.  That's right.

22  Q.  You didn't do that with any other law enforcement agency,

23  correct?

24  A.  That's right.

25  Q.  And you did that for months?

1   A.  No.

2   Q.  Well, did you un-install the equipment?

3   A.  That's right.

4   Q.  You did that in September, correct?

5   A.  I'm not sure.  I don't remember.

6           MR. DECASTRO:  I don't think I have anything further,

7   judge.

8           THE COURT:  Thank you.

9           Any redirect?

10          MR. EGAN:  No, your Honor.

11          THE COURT:  Thank you.  You may step down for now.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. DONALESKI:  The government calls Patrick Picciano.

2     PATRICK PICCIANO,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5          MS. DONALESKI:  May I inquire, your Honor?

6          THE COURT:  You may.

7     DIRECT EXAMINATION

8     BY MS. DONALESKI:

9     Q.   Good afternoon, Special Agent Picciano.

10    A.   Good afternoon.

11    Q.   You work at the DEA?

12    A.   Yes.

13    Q.   How long have you worked there?

14    A.   16 years.

15    Q.   Where are you currently assigned?

16    A.   For in the special operations division in Chantilly,

17    Virginia.

18    Q.   What was your previous assignment with the DEA?

19    A.   Previously, I worked as a DEA agent inside the United

20    States Embassy in Bangkok, Thailand.

21    Q.   And approximately what years were you there?

22    A.   From 2008 to 2014.

23    Q.   And what were your duties and responsibilities as a special

24    agent assigned to the U.S. Embassy in Bangkok, Thailand?

25    A.   We were diplomats assigned to the embassy, so we had

1  embassy duties.  And more importantly, we worked with the Royal

2  Thai Police counterparts.  We would liaison with them with

3  anything to do -- from any job or narcoterrorism

4  investigations.

5  Q.  Can the DEA operate in Thailand without the involvement of

6  Thai authorities?

7  A.  No, we cannot.

8  Q.  Can the DEA conduct any investigations or operations in

9  Thailand without the assistance and authority of the Thai

10  police?

11  A.  No, we cannot.

12  Q.  Are you familiar with the NSB?

13  A.  Yes, I am.

14  Q.  What is it?

15  A.  It's the Narcotics Suppression Bureau.  It's a unit that

16  just stands for, like, in the United States for a drug unit.

17  Q.  And did you work closely with anyone at the NSB during your

18  time in Thailand?

19  A.  Yes, for six years being in Thailand, I've worked for NSB,

20  for the Narcotics Suppression Bureau with the Thai counterpart

21  for -- do you want me to give the name?

22  Q.  Sure.

23  A.  I worked with Chokchai Varasard.  C-H-O-K-C-H-A-I,

24  V-A-R-A-S-A-R-D.

25  Q.  And you described him as your counterpart.  Can you please

1   explain that?

2   A.   A counterpart in foreign offices as much like in the United

3   States where you have task force of local police.  It works

4   much the same where we're working hand in hand with the -- a

5   foreign counterpart and the difference is -- a similarity is

6   that we work together.  The difference is in foreign countries

7   we cannot do the investigation.  We don't have arrest

8   authority.  We cannot do many things that we can do in the

9   United States.

10  Q.   Without the counterpart?

11  A.   Without the counterparts.

12  Q.   Did there come a time when you received information as a

13  result of the cooperation with Paul LeRoux?

14  A.   Yes.

15  Q.   Can you please describe how you received that information?

16  A.   I received a call from agents in the United States that

17  they needed assistance with an investigation in Thailand.

18  Q.   And generally speaking, what happened next in terms of the

19  investigation?

20  A.   They said that there were targets within Thailand that were

21  storing drugs.

22  Q.   What did you do as a result of learning that?

23  A.   I told the Thai counterpart, my police counters and they

24  wanted to pursue or assist the DEA with an ongoing

25  investigation that came from the United States.

1  Q.  With respect to the drugs that were in Thailand, what

2  happened next?

3  A.  They asked the DEA if we could assist with providing an

4  undercover officer to pick up the drugs.  They do what we would

5  call a sting operation and where we would call the bad guy who

6  was storing the drugs and ask if we could retrieve it.  And so

7  that's what we did.

8  Q.  Again, who were you working with when you conducted this

9  undercover operation in Thailand?

10  A.  With the Thai NSB police officers.

11  Q.  And did it result in the seizure of any drugs?

12  A.  Yes, it did.

13  Q.  To your knowledge, did the NSB open a case as a result of

14  this investigation?

15  A.  Yes, they did.

16  Q.  To your knowledge, did the NSB pursue separate arrests as a

17  result of this seizure?

18  A.  Yes, they did.

19  Q.  I'm going to direct your attention to the installation of

20  surveillance equipment of a home in Phuket, Thailand in

21  approximately March 2013.

22          So how did you learn -- withdrawn.

23          Did you speak to your Thai counterpart at the NSB

24  about the installation of this surveillance equipment?

25  A.  Yes, I did.

1   Q.  What was your understanding at the time of who owned the

2   home in which the surveillance equipment would be installed?

3   A.  I was told that it belonged to Paul LeRoux.

4   Q.  And who told you that?

5   A.  The agents in the U.S.

6   Q.  What was your understanding, if any, of whether Paul LeRoux

7   had given consent for the installation of the surveillance

8   equipment into that home?

9   A.  We didn't discuss the consent.  I -- I figured that they

10  would -- they told us that they -- they actually -- I'm sorry.

11  They said they had consent for us to go inside the house.

12  Q.  And "they," meaning the DEA?

13  A.  Agents said.

14  Q.  In the U.S.?

15  A.  In the U.S., said that we could go inside the -- and

16  install in Paul LeRoux's house.

17  Q.  And did you convey that information, namely, that Paul

18  LeRoux owned this home and that you had consent or you had the

19  authority to go in that house --

20  A.  Yes.

21  Q.  -- to your counterpart at the NSB?

22  A.  Yes, we had a meeting and discussed the operation of

23  installing the equipment in that house.

24          THE COURT:  Just to be clear, did you think that you

25  had consent from Paul LeRoux, or you just thought you had

1    authorization?

2                THE WITNESS:  I received verbal from the agents in the

3    United States, but they had in agreement to go inside the

4    house, that they were giving me the authority, basically, like

5    we have the authority, you can go install the equipment in the

6    house, because it's owned by Paul LeRoux.

7                THE COURT:  OK.

8                THE WITNESS:  And that's what I explained to the Thai

9    police.

10               THE COURT:  Again, when you say "agreement," you

11   thought it was an agreement from LeRoux?

12               THE WITNESS:  Correct.

13   Q.  So just to be clear, you told your counterpart at the NSB

14   that Paul LeRoux owned this home and that you understood that

15   Paul LeRoux had agreed to allow the installation of the

16   surveillance equipment in that home; is that correct?

17   A.  That's correct.

18   Q.  Did you subsequently participate in a meeting with the

19   general or the commander of the NSB?

20   A.  Yes, I did.

21   Q.  And what is the name of that general?

22   A.  The name is Chaiya, C-H-A-I-Y-A; Rujanavert,

23   R-U-J-A-N-A-V-E-R-T.  Not specifically, but --

24   Q.  I'll refer to him as the General, if that's all right.

25   A.  The General.

1    Q.   Please describe what happened during this meeting with the

2    General?

3    A.   The General does not speak very good English, so I had an

4    interpreter there and the -- I explained the investigation in

5    English to my interpreter that -- Jaroon, my foreign service

6    national who works with the Thai counterparts alongside me at

7    the embassy.  And we explained to the General the investigation

8    that led to the drug seizures that they were currently

9    investigating, and that we wanted to continue that

10   investigation with the installation of equipment into a house

11   owned by Paul LeRoux.

12   Q.   What did the General tell you in response?

13   A.   The General subsequently returned a message to the

14   lieutenant colonel at NSB who is my counterpart who said that

15   he received authority from the General.

16   Q.   And when you say "authority," what do you mean?

17   A.   Verbal authority to install the equipment in the house.

18   Q.   Have you received any training in Thai law?

19   A.   No, I haven't.

20   Q.   At that time, were you aware as to whether Thai law

21   prohibited non-Thai citizens from owning Thai property?

22   A.   I don't recall.  I don't know that information.

23   Q.   At that time did you ask -- were you aware as to whether

24   the Thai authorities under Thai criminal law needed a search

25   warrant to install the video cameras?

1    A.  My job was just to see if they had authority in which they

2    told me they did, and so we continued the investigation.

3    Q.  Did you convey this information, namely, that you had

4    requested approval from the General of the NSB, received that

5    approval, did you convey that information to the agents in the

6    U.S.?

7    A.  Yes, I did.

8    Q.  So I want to direct your attention to the purchase of the

9    surveillance equipment that would later be installed into this

10   house.  Who purchased it?

11   A.  The Thai police did.

12   Q.  And who reimbursed them?

13   A.  The DEA.

14   Q.  And do you recall who at DEA did that?

15   A.  Yes, I did.

16   Q.  Who, if anyone, did you provide the surveillance equipment

17   to in order to install it?

18   A.  I provided it to the technical foreign service national

19   or -- I'm sorry.  Our technical guy in the embassy, which was

20   Panya Pakchan.

21   Q.  Please describe what happened generally speaking when the

22   surveillance equipment was installed?

23   A.  Can you be more specific?

24   Q.  Absolutely.  Were you in Phuket on the day that the

25   surveillance equipment was installed?

1    A.  Yes, I was.

2    Q.  Who were you with?

3    A.  I was with the same Thai counterparts with the Royal Thai

4    Police with Chokchai Varasard and the two embassy personnel

5    that I worked with, the tech specialist, and Jaroon.  And we

6    proceeded to drive to the Phuket house to drop Jaroon and Panya

7    and the equipment off to the Phuket house.

8    Q.  And where did you and Chokchai go after you dropped them

9    off?

10   A.  I just went around the corner to a cafe and waited until

11   they were done, until they were complete and we just maintained

12   communication on the phone as to how the installation was

13   going, whether they needed anything.

14   Q.  I want to talk about the monitoring of the surveillance

15   video.  Who had access to the live feed from the surveillance

16   video?

17   A.  The entire unit that we were with, the Thai police and the

18   DEA personnel that were with us.

19   Q.  Did the Thai police monitor the surveillance video live

20   feed?

21   A.  Yes, they did.

22   Q.  How do you know that?

23   A.  Because I was with them.

24   Q.  Did you participate in the search of the Phuket house in

25   September 2013, or were you present for it?

I44BHUN4                      Picciano - Cross

1   A.  Once -- can you --

2   Q.  After the arrest.

3   A.  Yes, I was.

4   Q.  What was your understanding as to whether NSB agents had

5   obtained a search warrant for that home?

6   A.  Yes, they told me they had a search warrant.

7            MS. DONALESKI:  One moment, please, your Honor.

8   Q.  How long was the surveillance live feed set up?

9   A.  Can you explain a little bit more what -- specifically what

10  you want, how long?

11  Q.  Was the surveillance feed discovered at some by the

12  occupants of the home?

13  A.  Yes, it was.

14  Q.  And how long between when you installed it to when it was

15  discovered, approximately how much time passed?  A matter of

16  days, weeks, months?

17  A.  It was about a week.

18           MS. DONALESKI:  No further questions, your Honor.

19           THE COURT:  All right.  Mr. De Castro.

20  CROSS-EXAMINATION

21  BY MR. DE CASTRO:

22  Q.  Good afternoon, Special Agent.

23  A.  Good afternoon.

24  Q.  So you received a call from agents in the United States

25  regarding an investigation that involved Paul LeRoux, correct?

1    A.   Correct.

2    Q.   They informed you that Mr. LeRoux was an informant and

3    providing information to the DEA?

4    A.   That's correct.

5    Q.   And I think you testified that his information led to what

6    was an a narcotics investigation that you worked with your

7    counterpart, Mr. Varasard, right?

8    A.   That's correct.

9    Q.   And that was an investigation regarding methamphetamine,

10   right?

11   A.   Yes, at the beginning.

12   Q.   Arrests were made and people were prosecuted, right?

13   A.   Yes.

14   Q.   Mr. Hunter was not arrested in connection with that

15   investigation, right?

16   A.   That's correct.

17   Q.   He wasn't targeted in that investigation, right?

18   A.   No.

19   Q.   He had nothing -- you didn't even know his name while you

20   were doing that investigation, correct?

21   A.   That's correct.

22   Q.   Now, just a couple questions about Mr. Varasard.  He's your

23   sort of Thai counterpart, right?

24   A.   That's correct.

25   Q.   And he reports to General Rujanavert?

1    A.  Yes.

2    Q.  Would you say that while you were in Thailand for close to

3    six years that you got pretty close with Mr. Varasard?

4    A.  Yes.

5    Q.  And you had a very close working relationship, I assume?

6    A.  Yes.

7    Q.  So you became intimately involved in investigations they

8    were doing in terms -- and joint investigations?

9    A.  Yes.

10   Q.  Now, you then learned that pursuant to Mr. LeRoux's

11   cooperation or continued cooperation, that U.S. agents were

12   interested in doing a sting operation which resulted in these

13   cameras, right?

14   A.  Yes.

15   Q.  This was separate from the methamphetamine investigation?

16   A.  No, it was basically a continuation of that, because they

17   provided that information directly to me about the

18   methamphetamine that had direct relation to Paul LeRoux's

19   cooperation that led to a spider web of other investigations

20   that was done specifically by the same Thai police unit and the

21   same agents in the United States.

22   Q.  Not involving Joseph Hunter, right, for all you know?

23   A.  No, it involved -- it didn't directly involve Joseph

24   Hunter, but it involved Joseph Hunter, because Paul LeRoux is

25   the one who cooperated who provided that name.

1    Q.  The difference is the source.  I'm sorry.  I didn't mean to

2    interrupt you.  Go ahead.

3    A.  No.

4    Q.  The source of the information was Paul LeRoux and it was

5    the same agents as well that were talking to you?

6    A.  Correct.

7    Q.  So the agents told you that Paul LeRoux owned the home in

8    Thailand?

9    A.  Yes.

10   Q.  And that they had received consent from Mr. LeRoux to

11   search that residence?

12   A.  Yes.  Not to -- I'm sorry.  You said search?

13   Q.  I'm sorry.  To install the cameras?

14   A.  Yes.

15   Q.  What did they tell you about the circumstances surrounding

16   his ownership of that home?

17   A.  They didn't tell me much.  They didn't tell me anything

18   except they basically gave him an order that we would like for

19   you to install equipment.  We had the authority by the owner of

20   the house, which is Paul LeRoux.  That was basically it.

21   Q.  Did you direct anyone to verify that Paul LeRoux actually

22   owned that home?

23   A.  There was a real estate broker or manager that managed the

24   house for Paul LeRoux and we were provided that phone number

25   for the real estate broker to call and verify that we would be

1    going to the house and that real estate broker -- like pretty

2    much like a manager of a rental property provided the phone

3    number for a maid who lived at the house and took care of it

4    who would allow us access to the house and that's where the

5    Thai police coordinated that.

6    Q.  So you verified that certain people had access to the home,

7    but you didn't verify ownership, correct?

8    A.  No, I did not.

9    Q.  Because your understanding was that Paul LeRoux was not a

10   Thai citizen, correct?

11   A.  Yeah, I wasn't aware of his citizenship.

12   Q.  You just weren't sure?

13   A.  Correct.

14   Q.  Now, you were stationed there for around six years.  Could

15   you buy property in Thailand?

16   A.  I don't know.  I never researched it.

17   Q.  Are you aware that you actually can't, or just you don't

18   know that?

19   A.  No, I do know there's foreigners that own property there.

20   They own percentage.  It's based on a percentage.  But I don't

21   know how that works.  I don't know the circumstances of all

22   that, but I knew that foreigners owned some type of property

23   there, but...

24   Q.  So you first received word from the U.S. DEA agents that

25   they had received consent to install the cameras in this house,

1   right?

2   A.   Yes.

3   Q.   You then went to Mr. Varasard, correct?

4   A.   Correct.

5   Q.   And who then said I have to go to my boss, right?

6   A.   Yes.

7   Q.   Then he went to his boss, who is General R?  General R,

8   right?

9   A.   Rujanavert.

10  Q.   And you had this meeting?

11  A.   Correct.

12  Q.   Was it your understanding that he as just a general could

13  simply authorize the search of any home in Thailand or in his

14  vicinity, I guess?

15  A.   Can you rephrase that.

16  Q.   Was it your understanding of Thai law that he could just

17  authorize the search, meaning the General could authorize the

18  search of any property under his jurisdiction?

19  A.   I did not know that.

20  Q.   You were operating in -- prior to you working at the DEA in

21  Thailand, you worked in the United States?

22  A.   Correct.

23  Q.   Have you applied for a search warrants before?

24  A.   Yes.

25  Q.   You knew that that's a pretty extensive process, at least

1  here in the United States, right?

2  A.  Yes.

3  Q.  And it's a concept that has been embraced by many countries

4  of the world, correct?

5  A.  Yes.

6  Q.  During your work in Bangkok or in Thailand, had you seen

7  search warrants before?

8  A.  We just -- yes.

9  Q.  In fact, in this case, there was a search warrant that you

10  saw to allow for a search of the home in September of 2013?

11  A.  Yes.  But can I make a comment about that?

12  Q.  Go ahead.

13  A.  Since we don't -- since we have no authority in Thailand

14  and it's incumbent upon the Thai police that receive the

15  authority, that's an agreement that we speak about all the

16  time, make sure they have the authority, because they're the

17  ones that are going to be gaining the search warrant and we

18  might discuss verbally, but I'm not involved in the legal

19  matters that go -- involving applying for a search warrant,

20  like you said, the same in the United States.

21          It's different.  I wouldn't go to the Court.  I

22  wouldn't apply for a search warrant.  I won't develop all the

23  investigative tools that I would need in the United States.  I

24  would ask my counterpart, what do you need for -- we need --

25  whatever you need for your legal authority to get into the

1    house.

2    Q.  You never asked your counterpart, what do you need here to

3    get a search warrant or to install cameras in a house?

4    A.  Yeah, we discussed that verbally, yeah.

5    Q.  What was your understanding of what they needed to do in

6    Thailand?

7    A.  I don't know.  Every district is different from the north

8    to the south.

9    Q.  Pick one district.

10   A.  It's really not my authority whether they have local,

11   federal, some type of province rules.  I don't have the

12   understanding of all of that.

13   Q.  But you just said you talked with your counterpart about

14   this, right?

15   A.  Yeah, like you would normally talk with anyone.  Like, do

16   you have search warrant authority?  And they would say yes or

17   no.  Do we need search warrant authority?  Yes or no.  But I'm

18   not involved with this.  If they go to the court, I don't

19   escort them.  I don't talk to any lawyers or speak to the judge

20   or any of the courtroom duties.

21   Q.  But you're aware that there is a process, correct?

22            MS. DONALESKI:  Objection.  He's not a Thai lawyer.

23            THE COURT:  Overruled.

24   Q.  You're aware that there is a process, correct?

25   A.  Well, that depends on what the situation is and a search

 1  warrant if they tell me that they have authority, they have
 2  enough for a search warrant, then they have enough.  If they
 3  don't, we don't discuss details of -- they just tell me if they
 4  obtained a search warrant or they didn't have enough to get a
 5  search warrant.
 6  Q.  So the conversation is whether you have a search warrant or
 7  not, correct?
 8  A.  Yes.
 9  Q.  And in this particular case, a search warrant implies going
10  to a court and getting a search warrant, right?
11             MS. DONALESKI:  Judge, if we could just clarify.  He's
12  testifying about two instances of judicial authority, one where
13  there was a search warrant and one where there is verbal
14  approval.  So if counsel can clarify what he's asking about.
15             THE COURT:  OK.
16  Q.  I'll clarify.  You said in your conversations with
17  Mr. Varasard and in your work there you learned that there were
18  processes in different districts and different regions,
19  correct?
20  A.  Yes.
21  Q.  You might have conversations like, can you guys -- do you
22  have search authority, meaning, you, the law enforcement in
23  this area, can you just search without court order, right?
24  A.  Yes.
25  Q.  Or do you have to go to a judge to get court order to

1  search, like we do in the U.S.?

2  A.  Yes.

3  Q.  But here we don't always have to do that either, right,

4  there's exceptions, right?

5  A.  Yes, but more or less it's incumbent on the agent to get

6  those details.

7  Q.  Certainly.

8  A.  Where in Thailand, I rely on the Thai police and their

9  legal team to make sure they have legal authority to get into a

10  house or Court Orders or whatever.

11  Q.  But it's not your testimony that the DEA just blindly

12  accepts the word of any Thai law enforcement person, that we

13  did what we had to do, right?

14  A.  No.  No, generally if they say they have authority and they

15  obtained a search warrant, I don't review it, we don't get it

16  translated in English, we don't send it to our Department of

17  Justice to get verified.  No.  If they have authority to get

18  in, I take that as their word.

19  Q.  So in this case, were you informed by Mr. Varasard that you

20  had a search warrant to install the cameras?

21  A.  OK.  Yeah, it's good that you're making that clear, because

22  when you were asking me questions, installation, and when you

23  say "search warrant," I'm thinking you're talking about the

24  actual search warrant that we did obtain to get into house, OK?

25  So it was kind of confusing.

1              You asked me about the installation of the cameras.

2              THE COURT:  Just to be clear, the installation of the

3      cameras, did you have a search warrant or did you just have

4      this oral authorization?

5              THE WITNESS:  Oral authorization.

6              THE COURT:  Then the search warrant, it was for the

7      search?

8              THE WITNESS:  Correct.  We did have a search warrant.

9              THE COURT:  I understand.

10     BY MR. DE CASTRO:

11     Q.  Was it your belief that there was a requirement -- well,

12     withdrawn.

13              So you knew they needed a search warrant to search the

14     house, right?  You knew that, right?

15     A.  Yeah, because they told me they received a search warrant.

16     Q.  Was it your view that installing the cameras didn't

17     constitute a search and they did not need a search warrant?

18     A.  Yes, they told me verbally they did not need a search

19     warrant.

20     Q.  So that's what they said?  They said, We do not need a

21     search warrant --

22     A.  -- we can install the cameras.

23     Q.  Who is they?  You said, "They told us"?

24     A.  The General Chaiya and the Lieutenant Colonel Varasard.

25     Q.  So when you met with the General, he said at that meeting

1  you have authority?

2  A.  No.

3  Q.  Well, you just said the General told you that.  So when did

4  the General tell you that?

5  A.  The General told the lieutenant colonel, who told me when

6  they had permission to go in that house.

7  Q.  Who purchased the equipment for the installation?

8  A.  The Royal Thai Police.

9  Q.  And do you know how much it cost?

10  A.  No, I don't remember.

11  Q.  I think you in an affidavit in this case, you had said that

12  they were reimbursed by the DEA, correct?

13  A.  Yes.

14  Q.  But if this was a joint investigation and they were doing

15  the investigation as well, why would they need to be

16  reimbursed?  It's their case too?

17  A.  That was very common for us on most joint cases that would

18  have to do -- involving DEA where we spend a lot of resources

19  that they wouldn't normally spend on, we would include certain

20  things.

21  Q.  And this, after all, was an operation that had been started

22  by a DEA informant, right.

23  A.  Yes.

24  Q.  U.S. DEA agents were obtaining the information from that

25  informant, right?

1    A.   Yes.

2    Q.   They were ones asking for your assistance from the United

3    States, correct?

4    A.   Yes.

5    Q.   It made sense since you were also -- DEA was going to

6    install the equipment as well, right?

7    A.   Yes, the Thai police requested that we have an expert to

8    install the equipment.

9    Q.   You have that expert as a U.S. employee, right?

10   A.   Yes.

11   Q.   So that would make sense that they be reimbursed because

12   this was mostly a DEA operation, right?

13   A.   You know, it came from the DEA, so I would agree with you,

14   but when they -- when they involved the previous drug seizures,

15   two large seizures and with different arrests and multiple

16   surveillances, that they continue with this investigation that

17   led on to other Thai investigations, I would say it was a

18   complete joint investigation.

19   Q.   Thai cases, Thai arrests, Thai prosecutions, right?

20   A.   Yes.

21   Q.   The DEA also downloaded the information every day, right,

22   while it was operational?

23   A.   Yes.

24   Q.   Now, just incidentally, do your counterparts in Thailand

25   receive any type of payment from the DEA?  Do they sometimes

1    have contractors or anything like that?

2    A.  Can you be more specific.

3    Q.  For example, Mr. Varasard, do you know if he's paid by the

4    DEA at all?

5    A.  At the time that I was there, he was not.

6    Q.  He was not.  Was the General at all?

7    A.  Not that I'm aware of, no.

8    Q.  Now, with respect to the search on September, I think it

9    was 23rd of '13 of the house, you participated in that search,

10   correct?

11   A.  Yes, I did.

12   Q.  I think you already testified that there was a search

13   warrant for it.  Did you have to submit an affidavit for that?

14   A.  No.

15   Q.  Did you ever receive a copy of the actual search warrant?

16   A.  I don't remember.

17   Q.  But it was your understanding that they had gone to a judge

18   in seeking a search warrant of the home, right?

19   A.  Yes.

20   Q.  How many people from the DEA were present for that search?

21   A.  Specifically agents or personnel?

22   Q.  Well, would you describe that as the DEA searched that

23   house or was it a joint search?

24   A.  No, we're not allowed to search the house.  It was only one

25   DEA agent, which was myself, and two DEA personnel.  The rest

1    of the several 8 to 10, 12 team members that were there.

2              MR. DE CASTRO:  I have nothing else, Judge.  Thanks.

3              THE COURT:  Anything else?

4              MS. DONALESKI:  No, your Honor.

5              THE COURT:  Thank you.  You can step down.  Thanks.

6              I'm going to led the video in.  I'll rule before we

7    resume with the jury, but why don't you just take a few minutes

8    and try and get a bite to eat.

9              Thanks.

10             (Recess)

11             THE COURT:  Is everybody ready for the jury?

12             MR. EGAN:  Your Honor, we just wanted to clarify one

13   thing.  Our intention is to put Mr. Pakchan back on stand very

14   briefly.  We just wanted to ensure now that we've had the

15   hearing, that the cross isn't going to touch on suppression

16   issues.

17             MR. DE CASTRO:  No, no.

18             THE COURT:  All right.  You can bring him in now, I

19   think, and put him back on the stand.

20             MR. RAY:  Just so to be clear, does that mean that

21   we're playing the video now?

22             THE COURT:  Yes.

23             MR. EGAN:  We're playing the segment that we're going

24   to be putting on.

25             MR. RAY:  Got it.  Thank you.

1           (Jury present)

2           THE COURT:  Everyone can be seated.

3           Mr. Pakchan, I'm going to remind you that you're still

4      under oath.

5           MR. EGAN:  May I proceed, your Honor?

6           THE COURT:  You may.

7      DIRECT EXAMINATION (Resumed)

8      Q.  Mr. Pakchan, at the end of yesterday you were testifying

9      about the installation of video equipment in a house in Phuket.

10     Do you recall that?

11     A.  Yes, sir.

12          MR. EGAN:  Ms. Shields, if we could bring up

13     Government Exhibit 104-2 and play that for jury.  Mr. Pakchan,

14     if you can watch that on your screen.

15          (Video played)

16     Q.  Mr. Pakchan, is that one of the videos that was taken in

17     the surveillance system that you set up?

18     A.  Yes.

19          MR. EGAN:  No further questions.

20          THE COURT:  Cross-examination?

21          MR. DE CASTRO:  No questions.

22          MR. STERN:  No.

23          MR. RAY:  No, your Honor.

24          THE COURT:  Thank you.  You may step down.

25          MS. DONALESKI:  The government calls Chris Mueller.

1   CHRISTOPHER MUELLER,

2        called as a witness by the Government,

3        having been duly sworn, testified as follows:

4            MS. DONALESKI:  May I inquire?

5            THE COURT:  You may.

6            MS. DONALESKI:  Thank you, your Honor.

7   DIRECT EXAMINATION

8   BY MS. DONALESKI:

9   Q.  Good afternoon.  Where do you work?

10  A.  The Drug Enforcement Administration.

11  Q.  What is your title?

12  A.  Special agent.

13  Q.  Where are you currently assigned?

14  A.  Bristol, Virginia.  Post of duty.  B-R-I-S-T-O-L.

15  Q.  What was your previous assignment?

16  A.  I was a assistant country attaché at the DEA office in

17  Manila, Philippines.

18  Q.  Between what years are were you the assistant country

19  attaché at the DEA office in the Manila, Philippines?

20  A.  2014 to 2017.

21  Q.  What are your duties and responsibilities as an assistant

22  country attaché?

23  A.  In foreign offices, ma'am, what we normally do is

24  unilateral or bilateral investigations assisting with

25  investigations from the states or with our counterparts.  We do

1    liaison with international counterparts and capacity building,

2    like training.  I also would run the office in the absence of

3    the attaché.

4    Q.  Directing your attention to January 12, 2017.  Did you

5    participate in the recovery of any evidence that day?

6    A.  Yes, ma'am.

7    Q.  What type of evidence did you recover?

8    A.  It was a Toyota Innova, like a minivan or a crossover.

9    Q.  And what understanding did you have of what that vehicle

10   was from?

11   A.  I understood that it had been utilized to move a body in

12   relation to a homicide that occurred in Philippines.

13   Q.  And what was the name of the victim?

14   A.  Catherine Lee.

15            MR. SCHNEIDER:  I'm sorry.  Catherine Lee?

16            MS. DONALESKI:  Yes.

17   Q.  And what was your understanding of who was providing the

18   van to you?

19   A.  It was my understanding that Paul LeRoux had provided us

20   the information that led us to the location of where the van

21   was parked.

22   Q.  So please describe what happened that day.

23   A.  I drove my counterparts with the DEA, two special agents to

24   a housing complex in Las Piñas.  We had been directed to that

25   location to meet with a man named Arthur Abong.  He's a

1    Filipino who had possession of this van.

2    Q.   And where is Las Piñas in relation to Manila?

3    A.   It's south of Manila, not very far.  Depending on the

4    traffic, but it's probably about 12 kilometers or so south of

5    Manila proper.

6    Q.   How did you get the contact information for Arthur Abong?

7    A.   It was provided by Paul LeRoux through Special Agent Eric

8    Stouch.

9    Q.   And please describe what happened when you got to that

10   housing complex in Las Piñas?

11   A.   Eric Stouch made a telephone call to Arthur Abong.  I was

12   present for that.  Arthur met us within minutes in front of the

13   housing complex.  We followed him back to a residence and

14   parked in the street was a silver Innova -- the silver Innova

15   van.

16            He provided us a key and paperwork for the van.  We

17   examined the van and then drove out of the housing complex.

18   Eric Stouch followed me in and my car up to a gas station where

19   we met members of the national bureau of investigation of the

20   Philippines.

21   Q.   You described that you were given a key and paperwork for

22   the van.  At that time did you or another agent you were with

23   take photographs of the van?

24   A.   Yes, Special Agent Steve Casey took photographs of that.

25            MS. DONALESKI:  Ms. Shields, could you please publish

1    for the witness only, what's for identification as Government

2    Exhibit 105-1 through 6.

3    Q.  Sir, I'll just ask you to review these photographs?

4    A.  It's the van.

5    Q.  Let's wait until we get to the end.

6           MS. DONALESKI:  Ms. shields, if can you scroll through

7    to 6.

8    Q.  Do you recognize these photographs?

9    A.  Yes, ma'am.

10   Q.  What do you recognize them to depict?

11   A.  The Innova van that I was referring to.

12   Q.  And does this depict the van you recovered on January 12,

13   2017?

14   A.  Yes, ma'am.

15          MS. DONALESKI:  The government offers Government

16   Exhibit 105-1 through 105-6.

17          THE COURT:  Any objection?

18          MR. SCHNEIDER:  No objection.

19          THE COURT:  They'll be admitted.

20          (Government Exhibits 105-1 through 105-6 received in

21   evidence)

22          MS. DONALESKI:  Ms. Shields, please publish for the

23   jury 105-1.

24   BY MS. DONALESKI:

25   Q.  Sir, please describe what this photograph shows?

1  A.  That's the silver Innova van parked on the street as I

2  described it earlier.

3       MS. DONALESKI:  Ms. Shields, please publish Government

4  Exhibit 105-2 and 105-3.

5  Q.  Please describe what this photograph depicts?

6  A.  That's the interior of the Innova van.  It appears that the

7  carpet is removed.

8  Q.  Does it appear as if the seats were removed as well?

9  A.  The center seat.  There's front seats and then a middle

10  row, then a back row seats.  The middle row seat is also

11  removed.

12       MS. DONALESKI:  Ms. Shields, please publish Government

13  Exhibit 105-4.

14  Q.  Please describe what this depicts.

15  A.  Again, that's where the center seat would be and it's

16  removed.  It's the interior of the Innova van.

17       MS. DONALESKI:  Ms. Shields, please publish 105-5.

18  Q.  Please describe what this photograph depicts.

19  A.  The interior of the Innova van looking from the driver's

20  seat back to the back showing that the carpet and the center

21  seats are removed.

22       MS. DONALESKI:  Finally, Ms. Shields, please publish

23  105-6.

24  Q.  What does this show?

25  A.  Those are registration stickers that would be applied to

1   the wind screen of the van.

2          MS. DONALESKI:  Thank you.  Ms. Shields you can take

3   that down.

4   Q.  Sir, you mentioned that the vehicle was driven to a gas

5   station.  What happened at that gas station?

6   A.  Yes, ma'am.  We met with a special agent from the National

7   Bureau of Investigation, Rizaldy Rivera, and he explained to us

8   that they had a current investigation and it was a piece of

9   evidence and he demanded that we turn to over to him.  So we

10  did.  We provided him the keys to the van and he drove it back

11  to the National Bureau of Investigation headquarters.

12  Q.  And what is the National Bureau of Investigation?

13  A.  It is a Philippines law enforcement authority similar to

14  our FBI.

15  Q.  And did you follow Inspector Rivera back to the FBI

16  headquarters?

17  A.  I didn't follow him, but I arrived there shortly after he

18  did, so I parked the car in the back in the secure area.

19  Q.  Was the last place you saw the van in the parking lot of

20  the FBI headquarters?

21  A.  Yes, ma'am.

22  Q.  Sir, are you familiar with a place called the Mayfield Park

23  Residences?

24  A.  Yes, ma'am.

25  Q.  Where is it located?

1    A.   That is in Pasig, which is in the Philippines.

2    Q.   Is that P-A-S-I-G?

3    A.   Yes.

4    Q.   Have you been there?

5    A.   Yes, ma'am.

6           MS. DONALESKI:   Ms. Shields, could you please publish

7    for the witness only what's marked for identification as

8    Government Exhibit 7.

9    Q.   Sir, do you recognize the area depicted on this map?

10   A.   Yes, ma'am.

11   Q.   And what do you recognize it to depict?

12   A.   It's a Google map that has a pin where the Mayfield Park

13   residence would be.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MS. DONALESKI:  The government offers Government

2    Exhibit 7.

3          THE COURT:  It's received.

4          (Government's Exhibit Seven received in evidence)

5          MS. DONALESKI:  Would Ms. Shields please publish

6    Government Exhibit 7 to the jury.

7    Q.  Sir, the red pin that says "Mayfield Park Residences", is

8    the location of Mayfield Park Residences in the Philippines?

9    A.  It appears accurate, yes, ma'am.

10         MS. DONALESKI:  Thank you.  You can take that down.

11   Q.  Sir, are you familiar with a place, a location Monte Carlo

12   Street El Monte Verde Thai Resolve?

13   A.  Yes, ma'am.

14   Q.  Have you been there?

15   A.  I have.

16   Q.  Have you driven between the location I just mentioned and

17   the Mayfield Park Residences?

18   A.  Yes, I have.

19   Q.  Approximately, how long did it take you to drive between

20   those two locations?

21   A.  It took about 20 minutes.

22         MS. DONALESKI:  No further questions.

23         THE COURT:  Any cross-examination?

24         MR. SCHNEIDER:  Yes.

25   CROSS-EXAMINATION

1   Q.   Good afternoon, sir.

2   A.   Afternoon.

3   Q.   How are you today?

4   A.   Doing well.

5   Q.   So January 12th of 2017, that's when you recovered the van,

6   first saw the van, right?

7   A.   Yes, sir.

8   Q.   Now, prior to that prior to January 12 sometime during the

9   week of January 4 there was some information from Paul LeRoux

10  to the other agents, correct?

11  A.   I don't know.

12  Q.   Well, during the week of January 4 didn't Agent Stouch and

13  Casey get information from Mr. LeRoux about the van?

14  A.   I don't know when they got information about the van, sir.

15  Q.   Did you prepare any reports in connection with your portion

16  of the investigation in this case?

17  A.   I did do some reports, yes.

18  Q.   OK.  And did you prepare a report regarding the recovery of

19  this van, what happened on the 12th and some days leading up to

20  the 12th?

21  A.   I actually don't recall writing a report regarding it.

22           MR. SCHNEIDER:  May I approach the witness?

23           THE COURT:  You may.

24           MR. SCHNEIDER:  3511-01.

25  Q.   Before I go ahead, in addition to preparing reports, did

1    you also have a chance to review any other agents' reports?

2    A.  Yes.

3    Q.  Just take a look at that and just read it to yourself, not

4    out loud, please.

5           (Pause)

6    Q.  OK.  You had a chance to look at that?

7    A.  Yes, sir.

8    Q.  Did you prepare that report?

9    A.  I did not prepare that report.

10   Q.  Did you review that report as part of the investigation?

11   A.  I did, yes, sir.

12   Q.  OK.  So I again, my question is are you aware that the week

13   of January 4 Agents Stouch and Casey received information from

14   Paul LeRoux about the van?

15           MS. DONALESKI:  Objection.

16           THE COURT:  Sustained.

17           MR. SCHNEIDER:  Your Honor, it's not being offered for

18   truth.  It's just for the way he did what he did and followed

19   up.

20           THE COURT:  I'll give you a little bit of leeway.

21           MR. SCHNEIDER:  Thank you.  Appreciate it.

22   Q.  The judge said you can answer that.

23   A.  I'm aware of reading the report and reviewing the report.

24           MS. DONALESKI:  Your Honor, could we just have a brief

25   side bar?

I44AAHUN5                    Mueller – Cross

1              THE COURT:  Sure.

2              (Continued on next page)

1        (side bar)

2        THE COURT:  My concern is that if he didn't know about

3    this, it doesn't go to his state of mind as to why he did what

4    he did.

5        MR. SCHNEIDER:  If he didn't know about it, fair

6    enough, but I don't know that he didn't know about it at the

7    time.  I don't know cause I believe he had conversations with

8    the other agents prior to him going to the van because he

9    himself wanted to go speak to -- prior to the recovery of the

10   van the day before.  So he obviously spoke to the agents to

11   give him that information.  So he would know, A, how to contact

12   this person and, B, how to meet this person because he knew

13   that he met the person before the other agents came and talked.

14   My hope not being offered for the truth of whether he did in

15   fact talk about the van, just explain why he did mention

16   certain things which led up to the recovery of the van between

17   January 4 and the 12th.  I know he took -- on the 9th, 11th and

18   the 12th.  So he did those things is important.

19       MS. DONALESKI:  The reason I asked for a side bar is

20   the way that Mr. Schneider is doing this is improper.  He is

21   trying to refresh the witness's recollection saying he did

22   review it.  But what he is asking is based on that report.  He

23   is not refreshing him properly because the witness just

24   answered the question, well, based on record, reading this

25   report it says this and I'm just making the objection.

I44AAHUN5                    Mueller – Cross

1            THE COURT:  Can you rephrase and go back in time?

2            MR. SCHNEIDER:  I can show him a picture of The New

3    York Times.  The fact that he prepared the report is

4    irrelevant.  Ms. Donaleski is wrong in terms of my ability to

5    refresh his recollection with anything.

6            MS. DONALESKI:  But you are not refreshing his

7    recollection.  You're --

8            MR. SCHNEIDER:  Don't tell me how to ask questions,

9    please.  I know how to ask questions.

10           THE COURT:  Is the question, Does it refresh his

11   recollection?  You can ask about it.

12           MR. SCHNEIDER:  Thank you.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2    BY MR. SCHNEIDER:

3    Q.  Before we get to that question, did you speak to the agents

4    yourself before the recovery of the van?

5    A.  Yes.

6    Q.  Did you also speak to a civilian named Arthur Abong,

7    A-B-O-N-G, prior to recovery of the van on the 12th?

8    A.  I did not, no, sir.

9    Q.  You didn't meet him on the 11th?

10   A.  No, sir.

11   Q.  You didn't meet him the day before Agent Stouch and Casey

12   showed up?

13   A.  No.

14   Q.  Do you know who did?

15   A.  I haven't the slightest idea.

16   Q.  Just look at that document if you would again.  See if

17   there's an entry regarding the 11the.  Does that refresh your

18   recollection?

19   A.  We went there on the 11th, sir, but he and called him but

20   he didn't appear at the gate because it was set up for, to meet

21   him on the 12th.

22   Q.  Well, I understand that but wasn't there a discussion?

23   A.  So there may have been but I wasn't present for it.

24   Q.  OK.  So somebody went to go meet Arthur Abong on the 11th.

25   You weren't present, so you don't know.  Maybe another agent

1    did?

2    A.  No, sir, that's not correct.

3    Q.  What's correct?

4    A.  On the 11th we had driven to the Mayfield Park Residences

5    and then we drove to the housing complex.  Special Agent Stouch

6    attempted to locate Mr. Abong, ended up speaking -- I believe

7    he spoke to him by phone on that day in my presence but he said

8    that he wasn't anywhere around to meet us, that they had

9    previously apparently arranged to meet on the 11th, so we went

10   the following day.

11   Q.  OK.  So fair enough.  So the conversation you had, either

12   you or Agent Stouch with Mr. Abong regarding meeting to pick up

13   the transferring of the van; is that right?

14   A.  Correct.

15   Q.  OK.  And prior to that, as far as you know it was Paul

16   LeRoux who had given the information to the agents, Agent

17   Stouch and/or Agent Casey prior to your being there on the

18   12th?

19   A.  Correct.  And they hadn't arrived in the country until the

20   9th.  So anything that happened before then I wasn't present

21   for.

22   Q.  So on the 9th is when as far as you know there was a very

23   specific address given by LeRoux to the agents.  They had a

24   specific address as to where the van would be?

25   A.  Again, I don't know what date those conversations took

1  place exactly.  But there was an address provided or at least a

2  housing complex and a telephone number provided to the agents

3  and that's why we went to the Portofino Housing Complex.

4  Q.  OK.  And the agents who got that, Agent Stouch and Casey

5  got that from Paul LeRoux prior to the arrival on the 12th?

6  A.  I'm certain that they must have, otherwise, I wouldn't have

7  brought them there.  There was a conversation with Paul LeRoux

8  during our drive as well but we were already en route to that

9  housing complex.

10  Q.  This is 2017?

11  A.  Yes.

12  Q.  OK.  Now, at some point though you and the other agents

13  meet Mr. Abong at the location where you were expected to,

14  right?

15  A.  Yes, on the 12th.

16  Q.  And that's when he Mr. Abong gave either you or Agent

17  Stouch a set of keys, right?

18  A.  Yes.

19  Q.  And he also -- and a key to the van, correct?

20  A.  Yes.

21  Q.  And a key -- in addition to the key he gave you some

22  documents, paperwork for that van?

23  A.  Yes.

24  Q.  And in fact, I think you even scanned the documents to get

25  some other registration information about it, right?

1    A.  I did.

2    Q.  Now, did you know who Mr. Abong was when you got the keys

3    and the documents from him?

4    A.  He was a caretaker for some property belonging to

5    Mr. LeRoux was my understanding.

6    Q.  All right.  As far as you know, Mr. Abong was working for

7    LeRoux doing legitimate work as far as you know?

8    A.  As far as I know, he was a caretaker.

9    Q.  Did either you or Agent Stouch or Casey question Mr. Abong

10   about the van?

11   A.  I didn't talk to Mr. Abong about the van or how he'd gotten

12   it.

13   Q.  OK.  Did you hear Agent Stouch or Agent Casey talk to

14   Mr. Abong about the van?

15   A.  I heard -- there was conversation but I don't recall the

16   content of it.  I wasn't maybe close enough to hear.  I didn't

17   pay particularly close attention to whatever the conversation

18   was.

19   Q.  But it's clear that Mr. Abong was not arrested, was he?

20   A.  No.

21   Q.  And he was not -- even though he had the keys to a van that

22   was supposedly used in a murder five years ago, he, Mr. Abong

23   wasn't arrested was he?

24   A.  No.

25   Q.  As far as you know, do you have any idea either directly

1    from Mr. Abong or from Agent Stouch how Mr. Abong got the van?

2          MS. DONALESKI:  Objection.

3          THE COURT:  Sustained.

4    Q.  Did you Mr. Abong tell you how he got the van?

5    A.  No, sir.

6    Q.  Did you ask him?

7    A.  I didn't, no, sir.

8    Q.  Did you hear Agent Stouch ask him?

9    A.  I did not.

10         MS. DONALESKI:  Objection.

11         THE COURT:  He's already answered.  Move on.

12   Q.  Did you ever ask Mr. Abong where he got the keys to the

13   van?

14   A.  I did not.

15   Q.  Or whether you got the documents to the van?

16   A.  I did not.

17   Q.  Either you or Agent Stouch started right up, the van

18   started right up.  You put the keys in and tested it?

19   A.  Yes, it was driven.

20   Q.  From where it was down ultimately to the Philippines

21   police, right?

22   A.  The NBI, yes, sir.

23   Q.  You did ever ask Mr. Abong where the van had been for the

24   last five years?

25   A.  I didn't, sir.

1    Q.  Did you hear Agent Stouch?

2    A.  I don't recall the conversation he had.

3    Q.  Did Mr. Abong tell you whether he was asked or not where

4    the van had been for the last five years?

5    A.  No, sir.

6    Q.  Now, when you had noticed that the rear passenger seats

7    were removed, did you ask Mr. Abong why they were removed?

8    A.  I didn't have any particular conversation with Mr. Abong.

9    Q.  Did you hear Agent Stouch ask Mr. Abong why the rear seat

10   was moved?

11   A.  No, sir.

12   Q.  Now, at some point the van was driven and given over to

13   Detective Rivera, correct?

14   A.  Yes.

15   Q.  Now, at that point, at any point were any civilian

16   witnesses in your presence ever brought to look at the van to

17   see if they recognized the van?

18   A.  Not in my presence, no, sir.

19   Q.  Do you know if the van was ever driven in your presence to

20   a witnesses to see if those witnesses could identify the van as

21   being connected to this case?

22   A.  No, I have no idea.

23   Q.  Do you know whether the van had -- withdrawn.

24        Do you know of any experts, either DEA or Philippine

25   experts were brought to test the van for blood?

1    A.   To my knowledge there were none.

2    Q.   So as far as you know no expert brought to test for blood

3    or DEA or hair or fingerprints, as far as you know?

4    A.   Not as far as I know.

5              MR. SCHNEIDER:  I have nothing else.  Thank you.

6              MR. RAY:  Nothing, your Honor.

7              MS. DONALESKI:  Brief redirect, your Honor?

8              THE COURT:  Yes.

9    REDIRECT EXAMINATION

10   BY MS. DONALESKI:

11   Q.   Sir, did you take any steps to make it possible for experts

12   to test the van?

13   A.   I took many steps to make an attempt to have an FBI team

14   either somehow examine the van, whether it be in the

15   Phillipines or in the United States.

16   Q.   Why were you able to do that?

17   A.   The National Bureau of Investigation wouldn't cooperate

18   with those efforts.

19             MS. DONALESKI:  No further questions, your Honor.

20             MR. SCHNEIDER:  If I may?

21   RECROSS EXAMINATION

22   BY MR. SCHNEIDER:

23   Q.   Well, did you as the assistant country attache try to bring

24   the power of your office to talk to somebody from the NBI to

25   say these tests need to be done?

1    A.   Yes, sir.  We -- letters were written to the director of

2    the National Bureau of Investigation.  And we had meetings with

3    him to attempt to make that happen and it wouldn't happen.

4    Q.   Did they say why it didn't wouldn't happen?  "They" meaning

5    the Philippines police?

6    A.   The National Bureau of Investigation would not allow it to

7    happen.

8    Q.   Just so I'm clear, this is a murder in the Philippines of a

9    Philippine citizen and the Philippine police didn't want any

10   scientific tests done on this van; is that correct?

11   A.   They would not allow us to provide a team to conduct those

12   tests even for them.

13   Q.   But they, the Philippines police knew that it was a murder

14   investigation, correct?

15   A.   They did.

16   Q.   They knew it was a Philippine woman who was killed a number

17   of years before, right?

18   A.   Yes.

19   Q.   They knew she was killed in the Philippines, correct?

20   A.   Yes.

21   Q.   And the Philippine police wouldn't let you conduct tests or

22   they wouldn't conduct tests, correct?

23   A.   They wouldn't allow us to provide a team to conduct tests

24   for us or for them.

25              MR. SCHNEIDER:  Thank you.  Nothing further.

1            MS. DONALESKI:  Nothing further.

2            THE COURT:  Should we take a quick break?

3            MR. BOVE:  There is one stipulation we'd like to read

4     before the next witness, judge.

5            THE COURT:  Go ahead.

6            You can step down.  Thank you.

7            (Witness excused).

8            MR. BOVE:  Your Honor, the stipulation has been marked

9     Government Exhibit 100 and because it's executed by the parties

10    and there's and agreement that is the stipulation itself could

11    come into evidence, I'll ask permission to publish it so the

12    jury can see it.

13           THE COURT:  Sure.

14           MR. BOVE:  This is a stipulation between the parties,

15    your Honor, that relates to series of e-mail accounts and

16    Facebook accounts.  So if we could start with paragraph one.

17           Paragraph one relates to the Government Exhibits from

18    an e-mail account AGSamia@AOL.com.

19           Turning onto page two, paragraph two relates to

20    exhibits from an e-mail account Samia2130@AOL.com.

21           Paragraph three relates to exhibits from an e-mail

22    account Stillwell20@GMail.com.

23           Your Honor, the stipulation continues to set forth a

24    number of exhibits all from various e-mail and Facebook

25    accounts.

1          Ms. Shields, if we could take a look at page four.

2          And this is the operative paragraph, judge, where the

3     parties have agreed that these are all business records from

4     the Internet service providers that maintain the accounts at

5     issue.  And at this time with the exception of the two exhibits

6     that Mr. Ray raised an objection to which are 412-5 and 412-6,

7     I am going to offer Government Exhibit 1000, Government

8     Exhibits 400-1 through 74, 401-1 through 20, 402-1 through 13,

9     403-1 through 13, 404-1, 404-2, 405-1, 405-2, 406-1 through 22,

10    407-1 through 6, 408-1 through 8, 409-1, 410-1, 411-1, 4012-1

11    through 9 with the exception of two that I've referenced, 413-1

12    through to 10 and 415-1.

13          THE COURT:  All right.  Those will be admitted.

14          (Government's Exhibits 1000, 400-1 - 74, 401-1 - 20,

15    402-1 - 13, 403-1 -13, 404-1 received in evidence)

16          (Government's Exhibits 404-2, 405-1, 4-5-2, 406-1 -

17    22, 407-1 -6, 408-1 - 8, 409-1 received in evidence)

18          (Government's Exhibits 410-1, 411-1, 412-1, 412-3 - 9,

19    413-1 - 10 and 415-1 received in evidence)

20          MR. BOVE:  Thank you, your Honor.

21          With that, the government calls Paul LeRoux.

22          THE COURT:  We are going to ask you to step out just

23    for a minute.  We are going to take a very quick break and then

24    we'll bring you back shortly.

25          Thank you.

I44AAHUN5                    LeRoux – Direct

1          (Jury not present)

2          THE COURT:  Everyone can be seated.

3     PAUL CALDER LEROUX,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6     DIRECT EXAMINATION

7     BY MR. BOVE:

8     Q.  Mr. LeRoux, how old are you?

9     A.  I'm 45.

10    Q.  Where are you from?

11    A.  I was born in Zimbabwe.  I'm from South Africa.

12    Q.  In 2012 where did you live?

13    A.  I was living in the Philippines.

14    Q.  Do you know a man named 'Joseph Hunter'?

15    A.  I do, yes.

16    Q.  Please describe your relationship with Joseph Hunter?

17    A.  Joseph Hunter worked for me for many years as a mercenary.

18    He was involved in organizing murders for me and other jobs.

19    Q.  During what period of time approximately did Joseph Hunter

20    work for you?

21    A.  Approximately, from 2008 through to 2013.

22    Q.  Have you met Joseph Hunter in person?

23    A.  Yes.

24    Q.  Do you see Joseph Hunter in the courtroom today?

25    A.  Yes.

1   Q.   Could you please point him out based on an article of

2   clothing that he is wearing?

3   A.   A white shirt, sitting in the front row over there.

4             MR. BOVE:   Indicating Mr. Hunter, your Honor.

5             THE COURT:   The record will so reflect.

6   Q.   Mr. LeRoux, do you know of a man named 'Adam Samia'?

7   A.   Yes.

8   Q.   How did you learn that name?

9   A.   Approximately, 2018 I received an e-mail from a man named

10  'Dave Smith'.   In that e-mail was Adam Samia's passport copy

11  and his name.

12  Q.   Did Adam Samia work for you?

13  A.   Yes.

14  Q.   What type of work did Adam Samia do for you?

15  A.   Adam Samia worked for me as mercenary on various jobs.

16  Q.   During what period of time?

17  A.   From approximately 2008 through 2012.

18  Q.   Have you met Adam Samia in person?

19  A.   No.

20  Q.   Do you know of a woman named 'Catherine Lee'?

21  A.   Yes, I do.

22  Q.   Who was Catherine Lee?

23  A.   Catherine Lee was a real estate broker in the Philippines.

24  Q.   Sir, where is Catherine Lee today?

25  A.   I had her killed.

1    Q.  Why?

2    A.  I believed that she was involved in stealing money from me.

3    Q.  How do you know that Catherine Lee was murdered?

4    A.  I was told she was killed by Joseph Hunter.  Sorry.  What I

5    mean is I was told by Joseph Hunter that she had been killed.

6    Q.  Did Hunter tell you who participated in the murder?

7    A.  Yes.  Joseph Hunter told me that the kill team consisting

8    of Adam Samia and his partner were the ones that killed

9    Catherine Lee.

10   Q.  Where do you live today?

11   A.  I'm incarcerated.

12   Q.  Why?

13   A.  I was arrested in 2012.

14   Q.  Where were you arrested?

15   A.  Liberia.

16   Q.  What continent is that on?

17   A.  It's Africa.

18   Q.  What happened after you were arrested in Liberia?

19   A.  I started to cooperate.

20   Q.  And as you sit here today have you pleaded guilty to

21   federal crimes?

22   A.  Yes, I have.

23   Q.  What crimes have you pleaded guilty to?

24   A.  I pled guilty to the following felonies:  A drug

25   conspiracy, money laundering, wire fraud, a food and drug

1  violation, hacking, aiding and abetting a felon and a sanctions

2  violation.

3  Q.  Do you have a plea agreement, sir?

4  A.  I do, yes.

5  Q.  Generally speaking, what kind of plea agreement do you

6  have?

7  A.  It's a cooperation deal.

8  Q.  Have you been sentenced yet?

9  A.  I have not, no.

10  Q.  As you sit here today what is the most amount of jail time

11  that you could be sentenced to?

12  A.  Life.

13  Q.  You mentioned a moment ago that you pleaded guilty to a

14  crime involving sanctions; is that right?

15  A.  That's true.

16  Q.  Sanctions against what country?

17  A.  Iran.

18  Q.  What did that offense involve?

19  A.  The provision of explosives and missile technology to Iran.

20  Q.  Did you also seek to purchase weapons from island?

21  A.  Yes, I did.

22  Q.  What kinds of weapons?

23  A.  A variety of weapons including heavy machine guns, RPGs,

24  explosives, a variety of weapons.

25  Q.  Have you engaged in other weapons trafficking activities?

I44AAHUN5                        LeRoux - Direct

1    A.  Yes, I have.

2    Q.  Please describe some of them?

3    A.  I trafficked two guns to South Africa and I trafficked guns

4    from Indonesia to the Philippines and I provided money for the

5    purchase of weapons and/or for importing weapons in Somalia.

6    Q.  A moment ago you mentioned a drug trafficking crime that

7    you pleaded guilty to?

8    A.  Yes.

9    Q.  What kind of drug?

10   A.  Methamphetamines.

11   Q.  What did that crime involve?

12   A.  Conspiring to import produce and import methamphetamines

13   into the United States.

14   Q.  Prior to your arrests, were you also involved in the

15   distribution of methamphetamines?

16   A.  Yes, I was.

17   Q.  Where was that methamphetamine produced?

18   A.  That methamphetamine was produced in North Korea.

19   Q.  You also said that you pleaded guilty to a food and drug

20   violation?

21   A.  Yes, I did.

22   Q.  What do you mean by that?

23   A.  What I mean by that is I set up an online pharmacy which

24   involved supplying drugs illegally to American customers.

25   Q.  During what period of time did that website operate.

I44AAHUN5                          LeRoux - Direct

1   A.  That website operated from 2004 through to 2012.

2   Q.  Up until you were arrested?

3   A.  Yes.

4   Q.  Was there a customer service line related to the online

5   pharmacy?

6   A.  Yes, there was.

7   Q.  How was that customer service line administered?

8   A.  That customer service line was administered by the call

9   center staff, in particular a staff member named Nester.

10  Q.  What's a call center?

11  A.  A call center is basically an office where, consisting of a

12  number of staff and computers and telephone equipment and set

13  up to receive calls.

14  Q.  Approximately, how many people worked on the staff of all

15  of your call centers?

16  A.  Approximately, between one thousand to two thousand.

17  Q.  Were those paid employees?

18  A.  Yes, they were.

19  Q.  Apart from the staff at the call centers, did have you

20  other employees working on the website?

21  A.  I did, yes.

22  Q.  What other types of employees did you have that were

23  focused on the website?

24  A.  The other types of employees were programmers, doctors,

25  pharmacies and so on.

1    Q.  You said that this pharmacy operated from about 2004 to

2    2012?

3    A.  Yes.

4    Q.  Approximately, how much revenue did the pharmacy generate?

5    A.  Approximately, 30 million U.S. dollars.

6    Q.  All criminal proceeds?

7    A.  All from the proceeds of crime, yes.

8    Q.  Did you take any steps to launder that money?

9    A.  Yes.

10   Q.  What were some of the things that you did to launder money?

11   A.  I took all the crime proceeds from the criminal online

12   pharmacy operation and I set up front companies illegally in

13   Hong Kong using various fake identities and transferred the

14   money to Hong Kong.

15   Q.  Did you purchase any assets to launder funds?

16   A.  Yes, I did.

17   Q.  What types of assets?

18   A.  Gold, diamonds and property.

19   Q.  Where did you focus on buying gold for money laundering

20   purpose?

21   A.  Principally, in Africa.

22          MR. BOVE:  May I approach, your Honor?

23          THE COURT:  You may.

24   Q.  Showing you what's been marked for identification as

25   Government Exhibit 8.  Do you recognize this?

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  It's a map of Africa.

4            MR. BOVE:  Your Honor, the government offers Exhibit

5    8.

6            THE COURT:  Any objection?

7            (No)

8            THE COURT:  It'll be admitted.

9            (Government's Exhibit 8 received in evidence)

10           MR. BOVE:  Put that up for the jury.  Thank you.

11   Q.  Mr. LeRoux, how did the gold related money laundering work?

12   A.  I sent mercenaries, Echelon mercenaries to Africa to

13   purchase gold using the funds that had been laundered to Hong

14   Kong and principally cash.

15   Q.  You just used the term "Echelon mercenaries"; is that

16   right?

17   A.  Yes.

18   Q.  What do you mean by that?

19   A.  Echelon is the front company that was set up and operated

20   by Dave Smit.  It's a front company which hired a number of

21   Echelon mercenaries.

22   Q.  Now, were your mercenaries assigned to actually purchase

23   the gold or were there experts involved?

24   A.  There were experts involved.

25   Q.  Describe how that worked.

1  A.  On every project the experts were sent to actually assess

2  the gold for purchase and to buy the gold.  The Echelon

3  mercenaries were there principally to ensure that if any of

4  them stepped out of line there would be beatings, shootings

5  intimidation and if necessary, killings.

6  Q.  You have used the term "mercenary" a few times already

7  today.  What does that word mean to you?

8  A.  The word "mercenary" means a trained person with military

9  experience with an aggressive posture who will beat, intimidate

10 threaten, shoot and/or kill anyone on instruction.

11 Q.  Why did you feel it was necessary to send mercenaries to

12 Africa in connection with the gold purchases?

13 A.  The reason I felt it was necessary is because there was a

14 lot of theft and a lot of potential scams, I wanted to make

15 sure that any time there was any problem the mercenary would

16 take it upon himself or under instruction to intimidate,

17 threaten, shoot and if necessary, kill whoever stepped out of

18 line.

19 Q.  Now I'd like to focus for a minute on the year 2008.  I

20 believe you said a moment ago that the mercenaries you've used

21 in that timeframe worked for a front company called "Echelon"?

22 A.  Yes.

23 Q.  Who ran Echelon?

24 A.  In 2008 it was Dave Smit.

25 Q.  Did you meet Dave Smit in person?

1    A.  Yes, I did.

2    Q.  When approximately?

3    A.  Approximately, 2005.

4    Q.  How did you meet him?

5    A.  I met Dave Smit in approximately 2005 at a coffee shop.

6    Q.  During that initial meeting what, if anything, did Smit say

7    to you about the types of mercenaries he could make available?

8    A.  Dave Smit said he had a group of mercenaries available who

9    enjoyed killing and torturing and beating and those mercenaries

10   were available for me for any projects I had in mind.

11   Q.  Over what period of time did Dave Smit work for you?

12   A.  He worked for me approximately from 2005 through to 2010.

13   Q.  What happened in 2010, sir?

14   A.  I had Dave Smit killed.

15   Q.  Did you participate in that murder?

16   A.  Yes, I did.

17   Q.  Why did you have Dave Smit killed in 2010?

18   A.  I believed that Dave Smit was part of a plot to have me

19   killed and I also believed that he was stealing money from me.

20   Q.  Now I would like to focus on the time period between 2008

21   and approximately 2010 or 2011.  Who were some of the Echelon

22   mercenaries that worked for you during those years?

23   A.  Adam Samia, Joseph Hunter, Lachlan McConnell, Leonard

24   Jones, John O'Donahue, Timothy Vamvakias.

25   Q.  Are you familiar with a man named Chris Demeer?

1    A.  Yes, I am.

2    Q.  Who was Chris Demeer?

3    A.  Chris Demeer was also at the time a Echelon mercenary.

4    Q.  When you say at the time, was that between approximately

5    2008 and 2011?

6    A.  Yes.

7    Q.  Who introduced you to Chris Demeer?

8    A.  Dave Smit.

9    Q.  When was that?

10   A.  Approximately, 2005.

11   Q.  What, if anything, did Smit tell you about Demeer's

12   background?

13   A.  Smit told me that Chris Demeer was former French Foreign

14   Legion.

15   Q.  Do you know what the French Foreign Legion is?

16   A.  Yes, I do.

17   Q.  What is it?

18   A.  It's the military service of the French government, one of

19   their special forces teams.

20          MR. BOVE:  Ms. Shields, could you please publish

21   Government Exhibit 403-1 which is in evidence.

22          (Pause)

23          Let's zoom in on the bottom e-mail dated May 16 of

24   2008 at 5:24 a.m.

25          (Pause)

I44AAHUN5                      LeRoux - Direct

1    Q.  This is an e-mail from Johan Smit; do you see that?

2    A.  Yes, I do.

3            MR. BOVE:  Could you please highlight the from line.

4    Q.  Who is the user of this e-mail?

5    A.  That's me.

6            MR. BOVE:  And the e-mail to Dave_Smith@0917 at

7    Yahoo.com.

8            Ms. Shields, please highlight that.

9    Q.  Who was the user of that account in May of 2008?

10   A.  Dave Smith.

11   Q.  Now the subject of this e-mail is landing rights; do you

12   see that?

13   A.  Yes, I do.

14           MR. BOVE:  Ms. Shields, if we could put this part of

15   the e-mail on the left and put page two up on the right please.

16   Q.  And I'll ask you to take a look once it's on the screen,

17   Mr. LeRoux.

18           (Pause)

19   Q.  Generally speaking, what were you referring to in this

20   e-mail?

21   A.  Generally speaking, it refers to a smuggling operation

22   involving a plane.

23   Q.  What types things were you seeking to smuggle in 2008?

24   A.  Cash, chemicals, drugs and gold.

25   Q.  What kind of planes were you using?

1    A.   Small private jet.

2    Q.   And where were you seeking to have the planes land?

3    A.   In the Philippines.

4              MR. BOVE:  Ms. shields, now on the main screen if you

5    could zoom-in on the top e-mail in this exhibit.

6              (Pause)

7    Q.   So this is an e-mail from Dave Smith to you, dated May 18th

8    of 2008, correct?

9    A.   Yes.

10   Q.   And the e-mail begins:  Hi Paul, the following is salary.

11             MR. BOVE:  Could you please highlight that.

12             (Pause)

13   Q.   Do you see that?

14   A.   Yes, I do.

15   Q.   What is your understanding of what Dave Smith meant by

16   "salary"?

17   A.   He is referring -- and I understood he is referring here to

18   the salaries for the Echelon mercenaries.

19   Q.   Between about 2008 to 2009 what was the typical salary that

20   you paid to these mercenaries?

21   A.   Approximately, five thousand U.S. dollars.

22   Q.   Did that amount change over time?

23   A.   Yes, it did.

24   Q.   When you said approximately five thousand U.S. dollars, is

25   that a monthly salary?

I44AAHUN5                    LeRoux - Direct

1   A.  Yes, it was.

2   Q.  Did the mercenaries incur expenses?

3   A.  Yes, they did.

4   Q.  For what types of things?

5   A.  Travel expenses, living expenses, fuel and so on.

6   Q.  Did you pay their expenses?

7   A.  Yes, I did.

8   Q.  Now, other than salary and expenses, did you make other

9   payments to the mercenaries?

10  A.  Yes, I did.

11  Q.  How did you refer to these other payments?

12  A.  The other payments were referred to as bonus jobs.

13  Q.  What types of things did you pay a bonus for to the

14  mercenaries?

15  A.  Acts of killing and any other acts of violence.

16  Q.  What was the bonus that you paid for a murder to the

17  mercenaries?

18  A.  Twenty-five thousand U.S. dollars.

19  Q.  I'd like to go back to the e-mail.  It's on the screen,

20  Government Exhibit 403-1.  There's a reference to Lachlan next

21  line; do you see that?

22  A.  Yes, I do.

23  Q.  Who did you understand Smith to be referring to there?

24  A.  I understand he meant Lachlan McConnell.

25  Q.  That's somebody you mentioned a moment ago, correct?

1    A.  Yes.

2    Q.  One of the Echelon mercenaries?

3    A.  Yes.

4    Q.  What kind of work was Lachlan McConnell doing for you in

5    2008?

6    A.  Lachlan McConnell was part of the Echelon team associated

7    with gold purchases in Africa providing the necessary

8    mercenaries in case any act of violence was needed.

9    Q.  The line below the reference to Lachlan there's a reference

10   to --

11              (Pause)

12   Q.  Do you see that, Mr. LeRoux?

13   A.  Yes, I do.

14   Q.  Who did you understand Dave Smith to be referring to there?

15   A.  I understood he's referring to Bruce Jones.

16   Q.  Who is Bruce Jones?

17   A.  Bruce Jones was one of the boat captains.

18   Q.  So you had more than one?

19   A.  Yes, I did.

20   Q.  Why?

21   A.  There were multiple smuggling operations ongoing.

22   Q.  Did you have more than one boat?

23   A.  Yes, I did.

24   Q.  What were the names of some of the boats?

25   A.  One of the boats was called Moumantai.

I44AAHUN5                          LeRoux - Direct

1    Q.  Did you have a boat called the Ufuk.

2    A.  Yes.

3    Q.  Could you spell that please?

4    A.  U-F-U-K.

5           MR. BOVE:  Ms. Shields, could you please highlight the

6    line that reads "Ticket to Maldives".

7    Q.  That line reads Ticket to Maldives is 1400 for whomever, do

8    you see that?

9    A.  Yes, I do.

10          MR. BOVE:  Ms. Shields, if you could move this exhibit

11   over to the left on the right bringing up Government Exhibit

12   One which is the map.

13          (Pause)

14          If you could zoom-in on the --

15   Q.  Where relative to Indonesia are the Maldives?

16   A.  The Maldives are off the southwest Indian coast.

17   Q.  Why were you communicating with Smith about the Maldives in

18   2008?

19   A.  The Maldives was a designation where the Moumantai yacht

20   was supposed to stop for refueling on a smuggling operation.

21   Q.  Smuggling what?

22   A.  Cash, chemicals, drugs.

23          MR. BOVE:  Now, Ms. Shields, if you could keep 403-1

24   where it is and please highlight the reference to PNG.

25          (Pause)

1    Q.  Mr. LeRoux, what did you understand Smith to be referring

2    to when you wrote PNG?

3    A.  I understand he meant Papau New Guinea.

4              MR. BOVE:  If you could bring up Government Exhibit

5    two in evidence.

6              (Pause)

7              Could you please put a circle around Papau New Guinea.

8              (Pause)

9    Q.  Mr. LeRoux, what were some of the things that you were

10   doing in Papau New Guinea in 2008?

11   A.  Purchasing gold and also investigating, obtaining land for

12   palm oil plantations.

13             MR. BOVE:  Ms. Shields, in the window on the left

14   could you please bring up Government Exhibit 227 which is a

15   passport seized from Adam Samia's house in July of 2015 and

16   let's start by zooming-in on the header in the e-mail.  And now

17   if you could please zoom-in on the box and see if you could

18   highlight the name 'Donahue' please.

19             (Pause)

20   Q.  Mr. LeRoux, did you know a man named John O'Donahue?

21   A.  Yes.

22   Q.  Who was John O'Donahue?

23   A.  John O'Donahue was one of the Echelon mercenaries.

24             MR. BOVE:  Ms. Shields, if you could turn to Exhibit

25   Two of Government Exhibit 227 please and please zoom-in on the

1    top back.

2    Q.  Mr. LeRoux, do you see the reference of Porta Morseby?

3    A.  Yes, I do.

4    Q.  Do you know where that is?

5    A.  Yes, sir, I do.

6    Q.  Where is Porta Morseby?

7    A.  Papau New Guinea.

8             MR. BOVE:  Ms. Shields, in the window if you could

9    take a look at Government Exhibit 247 and let's start at page

10   two.

11   Q.  Now if you could take a look at page eight please.

12            MR. BOVE:  And if you rotate that and zoom-in on page

13   eight in the passport.

14            (Pause)

15   Q.  Mr. LeRoux, between 2008 and 2009, did you encounter any

16   issues with your operations in Papau New Guinea?

17   A.  Yes, I did.

18   Q.  What happened?

19   A.  Approximately, 50,000 U.S. dollars went missing.

20   Q.  So let's take a look at the e-mail on the right.  The

21   highlighted text reads Paul PNG will let you know -- do you see

22   that?

23   A.  Yes, do.

24   Q.  What did you understand Smith to be referring to there?

25   A.  I understood he was referring to the act of violence I

1    discussed with him and the investigation I discussed with him

2    related to the thefts in Papau New Guinea.

3    Q.  Did Smith make any recommendations based on the

4    investigation in Papau New Guinea?

5    A.  Yes, he did.

6    Q.  What did he recommend happened?

7    A.  He recommended that a team he sent there to recover the

8    money using all necessary acts of violence.

9    Q.  Did you follow that recommendation in Papau New Guinea?

10   A.  I did not.

11   Q.  Why not?

12   A.  I concluded that the cost of sending a team there including

13   smuggling the necessary weapon for the necessary act of

14   violence would be too expensive.

15   Q.  Now, if I could direct you back to the right side of the

16   screen?

17          MR. BOVE:  Ms. shields, take the highlighting of but

18   highlight the line that shows "Tickets to Ghana".

19   Q.  Do you see that, Mr. LeRoux?

20   A.  Yes.

21   Q.  What, if anything, activities did you have in Ghana during

22   this time period?

23   A.  Purchasing gold.

24          MR. BOVE:  Now let's take a look at 400-5 and zoom-in

25   on the bottom of page 1 with the header please.

1           (Pause)

2    Q.  So this is an e-mail from Dave Smith to Adam Samia.  It

3    reads:

4           Hey there Adam, I have a job for you.  It is an easy

5    gig in Africa if you want.  It pays 7K a month but once it gets

6    up and running I will pay 10-K.  So if you are interested let

7    me know ASAP.

8           MR. BOVE:  Could you now zoom-in on the top of this

9    exhibit.

10          (Pause)

11   Q.  This is a message from AGSamia@AOL.com to Dave Smith and it

12   reads:

13          Yeah, definitely interested.  My number is

14   (508)579-9202.

15          MR. BOVE:  Now, Ms. Shields, if you move that to the

16   left and on the right side of the screen bring up 247.

17          (Pause)

18          And go to page five of 247 please.  I'll ask that you

19   zoom-in onto the top right quadrant of page 12.

20   Q.  This is a passport entry to Hong Kong dated June 4, 2008.

21   Mr. LeRoux, were you doing anything in Hong Kong in 2008?

22   A.  Yes, I was.

23   Q.  What were some of your activities in Hong Kong?

24   A.  Principally laundering money.

25   Q.  Do you know a man named Edward Fontondra?

1    A.  Yes, I do.

2    Q.  Did you work with him in Hong Kong?

3    A.  Yes, I did.

4    Q.  What was your role?

5    A.  Fontondra was used as a director of several of the money

6    laundering front companies in Hong Kong.

7            MR. BOVE:  Ms. Shields, in the main window could we

8    take a look at 403-3 please.

9            (Pause)

10   Q.  Mr. LeRoux, what is this?

11   A.  This is an e-mail from Dave Smith dated June 14, 2008, to

12   me.

13   Q.  What is your understanding why it says 'South African'?

14   A.  I understand it said 'South African' because I am a South

15   African and that's an alias that Mr. Smith typically used for

16   me.

17           MR. BOVE:  Ms. Shields, could you please highlight the

18   'attachments' field.

19   Q.  What's indicated here, Mr. LeRoux?

20   A.  The attachments field contains three files named Adam

21   Samia.JPG, Joseph Hunter.JPG and Lachlan McConnell.JPG.

22           MR. BOVE:  Ms. Shields, could you please bring up page

23   two of this exhibit on the left of the screen and page four on

24   the right side.  Zoom-in on the main pages of the passport.

25           Now we'll take a look at page three of this exhibit.
             (Continued on next page)

1   Q.  Is this Lachlan McConnell?

2   A.  Yes, it is.

3        MR. BOVE:  Thank you.  You can take that down and

4   let's take a look at 403-4, please.

5   Q.  What is this, Mr. LeRoux?

6   A.  This is an email from Dave Smith dated June 16, 2008, to

7   me.

8   Q.  The body of the email reads, "Where is Tim's ID?"

9        Do you see that?

10  A.  Yes, I see it.

11  Q.  What's indicated in the attachments field?

12  A.  Passport-timvamvakias.pdf.

13       MR. BOVE:  Ms. Shields, can you please bring up page

14  2.  Thank you.  Now, can you please publish 403-2.  If you can

15  zoom in on the bottom email, please.

16  Q.  Mr. LeRoux, what is this?

17  A.  That is an email from me to Dave Smith dated June 10, 2008.

18  Q.  And what's indicated in the subject of the email?

19  A.  Ghana.

20       MR. BOVE:  Ms. Shields, if you can move this over to

21  the left and take a look at the map on the right.

22  Q.  Mr. LeRoux, where is Ghana?

23  A.  Ghana is located on the left side of the map in West

24  Africa, just near the curve of West Africa.

25       MR. BOVE:  Ms. Shields, if you can circle that,

1    please.

2    Q.  What were you trying to accomplish in Ghana?

3    A.  Gold purchases.

4    Q.  Now, folks on the email in the left side of the screen, the

5    second paragraph starts about Ghana, "Steve's brother Andrew

6    and I -- Andrew and one more guy will go to Ghana.  I suggest

7    you put Andrew, the other guy, and Lachlan on the account."

8            Do you see that?

9    A.  I see it.

10   Q.  Who were you referring to when you wrote "Steve"?

11   A.  I was referring to the gold purchasing expert, Steve Hahn.

12   Q.  Who were you referring to when you wrote Andrew?

13   A.  I was referring to the brother of Steve Hahn, a second gold

14   purchasing export -- expert.

15   Q.  Where did you meet Steven and Andrew Hope Hahn?

16   A.  I met them in the Philippines.

17   Q.  When, approximately?

18   A.  Approximately 2008, 2009.

19   Q.  Who introduced you?

20   A.  They were introduced to me by my cousin, Matthew Smith.

21           MR. BOVE:  Now, focusing back on the left side of the

22   screen.  In the final paragraph there's a reference to DRC.

23   Ms. Shields, can you highlight that, please.

24   Q.  Do you see that, Mr. LeRoux?

25   A.  I see it.

I44BHUN6                         LeRoux - Direct

1    Q.  What did you mean by "DRC"?

2    A.  Democratic Republic of Congo.

3    Q.  And directing your attention to the right side of the

4    screen.  Do you see the Democratic Republic of Congo on the

5    map?

6    A.  Yes, I do.

7    Q.  Where is it?

8    A.  It's located in Central Africa in the middle of the map and

9    it has the initials DRC.

10          MR. BOVE:  Could you circle DRC, please, Ms. Shields.

11   Q.  Mr. LeRoux, are you familiar with a company called Southern

12   Ace Limited?

13   A.  I am, yes.

14   Q.  What was Southern Ace Limited?

15   A.  Southern Ace Limited was one of the money laundering front

16   companies set up in Hong Kong to receive the illegal online

17   pharmacy funds.

18   Q.  That's a company you set up?

19   A.  Yes, it is.

20   Q.  What, if any, activities did Southern Ace Limited have in

21   the DRC?

22   A.  Southern Ace Limited was the front company that was used in

23   connection with purchasing the gold.

24   Q.  Is there a second country in Africa sometimes referred to

25   as "the Congo"?

1   A.  Yes, there it is.

2   Q.  What's the formal name of that country?

3   A.  Republic of Congo.

4   Q.  Where is the Republic of Congo on this map?

5   A.  Republic of Congo is to the left side of the DRC, also

6   roughly in the middle of the map.

7   Q.  Is the country name labeled on this map?

8   A.  It is not labeled on this map.

9           MR. BOVE:  Ms. Shields, can you circle the approximate

10  area of the Republic of the Congo.

11  Q.  What were you trying to accomplish in these two Congo

12  countries in 2008?

13  A.  I was interested in purchasing gold and also in obtaining

14  timber concessions.

15  Q.  Why timber concessions?

16  A.  Timber concessions are basically pieces of land with timber

17  with -- with trees growing on the land and essentially we cut

18  down the trees and sell the trees.

19          MR. BOVE:  Ms. Shields, if we can take a look on the

20  right side of the screen at Government Exhibit 247, please, and

21  go to page 2.  Now take a look at page 7 of the exhibit and if

22  you can zoom in on page 17 of the passport and highlight

23  "Republique Democratique du Congo."

24          If you can please turn to page 8 of this exhibit and

25  zoom in on page 19 of the passport.  Now, on the left side of

1    the screen, let's take a look at the top email.  If we could

2    please pull up on the left side of the screen, the top of the

3    email on Government Exhibit 403-2.

4    Q.  What is this, Mr. LeRoux?

5    A.  That is an email from Dave Smith dated June 11, 2008, to

6    me.

7    Q.  The third sentence of this email reads "Also, I am sending

8    Tim to Ghana to pick up the goods and put it in a safe house

9    that no one knows about."

10            Do you see that?

11   A.  Yes, I do.

12   Q.  What did you understand Smith to be referring to when he

13   wrote "Tim"?

14   A.  I understood he meant Tim Vamvakias.

15   Q.  And what did you understand Smith to be referring to when

16   he wrote "the goods?

17   A.  I understood he was referring to gold.

18   Q.  What's a safe house?

19   A.  A safe house is basically a house that's used to store

20   something criminal, be it the gold or anything else criminal in

21   safety.

22   Q.  How did you obtain access to safe houses in Africa?

23   A.  Typically, we rented them.

24   Q.  And the next sentence of this email reads, "As you said,

25   Lachlan and the guys are going trait to Lubumbashi to oversee

1    the deal there."

2              Do you see that?

3    A.  Yes, I do.

4    Q.  What did you understand Smith to mean when he wrote that?

5    A.  He's referring to Echelon mercenaries going straight to a

6    city in the DRC and that city's name is Lubumbashi.

7    Q.  What did you mean to mean by "oversee the deal"?

8    A.  What I understood was meant by oversee, was in case of any

9    acts of violence unnecessary related to the gold purchases, the

10   mercenaries are right there to intimidate, threaten, shoot

11   and/or kill anyone who steps out of line.

12             MR. BOVE:  Ms. Shields, if we can move to that the

13   left side of the screen.  And on the right side, please bring

14   up Government Exhibit 202.  Now let's try 222.  I'm sorry.  If

15   you can zoom in on the passenger data field and now the flight

16   data.

17   Q.  Mr. LeRoux, I'd like to direct your attention back to the

18   email 403-2.  Part of that reads, "then one of our guys will go

19   to Zim to sit on it."

20             Do you see that?

21   A.  Yes, I do.

22   Q.  What did you understand Smith to mean when he wrote "Zim"?

23   A.  Zimbabwe.

24             MR. BOVE:  If we can bring up Government Exhibit 8 on

25   the right side of the screen.

1    Q.  Do you see Zimbabwe on this map?

2    A.  Yes.

3    Q.  And where is it?

4    A.  Zimbabwe is in the lower corner towards the right of the

5    map, just above South Africa.

6             MR. BOVE:  Ms. Shields, can you please circle

7    Zimbabwe.  Now let's take a look in this window on the right at

8    Government's Exhibit 202 and scroll down one page, and now to

9    page 28, please.  If you can rotate this counterclockwise and

10   zoom in on the bottom page.  Thank you.  Now on the main window

11   if we can look at 403-5.

12   Q.  Mr. LeRoux, what is this?

13   A.  This is an email from Dave Smith dated June 20, 2008, to

14   me.

15             MR. BOVE:  And let's take a look at page 2, please.

16   Q.  This is an email from Dave Smith.  Do you see that?

17   A.  Yes, I do.

18   Q.  And there's a message at the top in all capital letters,

19   "Salary due to be paid as of yesterday."

20             Do you see that?

21   A.  Yes, I do.

22   Q.  What did you understand Smith to mean when he wrote that?

23   A.  I understood he meant the salary was due to be paid for the

24   Echelon mercenaries.

25   Q.  Now, the first entry in this email reads, "Pay for Samia is

1    3,000, plus 850 for his travel.  He took 500 from Op fund for

2    personal expenses.  Total deposit is 3,850."

3           Do you see that?

4    A.  Yes, I do.

5    Q.  What did you understand Smith to mean by that?

6    A.  I understood he meant that the pay for the Echelon

7    mercenary Samia is $3,000 plus an additional 850 for travel.

8    He's also stating that he used 500 from the operational fund

9    for his personal expenses.

10   Q.  What's an operational fund?

11   A.  The operational fund is a fund that was set up for the

12   expenses of any of the Echelon mercenary.  It was typically a

13   few thousand dollars and they drew down on the fund as they

14   needed expenses.

15   Q.  The next entry in the email reads "Hunter is 3,500 plus

16   1,000 for his travel.  Total deposit:  4,500."

17          Do you see that?

18   A.  Yes, I do.

19   Q.  And then there's a reference to Tim in the line below that.

20          Do you see that?

21   A.  Yes, I do.

22   Q.  Who did you understand Smith to be referring to when he

23   wrote that?

24   A.  For the line that mentions Lachlan.  I understood he meant

25   Lachlan McConnell and the Tim part is Tim Vamvakias and the

1    Hunter part is Joseph Hunter.

2    Q.  Now, just below that it says "Bill Chambers, ticket from

3    Rio, Brazil, 3.070, which you agreed upon.  He is the guy for

4    Mozam."

5             Do you see that?

6    A.  Yes, I do.

7    Q.  What did you understand Smith to mean by "Mozam"?

8    A.  I understood he meant Mozambique.

9    Q.  And what were you trying to publish in Mozambique in the

10   summer of 2008?

11   A.  I was trying to get a timber concession.

12            MR. BOVE:  Ms. Shields, let's take a look at page 1 of

13   this exhibit.  Please zoom in on the bottom email.  This is

14   dated June 19, 2008.

15   Q.  What is this, Mr. LeRoux?

16   A.  This is an email from me to Dave Smith dated June 19, 2008.

17            MR. BOVE:  Ms. Shields, can you please highlight the

18   header information.

19   Q.  What were you communicating to Smith in this message?

20   A.  This messenger contains a bank transfer copy.

21   Q.  And there's a reference to "DIKO" just below the

22   highlighting on the right side of the email.

23            Do you see that?

24   A.  Yes.

25   Q.  What is the DIKO account?

1   A.  DIKO is one of the money laundering front companies that

2   was set up in Hong Kong.

3   Q.  Now, between 2008 and 2009, how did you typically pay the

4   mercenaries?

5   A.  Typically they were paid by wire transfer.

6           MR. BOVE:  Ms. Shields, if you can zoom in on the top

7   email this exhibit, 403-5, please.

8   Q.  Mr. LeRoux, can you tell if there was an attachment to this

9   email?

10  A.  Yes, I can.

11  Q.  What's the name of the attachment?

12  A.  Bankinginformation.docx.

13  Q.  Let's take a look at the attachment starting at page 3 of

14  the exhibit.  What is this, Mr. LeRoux?

15  A.  The attachment consists of banking information.

16  Q.  Who's listed in the top entry?

17  A.  Adam Samia.

18          MR. BOVE:  Ms. Shields, if you can highlight the

19  account name, please.

20  Q.  Who's listed in the middle entry?

21  A.  Joseph Hunter.

22          MR. BOVE:  If you can highlight that as well.  Now if

23  you can please turn to page 4 of the exhibit, another page of

24  the attachment.

25  Q.  Who's listed in the second entry here, the only complete

1    entry on the page?

2    A.   Tim Vamvakias.

3    Q.   Did you change your practice of using bank transfer to pay

4    the mercenaries at some point?

5    A.   Yes, I did.

6    Q.   Why?

7    A.   In order to reduce the chances of detection by law

8    enforcement, I switched to using cash.

9    Q.   When, approximately, did you do that?

10   A.   Approximately 2010, 2011.

11          MR. BOVE:  I'd like to take a look now at Government's

12   Exhibit 403-9.  You can zoom in on the email, please.

13   Q.   What is 403-9?

14   A.   I'm sorry.  Repeat the question.

15   Q.   What is this email on the screen?

16   A.   This email is an email from Dave Smith dated July 28, 2008,

17   to me.

18   Q.   What's written in the subject line of the email?

19   A.   Subject line says "payroll."

20   Q.   Are there any attachments?

21   A.   Yes, there are.

22   Q.   What's the name of the attachment?

23   A.   The attachment's name is payrolljuly2008.xls.

24          MR. BOVE:  Let's take a look at page 2, please.

25   Q.   Mr. LeRoux, what is this?

1   A.  This is the Echelon mercenary payroll spreadsheet.

2   Q.  And I'd like to direct your attention to the yellow cell in

3   the top right.  What period of time did this particular

4   spreadsheet cover?

5   A.  The period of time the spreadsheet covers is July 2008.

6           MR. BOVE:  Ms. Shields, can we zoom in on the center

7   footer, please.

8   Q.  What do you understand that to mean?

9   A.  I understood this meant the Echelon front company, which

10  was used as a front company to pay the mercenaries.

11          MR. BOVE:  And if we could zoom back out, please.

12  Q.  And I'd like you to focus now on the column labeled "name."

13          Do you see that?

14  A.  I'm sorry.  Which column?  Say it again.

15  Q.  Labeled "name."

16  A.  Yes, I see it.

17  Q.  Who are those men?

18  A.  Those are the Echelon mercenaries.

19  Q.  Now, let's take a look at Government's Exhibit 403-8,

20  please.  What is this?

21  A.  That is an email from Dave Smith dated July 21, 2008 to me.

22          MR. BOVE:  Ms. Shields, can you please zoom in on the

23  header of the email that was forwarded and if you can

24  highlight, please, the "from" field.

25  Q.  Who was using the email account Juliethotel55@yahoo.com?

1    A.   Joseph Hunter.

2    Q.   And who did Hunter send this email to?

3    A.   To Dave Smith and to John O'Donoghue.

4    Q.   And O'Donoghue was the user of the email

5    Oscardelta55@yahoo.com?

6    A.   Yes, he was.

7              MR. BOVE:   If we can zoom back out to focus on the

8    text of this email, Ms. Shields.

9    Q.   So Hunter's email starts, "Sir, I have started buying here

10   which requires trips into the jungle four days out of the week

11   with two overnight stays.  I need another security guy as soon

12   as you can provide one.  Everything is going good.  It looks

13   like we will get minimum 50 kilos a month, but at 25 a kilo."

14             Do you see that text in Hunter's message?

15   A.   Yes, I do.

16   Q.   When you got this email, what did you understand Hunter to

17   mean by "security guy"?

18   A.   Security was the euphemism used to describe the Echelon

19   mercenaries.

20   Q.   What did you understand Hunter to mean when he wrote 50

21   kilos a month, but at 25 a kilo?

22   A.   I understood he meant 50 kilograms of gold at 25,000 U.S.

23   dollars a kilogram.

24             MR. BOVE:   Ms. Shields, can you please highlight the

25   part of the email that reads, "Steve and I have researched this

I44BHUN6                          LeRoux - Direct

1    to the end."

2    Q.  Who did you understand Hunter to be referring to when he

3    wrote "Steve"?

4    A.  I understood he was referring to Steve Hahn.

5    Q.  That was one of the gold experts?

6    A.  Yes, he was.

7    Q.  This email finishes, "please send someone ASAP, preferably

8    either Adam, Tim, or Lock."

9            Do you see that?

10   A.  Yes, I do.

11   Q.  When Hunter used those three names "Adam, Tim, or Lock,"

12   who did you understand him to be referring to?

13   A.  I understood he was referring to either Adam Samia, Tim

14   Vamvakias, or Lachlan McConnell.

15           MR. BOVE:  Ms. Shields, can you please publish 403-11.

16           THE COURT:  Let me just interrupt you for a minute.

17   Should we take a short break?  Is everyone OK with that?  Why

18   don't we take a short break now.  We will keep it short because

19   we're close to the end of the day.  So, please, ladies and

20   gentlemen, just remember don't discuss the case and keep an

21   open mind.

22           Why don't we resume in ten minutes.

23           Thank you.

24           (Recess)

25           THE COURT:  Why don't we bring the jury back in.

1    Everyone can be seated.  You may proceed.

2                 MR. BOVE:  Thank you, Judge.

3                 Ms. Shields, if you can publish 403-11, please.

4    BY MR. BOVE:

5    Q.  Mr. LeRoux, what is this?

6    A.  This is an email from Joseph Hunter dated August 1, 2008 to

7    me.

8    Q.  What's written in the subject line?

9    A.  "Mali gold."

10                MR. BOVE:  If you can move the exhibit to the left

11   side of the screen, please, and bring up Government Exhibit 8

12   the map on the right.

13   Q.  Mr. LeRoux, do you see Mali on this map?

14   A.  Yes.

15   Q.  Where is it?

16   A.  It's in the top left side of the map.  It's entitled

17   "Mali."

18                MR. BOVE:  Ms. Shields, if you can circle that,

19   please.  Now, if we can take a look in the right window at 247,

20   please.  Go to page 2.  Now page 9, please.  Zoom in on the

21   left passport page, please.  Now, if you can take a look at 202

22   on the right side, please, page 2, and page 32, please, and

23   zoom in on the left page.

24   Q.  Now, Mr. LeRoux, I'd like you to take a look at the email

25   on the left side of the screen, Government Exhibit 403-11.

1            The email starts, "As you know, Steve and I attempted

2    to execute a deal where we were conned into giving money before

3    the product."

4            Do you see that at the top of the email?

5    A.  Yes, I do.

6    Q.  What did you understand Hunter to mean when he wrote that?

7    A.  What he meant is -- what I understood he meant is that

8    during the purchase, which was conducted by the expert Steve

9    Hahn, there was a fraud and this is a fraud related to the

10   purchase of gold.

11   Q.  What do you mean by "fraud"?

12   A.  Essentially what I understood is that they tried to

13   purchase gold and the gold didn't arrive.

14            MR. BOVE:  Ms. Shields, if you can zoom in on the

15   second full paragraph so at the start of this paragraph.

16   Q.  It says, "Regardless of our intent, I failed to do my job

17   properly.  The money was my responsibility, and my number one

18   priority, should, was to obtain approval before any

19   disbursement of it."

20            Do you see that, Mr. LeRoux?

21   A.  Yes, I see it.

22   Q.  What did you understand Hunter to be referring to there?

23   A.  What I understood Hunter meant is that he is the Echelon

24   mercenary on the ground, so the money was his responsibility to

25   get back and to ensure it was spent properly.

1              MR. BOVE:  Ms. Shields, can you please, from "but one

2      last thing I would like to say," until the end of the email.

3      Q.  In the highlighted text, do you see the reference to Dave

4      or his guys, Mr. LeRoux?

5      A.  Yes, I do.

6      Q.  Who did you understand Hunter to be referring to there?

7      A.  I understood he meant Dave Smith and the rest of the

8      Echelon mercenary team.

9      Q.  The email continues, "I know only Lachlan, Adam, and Tim in

10     his company, but I know they all do their.

11             Jobs."  Do you see that?

12     A.  Yes, I do.

13     Q.  Who did you understand Hunter to be referring to when he

14     wrote Lockland, Adam, and Tim?

15     A.  I understood he meant Lachlan McConnell, Adam Samia, and

16     Tim Vamvakias.

17     Q.  What did you understand Hunter to mean when he wrote "I

18     know they all do their jobs"?

19     A.  What I understood he meant is they're good at intimidating,

20     threatening, killing, or doing any other act of violence that

21     may be necessary.

22             MR. BOVE:  If we can zoom back out to the entire

23     email.

24     Q.  So this is an email from Hunter about a loss of funds,

25     correct?

1    A.  Yes.

2    Q.  Were the funds ever recovered?

3    A.  No, they weren't.

4    Q.  Did you do anything to sanction or punish Hunter as a

5    result of this incident?

6    A.  Nothing happened.

7    Q.  Why not?

8    A.  Hunter was too valuable.

9            MR. BOVE:  Ms. Shields, if we can take a look at

10   403-12, please.

11   Q.  Mr. LeRoux, what is this?

12   A.  This is an email from Joseph Hunter dated August 4, 2008,

13   to me.

14           MR. BOVE:  If you can zoom in on the bottom email,

15   please, which is dated August 4, 2008 at 1:36 p.m.

16   Q.  Mr. LeRoux, what's written in the subject line of this

17   email?

18   A.  The subject line says, "Re: Trip to SA."

19   Q.  Who wrote this message?

20   A.  I did.

21   Q.  What did you mean by "SA"?

22   A.  I meant an abbreviation for South Africa.

23           MR. BOVE:  If you can move this over to the left,

24   Ms. Shields, and bring up Government Exhibit 8 on the right.

25           Do you see South Africa on Government Exhibit 8?

1    A.  Yes, I do.

2    Q.  Where?

3    A.  It's in the bottom of the map in the center.

4           MR. BOVE:  Ms. Shields, if you can please circle South

5    Africa.

6    Q.  Now, Mr. LeRoux, I'd like you to focus on the left side of

7    the screen, the email there.  It begins, "Joe, I am sending you

8    a letter to Louis care of the lawyer he knows, Billy

9    Meintjies."  Then the email goes on you instruct Hunter to

10   deliver the letter to a bank in Swaziland.

11          Do you see that?

12   A.  Yes, I do.

13   Q.  What is Swaziland?

14   A.  Swaziland is a country in Africa.

15   Q.  Do you see that on the map in Government Exhibit 8?

16   A.  Yes, I do.

17   Q.  Where?

18   A.  It's in the south of Africa to the right side of South

19   Africa.

20          MR. BOVE:  Ms. Shields, if we can do a new circle for

21   Swaziland.

22   Q.  Mr. LeRoux, what were you trying to accomplish in Swaziland

23   in 2008?

24   A.  I was trying to set up a call center as a front for the

25   purposes of obtaining a diplomatic passport.

1    Q.  What do you mean by "setting up a call center as a front"?

2    A.  What I meant is the call center was just a front, a means

3    to facilitate bribing the officials in Swaziland.

4    Q.  Why did you want a diplomatic passport?

5    A.  At this time I wanted to protect myself from possible

6    arrest.

7    Q.  If you could focus back in the email on the left, who did

8    you send this message to?

9    A.  The message was sent to Joseph Hunter and cc'd to Dave

10   Smith.

11          MR. BOVE:  Ms. Shields, if you can highlight the

12   reference to Billy Meintjies, please.

13   Q.  Mr. LeRoux, who was Billy Meintjies?

14   A.  Billy Meintjies was an extremely corrupt lawyer working in

15   South Africa.

16   Q.  What were some of the types of things that Meintjies did

17   for you?

18   A.  He was involved in assisting us in purchasing weapons and

19   also in obtaining passports illegitimately.

20   Q.  Are you aware of specific instances where Meintjies helped

21   someone working for you obtain a fraudulent passport?

22   A.  Yes, I am.

23   Q.  Please describe that.

24   A.  Billy Meintjies assisted Joseph Hunter in obtaining a

25   fraudulent passport.

I44BHUN6                          LeRoux - Direct

1   Q.  How did you learn about that?

2   A.  At one point I saw a copy of the passport.

3   Q.  Did you ever discuss it with Joseph Hunter?

4   A.  I did, yes.

5   Q.  What were some of the things that were said about the

6   passport during the conversation between you and Hunter?

7   A.  Hunter told me that the passport was under the name of

8   Fernando Santana.

9   Q.  And you mentioned that Billy Meintjies was also involved in

10  weapons trafficking?

11  A.  Yes.

12  Q.  What types of things did he do for you with respect to

13  weapons trafficking?

14  A.  He showed Joseph Hunter a warehouse filled with weapons.

15  Q.  Why?

16  A.  I was looking to purchase weapons.

17  Q.  Where was the warehouse?

18  A.  It was located in South Africa.

19          MR. BOVE:  Ms. Shields, in the right window, if you

20  can bring up Government Exhibit 202, please.  Go to page 2.

21  And then page 18, if you could rotate this counterclockwise and

22  zoom in on the B page.  Thanks.  You can take that down.

23  Q.  After Meintjies showed Hunter the weapons in South Africa,

24  what happened?

25  A.  I was told via Dave Smith that Billy Meintjies had said

1   that licenses were required to purchase the weapons.

2   Q.  Did you go forward with the obtaining weapons from

3   Meintjies?

4   A.  I did not, no.

5   Q.  Why not?

6   A.  Because the license was required and we didn't have a

7   license.

8   Q.  Did you take any steps to send weapons to the mercenaries

9   in Africa in 2008, 2009?

10  A.  Yes, I did.

11  Q.  What did you do?

12  A.  Two weapons were loaded on to my private jet and flown to

13  South Africa.

14  Q.  How were the weapons recovered in South Africa?

15  A.  The weapons were collected by the Echelon mercenaries in

16  South Africa.

17  Q.  Is that an instruction you provided to Dave Smith?

18  A.  Yes, it was.

19          MR. BOVE:  Ms. Shields, can you please bring up

20  Government Exhibit 8 again.

21  Q.  Do you see the country of Somalia on this map?

22  A.  Yes, I do.

23  Q.  Where?

24  A.  It's in the far right side of the map, center, at the tip

25  of Africa.

1                MR. BOVE:  Ms. Shields, if you can circle Somalia,

2     please.

3     Q.  Did you have any activities in Somalia between about 2008

4     and 2010?

5     A.  Yes, I did.

6     Q.  What were you doing in Somalia?

7     A.  I set up a front company in Somalia, which pretended to be

8     about a fishing operation, but was actually a front for

9     criminal activity.

10    Q.  What was your objective in Somalia?

11    A.  My objective in Somalia was to obtain a small territory and

12    set myself up as a warlord using whatever violence was

13    necessary.

14    Q.  You testified earlier about a company named Southern Ace

15    Limited that you had set up?

16    A.  Yes.

17    Q.  Did you cause Southern Ace Limited to have any activities

18    in Somalia?

19    A.  Yes, I did.

20    Q.  What types of things?

21    A.  Southern Ace was responsible for sending the cash.  I sent

22    the cash to Somalia using Southern Ace and I instructed that

23    weapons be purchased there and I provided funds for weapons to

24    be purchased and/or imported as needed.

25    Q.  Did you have security personnel in Somalia?

1    A.  Yes, I did.

2    Q.  About how many people?

3    A.  Initially around 70 people, but the number grew to

4    approximately 200.

5    Q.  When you say "the number grew," what do you mean, sir?

6    A.  Additional staff were added over time and the number ended

7    up around 200.

8    Q.  Was the security force armed?

9    A.  Yes, they were.

10   Q.  With what types of weapons?

11   A.  They were armed with AK-47s, heavy machine guns,

12   antiaircraft weapons, RPGs.

13   Q.  Did you also send mercenaries to Somalia?

14   A.  Yes, I did.

15   Q.  Were the mercenaries and the security force involved in

16   acts of violence?

17   A.  Yes, they were.

18   Q.  What kinds of violence?

19   A.  The types of violence include at least one killing, the

20   defense of the town against attack, and various shootings.

21   Q.  Did you take any steps to try and import larger weapons

22   into Somalia?

23   A.  Yes, I did.

24   Q.  What kinds of weapons?

25   A.  Explosives, land mines, antitank rockets, and heavy machine

1    guns.

2    Q.   What was the plan for importing those types of weapons?

3    A.   The plan was to set myself up as warlord in the area and

4    for that reason I needed a lot of armaments to give to the

5    Echelon mercenaries and the other security on the ground.

6    Q.   But was there actually a plan, in specific, to bring those

7    weapons into Somalia?

8    A.   Yes, there was.

9    Q.   What was that plan?

10   A.   The plan was to obtain a runway so we could land an

11   aircraft.

12   Q.   Did that happen?

13   A.   It did not.

14   Q.   Why not?

15   A.   I decided that -- or I believed that there was stealing

16   going on, and for that reason I canceled the project.

17   Q.   What do you mean when you say there was "stealing" going

18   on?

19   A.   I believed that individuals were stealing from me in

20   Somalia.

21   Q.   Did you take any steps against anyone in Somalia based on

22   that belief?

23   A.   I had a discussion with Dave Smith and he told me in that

24   discussion that the manager should be killed.

25   Q.   What did you do based on Smith's recommendation?

1    A.  I told Smith, no, I don't want the manager killed.  Let's

2    just fire the manager.

3    Q.  What happened next in Somalia?

4    A.  The project was canceled.

5    Q.  What do you mean when you say "canceled"?

6    A.  Well, the staff were withdrawn from the country over a

7    period of time.

8    Q.  Are you familiar with a country called the Seychelles?

9    A.  Yes, I am.

10   Q.  Government Exhibit 8 is still on the screen.  Where

11   approximately are the Seychelles located on this map?

12   A.  Approximately off the cost of Somalia of the far right of

13   the Africa map.

14   Q.  Between approximately 2008 and 2011, did you send any

15   mercenaries to the Seychelles?

16   A.  I did, yes.

17   Q.  Who?

18   A.  Joseph Hunter.

19           MR. BOVE:  Ms. Shields, if you can bring up Government

20   Exhibit 202, please, and go to page 2, and now page 23.  Zoom

21   in on the top half of the "M" page.  If you can highlight the

22   text that says "Seychelles."

23   Q.  Mr. LeRoux, why did you instruct Joseph Hunter to go to the

24   Seychelles?

25   A.  I instructed him to go to the Seychelles because I believed

I44BHUN6                        LeRoux - Direct

 1    it was possible to launch a coup d'etat, basically to take over

 2    the government in the Seychelles.

 3    Q.  And had you discussed that idea of a coup in the Seychelles

 4    with anyone related to political officials?

 5    A.  Yes.

 6    Q.  Who did you talk with about the potential coup?

 7    A.  I was introduced to a man who claimed to be the nephew of

 8    the sitting Seychelles president at the time by Dave Smith and

 9    in the meeting between myself, that individual, and Dave Smith,

10    we discussed the operation.

11    Q.  What was discussed during that meeting?

12    A.  It was discussed that the Echelon mercenary team would be

13    sent to Seychelles to essentially take over the government and

14    install the nephew of the president as the new president.

15    Q.  What did you stand to gain if that happened?

16    A.  I hoped to gain a diplomatic passport from the new

17    government.

18    Q.  Based on this meeting, did you instruct Hunter to do

19    anything?

20    A.  Yes, I did.

21    Q.  What did you instruct Hunter to do?

22    A.  Hunter was instructed by Dave Smith to travel to the

23    Seychelles and assess the feasibility of sending a large group

24    of Echelon mercenaries to the Seychelles to take over the

25    country.

I44BHUN6                           LeRoux - Direct

1   Q.  So that was an instruction that you gave to Smith?

2   A.  Yes, it was.

3   Q.  And then he tasked Hunter?

4   A.  Yes.

5   Q.  Did Hunter report back after visiting the Seychelles?

6   A.  Yes, he did.

7   Q.  What did he report?

8   A.  Hunter reported that approximately 30 mercenaries would be

9   required, 30 Echelon mercenaries.

10  Q.  Required for what?

11  A.  To take over the government, basically to defeat any

12  resistance in the Seychelles and take over the government.

13  Q.  When Mr. Hunter made that recommendation, that report, how

14  did you respond?

15  A.  I responded to Smith that I believed that the project was

16  not viable because, although the Echelon mercenaries being

17  trained killers and well-trained and capable of initially

18  overrunning the country and taking over the government, it

19  would not be sustainable in the long-term, because the country

20  had allies in the region.

21              (Continued on next page)

22

23

24

25

1   BY MR. BOVE:

2   Q.  What do you mean by that?

3   A.  Meaning that after the Echelon mercenary team took over the

4   Seychelles the neighboring countries such as Tanzania would

5   intervene.

6   Q.  What do you mean when you say 'intervene'?

7   A.  I mean that they would send troops to reverse the situation

8   meaning to reverse the coup detat.

9   Q.  Mr. LeRoux, are you familiar with a Philippines entity

10  known as RWB?

11  A.  Yes, I am.

12  Q.  What is RWB?

13  A.  RWB is a weapons trafficking front copy whose full name is

14  Red, White and Blue located in the Philippines.

15  Q.  Who set up RWB?

16  A.  I did.

17  Q.  Did anyone manage it for you?

18  A.  Yes.

19  Q.  Who are some of the people involved in the management of

20  RWB?

21  A.  It's a Del Rosario and Michael Wantok.

22  Q.  What were some of things that Wantok did on your behalf in

23  the Philippines?

24  A.  Wantok was a weapons expert and was the local manager in

25  the RWB operation in the Philippines.

1   Q.  Did he traffic in firearms?

2   A.  Yes, he did.

3   Q.  What about explosives?

4   A.  Yes, he did.

5   Q.  What kinds of explosives?

6   A.  Principally C-4.

7   Q.  So using Michael Wantok, what types people did you sell

8   weapons and explosives to in the Philippines?

9   A.  Rebels, warlords, criminals, essentially anyone who had

10  money.

11  Q.  Now at the beginning of your testimony you mentioned that

12  you pleaded guilty to a violation of the sanctions against the

13  country of Iran; is that correct?

14  A.  Yes.

15  Q.  And you talked a little bit about that sanctions violation

16  involving weapons tracking?

17  A.  Yes.

18  Q.  What kinds of weapons projects did you work on with Iran?

19  A.  Developing missile technology and explosives.

20  Q.  What kinds of missile technology?

21  A.  Missile guidance systems.

22  Q.  What, specifically, did you do?

23  A.  I instructed a team to go to Iran and obtain weapons from

24  Iran and at the same time we delivered to Iran missile

25  technology and explosives technology.

1    Q.  What kind of explosives technology?

2    A.  A new type of primary explosive called 'ETN'.

3    Q.  What's a primary explosive?

4    A.  A primary explosive it an explosive that's very sensitive.

5    It's usually used to set off a chain reaction with other types

6    of explosives.

7    Q.  You said that you helped design a primary explosive called

8    'ETN'?

9    A.  Yes.

10   Q.  What was the main characteristic of ETN?

11   A.  The main characteristic of ETN was that it was very easily

12   to produce using ordinary substances such as certain types of

13   sugar and very powerful.

14   Q.  Are you familiar with the term end-user certificate?

15   A.  Yes, I am.

16   Q.  Is that sometimes referred to as an "EUC"?

17   A.  Yes, it is.

18   Q.  What is an EUC?

19   A.  An EUC is a permit issued by a government to allow the

20   import or export of weapons to another country.

21   Q.  Is an EUC necessary in order to obtain weapons from a

22   legitimate weapons manufacturer?

23   A.  Yes, it is.

24   Q.  Why?

25   A.  EUCs are used essentially to police weapon sales.  EUCs are

I44AAHUN7                          LeRoux - Direct

1     the means by which governments ensure that weapons are not

2     falling into the hands of criminals.

3     Q.  Did you obtain EUCs illegally between about 2008 and 2011?

4     A.  Yes.

5     Q.  Generally speaking, how did you go about that?

6     A.  By paying bribes.

7     Q.  From what countries did you obtain EUCs?

8     A.  From the Philippines and also from Mali.

9     Q.  Well, let's start with the Philippines.  How many times did

10    you obtain EUCs in the Philippines?

11    A.  Twice.

12    Q.  Who in the Philippines issued those EUCs?

13    A.  The police headquarters.

14    Q.  That's the Philippine National Police?

15    A.  Yes.

16    Q.  What did you have to do to obtain the EUCs in the

17    Philippines?

18    A.  I had to provide documents and I had to bribe the officials

19    involved.

20    Q.  What did the first EUC that you obtained authorize?

21    A.  The import of pistols.

22    Q.  From where?

23    A.  From the United States.

24    Q.  Were you able to purchase the pistols?

25    A.  Yes, I was.

1    Q.   Were they transported to the Philippines?

2    A.   Yes, they were.

3    Q.   What happened to those pistols when they got there?

4    A.   Those pistols were sent to the police headquarters.

5    Q.   Why?

6    A.   At the police headquarters, RWB, which is the weapons

7    trafficking front company maintained a safe as required under

8    the Philippine law.  So the weapons were deposited in the RWB

9    safe.

10   Q.   What happened with those pistols?

11   A.   Those pistols were offered for sale.

12   Q.   And you said you obtained a second EUC from the

13   Philippines?

14   A.   Yes.

15   Q.   What did that offer?

16   A.   The second EUC authorized importation of pistols from PT.

17   Pindad in Indonesia.

18   Q.   What is PT. Pindad?

19   A.   PT. Pindad is one of the Indonesian government's weapons

20   manufacturing companies.

21   Q.   You said you also obtained an EUC in Mali?

22   A.   Yes.

23   Q.   You probably testified a bit about Mali today.  If we could

24   take a look at Government Exhibit Eight and circle Mali on the

25   map.

1                  (Pause)

2                  MR. BOVE:  If you could move over to the right and on

3      the left side please bring up Government Exhibit 403-10,

4      zoom-in on the e-mail please.

5                  (Pause)

6      Q.  Mr. LeRoux, what is this?

7      A.  That is an e-mail from Joseph Hunter dated July 31, 2008 to

8      both me and to my co-defendant Shai Reuven.

9      Q.  Who is Shai Reuven?

10     A.  Shai Reuven was the expert assigned at the time to pay the

11     necessary bribes in order to obtain the end-user certificates

12     in Mali.

13     Q.  And you just said that he was your co-defendant?

14     A.  He is, yes.

15     Q.  What do you mean by that?

16     A.  I meant that he is also indicted on my case.

17     Q.  Now, so Reuven was the user of the e-mail

18     TBMsupervisor4@GMail.com; is that right?

19     A.  Yes.

20     Q.  What does "TBM" stand for?

21     A.  TBM stands for the betting machine.

22     Q.  What was the betting machine?

23     A.  At that timeframe there was a project in Costa Rica to

24     setup an online gambling operation and the betting machine was

25     the name of that project.

1    Q.  What, if any role did Hunter play in your obtaining of the

2    EUCs in Mali?

3    A.  Hunter was in Mali and as an Echelon mercenary his job in

4    Mali was to intimidate, shoot, threaten, and/or kill the expert

5    meaning Shai Reuven or anyone else who stepped out of line.

6    Q.  What do you mean by "stepped out of line"?

7    A.  By 'stepped out of line' I mean anyone who stole from me,

8    who threatened the team or who committed some transgression.

9    Q.  Focus back on the e-mail on the left which is Government

10   Exhibit 403-10.  Was there an attachment to this document?

11   A.  Yes.

12   Q.  What was it called?

13   A.  File 001.JPG.

14        MR. BOVE:  Ms. Shields, if we could take a look at

15   that at page two of this exhibit.  If you could zoom-in on the

16   text.

17        (Pause)

18   Q.  What is this document?

19   A.  The document is a bank wire transfer copy.

20   Q.  Are you able to tell the date of the bank transfer in

21   question?

22   A.  Yes.

23   Q.  What's the date?

24   A.  Thirtieth of July 2008.

25        MR. BOVE:  Ms. Shields, if you could highlight the

1     rows 'date', 'currency' and 'amount', please.

2     Q.   What was the amount of the transfer?

3     A.   The amount is 180,000 U.S. dollars.

4     Q.   According to this document who sent the transfer?

5     A.   Joseph Hunter.

6            MR. BOVE:  Ms. Shields, if you could highlight the row

7     that reads 'Hunter Joseph Manuel'.

8     Q.   Mr. LeRoux, can you tell from this document where the

9     transfer was sent from?

10    A.   Yes.

11    Q.   Where?

12    A.   Mali.

13    Q.   Can you tell which bank?

14    A.   Yes.

15    Q.   Is that in field 52A?

16    A.   Yes, it is.

17           MR. BOVE:  Ms. Shields, if you can highlight that.

18    Q.   Where did Hunter send these funds?

19    A.   Hunter sent the funds to Singapore.

20    Q.   And directing your attention to the entry marked 59 in the

21    bottom.

22           MR. BOVE:  Ms. Shields, if you could highlight those

23    three lines.

24           (Pause)

25    Q.   Mr. LeRoux, do you see the reference to 'Martinez Trading

1    Limited'?

2    A.  I do, yes.

3    Q.  What was that entity?

4    A.  That entity was one of the front companies that was set up

5    in Singapore for the purchase of purchase of -- concessions in

6    Africa.

7    Q.  Set up by who?

8    A.  By me.

9    Q.  What is your understanding of the purpose of this wire

10   transfer reflected in this document?

11   A.  My understanding is the purpose was the refund of the

12   excess money that was used for purchasing the or paying bribes

13   for the purchase of the end-user certificate in Mali.

14   Q.  What do you mean by 'refund'?

15   A.  Essentially it's the excess funds.  It's funds that was not

16   used in paying bribes.

17   Q.  You said that you were able to obtain an end-user

18   certificate in Mali?

19   A.  Yes.

20   Q.  What did that authorize?

21   A.  That authorized the purchase of rifles from PT. Pindad in

22   Indonesia.

23   Q.  So at that point you had an EUC from the Philippines

24   authorizing the purchase of pistols from PT. Pindad; is that

25   correct?

1    A.  Yes.

2    Q.  And also EUC from Mali authorizing the purchase of firearms

3    from PT. Pindad?

4    A.  Yes.

5    Q.  What, if anything, did you do with those EUCs?

6    A.  Those EUCs were submitted to the Indonesian government.

7    Q.  What happened next?

8    A.  The Indonesian government authorized on the basis of the

9    EUCs authorized the purchase of weapons from PT. Pindad.  Those

10   weapons were loaded onto the Ufuk ship.

11   Q.  Is that one of your boats that you mentioned earlier?

12   A.  Yes, it is.

13   Q.  How big was the Ufuk?

14   A.  The Ufuk ship was approximately two thousand tons.

15   Q.  How did the weapons get from PT. Pindad to the Ufuk?

16   A.  The weapon were loaded onto the ship by the Indonesian --

17   Q.  Did you send mercenaries to Indonesia to oversee the

18   operations?

19   A.  Yes, I did.

20          MR. BOVE:  Ms. Shields, if we could please bring up

21   Government Exhibit 202 please and go to page two and then page

22   23 and please zoom-in on the bottom half of the passport page

23   marked 'M' as in 'Mary'.

24          (Pause)

25   Q.  Why did you send Hunter to Indonesia?

1    A.  Hunter was one of the Echelon mercenaries assigned to Ufuk

2    ship.

3    Q.  For what purpose?

4    A.  For the purpose of insuring that if there was any issue

5    such as anyone stepped out of line, meaning tried to interfere

6    with the transportation of this illegal shipment of weapons to

7    the Philippines, they would be dealt with.

8    Q.  Were others involved on your behalf in the smuggling

9    operation out of Indonesia?

10   A.  Yes.

11   Q.  Who else?

12   A.  There was an additional mercenary, Chris Demeer, on the

13   ship.  The other Echelon mercenary as Bruce Jones who was the

14   captain of the ship at the time.

15   Q.  Did you instruct Dave Smith to have Hunter and Samia on the

16   Ufuk as it traveled?

17   A.  Yes, I did.

18   Q.  Did the Ufuk go to Mali?

19   A.  It did not.

20   Q.  Where did you instruct that the Ufuk be brought?

21   A.  To the Philippines.

22   Q.  Was Hunter on the Ufuk for part of that voyage?

23   A.  That is my understanding, yes.

24   Q.  What is your understanding based on?

25   A.  My understanding is based on reports from Dave Smith.

1   Q.   What happened with those guns?

2   A.   The guns were seized.

3   Q.   All of them?

4   A.   No.

5   Q.   Let's start with the guns that were not seized?  What

6   happened with those?

7   A.   Approximately 50 rifles were loaded onto a boat by Dave

8   Smith and taken to his beach house in the south of the

9   Philippines prior to the seizure of the guns and boat.

10  Q.   Where, approximately, did the seizure occur?

11  A.   The seizure occurred approximately in the city of Mariveles

12  in the Philippines.

13           MR. BOVE:  Ms. Shields, if you could bring up

14  Government Exhibit three please.

15  Q.   Mr. LeRoux, where approximately is Mariveles on this map?

16  A.   Mariveles is approximately on the left side of the top

17  island in the Philippines roughly next to where it says

18  'Manila', the left side of that along the coast.

19           MR. BOVE:  If you could zoom-in around the area of

20  Manila, please.

21  Q.   So is it the smaller reach head just to the left of the

22  black dot?

23  A.   Yes, it is.

24  Q.   So you said some of the firearms were smuggled off of the

25  Ufuk before they were seized?

1   A.  Yes.

2   Q.  Who was responsible for that?

3   A.  That was handled by Dave Smith.

4   Q.  What happened with those guns?

5   A.  Those weapons were transported to Dave Smith's beach house

6   in the south and in the southern Philippines.

7   Q.  And after that?

8   A.  After that they were brought to the house of Herbert Chu.

9   Q.  How many of the firearms were seized?

10  A.  Approximately, 50 rifles were seized and approximately ten

11  pistols were seized.

12  Q.  How many firearms in total had been on the Ufuk?

13  A.  Approximately, 10 rifles and approximately 10 pistols.

14  Q.  You mentioned that Bruce Jones was the captain of the Ufuk?

15  A.  Yes, he was.

16  Q.  What did you do to Bruce Jones following the seizure?

17  A.  I had him killed.

18  Q.  Why?

19  A.  He started cooperating with the authorities.

20  Q.  Who did you instruct to kill Bruce Jones?

21  A.  Dave Smith.

22  Q.  Did you pay for that murder?

23  A.  Yes, I did.

24  Q.  Did Smith later tell you what happened?

25  A.  Yes, he did.

I44AAHUN7                         LeRoux - Direct

1    Q.  How was Bruce Jones killed?

2    A.  My understanding is Bruce Jones was driving in a vehicle in

3    the -- and two men on a motorcycle shot him through one of the

4    windows in the vehicle.

5    Q.  Did you know a man named Joe Frank Zuniga?

6    A.  Yes, I did.

7    Q.  Who was Zuniga?

8    A.  Zuniga was the lawyer of Bruce Jones.

9    Q.  What, if anything, did you do to Zuniga?

10   A.  I had him killed.

11   Q.  Why?

12   A.  Zuniga was the lawyer who had assisted Bruce Jones in

13   cooperating against me.

14   Q.  Who did you instruct to kill Zuniga?

15   A.  John Nash.

16   Q.  When did that murder happen, approximately?

17   A.  That murder happened approximately mid to 2012.

18   Q.  Did you pay Nash?

19   A.  No.

20   Q.  Was he compensated?

21   A.  Yes, he was.

22   Q.  How?

23   A.  Nash owed me money and he deducted 25,000 U.S. dollars from

24   the amount that he owed me.

25   Q.  How did that debt --

1  A.  I paid for cocaine from John Nash which turned out to be

2  fake.

3  Q.  Were there also firearms involved in that transaction?

4  A.  Yes.

5  Q.  What types of firearms?

6  A.  I purchased some MP5s from John Nash which also turned out

7  to be fake.

8  Q.  What's an MP5?

9  A.  An MP5 is a type of submachine gun.

10 Q.  Now at some point did you come to believe that someone else

11 was partially responsible for the weapons seizure related to

12 Ufuk?

13 A.  I did, yes.

14 Q.  Who?

15 A.  Manuel Jalos.

16 Q.  Who is Manuel Jalos?

17 A.  Manuel Jalos was a boat captain in Mariveles.

18 Q.  After you came to believe that Jalos was involved in the

19 seizure, what did you do?

20 A.  I had Manuel Jalos put under surveillance by my Philippino

21 surveillance team.

22 Q.  What do you mean by Philippino surveillance team?

23 A.  I had a small Philippino surveillance team run by a man

24 named Noyt.  And they basically tracked my intended victims and

25 took photographs and discovered information about the intended

1    victims.

2    Q.  You said a man named Noyt managed the Philippines

3    surveillance team?

4    A.  Yes.

5    Q.  Do you know his legal name?

6    A.  I understood that his name was Roland Baron Quartro.

7            MR. BOVE:  Your Honor, may I approach?

8            THE COURT:  You may.

9    Q.  I'm showing you documents with two images from a disk

10   that's marked for identification as N185 and I've marked those

11   images for identification as N185A through 185B.

12           Do you recognize those?

13   A.  Yes.

14   Q.  What are those photos?

15   A.  The two pictures are pictures of Manuel Jalos.

16   Q.  Were those photos obtained by your Philippino surveillance

17   team?

18   A.  Yes, they were.

19           MR. BOVE:  Your Honor, the government offers N185A and

20   185B.

21           THE COURT:  Any objection?

22           (No)

23           THE COURT:  They'll be admitted.

24           (Government's Exhibits N185A and 185B received in

25   evidence)

I44AAHUN7                       LeRoux - Direct

1        MR. BOVE:  Ms. Shields, could you please publish those

2   two side-by-side.  Could you now please publish Government

3   Exhibit 403-13.

4              (Pause)

5   Q.  Mr. LeRoux, what is this?

6   A.  It is an e-mail from Dave Smith dated August 13, 2008 to

7   Lachlan McConnell and to myself.

8        MR. BOVE:  Ms. Shields, if you could zoom-in on the

9   header of the top e-mail please.

10  Q.  You said this e-mail is to you.  Is that the South African

11  reference in the 'to' field?

12  A.  Yes, it is.

13  Q.  And Lachlan McConnell the -- of the U.S. ---HOLAM.EZ?

14  A.  Yes.

15  Q.  What's in the subject line?

16  A.  Re: Z report follow-up.

17  Q.  What did you understand Smith to be referring to by the

18  letter "Z"?

19  A.  I understood he was referring to Zambia.

20        MR. BOVE:  If you could zoom-out please, Ms. Shields.

21  Q.  Take a minute to scan the e-mail and when you are done my

22  question will be generally, what is being discussed here?

23  A.  Generally speaking what is being discussed is the gold

24  transaction that went wrong in Zambia.

25  Q.  What do you mean by "went wrong"?

1   A.  Approximately, 80,000 U.S. dollars was spent on purchasing

2   gold in Zambia and it turned out to be fake gold.

3   Q.  Now there's a paragraph number three; do you see that?

4   A.  Yes.

5          MR. BOVE:  Can you please highlight that.

6          (Pause)

7   Q.  And that paragraph starts, Steve will be back in town

8   Saturday.  He will test to see if the dog has cancer.

9          When Smith wrote Steve, who did you understand him to

10  be referring to

11  A.  I understood he was referring to the gold purchasing expert

12  named Steve Hines?

13         MR. BOVE:  Ms. Shields, if you could now highlight and

14  zoom-in on the fourth paragraph.

15         (Pause)

16  Q.  This paragraph reads:  Joe will go with the product to it

17  next location.  He will follow Steve with the product.  Then

18  Joe will get on the plane.  I will inform you where it is going

19  over the phone.

20         Mr. LeRoux, when Smith wrote 'Joe' who did you

21  understand him to be referring to

22  A.  I understood he meant Joseph Hunter.

23  Q.  What did you understand Smith to be communicating to

24  McConnell in this paragraph?

25  A.  I understood he was saying that the gold expert, Steve

1    Hines, will take the product.  And Joe is the person who is

2    assigned to intervene if anything goes wrong meaning to

3    intimidate, threaten, shoot and/or kill anyone who interferes

4    with the transportation by the gold expert, Steve Hines.

5    Q.  So when Smith wrote "product" in this product, what did you

6    understand him to be referring to?

7    A.  I understood he meant gold.

8            MR. BOVE:  I'm now going to zoom back out please.

9    Q.  So the subject here is "Z" report follow-up.  Do you see

10   that?

11   A.  Yes, I do.

12   Q.  Did Smith provide you with any further information about

13   this incident in Zambia?

14   A.  Yes, he did.

15   Q.  What else did Smith report?

16   A.  Smith reported that in his opinion and based on the

17   assessment made the gold experts were the ones who basically

18   stolen the money.

19   Q.  Which gold experts?

20   A.  Andrew Hahn and Steve Hahn.

21   Q.  Based on that report from Smith, what did you decide to do?

22   A.  I decided to immediately deploy an Echelon mercenary team

23   to get back the money using any necessary violence which could

24   include any shootings or if necessary, killings.

25   Q.  Which mercenaries were deployed?

1   A.   The mercenaries that were deployed were Joseph Hunter.

2   Q.   Let's take a look at Government Exhibit 403-14.   What is

3   this?

4   A.   That's an e-mail from Dave Smith dated September 7, 2008 to

5   Joseph Hunter and also to myself.

6   Q.   Are there any attachments to this e-mail?

7   A.   Yes.

8   Q.   What's the name of the attached file?

9   A.   The attachment file is called scan DOCCS.PDF.

10          MR. BOVE:   Ms. Shields, let's take a look at the

11   attachment.   If you bring up page two of the exhibit on the

12   left and page three of the exhibit on the right.

13          (Pause)

14   Q.   Mr. LeRoux, what are these?

15   A.   They're passport copies.

16   Q.   Related to who?

17   A.   They're related to the gold experts, Steve Hahn and Andrew

18   Hahn.

19   Q.   Why were these documents sent to just the plaintiff?

20   A.   These documents were part of the page that Hunter needed in

21   order to track down these individuals in order to get back the

22   money or intimidate, threaten or shoot or any other act of

23   violence that might be needed related to these individuals.

24          MR. BOVE:   Ms. Shields, please bring up in the main

25   window page one of this e-mail 403-14.   If you could zoom-in on

 1    the e-mail itself.

 2              (Pause)

 3    Q.  The first sentence of the e-mail reads:  The document

 4    you've got please give them to Billy; do you see that?

 5    A.  Yes.

 6    Q.  What did you understand "Smith" to mean there?

 7    A.  I understood he meant that the passport copies should be

 8    given to Billy.  She is the corrupt lawyer in South Africa.

 9    Q.  Why did you want that done?

10    A.  The corrupt lawyer Billy meant she would be the one to say

11    assist Joseph Hunter in tracking down the gold experts, Steve

12    Hahn and Andrew Hines or their retaliation that would be

13    necessary.

14    Q.  The third sentence of this e-mail reads:  Next thing on the

15    list is that we need to move on these two guys.  Make sure the

16    two guys are on top of them at all times.  Do you see that?

17    A.  Yes, I do.

18    Q.  What did you understand Smith to mean by that in this

19    e-mail to you and Joseph Hunter?

20    A.  I understood he meant that we need to retaliate against

21    these two individuals meaning the gold expert Steve Hahn and

22    Andrew Hahn as soon as possible and he is referring here where

23    he says the two guys on top of them at all times to the Echelon

24    must redeem.

25    Q.  Towards the end of the e-mail Smith wrote, once they have

1    settled their debt to us, sure, he can leave.  Until then he

2    stay where he is.  Do you see that?

3    A.  Yes, I see it.

4    Q.  What did you understand Smith to be referring to there?

5    A.  I thought he was referring to the missing money that was

6    used to buy the gold and he is specifically referring to when

7    he says settle their debt meaning either give back the money or

8    get shock or whatever other act of violence is necessary.

9    Q.  Have you essentially directed that Steve and Andrew Hahn be

10   detained at this point until they paid the debt?

11   A.  Yes, I did.

12   Q.  Did you direct any violence against Steven Hahn?

13   A.  Yes, I did.

14   Q.  Who did you provide instruction to?

15   A.  I told Dave Smith that Steve should be shot in the hand and

16   that the retaliation necessary as soon as possible.

17   Q.  When, approximately, did you give that instruction?

18   A.  Approximately, September 2008.

19   Q.  After you directed Smith to do that, did he report back to

20   you?

21   A.  Yes, he did.

22   Q.  What did Smith tell you?

23   A.  Smith told me that Joseph Hunter had tracked down Steve

24   Hahn and shot Steve Hahn in the hand.

25              MR. BOVE:  Your Honor, this might be a good place to

I44AAHUN7                        LeRoux – Direct

1    stop.

2                  THE COURT:  I think so too.

3                  Ladies and gentlemen, we are going to adjourn for the

4    day.  Breakfast will be ready for you at 9:30.  We are going to

5    start promptly at ten.  Please don't discuss the case and keep

6    an open mind.  Have a good evening.

7                  (Jury not present)

8                  (Adjourned to 9:30, Thursday, April 5, 2018)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                            Page

 3     MARK MASSEY

 4    Direct By Mr. Egan . . . . . . . . . . . . . . 159

 5    Cross By Mr. Schneider . . . . . . . . . . . 189

 6    Cross By Mr. Ray . . . . . . . . . . . . . . 203

 7     ERIC STOUCH

 8    Cross By Mr. Ray . . . . . . . . . . . . . . 223

 9    PANYA PAKCHAN

10    Direct By Mr. Egan . . . . . . . . . . . . . 249

11    Cross By Mr. Decastro  . . . . . . . . . . . 252

12     PATRICK PICCIANO

13    Direct By Ms. Donaleski  . . . . . . . . . . 262

14    Cross By Mr. De Castro . . . . . . . . . . . 271

15    Direct Q.  . . . . . . . . . . . . . . . . . 286

16     CHRISTOPHER MUELLER

17    Direct By Ms. Donaleski  . . . . . . . . . . 287

18    Cross Q. . . . . . . . . . . . . . . . . . . 295

19    Redirect By Ms. Donaleski  . . . . . . . . . 306

20    Recross By Mr. Schneider . . . . . . . . . . 306

21    PAUL CALDER LEROUX

22    Direct By Mr. Bove . . . . . . . . . . . . . 310

23                      GOVERNMENT EXHIBITS

24    Exhibit No.                             Received

25     205, 206 and 1007  . . . . . . . . . . . . 157
```

1    247-249   . . . . . . . . . . . . . . . 165

2    133-1 through 133-9   . . . . . . . . . . . 169

3    244-N203, 244-N207, and 244-N212   . . . . . . 173

4    207 through 243   . . . . . . . . . . . . . 175

5    134-1 through 134-5   . . . . . . . . . . . 183

6    251-N166, 251-N185, and 251-N176   . . . . . . 185

7    132-1 through 132-10  . . . . . . . . . . . 187

8    253-N226   . . . . . . . . . . . . . . . 189

9    250-N173   . . . . . . . . . . . . . . . 216

10   606   . . . . . . . . . . . . . . . . . 218

11   105-1 through 105-6   . . . . . . . . . . . 290

12   Seven   . . . . . . . . . . . . . . . . 294

13   1000, 400-1 – 74, 401-1 – 20, 402-1 – 13, 403-1 309 – 13, 404-1

14   404-2, 405-1, 4-5-2, 406-1 – 22, 407-1 –6, 408-1 309 – 8, 409-1

15   410-1, 411-1, 412-1, 412-3 – 9, 413-1 – 10 and 405 309-1

16   8   . . . . . . . . . . . . . . . . . . 317

17   N185A and 185B   . . . . . . . . . . . . 374

18

19

20

21

22

23

24

25