I45BHUNF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                      13 CR 521 (RA)

JOSEPH MANUEL HUNTER, ET AL.,

           Defendants.
------------------------------x

                           New York, N.Y.
                           April 5, 2018
                           9:40 a.m.

Before:

                  HON. RONNIE ABRAMS,

                              District Judge

                     APPEARANCES

GEOFFREY S. BERMAN
     Interim United States Attorneys for the
     Southern District of New York
REBEKAH A. DONALESKI
EMIL BOVE
PATRICK EGAN
     Assistant United States Attorney

CESAR DE CASTRO
VALERIE A. GOTLIB
     Attorneys for Defendant Hunter

DAVID M. STERN
JEREMY SCHNEIDER
     Attorneys for Defendant Samia

ROBERT W. RAY
BRITTNEY M. EDWARDS
     Attorneys for Defendant Stillwell

ALSO PRESENT:  JAMES STOUCH, Special Agent, DEA
MARGARET SHIELDS, Paralegal
STELLA LEUNG, Paralegal
MAYERLIN ULERIO, Paralegal

I45BHUNF

| | |
|---|---|
| 1 | (Trial resumed) |
| 2 | THE COURT:  Good morning, everybody. |
| 3 | Everyone can be seated.  We have to address a legal |
| 4 | issue.  Can we proceed without Ms. Donaleski, or do you want me |
| 5 | to wait a minute? |
| 6 | MR. BOVE:  We can proceed, Judge.  Thank you. |
| 7 | THE COURT:  Before we bring in the jury, I first want |
| 8 | to state for the record my reasoning for Hunter's renewed |
| 9 | suppression motion regarding the video. |
| 10 | In light of Agent Picciano's testimony -- |
| 11 | MR. DE CASTRO:  I'm sorry.  Judge, is your mic on? |
| 12 | THE COURT:  It is on. |
| 13 | MR. DE CASTRO:  I haven't been hearing you. |
| 14 | THE COURT:  You can't hear me.  Hold on.  I'll speak |
| 15 | very loudly and I'll make sure that the microphone is working |
| 16 | for purposes of the trial. |
| 17 | I'm just going to state the basis for my denial of |
| 18 | Hunter's motion, essentially for the same reasons that I did on |
| 19 | March 29.  Agent Picciano testified credibly, in my view, to |
| 20 | facts establishing that the installation of the surveillance |
| 21 | equipment and subsequent search of the Phuket house were not |
| 22 | the result of the DEP directing or controlling Thai law |
| 23 | enforcement authorities. |
| 24 | Rather, there was a parallel investigation by Thai law |
| 25 | enforcement into narcotics trafficking by the occupants of the |

Phuket house.  Thai police purchased the surveillance equipment used in the operation and were later reimbursed by the DEA, which, according to Agent Picciano, is a relatively common practice in Thailand.

Moreover, the DEA was involved in the physical installation of the surveillance equipment, because Thai officials, lacking the requisite technical expertise, requested assistance.  The DEA expert, however was accompanied to the Phuket house by Thai law enforcement.  After installation of the cameras' broadcast in realtime monitors were viewed both by the Thai and American officials.

The investigation ultimately led to the arrest and prosecution by Thai officials of several individuals for violation of Thai law, in addition to the charges here.

Even assuming, however, that the installation of the surveillance equipment was a DEA operation, suppression would be inappropriate, that the DEA conducted the operation requires only that the search, which was of a U.S. citizen located abroad, comport with the reasonableness requirement of the Fourth Amendment.  See, for instance, *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d at 172.  As I discussed at length at the final retrial conference, the installation and subsequent search of Phuket the house were reasonable.

Bolstering the statements in his affidavit, Agent

1    Picciano testified that he was informed by DEA agents in the

2    United States that a cooperating witness, Paul LeRoux, had

3    given authority his consent to install surveillance in a home

4    he owned in Thailand.  Agent Picciano relayed this information

5    to his counterparts at the Thai NSB, who in turn informed him

6    that there was legal authority under Thai law to install the

7    surveillance equipment and subsequently secure a warrant to

8    search the home.

9         Notably, United States officials are not obligated to

10   review the procedures required under foreign law and may

11   reasonably rely on representations of foreign officials.  That

12   legal approval had been secured, particularly where, as here,

13   they're conducting an investigation in conjunction with their

14   foreign counterparts.  See *United States v. Lee* 723 F.3d at

15   137.

16        Moreover, and as I discussed in my initial ruling, the

17   invasion of Mr. Hunter's privacy was relatively limited in

18   scope and the government had a substantial interest in

19   conducting the surveillance at issue in light of Hunter's

20   alleged membership in the vast criminal enterprise responsible

21   for, among other things, murder and narcotics trafficking.

22        When these factors are considered in conjunction, I'm

23   convinced that the search was reasonable.  At the very least,

24   the good faith exception would apply in this instance, given

25   the reasonable reliance by the American agents involved on

I45BHUNF

1    representations made by Thai authorities.  So for those reasons

2    established, that motion is denied.

3         I also want to address Mr. Stillwell's 403 objection

4    to the anticipated testimony by CW-1 that Hunter stated his

5    intention to travel to North Carolina to visit Mr. Samia and a

6    guy regarding those jobs.  I agree with the government that the

7    potential flaws of his testimony go to the evidence's weight

8    rather than admissibility and accordingly that the issues

9    should be left for the jury to assess.

10        Mr. Ray.

11        MR. RAY:  Your Honor, I was hoping to be heard with

12   regard that issue before you ruled.

13        THE COURT:  OK.

14        MR. RAY:  I think, first of all, the basic premise

15   here is whether or not and your Honor asked the appropriate

16   question at the outset, which was:  What is this evidence being

17   offered to show?

18        It's being offered to show and have the jury make an

19   inference that a conversation between Mr. Hunter and Mr. Samia

20   and possibly Mr. Stillwell occurred in North Carolina.  The

21   government indicted this case based upon a showing that Joseph

22   Hunter entered the country on December 10, 2011, and the

23   government has since walked away from border crossing records

24   that would appear to reflect that, because the government now

25   knows that that's not what those records reveal.

I45BHUNF

1    So I know we have a lengthy submission by the

2    government, six pages, single spaced to essentially try to walk

3    around the basic problem, which is they don't have proof that

4    Mr. Hunter was either in the country and certainly no proof,

5    even if he were in the country, that he took a side trip to

6    North Carolina.

7         My client should not have to defend this case on the

8    basis of having to prove a negative.  Proof of someone's

9    intention to go do something is a little like trying to prove

10   that I intend to lose ten pounds.  It's proof of intent.  It

11   isn't proof that a meeting took place and the government's

12   going to ask the jury to infer on that basis, in light of what

13   amounts to virtually no evidence that Mr. Hunter was even in

14   the country.

15        I will back, your Honor, because I don't know that

16   you've seen it.  The government makes a representation to the

17   Court suggesting that it is relying on CBP records of this

18   flight on December 10, 2011.  I brought this matter to the

19   attention of the chief of the criminal division at the U.S.

20   Attorney's Office before trial.  Those records do not reflect

21   that.  As the government now well knows, Homeland Security

22   makes a record the minute a plane reservation is made, whether

23   or not the passenger ever uses that plane reservation to

24   travel.

25        That's precisely what happened here.  I know that now

1    because, your Honor, I will point you to the records if you're

2    interested, but with regard to Mr. Samia's travel and

3    Mr. Stillwell's travel, the clue was, the very same border

4    crossing records reflect that they traveled pursuant to an

5    initial reservation they made to return from the Philippines

6    early, plane trips that they never took.  Yet the same border

7    crossing records reflect entry into the United States through

8    Guam, which we know and the government knows never happened.

9    That was the tip-off to inquire further about records the

10   government asked to us stipulate to reflecting an entry by

11   Mr. Hunter into the United States on December 10.

12           Moreover, if this evidence comes in, we're going to

13   have a minitrial about whether or not Mr. Hunter was in the

14   United States, because I also have Internet service provider

15   records which reflect point of origin to the Philippines that

16   show Mr. Hunter emailing from the Philippines throughout

17   December of 2011 and beyond that.  We also know where he

18   traveled to on or around that time.  His passport reflects the

19   fact that he left the Philippines where he was and throughout

20   the latter part of 2011 was continuously renewing his visa

21   while in the Philippines, which I understand can only be done

22   while he's there, all the way through and including January of

23   2012, periodically, I think it was every 60 days during that

24   period of time so that he could remain in the Philippines.

25           The only trip he took was a trip out of the

1  Philippines to Thailand, which his passport in his name and his

2  United States credentials and his military address all reflect

3  a reservation that he took and a plane ride that he boarded

4  from the Philippines to Thailand, and then returning on January

5  2, 2012.

6           THE COURT:  Look, you may be right about all that.  I

7  don't know, but isn't that what a trial is for?

8           MR. RAY:  No, your Honor --

9           THE COURT:  For the government to see if the

10  government meets its burden of proof.

11           MR. RAY:  No.  With regard to 403, that evidence has

12  such scant value because it cannot tend to prove other than by

13  wild speculation that a meeting took place in North Carolina.

14  The government is seeking to introduce that evidence against a

15  defendant in a case who stands to serve life in prison on the

16  notion that the prejudice doesn't substantially outweigh the

17  ridiculous amount of probative value that that has, which is

18  basically none, and we should not have to defend against that

19  evidence.

20           That is an inference that the jury cannot properly

21  draw.  It can't draw beyond a reasonable doubt.  It can't draw

22  it at all.  It's not evidence of anything.  It doesn't prove

23  that anything about whether or not a meeting occurred and

24  they're introducing that evidence to suggest that that's the

25  case, and they made representations to the Court that are no

1   better than the representations they made yesterday with regard

2   to, you know, whether there was a Thai investigation or not.

3   All of which turned out to be false.

4           THE COURT:  First of all, after having heard Agent

5   Picciano, I don't think that those representations are false.

6   I think that, as I made clear, I found him to be credible.  I

7   do believe that it was a joint investigation.  We don't need to

8   relitigate that.  I just read you my ruling on that.

9           MR. RAY:  Also, I will say -- I'm sorry.  I missed --

10          THE COURT:  This is a different issue.  It appears

11  that that in part was based on limited knowledge of someone who

12  is lower level.  Perhaps some language issues in addition, but

13  I really don't think those were intentional misrepresentations.

14          MR. RAY:  I was referring more to the representations

15  that the government made that Agent Stouch made and others made

16  about the fact that this was a Thai law enforcement

17  investigation.  They certainly were in a position to know

18  better.  Anyway, I'll leave that aside.

19          The last thing I wanted to mention was with regard to

20  the Korean Airlines flight records, the government also

21  misrepresents those.  It's absolutely clear he was not on that

22  flight.  He never used that reservation.  There's no question

23  that he made the reservation, because that's why he did the

24  border records.  He was not on the plane, he was not on the

25  flight manifest.  There's no evidence to suggest otherwise.

1          The sum total of this is, they can't prove he was in

2     the United States.  I can prove he was in the Philippines.

3     They're attempting to introduce evidence though the witness to

4     suggest that while he was in the United States he indicated an

5     intention to somebody, a secondhand conversation with regard to

6     a meeting, a thirdhand conversation with regard to Mr. Samia

7     that, in a fourth way, might possibly involve my client,

8     Mr. Stillwell, with absolutely no evidence of any travel by

9     anybody with regard to how that meeting would have occurred --

10    no E-ZPass records, no phone calls to suggest it happened, no

11    photographs, no nothing.  Zero.  That evidence is supposed to

12    come in.

13         We can all agree about the possible relevance of it,

14    but there's absolutely no question that that is hugely

15    prejudicial and the test is whether or not, given its scant

16    probative value, whether that's substantially outweighed by the

17    danger of unfair prejudice, which it clearly is and it should

18    be excluded.  And if it goes in, it's a problem.

19         THE COURT:  Does anyone want to respond on behalf of

20    the government?

21         MS. DONALESKI:  Certainly, your Honor.

22         Let me first update the Court and defense counsel on

23    what we've heard from Korean Airlines.  We spoke to counsel for

24    Korean Airlines last night.  They told us they provided us the

25    passenger manifest.

I45BHUNF

1          THE COURT:  Bring the mic closer.

2          MS. DONALESKI:  Is that better?

3          THE COURT:  I think so.

4          MS. DONALESKI:  They told us that the Excel

5     spreadsheet that they provided us and which we've already

6     provided to the defense was the onboard passenger manifest and

7     if no one from the defense will stipulate to it, they will make

8     a witness available early next week to testify that that is the

9     onboard passenger manifest and Mr. Hunter was on Korean Air

10    Flight 35 into the country on December 10, 2011.

11         With respect to the arguments that defense counsel is

12    making, your Honor is exactly right.  This is why we have a

13    trial, so that he can make those arguments to the jury and he

14    can tell the jury whether they should credit or discredit the

15    testimony in light of the other evidence.

16         The evidence has normal probative value.  Mr. Hunter

17    is admitting to CW-1 the element of what is formally Count

18    Three and now is Count One, that he is in the United States

19    conspiring to commit murders abroad.  He is recruiting

20    Mr. Samia and Mr. Stillwell.  The jury can infer from that.  It

21    is permissible circumstantial evidence that that meeting

22    existed.

23         THE COURT:  Is that all you're going to have to prove

24    up the jurisdictional element with respect to Mr. Stillwell?

25         MS. DONALESKI:  No, absolutely not.

I45BHUNF

1            THE COURT:  It's just intention to meet him.

2            MS. DONALESKI:  No.  We have emails, we have

3    electronic records that will be introduced next week, we have

4    cooperator testimony from Mr. LeRoux that you'll hear today and

5    from CW-1 that you'll hear either today or Monday.

6            This is, by no means, the government's only proof as

7    to the jurisdictional element as to Mr. Stillwell.  We indicted

8    Mr. Stillwell on a body of evidence that didn't include this

9    testimony and we feel confident that we can convict beyond a

10   reasonable doubt based on all the evidence that we have.  This

11   is not the only evidence of the jurisdictional element as to

12   Mr. Stillwell.  It is enormously probative and Mr. Ray has not

13   identified any legally relevant prejudice.  He's identifying

14   prejudice in terms of it is detrimental to his defense.

15           THE COURT:  I don't think that's all he's saying.

16   He's saying it's too speculative, and therefore, misleading.

17           MS. DONALESKI:  It's not speculative.

18           THE COURT:  It's not just that, oh, this is harmful.

19   I think he's worried that, look, if this is all you have, it

20   will be too confusing for the jury.  But look, ultimately I do

21   think, as I said at the start, this goes to weight not

22   admissibility.

23           Mr. Ray, you can make all the arguments that you made

24   to me today to the jury and I think that that's the appropriate

25   place to make them.  While I agree that there certainly could

1    be evidence that's more probative of whether Mr. Hunter met

2    with Mr. Stillwell in North Carolina, the statement is by no

3    means devoid of probative value.  In fact, it is probative.  So

4    I am going to let it go to the jury over your objection.

5    That's my ruling on that.

6              Is there anything else we need to discuss today?

7              MR. BOVE:  Judge, I just had one administrative

8    matter.

9              Yesterday when I offered the stipulation marked

10   Government Exhibit 1000, there were two exhibits referenced in

11   the stipulation that I neglected to offer at the time I was

12   reading it to the jury.  Those are Government Exhibits 403-14.

13             THE COURT:  Why don't you do that in front of the

14   jury.

15             MR. BOVE:  OK.

16             THE COURT:  You had mentioned that there were two.

17   I'm not sure if there was what you were referring to, but you

18   had mentioned that there were two exhibits for which there were

19   objections.

20             MR. BOVE:  Yes, Judge.

21             THE COURT:  Are these the exhibits you were talking

22   about?

23             MR. BOVE:  No, your Honor.

24             Those are two exhibits from the Facebook account of

25   Mr. Stillwell that reference the motorcycle that Mr. Ray raised

I45BHUNF

1  the objection to on 403 grounds and we'll offer them pursuant

2  to the stipulation if your Honor rules in our favor, but we

3  would do that next week.  So I don't think that's something

4  that needs to be addressed.

5       THE COURT:  Are those photos of the motorcycle that

6  you want me to look at or are they emails about it?

7       MR. BOVE:  There are photographs and comments on the

8  Facebook page.

9       THE COURT:  So if you want me to rule on that, just

10  show them to me so that I can review them first.

11       MR. BOVE:  I think if we could, Judge, we'd like to

12  take some time to cue it up in the context of all the evidence

13  this weekend.  We will put it in a brief submission.  We don't

14  intend to formally offer it or publish to the jury until next

15  week.

16       THE COURT:  All right.  Thanks.

17       Do we have an updated Government Exhibit list?  Can I

18  get an updated one if you have one?

19       MR. BOVE:  Yes, Judge.

20       THE COURT:  Should the marshals bring out Mr. LeRoux

21  now?

22       MR. BOVE:  Yes, your Honor.

23       THE COURT:  We're still waiting on one juror.

24

25

1          (Jury present)

2          THE COURT:  Good morning, everyone.  You can be

3    seated.

4          I'm going to remind you that you're still under oath.

5          MR. BOVE:  Your Honor, before I proceed with

6    Mr. LeRoux, I want to offer Government Exhibit 403-14, pursuant

7    to the stipulation admitted yesterday Government Exhibit 1000.

8          THE COURT:  Yes. It will be admitted.

9          Thank you.

10          (Government Exhibit 403-14 received in evidence)

11          MR. BOVE:  May I inquire?

12          THE COURT:  You may.

13    DIRECT EXAMINATION (Resumed)

14    BY MR. BOVE:

15    Q.  Mr. LeRoux, at the end of the day yesterday you were

16    testifying about a man named Steven Hope Hahn, correct?

17    A.  Yes.

18    Q.  And about an incident in which approximately $800,000 was

19    missing that you believed Hahn helped to steal from you?

20    A.  Yes.

21    Q.  And at the end of your testimony yesterday, you were

22    describing an incident involving Joseph Hunter that was

23    reported to you by David Smith?

24    A.  Yes.

25    Q.  What did Smith report to you?

1  A.  Smith reported that Joseph Hunter had tracked down Steve

2  Hahn and shot him in hand.

3          MR. BOVE:  Ms. Shields, can you please publish the

4  portion of Government Exhibit 104-3 from the beginning to three

5  minutes and 17 seconds.

6          (Video played)

7          MR. BOVE:  Thank you, Ms. Shields.  You can take that

8  down.

9  Q.  Mr. LeRoux, yesterday you mentioned that said Steven Hope

10 Hahn has a brother, I believe?

11 A.  Yes.

12 Q.  What is his name?

13 A.  Andrew Hahn.

14 Q.  Did you believe that Andrew Hahn was also involved in the

15 loss of the money?

16 A.  Yes.

17 Q.  What, if anything, did you do to retaliate against Andrew

18 Hahn?

19 A.  I lured Andrew Hahn to the Philippines and then I told Dave

20 Smith to have drugs planted on him.

21 Q.  Was that also around 2008?

22 A.  Yes, it was.

23 Q.  Did Smith report back to you after you gave that

24 instruction?

25 A.  Yes.

1    Q.   What did David Smith tell you?

2    A.   Dave Smith told me that drugs had been planted on Andrew

3    Hahn and he had been arrested.

4    Q.   Other than Steven and Andrew Hahn, did you believe that

5    anyone else was responsible for stealing this money from you?

6    A.   Yes, I did.

7    Q.   Who else did you believe was responsible?

8    A.   My cousins, Matthew Smith and Gary Smith.

9    Q.   How did you form that belief?

10   A.   I formed the belief based on the information reported to me

11   by Dave Smith, which was the result of the investigation by the

12   Echelon mercenaries in Africa.

13   Q.   Did you instruct Smith to carry out acts of violence

14   against your cousins, Matthew and Gary Smith?

15   A.   Yes.

16   Q.   What did you instruct Dave Smith to do?

17   A.   I instructed Dave Smith to send an Echelon mercenary team

18   to Zimbabwe and use any necessary acts of violence to get the

19   money back.

20   Q.   Did Smith tell you what happened?

21   A.   Yes.

22   Q.   What did Smith tell you about how he carried out that

23   instruction?

24   A.   Smith told me that Joseph Hunter and Chris DeMeer had been

25   sent to Zimbabwe and they had firebombed Matthew Smith's house.

1  Q.  What is your understanding of what Smith meant by

2  "firebombed"?

3  A.  I understood he threw an alcohol mixture that set the house

4  on fire.

5  Q.  When you say "he," who do you mean?

6  A.  I understood he was referring to Chris DeMeer and Joseph

7  Hunter.  And person I was speaking to was Dave Smith.

8  Q.  And you mentioned Chris DeMeer yesterday, correct?

9  A.  Yes.

10  Q.  He was the mercenary that David Smith told you was formally

11  in the French Foreign Legion?

12  A.  Yes.

13  Q.  After Smith told you about Hunter and DeMeer firebombing

14  your cousin's house, did you take any further steps to carry

15  out violence against your cousins?

16  A.  Yes, I did.

17  Q.  What did you do?

18  A.  I instructed a hit man named Marcus to firebomb the house

19  of Gary Smith.

20  Q.  Where was Marcus from?

21  A.  Marcus was from South Africa.

22  Q.  Did Marcus report back to you after you gave him that

23  instruction?

24  A.  Yes.

25  Q.  What did Marcus tell you that he did?

1    A.  Marcus told me that he firebombed the house of Gary Smith

2    in Johannesburg, South Africa.

3    Q.  Did you later instruct Marcus to kill your cousins?

4    A.  Yes.

5    Q.  What did Marcus report back?

6    A.  He did not kill my cousins.  The job was canceled.

7    Q.  Who canceled the job?

8    A.  I did.

9    Q.  Why?

10   A.  I decided since they were family members, I couldn't go

11   through with it.

12   Q.  Now, I'd like to stay focused on the year 2008.  Was there

13   a time during that year when you instructed Dave Smith to carry

14   out an act of violence against a real estate broker in the

15   Philippines?

16   A.  Yes.

17   Q.  And is this a real estate broker other than Catherine Lee?

18   A.  Yes.

19   Q.  Why did you target this other person?

20   A.  That other person owed me approximately 1,000 U.S. dollars.

21   Q.  Did Smith report back about what had happened in response

22   to your instruction?

23   A.  Yes.

24   Q.  What did Smith tell you about this incident?

25   A.  Smith told me that Chris DeMeer had thrown a grenade at the

1    person's house.

2    Q.  Do you know a man named Moran Oz?

3    A.  Yes.

4    Q.  Who was Moran Oz?

5    A.  Moran Oz was the call center manager in Israel for the

6    online pharmacy criminal operation.

7    Q.  And remind us, what was the purpose of these call centers?

8    A.  The purpose of the call centers was administration, paying

9    invoices and customer support.

10   Q.  For the pharmacy?

11   A.  Yes.

12   Q.  Did you ever direct violence against Moran Oz?

13   A.  Yes.

14   Q.  Why?

15   A.  I believe he was involved in stealing from me.

16   Q.  Who did you instruct to carry out violence against Moran

17   Oz?

18   A.  Dave Smith.

19   Q.  When, approximately, did you give that instruction?

20   A.  Approximately 2008, 2009.

21   Q.  What happened after you provided that instruction to David

22   Smith?

23   A.  Dave Smith reported back to me that Moran Oz had been taken

24   out on a boat by Joseph Hunter and Chris DeMeer, and thrown in

25   the water and shot at by Joseph Hunter.

1   Q.  Based on what Smith reported, what was your understanding

2   of whether or not Moran Oz was killed during that incident?

3   A.  I understood that he was not killed.

4            MR. BOVE:  Ms. Shields, could you please publish

5   Government Exhibit 400-9.

6            This is an email from Joseph Hunter to Adam Samia

7   dated September 22, 2008, and the subject is, "Hi, from Joe."

8            The email reads, "Thanks for the heads-up.  I heard

9   you left PI and are on the way to the States.  Stay safe.  And

10  I hope to see you down the road somewhere.  If you hear of any

11  work or opportunity for me, please let me know.  My permanent

12  email is Josephmhunter@usarmy.mil.  Keep it safe, because the

13  military has access to this email.  Again, if you know of any

14  work for me, let me know.  I'm still trying to get out of South

15  Africa and should be in the PI in one or two weeks, but you

16  know the lies they tell us.  Talk with you later."

17           Ms. Shields, can we take a look at 400-11 now.  If you

18  can zoom in on the message dated October 16, 2008 at 7:52.

19           This is an email from Hunter to Agsamia@aol.com dated

20  October 16, 2008, with the subject, "Hey, bro."

21           Hunter's message which he signed Joseph Hunter reads:

22  "Good to hear from you.  I'm still in Africa, but I'm leaving

23  on Saturday with Lock going to PI.  OD is supposed to come and

24  replace us.  I did the thing with Bad Steve and then came to

25  Mozambique.  Lock is saying he is not coming back to Africa and

1    I think he's trying to get where he does only Hong Kong.  If

2    that happens I will quit.  I'm not going to take all the risks

3    for these guys in Africa while the rest of them are in HK and

4    PI.  They want me to do the hardships while they do nothing.

5    Total BS.  You know how it goes.  Have you found work yet?"

6    BY MR. BOVE:

7    Q.  Now, Mr. LeRoux, there's reference in this email in the

8    second line to "OD."

9            Do you see that?

10   A.  Yes.

11   Q.  You testified earlier that one of the mercenaries was named

12   John O'Donoghue; is that right?

13   A.  Yes.

14   Q.  Did he sometimes use the code name OD?

15   A.  Yes.

16           MR. BOVE:  Ms. Shields, can we take a look at

17   Government Exhibit 400-13, please.  Zoom in on the message,

18   please.

19           This is a message from Samia to Hunter dated January

20   11, 2009.  Subject:  "Hey, bro."

21           The message reads, "Hey, Joe, how goes it?  Last time

22   we talked I think you said you were going back on the 8th.  If

23   you did, stay in touch, because I can't find anything soon, by

24   like the end of February, I might be calling Dave to see if he

25   can put me back on.  Let me know where you're at and what you

1  are doing, bro.  I think OD isn't work for Paul anymore.  Let

2  me know if you heard anything about that.  Take and watch your

3  six, bro.  Adam."

4          Ms. Shields, can you now zoom in on the email dated

5  March 2, 2009, at 6:57.  I'm sorry.

6          If you can put up Government Exhibit 400-15.  Now take

7  a look.  Let's start with the February 15 email.

8          This is an email from Samia to Hunter dated February

9  15, 2009.  Again, subject:  "Hey, bro."

10          This one says "hey, Joe, how are things going where

11  you're at and what are you up to? still working for Paul and

12  stuff?"

13          Now let's take a look at the March 2, 2009, email.

14  This is Hunter's response dated March 2, 2009.

15          "Adam.  I'm in Africa and I've been here for a month.

16  Still working for Dave and Paul and everything is still the

17  same with those two.  No planning and the planning they do is

18  shit.  Still doing the other thing for them.  What are you up

19  to?  Joseph Hunter."

20  BY MR. BOVE:

21  Q.  Mr. LeRoux, in that email, Hunter wrote that there's no

22  planning."  Do you see that?

23  A.  Yes.

24  Q.  Did Hunter ever express concerns to you about planning for

25  the acts of violence that he was instructed to carry out?

1    A.  Yes, he did.

2    Q.  What type of concerns?

3    A.  He basically stated to me that Dave Smith spent more time

4    drinking and womanizing and wasn't really actively planning

5    anything.

6    Q.  And were those complaints that were expressed to you by

7    Hunter in the 2009-2010 time frame?

8    A.  No, later on.

9    Q.  When, approximately?

10   A.  2011.

11        MR. BOVE:  Ms. Shields, can you please bring up

12   Government Exhibit 400-17.  Let's start by zooming in on the

13   bottom email dated May 15, 2009.

14        This is an email from Samia to Hunter, subject: "Hey,

15   dude."

16        It reads, "Hey, bro, how goes it?  Are you still

17   working on the same stuff for the same people or did that come

18   to an end?  You said your thing that you were going to quiet

19   wondering if you did or not stay.  Safe bro.  Take it easy and

20   stay in touch."

21        Now if we can take a look at the email on May 15, 2009

22   at 11:58.  This is Hunter's response "Adam, still with the same

23   idiots.  I'm in PI right now and I'm supposed to head out to

24   Africa again next week.  Nothing has really changed.  Still

25   doing the same thing.  Trying to hold out as long as I can

1  before I leave though, Joseph Hunter."

2            MR. BOVE:  Ms. Shields, can you please publish

3  Government Exhibit 400-20.  Let's start on page 2 of this

4  exhibit and if you can zoom in on the email dated December, 16.

5  2009.

6            This is an email from an account,

7  prostreet60@yahoo.com sent to Samia on December 16, 2009.

8            It reads, "Hey, you want do work with Joe?  9K plus

9  bonus.  I don't want to get into details.  If yes, I will have

10  Joe contact you."

11            Let's take a look at the next message on this thread,

12  which starts on page 1.  This is an email dated December 16,

13  2009 from Samia to Hunter and it reads, "Hey, bro, Dave sent me

14  this email today.  You know anything about this?  Or is this

15  what we spoke about or something different?  Let me know.  And

16  are you still in SA or are you going to be home for the

17  holidays?  Adam."

18            Let's take a look at the next message, which is dated

19  December 17, 2009, and this is Hunter's reply.

20            "Adam, I just got here in the U.S. for the holidays

21  and I will give you a call.  This is something else other than

22  what I told you about.  It is for doing the serious thing in

23  Africa.  I will talk to you later."

24            If you can zoom in, please, on the top message.  This

25  is the last response on this thread from Samia to Hunter dated

 1    December 18, 2009. "Roger that, bro.  Give me a call."

 2              Ms. Shields, can we take a look at Government Exhibit

 3    400-21, please, and if you can zoom in on the bottom email.

 4              This is a message to Samia from someone using the

 5    alias John Stevens.

 6              Ms. Shields, if you can highlight the subject line,

 7    please.  The subject reads, "Dude, Dave here."  And the message

 8    to Samia says, "The job is simply it.  9K a month, plus 25K

 9    bonus on each job done.  As you know what Joe does for us.

10    Clean up with our problem people.  You will work with Joe.

11    Need answer."

12              Ms. Shields, can you highlight the text that says,

13    "25K bonus," please.

14    BY MR. BOVE:

15    Q.  Mr. LeRoux, what types of things were you paying a $25,000

16    bonus for between 2009 and 2012?

17    A.  Murders.

18              MR. BOVE:  Ms. Shields, could you please zoom in on

19    the email in this thread dated December 28, 2009, 52838.

20              This is Samia forwarding that message to Joseph

21    Hunter. "Hey, bro.  Give me a call again AASP.  I have some

22    ideas."

23              You can take that down, please.

24    BY MR. BOVE:

25    Q.  Mr. LeRoux, you testified yesterday that you murdered Dave

1    Smith in 2010?

2    A.  Yes.

3    Q.  Was that in December of 2010, approximately?

4    A.  Approximately December 2010, yes.

5    Q.  Why did you kill Dave Smith?

6    A.  I believed that Dave Smith was involved in a plot to have

7    me kidnapped, tortured, and killed and I believed he was also

8    stealing money.

9    Q.  Describe how Dave Smith was killed?

10   A.  Dave Smith was lured by Marcus and myself to a strip of

11   land in the south of the Philippines.  He dug a hole believing

12   that he would be burying money.  Marcus then started shooting

13   him with a pistol he was holding in the head, many times.  When

14   Dave Smith was down on the ground, I shot him a couple of times

15   with the rifle that I had.

16   Q.  You said that Marcus was with you during that murder?

17   A.  Yes.

18   Q.  That's the South African hit man that you described

19   earlier?

20   A.  Yes.

21   Q.  Was there a man named Joseph, other than Hunter, that you

22   also believed was involved in the plan of Dave Smith to steal

23   from you?

24   A.  Yes.

25   Q.  Do you know Joseph's last name?

1    A.  I don't, no.

2    Q.  What, if any, steps did you take to carry out violence

3    against Joseph?

4    A.  I instructed a man named the Accountant to plant a

5    explosive device under his vehicle.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. BOVE:

2  Q.  Who is the accountant?

3  A.  I believe the accountant was a rebel leader in the

4  Philippines.

5  Q.  Do you know if that happened, if the explosives were

6  planted under Joseph's vehicle?

7  A.  Yes, it did.

8  Q.  Do you know if Joseph was killed?

9  A.  He was not.

10  Q.  After you had Dave Smith killed did you meet with Joseph

11  Hunter?

12  A.  Yes.

13  Q.  When approximately was the first meeting?

14  A.  Approximately, early 2011.

15  Q.  Where was that meeting?

16  A.  In the Philippines.

17  Q.  What were some of the things that you spoke to Hunter about

18  in the Philippines following the murder of Dave Smith?

19  A.  I confirmed with Joseph Hunter that Dave Smith had been

20  killed.  I stated he had been killed because he was stealing

21  money and said to Joseph Hunter that he should be the one to

22  take over the Echelon mercenary team.  The Echelon mercenary

23  front operation was no longer required however.  I also told

24  Joseph Hunter that I needed a new team put together for

25  upcoming murders and the payment for each murder was $25,000.

1    Q.  Was there any discussion about salary for Hunter in

2    connection with this potential promotion?

3    A.  Yes.

4    Q.  What was discussed on the topic of Hunter's salary?

5    A.  It was discussed that Joseph Hunter would receive

6    approximately 12,000 U.S. dollars because he would be the

7    manager of the new kill teams.

8    Q.  And you said that there was discussion needing to recruit

9    new mercenaries for murders; is that right?

10   A.  Yes.

11   Q.  Was there any discussion about how those teams should be

12   constituted or their size?

13   A.  Yes.

14   Q.  What was said during this meeting about that topic, the

15   size of the murder teams?

16   A.  I discussed with Joseph Hunter that the new kill team

17   should consist of two men.

18   Q.  Based on this meeting did Hunter accept the promotion?

19   A.  Yes, he did.

20          MR. BOVE:  Ms. Shields, could you please publish

21   Government Exhibit 104-4.

22          (Video/audiotape played)

23   Q.  After you promoted Hunter to take over for Dave Smith in

24   early 2011, did Hunter recruit men to come to the Philippines

25   to commit more murders?

1    A.  Yes.

2              MR. BOVE:  Ms. Shields, could you please publish

3    Government Exhibit 400-34 and let's start at the very bottom.

4              (Pause)

5              MR. BOVE:  This is a message from Adam Samia to Joseph

6    Hunter with the subject "Uzi" dated March 15, 2011.  Samia sent

7    Hunter a link to YouTube.  Now if we could take a look at next

8    message in this thread.

9              (Pause)

10             This is Hunter's response to Samia dated March 18th of

11   2011.

12             Adam, if you want to know about work, get a prepaid

13   card and call me from some phone that is not yours at this

14   number.  You might have to add a zero in front of the nine, I

15   don't know.  You can call me any time.  Joseph Hunter.

16             And now let's take a look at next message please.

17             (Pause)

18             this is from Samia to Hunter dated March 20, 2011.

19             Joe, tried calling that number at 20:30 hours my time.

20   It would not go through.  It was saying the number was not in

21   service.  Can you call my cell?  Adam.

22             Ms. Shields, now if you could publish 400-36 and

23   please zoom-in on the bottom e-mail dated April 9, 2011.

24             This is a message from Samia to Hunter with the

25   subject "Hey, bro".

1      Hey bro, how are things going?  I have a guy that is

2  interested in going to work if you are interested.  He would be

3  a good second guy.  E-mail me or call for more info.  I am

4  still in the process with TC.  If it don't work out I will be

5  getting in contact with you.  Take care, bro and watch your

6  six.  Adam.

7      If you could zoom-in on the top message.

8      This is Hunter's response sent to Samia dated

9  April 16, 2011.

10     Hi, yes, received your e-mail.  Will keep him in mind.

11 Right now don't need anyone.  Already have eight guys working

12 for me on various things.  But people will always leave, so

13 replacements could be needed at any time.  Joseph Hunter.

14 Q.  Mr. Leroux, do you see the part of that e-mail where Hunter

15 wrote already have eight guys working for me on various things?

16 A.  Yes.

17 Q.  Was Hunter successful in recruiting more than two people to

18 come to work on the mercenary team after the promotion?

19 A.  Yes.

20 Q.  Who were some of the people that he recruited?

21 A.  Chris Demeer, Daddy Mac, Tim Vamvakias, as well as various

22 people who operated under aliases.

23 Q.  You mentioned somebody using the alias Daddy Mac?

24 A.  Yes.

25 Q.  Did you learn Daddy Mac's legal name?

1    A.  No, I did not.

2    Q.  You testified yesterday that you first heard of Demeer in

3    2005; is that right?

4    A.  Yes.

5    Q.  In this timeframe, early to mid 2011, did you ever meet

6    Demeer and this man named Daddy Mac?

7    A.  Yes, I did.

8    Q.  Where?

9    A.  In the Philippines.

10   Q.  Describe that meeting.

11   A.  I met Chris Demeer, Daddy Mac with Joseph Hunter at a

12   meeting in the Philippines and they were introduced to me as

13   the new kill team put together by Joseph Hunter.

14   Q.  Who introduced Demeer and Daddy Mac that way?

15   A.  Joseph Hunter.

16   Q.  What, if anything, did Hunter say about Daddy Mac's

17   background?

18   A.  Hunter told me that Daddy Mac was from New Zealand.

19   Q.  Let's take a step back for a minute.  You'd said yesterday

20   that one of the crimes you'd pleaded guilty to was a hacking

21   crime?

22   A.  Yes.

23   Q.  What did that entail?

24   A.  It involved conspiracy to steal customer databases,

25   customer lists.

1   Q.  What type of customers?

2   A.  Online pharmacy customers.

3   Q.  Do you have a background in computer science?

4   A.  Yes, I do.

5   Q.  Please summarize.

6   A.  I have knowledge on computer programming databases as well

7   as encryption.

8   Q.  Now some of the e-mails you described yesterday involved

9   e-mail address Johan58@GMail.com.  Do you recall those

10  messages?

11  A.  Yes, I do.

12  Q.  Did you stop using that account at some point?

13  A.  Yes, I did.

14  Q.  When approximately did you stop using the GMail account?

15  A.  Approximately 2010, 2009/2010.

16  Q.  When you did that did you establish a form of communication

17  that you believed was more secure?

18  A.  Yes.

19  Q.  How did you do that?

20  A.  I set up a server in the Philippines and registered the

21  domain and set up that system as the new secure system.

22  Q.  Why did you believe that this new system was more secure?

23  A.  Because I set it up myself it was my own server and I

24  installed encryption on the server.

25  Q.  What kind of encryption?

1    A.   The encryption used consisted of the encryption protocol

2    SSL and also PGP.

3    Q.   What is SSL?

4    A.   SSL is a type of point to point protocol that allows two

5    computers to communicate with each other in safety encrypted

6    fashion.

7    Q.   You used the term PGP?

8    A.   Yes.

9    Q.   What is PGP?

10   A.   PGP stands for "pretty good privacy".  It's a piece of

11   software used to encrypt e-mails.

12   Q.   Was the domain for these e-mail accounts fast-3-e-mail.com?

13   A.   Yes.

14   Q.   Do you remember setting up a fast3e-mail.com account for

15   Adam Samia?

16   A.   No.

17   Q.   What about for Hunter?

18   A.   Yes.

19   Q.   How would a user of the fast3 e-mail accounts access his

20   account?

21   A.   They would use an Internet browser like Internet explorer

22   or analog into the server in a similar way to Hotmail.

23   Q.   When messages were sent and received using these accounts?

24   Were they stored on a server?

25   A.   Yes, they were.

1   Q.  And was it set up so that those messages were served around

2   the time they were transmitted?

3   A.  Yes.

4   Q.  Prior to your arrest in 2012 where was the server located

5   that hosted these e-mails?

6   A.  In the Philippines.

7   Q.  Where is that server today?

8   A.  That server is either stolen or missing.

9   Q.  Did you learn of that after you were arrested?

10  A.  Yes.

11  Q.  Now you testified yesterday that you started to cooperate

12  after you were arrested in Liberia in 2012?

13  A.  Yes.

14  Q.  Did there come a time when agents from the DEA gave you

15  instructions to try to recover e-mails from the fast3e-mail.com

16  server?

17  A.  Yes.

18  Q.  Were you able to do that?

19  A.  Yes.

20  Q.  How did you do it?

21  A.  Acting under the supervision at all times of the agents I

22  was able to log into the server in the Philippines using the

23  protocol SSL.

24  Q.  Where were you when you logged into the server?

25  A.  Sorry.  Please repeat.

1    Q.  Where were you physically when you logged into the server?

2    A.  I was in a proffer session room in 500 Pearl Street.  I was

3    monitored by the agents at all time.

4    Q.  You said 500 Pearl Street.  Is that one of the government

5    buildings here in Manhattan?

6    A.  Yes, it is.

7              MR. BOVE:  May I approach, your Honor?

8              THE COURT:  You may.

9    Q.  I am showing you documents marked for identification

10   Government Exhibits 414-1 through 414-28 and I'll ask that you

11   take a look at those.

12             (Pause)

13   Q.  Do you recognize those exhibits, sir?

14   A.  Yes, I do.

15   Q.  Did you have an opportunity to review them prior to your

16   testimony today?

17   A.  Yes, I did.

18   Q.  How do you know those are the documents you reviewed?

19   A.  I signed every document in the bottom right-hand corner.

20   Q.  What are Government Exhibits 414-1 through 414-28?

21   A.  These are e-mails from the secure server fast-3-e-mail.com.

22   Q.  Are those e-mails that you recovered at the direction of

23   the DEA?

24   A.  Yes, whilst being monitored by the DEA I was able to

25   recover those e-mails, correct.

1          MR. BOVE:  The government offers 414-1 through 414-28.

2          (No objection)

3          THE COURT:  They'll be admitted.

4          (Government's Exhibits 414-1 - 414-28 received in

5    evidence)

6          MR. BOVE:  Would you please publish 414-1.

7          (Pause)

8    Q.  Mr. Leroux, this is a message from Rambo@fast3e-mail.com;

9    do you see that?

10   A.  I do.

11   Q.  Who is assigned the e-mail account with the user name

12   "Rambo"?

13   A.  Joseph Hunter.

14   Q.  And this is a message from Hunter to a user named "John".

15   Do you see that?

16   A.  Yes.

17   Q.  Who used the account on fast3e-mail.com with user name

18   John?

19   A.  I did.

20         MR. BOVE:  Could you please zoom-in on the bottom

21   e-mail.

22         (Pause)

23         MR. BOVE:  Highlight the top line and date.

24   Q.  This is a message dated May 25, 2011 from Hunter; is that

25   right?

1   A.  Yes.

2   Q.  And it begins:

3           Sir, below is list of salaries for 1 June.

4           Do you see that text?

5   A.  Yes.

6   Q.  And below that there's a reference to JaRule; do you see

7   that?

8   A.  Yes.

9   Q.  What is your understanding of who Hunter was referring when

10  he wrote JaRule?

11  A.  Himself.

12  Q.  What is your understanding why his salary is listed as

13  12,000?

14  A.  My understanding is it was because he had been promoted to

15  the manager of the new kill team.

16  Q.  Now below that entry is a reference to a Alexi; do you see

17  that text?

18  A.  Yes.

19  Q.  Who did you understand Hunter to be referring to when you

20  used that coding?

21  A.  Chris Demeer.

22  Q.  There's a reference to a salary of $10,000 plus a $15,000

23  bonus; do you see that?

24  A.  Yes.

25  Q.  What did you understand Hunter to be referring to when he

1   said that there was a $15,000 bonus?

2   A.  I understand it was an act of violence.

3   Q.  Do you remember what Demeer was instructed to do in this

4   timeframe that led to that bonus payment?

5   A.  I don't, no.

6   Q.  Do you believe was some kind of act of violence?

7   A.  I do, yes.

8   Q.  Could it have been a murder?

9           MR. SCHNEIDER:  Objection.

10          THE COURT:  Sustained.

11  Q.  The second section of the e-mail begins:

12          These two are the down south guys and need to be paid

13  in the U.S.  Do you see that text?

14  A.  Yes.

15  Q.  What did you understand Hunter to be referring to when he

16  wrote that?

17  A.  I understood he was referring to the two individuals

18  handling the Tramadol operation in Texas.

19  Q.  What is Tramadol?

20  A.  Tramadol is one the painkillers that I sold online in the

21  illegal online pharmaceutical operations.

22  Q.  You said there was a Tramadol operation?

23  A.  Yes.

24  Q.  What do you mean by that?

25  A.  The Tramadol operation referred to a smuggling operation on

1   behalf of the illegal online pharmacy which consisted of

2   smuggling Tramadol from Mexico to Texas.

3   Q.  The next entry below that text says:

4           Tay $10,000.

5           Do you see that?

6   A.  Yes.

7   Q.  Who did you understand Hunter to be referring to when he

8   wrote "Tay"?

9   A.  I understood he meant Tim Vamvakias.

10  Q.  Below that that's a reference to Diggler; do you see that?

11  A.  Yes.

12  Q.  Who did you understand Hunter to be referring to when he

13  wrote that?

14  A.  The person working with Tim Vamvakias on the Tramadol

15  operation in Texas.

16  Q.  In 2011 and 2012 did you ever pay a $15,000 bonus for a

17  murder?

18  A.  No.

19  Q.  What was the bonus that you paid for murders in that

20  timeframe?

21  A.  The bonus was always 25,000 U.S. dollars.

22          MR. BOVE:  Let's take a look at the top message.  And

23  could you please highlight the text that says "please advise of

24  the P90 paid back".

25  Q.  This part of the message says:

1      Regarding Chris, please advise how was the P90 paid

2   back.  Just refresh my memory.  Thanks.

3      Do you see that?

4   A.  Yes.

5   Q.  Who wrote that?

6   A.  I did.

7   Q.  What did you mean by that?

8   A.  There was an incident involving Chris Demeer where a

9   weapon, a P90 specifically had been stolen because Chris Demeer

10  wired funds -- cries Chris Demeer stole --

11  Q.  Who told you about that incident?

12  A.  Dave Smith.

13  Q.  Was Dave Smith still alive in May of 2011?

14  A.  He was not, no.

15  Q.  Who told but the incident, sir?

16  A.  About this specific instance it was Joseph Hunter.

17  Q.  There's a reference here of a P90; do you see that?

18  A.  Yes.

19  Q.  What's a P90?

20  A.  A P90 is a type of rifle.

21  Q.  Are you generally familiar with that type of firearm?

22  A.  Yes.

23      MR. BOVE:  May I approach judge?

24      THE COURT:  You may.

25  Q.  I'm showing you a photograph marked for identification as

1    Government Exhibit 131-1.  Do you recognize that?

2    A.  Yes, I do.

3    Q.  What is it?

4    A.  This is a P90.

5         MR. BOVE:  Your Honor, the government offers 131-1.

6         THE COURT:  Any objection?

7         MR. DECASTRO:  None.

8         THE COURT:  All right.  It'll be admitted.

9         MR. BOVE:  Please move the exhibit to the left and

10   bring up on the right side of the screen Government Exhibit

11   131-1.

12        (Pause)

13   Q.  Is this the type of firearm that is being referred to in

14   this e-mail?

15   A.  Yes, it is.

16   Q.  How was the issue with the P90 resolved?

17   A.  The venue the P90s paid back over time by Chris Demeer.

18        MR. BOVE:  If you could highlight the entry on the

19   top.

20        Hunter writes:  He is to pay $1,000 his regular pay

21   per month.

22        You can take those down.  Thank you.

23        Now, if you'd please bring up Government Exhibit 414-1

24   on the left and 400-38 on the right.

25        (Pause)

1          In 400-38 zoom-in on the bottom message please.

2          This is message from Samia to Hunter dated May 31,

3    2011.

4          Hey bro, happy Memorial Day.  Drop me a line when you

5    get a second.  Stay safe.  Adam.

6          Now zoom-in on the message above.  That's Hunter's

7    response.  This is dated May 31, 2012 from Hunter to Samia.

8          Dude, the same stuff going on here.  Nothing else

9    happening.  Everyone is safe and still making money.  Joseph

10   Hunter.

11         You could take those down.  Thank you

12   Q.  Mr. Leroux, did you know a man named Nestor Del Rosario?

13   A.  Yes.

14   Q.  Who was Del Rosario?

15   A.  Nester Del Rosario was one of the call center

16   administrators.  He was also the person that oversaw the

17   mission to Iran.

18   Q.  What do you mean by "mission to Iran"?

19   A.  The mission was to purchase weapons from Iran and also

20   supply the explosive technology and missile technology to Iran.

21   Q.  What types of weapons were you seeking to obtain from Iran?

22   A.  Heavy weapons, rockets, machine guns, explosives.

23   Q.  Do you know where Nestor Del Rosario is today?

24   A.  I do not, no.

25   Q.  How did your relationship with him end?

1    A.   Badly.

2    Q.   What do you mean by that?

3    A.   I threatened to kill him.

4    Q.   When, approximately?

5    A.   Approximately, 2010/2011 timeframe.

6    Q.   Why?

7    A.   I believed he was involved in stealing money.

8    Q.   What happened with Del Rosario after you made that threat?

9    A.   He quit.

10   Q.   Did you ever see him again?

11   A.   I did not, no.

12   Q.   In this timeframe that you are talking about, 2010 and

13   2011, did you believe anyone else was involved in stealing

14   money from you with Nestor Del Rosario?

15   A.   Yes.

16   Q.   Who were some of the others that you believed were

17   involved?

18   A.   Naomi Edillor and Catherine Lee.

19   Q.   Who is Naomi Edillor?

20   A.   Naomi Edillor was a purchasing manager that worked for me

21   and also a real estate broker.

22   Q.   What is a purchasing manager?

23   A.   It's basically somebody who handles purchasing products,

24   issuing invoices, issuing checks and also assisting me and

25   getting items through Customs.

1    Q.   Through Customs where?

2    A.   Through Customs in the Philippines.

3    Q.   You said Edillor also worked as a real estate agent?

4    A.   Yes.

5    Q.   You testified yesterday that Catherine Lee was a real

6    estate agent as well?

7    A.   Yes.

8    Q.   What was your connection to Catherine Lee?

9    A.   Catherine Lee was the real estate broker who was

10   responsible for the transaction involving me purchasing some

11   land in the south of the Philippines.

12   Q.   What did you believe happened in connection with that

13   transaction that led you to target Catherine Lee?

14   A.   I believed that money was stolen.

15   Q.   When you formed these beliefs regarding Edillor and Lee did

16   you take any steps to target them or investigate them?

17   A.   Yes, I did.

18   Q.   Let's start with Edillor, what did you do?

19   A.   I assigned the Philippino surveillance team which was run

20   by Noyt to produce surveillance and gather information on

21   Edillor.

22   Q.   When that part of the investigation by Noyt and the

23   Philippine surveillance team was completed, did you meet with

24   Hunter?

25   A.   Yes, I did.

1    Q.  Was that in person?

2    A.  Yes.

3    Q.  When approximately did you meet with Joseph Hunter to

4    discuss Naomi Edillor?

5    A.  Approximately, the end of the first quarter of 2011.

6    Q.  Where was that meeting?

7    A.  In the Philippines.

8    Q.  What were some of the things that you discussed with Hunter

9    regarding Edillor?

10   A.  I discussed with Hunter that I wanted Edillor dead and that

11   Edillor should be killed with a .22 caliber pistol to keep it

12   silent and I discussed that the team should pretend to be real

13   estate buyers in order to carry out the murder.

14   Q.  Did Hunter say anything about who he intended to assign to

15   carry out that murder?

16   A.  Yes.

17   Q.  What did Hunter say?

18   A.  Hunter told me that the kill team would consist of Chris

19   Demeer and Daddy Mac.

20   Q.  During this meeting with Hunter, was there any discussion

21   about the timing of the murder?

22   A.  I said the murder should happen as soon as possible.

23   Q.  Did you later take steps to provide Hunter with a .22

24   caliber pistol?

25   A.  Yes.

1    Q.   How?

2    A.   I instructed my Philippino staff named Tony to collect the

3    weapon from the RWB warehouse and deliver it to Hunter.

4    Q.   You just used a term "RWB warehouse"?

5    A.   Yes.

6    Q.   I believe you testified yesterday RWB was the weapons

7    tracking front that you set up in the Philippines?

8    A.   Yes.

9    Q.   What was the RWB warehouse?

10   A.   The RWB warehouse was one of the locations where we stored

11   weapons.

12   Q.   Did you instruct Tony to provide a pistol to Hunter?

13   A.   Yes.

14   Q.   Was Naomi Edillor murdered?

15          MR. SCHNEIDER:   Sorry.   Couldn't hear you.

16   Q.   Was Miami Edillor murdered?

17   A.   Yes.

18   Q.   When, approximately?

19   A.   Approximately, the middle of 2011.

20   Q.   How do you know that?

21   A.   I was told by Joseph Hunter that she had been killed by the

22   kill team consisting of Chris Demeer and Daddy Mac.

23   Q.   What were some of the things that Hunter told you about the

24   murder?

25   A.   Hunter told me that the team, the kill team had followed my

1   instructs.  They had pretended to be real estate buyers.  They

2   had traveled with Edillor to a house.  Edillor had been killed

3   outside the front of a house.  The body had been left basically

4   outside the front of the house and he also stated that there

5   had been no witnesses to his knowledge because it was raining

6   on that date.

7   Q.  How did you react when Hunter described the way in which

8   the murder was carried out?

9   A.  I wasn't happy.

10  Q.  Why?

11  A.  I believed that it was only by luck that there had been no

12  witnesses.

13  Q.  What do you mean by that?

14  A.  Essentially, the kill team consisting of Chris Demeer and

15  Daddy Mac had just got lucky because on that day it was

16  raining.

17          MR. BOVE:  Could you please publish Government Exhibit

18  414-2.

19          (Pause)

20  Q.  Mr. Leroux, what is this?

21  A.  It is an e-mail from Joseph Hunter dated June 23, 2011 to

22  me.

23  Q.  What's written in the subject line of this e-mail?

24  A.  It says "salaries for the first of July".

25  Q.  The e-mail begins:

1    Sir, the following amounts are due on 1 July for

2  salaries.

3    Do you see that?

4  A.  Yes.

5  Q.  And then the first entry says "Alexi"; do you see that

6  text?

7  A.  Yes.

8  Q.  Who did you understand Hunter to be referring to there?

9  A.  I understood he meant Chris Demeer.

10  Q.  Then the next entry reads:

11    "Daddy Mac".

12    Do you see that

13  A.  Yes.

14  Q.  Who did you understand that to be a reference to?

15  A.  The second member of the kill team that had killed Edillor.

16  Q.  Now both of these entries relating to Alexi and Daddy Mac

17  read 10K plus 25K sales bonus.  Do you see that?

18  A.  Yes.

19  Q.  What did you understand Hunter to mean by "sales bonus"?

20  A.  I understood it was a type of code.  It means a bonus for

21  carrying out the murder of Edillor.

22  Q.  The next line reads:

23    Fernando 12K plus 3K raise.

24    Do you see that text?

25  A.  Yes.

1    Q.  Who did you understand Hunter to be referring to when he

2    wrote "Fernando"?

3    A.  Himself.

4    Q.  What did you understand him to mean by "3K raise"?

5    A.  I understood he meant that he wanted an additional three

6    thousand dollars because he had been successful as the manager

7    of the kill team consisting of Demeer and Daddy Mac and they

8    had successfully killed Edillor.

9    Q.  The final two entries refer to Tay and Diggler; do you see

10   those?

11   A.  Yes.

12   Q.  Did you believe those were references to Vamvakias and his

13   associates?

14   A.  Yes.

15   Q.  In this timeframe, June 2011, what is your understanding of

16   what Vamvakias and Diggler were doing?

17   A.  Vamvakias and Diggler were handling the Tramadol operation

18   in Texas.

19   Q.  What was the status of what you were referring to as

20   Tramadol operation in Texas in this timeframe?

21   A.  Tramadol was stored in the house in Texas.  The illegal

22   Tramadol that had been shipped from Mexico and Tramadol was

23   waiting to be shipped to the east coast.

24        MR. BOVE:  Please bring up Government Exhibit 414-28

25   and zoom-in on both messages please.

1          (Pause)

2    Q.  Mr. Leroux, what is this?

3    A.  This is an e-mail from Joseph Hunter dated June 29, 2011,

4    to me.

5    Q.  And I'd like to direct your attention first to the bottom

6    message.  There's a link to the Internet in that message.  Do

7    you see it?

8    A.  Yes.

9    Q.  Do you recall what that link related to?

10   A.  Yes.

11   Q.  What did that link relate to?

12   A.  That link related to the murder of Edillor.  It was a news

13   article related to the murder of Edillor.

14   Q.  Now I'd like you to take a look at the message that Hunter

15   wrote to you and it states:

16          There is your fucking proof.  Have my guys money

17   tomorrow.  They're running around doing your crazy shit and you

18   insult them.  Have everyone's money tomorrow including my guys

19   south, both their pay and bonus money.  No more bullshit.

20          Do you see that?

21   A.  Yes, I do.

22   Q.  What did you understand Hunter to be indicating here?

23   A.  I had requested that Hunter provide proof that Edillor had

24   actually been killed and he does that by attaching a newspaper

25   article.

1    Q.  You wrote in the second sentence, "have my guys money

2    tomorrow"; do you see that?

3    A.  Yes.

4    Q.  What did you understand him to mean by that?

5    A.  He means that I should produce the payment including all of

6    the necessary bonuses for the murder of Edillor, as well as the

7    salary by tomorrow.

8    Q.  Do you see a part of the e-mail where Hunter refers to my

9    guys south, both their pay and bonus money?

10   A.  Yes.

11   Q.  What did you understand Hunter to be referring to there?

12   A.  He is referring to Tim Vamvakias and Diggler in Texas who

13   were handling the Tramadol operation.

14   Q.  What type of bonus was Hunter requesting for Vamvakias and

15   Diggler?

16   A.  I understood he was requesting the bonus that was paid

17   every time the illegal Tramadol was successfully shipped to

18   Texas.

19          MR. BOVE:  Ms. Shields, please bring up Government

20   Exhibit 414-3 and if you could zoom-in on the message please.

21          (Pause)

22   Q.  Mr. Leroux, what is this?

23   A.  It is an e-mail from Joseph Hunter.

24   Q.  What is written on the subject line?

25   A.  Two guys.

1    Q.  This message begins:  Sir, Chris sent me an e-mail saying

2    that something happened to his mother and he had to go to

3    Belgium and will be back in one week.

4            Do you see that?

5    A.  Yes.

6    Q.  Who did you understand Hunter to be referring to when he

7    wrote "Chris"?

8    A.  I understood he meant Chris Demeer.

9    Q.  Then the e-mail continues:

10           Then he said that the big guy is quitting because he

11   is going back to his old job.  He wants $8,600 for airfare back

12   to New Zealand.

13           Do you see that?

14   A.  Yes.

15   Q.  Who did you understand Hunter to be referring to when he

16   wrote "the big guy"?

17   A.  I understood he was referring to Daddy Mac.

18   Q.  After you received this e-mail, did you discuss these

19   topics in person with Joseph Hunter?

20   A.  Yes, I did.

21   Q.  Did you also communicate with Hunter using blackberry

22   messages?

23   A.  Yes, I did.

24   Q.  What were the some of the things that you discussed with

25   Hunter using those two men?

1    A.  I discussed with Joseph Hunter that a new kill team was

2    needed as soon as possible and that the kill team should

3    consist again of two men.

4    Q.  What did Hunter communicate to you that led you to believe

5    that a new kill team was necessary?

6    A.  Hunter told me that Chris Demeer and Daddy Mac had

7    essentially quit.

8    Q.  Did you give Hunter any specific instructions about what to

9    do once the team was recruited?

10   A.  It was understood that as soon as the team was recruited

11   there would be additional murders.

12   Q.  Did you have an expectation at that point about meeting

13   with members of the new team before they began that task?

14   A.  Yes.

15   Q.  Did you communicate that expectation to Joseph Hunter?

16   A.  Yes.  I told Joseph Hunter that I was upset about how the

17   Edillor murder had been conducted because they were just lucky

18   that there were no witnesses and for that reason I wanted to

19   sit down and talk to the new kill team to make sure that the

20   jobs were done cleanly, meaning the murders were done cleanly

21   without witnesses and without problems in the future.

22         MR. BOVE:  Ms. Shields, please publish Government

23   Exhibit 414-4.

24         (Pause)

25   Q.  Mr. Leroux, what is this?

1    A.  It is an e-mail from Joseph Hunter dated Friday

2    September 30, 2011 to me.

3    Q.  The e-mail begins: "Benny", do you see that?

4    A.  Yes.

5    Q.  Who did you understand Hunter to be referring to when he

6    wrote "Benny"?

7    A.  I understood he is referring to me.

8    Q.  Is that a name he sometimes used to address you?

9    A.  Yes.  It was one of the aliases sometime used by Joseph

10   Hunter to address me.

11   Q.  Now the first three sentences of this e-mail reads:

12           The first run will start next weekend.  We need to

13   Western Union some funds to Adam or the guy.  He will need gas

14   and lodging money.

15           Do you see that?

16   A.  Yes, I do.

17   Q.  Who did you understand Hunter to be referring to when he

18   wrote that?

19   A.  I understood he was referring to Adam Samia.

20   Q.  What did you understand Hunter to mean by "the first run"?

21   A.  I understood he was referring to the Tramadol's funding

22   operation from Texas to the east coast.

23   Q.  The e-mail continues:  "Adam will give it to the guy".

24           Do you see that?

25   A.  Yes.

1    Q.  There are a couple of references to this first passage of

2    the e-mail to the guy.  Do you see the second one in the first

3    line?

4    A.  Yes.

5    Q.  Who did you understand Hunter to be referring to when he

6    wrote "the guy"?

7    A.  I understood he was referring to the individual that would

8    be handling the actual movement of the illegal Tramadol from

9    Texas to the east coast.

10   Q.  Now this e-mail continues:

11           Adam will work on his ticket today and let me know the

12   cost and how he wants to pay for it.  I told him he can buy it

13   and be reimbursed in the place you guys are going to meet or we

14   can Western Union him the money.

15           Do you see that?

16   A.  Yes, I do.

17   Q.  What did you understand Hunter to be referring to in that

18   part of the e-mail?

19   A.  I understood he meant that Adam Samia was supposed to come

20   to Brazil to sit down with me to discuss the upcoming murders

21   and he's talking specifically here about how those funds will

22   be reimbursed.  I'm supposed to reimburse Adam Samia in Brazil.

23   Q.  Reimburse Samia for what?

24   A.  The cost of the ticket.

25   Q.  The second to last sentence the e-mail says:

1          Adam, Samia is arriving and I told him I will give him

2     a contact number for our guy there.

3          Do you see that

4     A.   I see it.

5     Q.   What did you understand Hunter to mean when he wrote "our

6     guy there"?

7     A.   I understood he meant one of my staff in Brazil.

8     Q.   The last sentence reads:

9          I also told him I will give him a contact number for

10    Tay and I will need a contact number for him to deliver in the

11    east.

12         Do you see that?

13    A.   I see it.

14    Q.   When Hunter used the term "him" in this sentence who did

15    you understand him to be referring to?

16    A.   In this sentence he is referring to Adam Samia in the first

17    part where he says "told him".

18    Q.   What did you understand Hunter to be referring to in this

19    sentence?

20    A.   I understood that it's the contact number that is supposed

21    to be given to Tim Vamvakias for the person that will receive

22    the fund will receive the Tramadol shipment, the illegal

23    Tramadol shipment in the east coast.

24         MR. BOVE:  Ms. Shields, please publish Government

25    Exhibit 414-5.

1        (Pause)

2   Q.  Mr. Leroux, what is this?

3   A.  That is an e-mail from me dated October 2, 2011, to Joseph

4   Hunter.

5        MR. BOVE:  Start by zooming in on the bottom message.

6   This is a message from Samia to Hunter dated September 30,

7   2011, subject "info".  The message says:

8        The cheapest flight is around 1800 leaving the 13th

9   and coming back in one week.  The prices were the same for

10  round trip as to one-way.  Let me know what you want me to do.

11  I would like to get back to make sure my guy is all set and the

12  op is running smoothly.

13       Now if you could zoom-in on the e-mail above that.

14       (Pause)

15       Highlight the text that says October 1, 2011.

16  Q.  So this is message from Hunter to you, correct?

17  A.  Yes.

18  Q.  Dated October 1, 2011?

19  A.  Yes.

20  Q.  This message says:

21       Benny, Adam says the price of the ticket is 1800 which

22  he will need by Western union and trans guy will need funds for

23  one month for gas and lodging for four trips.  Please Western

24  union all of that to Adam.  I will get his Western Union info

25  sent today.  Do you see that?

1   A.   Yes.

2   Q.   Which -- were you referring to --

3   A.   I understood he was referring to Adam Samia.

4   Q.   Did you see a reference to "the trans guy"?

5   A.   Yes.

6   Q.   Who did you understand Hunter to be referring to there?

7   A.   I understood he was referring to the individual that will

8   transport the illegal Tramadol from Texas to the east coast.

9   Q.   Do you see the reference to four trips in the third line of

10  the e-mail?

11  A.   Yes.

12  Q.   What did you understand Hunter to mean by that?

13  A.   I understood he meant that it would take four trips to move

14  the large quantity of Tramadol from Texas to the east coast.

15  Q.   Now if we could take a look at the top e-mail in this

16  exhibit please.  This is your response to Hunter on October 2,

17  2011.  You wrote this is to Brazil, "I will send him the money

18  as soon as I am in Brazil."

19          Do you see that?

20  A.   Yes.

21  Q.   Did you take steps to send funds to Adam Samia?

22  A.   Yes.

23          MR. BOVE:  Ms. Shields, could you please publish

24  Government Exhibit 414-6.

25          (Pause)

1   Q.  Mr. Leroux, what is this?

2   A.  That is an e-mail from me dated October 5, 2011 to Joseph

3   Hunter.

4           MR. BOVE:  Zoom-in on the bottom message which also

5   carries over onto page two.  If you could move this to the

6   right and bring up page one on the left please.

7           (Pause)

8   Q.  So the bottom of this exhibit is a message from Hunter to

9   Samia dated October 2, 2011.

10          Do you see that?

11  A.  Yes, I do.

12  Q.  And Hunter writes:

13          Also the boss of the trip for next weekend for the

14  other guy is off hold until he makes coordination with this

15  sum.  So I will get you know and it is go.  It will be soon, if

16  not this coming weekend.  Do you see that text?

17  A.  Yes, I do.

18  Q.  What did you understand Hunter to be referring to there?

19  A.  I understood he was referring to the problems that I was

20  having in coordinating the east side and this is related

21  basically to the Tramadol smuggling operation.

22  Q.  So when Hunter wrote "east side" what did you understand

23  him to mean?

24  A.  I understand he is referring to the east side of America.

25          MR. BOVE:  Now if we could take a look at page one of

1    the exhibit in the main screen.  If you could zoom-in on the

2    e-mail dated October 3, 2011 at 4:12 p.m.

3    Q.  So this is Samia's response to Hunter and this thread was

4    later sent to you dated October 3, 2011; do you see that in the

5    header?

6    A.  Yes, I do.

7    Q.  And the second paragraph of this e-mail reads:

8              The other guy's name will be John Wilson.  Need to

9    Western union op fund for John to meet for gas, lodging, food,

10   GPS and miscellaneous.  The round trip for the op is 5500

11   miles.

12             Do you see that part?

13   A.  Yes.

14   Q.  When Samia wrote that, what did you understand him to be

15   referring to?

16   A.  I understood he was referring to the person who would be

17   smuggling the Tramadol across the U.S. from Texas to the east

18   coast.

19   Q.  And when Samia wrote "John Wilson" who did you understand

20   that to be?

21   A.  I understood that that was the person assigned to handle

22   the Tramadol smuggling operation.  Essentially, he would be the

23   driver of the vehicle carrying the Tramadol from Texas to the

24   east coast.

25   Q.  Take a look at the first paragraph, the Samia e-mail.  Does

1   this make reference to the fight information on Continental

2   Airlines to Rio de Janeiro.  Do you see that?

3   A.  I see it.

4          MR. BOVE:  Could you take a look at the top of the

5   e-mail please.

6          (Pause)

7   Q.  What is this, Mr. Leroux?

8   A.  That is an e-mail from me dated October 5, 2011, to Joseph

9   Hunter.

10  Q.  What did you mean by "I will request the funds now"?

11  A.  What I meant is I will send the necessary funds by Western

12  Union.

13         MR. BOVE:  Could you please bring up 414-7.

14  Q.  Mr. Leroux, what is this?

15  A.  That is an e-mail from Joseph Hunter dated October 7, 2011,

16  to me.

17  Q.  What's written at the subject line?

18  A.  New guy.

19  Q.  Now this e-mail starts:

20         I'm not going to ask for the other guy for our trips

21  until Adam is there with you.  If I ask him for now he might

22  decide he wants to do and we need him for other things.  Do you

23  see that?

24  A.  Yes, I do.

25  Q.  What did you understand Hunter to mean by that?

1    A.  I understood he meant that since Adam Samia was one of the

2    two people assigned to the new kill team to handle the upcoming

3    murders that he wanted to keep Adam Samia away from the

4    Tramadol operation.

5    Q.  So the e-mail continues:

6                Also, I am thinking to give the guy that drives a head

7    only 5K because he is just driving for risk.  We can give the

8    other 5K to the other guy driving stuck.  The bonus makes his

9    possible bonus is 5K.  So basically, you get two guys for 20K

10   but the bonus is included in that.  Tell me what you think.

11               Do you see that part of the e-mail?

12   A.  Yes, I do.

13   Q.  What did you understand Hunter to be referring to there?

14   A.  That part of the e-mail refers to the Tramadol operation,

15   specifically, the smuggling of the Tramadol from Texas to the

16   east coast in vehicles.

17               MR. BOVE:  Could you please publish 414-8.

18   Q.  Mr. Leroux, what is this?

19   A.  It is an e-mail from Joseph Hunter to me dated October

20   10,2011.

21   Q.  The first paragraph of this e-mail reads:

22               First, please send me a contact number for Adam for

23   his arrival there.  I will forward to him and he will contact

24   them when he lands there.

25               Do you see that?

I45AAHUN2                    LeRoux - Direct

1    A.  Yes, I do.

2    Q.  What did you understand Hunter to be referring to there?

3    A.  I understood he was referring to contact number for Adam

4    for his arrival from Brazil, namely, one of my staff numbers.

5    Q.  The second paragraph begins:

6            Second, as far as the trans goes from down south to SC

7    the guys were ready to go.

8            Do you see that?

9    A.  Yes, I do.

10   Q.  What did you understand Hunter to mean by the trans guy,

11   the trans goes?

12   A.  I understood he is referring to the transportation from

13   Texas to the east coast of the illegal Tramadol.

14           MR. BOVE:  Ms. Shields, if you could move this to the

15   left please.  In the right window please bring up Government

16   Exhibit 400-42 and if you could zoom-in on the e-mail dated

17   October 11, 2011 at 10:36 a.m.  This is an e-mail, Hunter to

18   Samia as I said dated October 11, 2011, subject, Western Union.

19   The first paragraph -- if you could highlight that

20   Ms. Shields -- refers to a Western Union transfer to Adam Samia

21   in the amount of $1610.  Then there are two references to Benny

22   in message.  Could you please highlight those.

23           (Pause)

24           The e-mail ends:

25           When Adam arrives we need to go to this hotel.

1   Q.  I ask you, Mr. Leroux, to take a look at the address below

2   the reference of the hotel in the e-mail; do you recognize

3   that?

4   A.  Yes, I do.

5   Q.  What is that?

6   A.  That hotel is the hotel I was staying at in Brazil at the

7   time.

8           MR. BOVE:  Could you now please zoom-in on the top

9   e-mail in 400-42.  This is from Adam Samia to Hunter also on

10  October 11, 2011.  Subject Western Union and Samia writes:

11  "Received it.  Thanks".  Will someone be meeting me at the

12  airport?

13          Ms. Shields, if you could bring up on the right now

14  400-43.  If could you start by highlighting the subject line.

15  And now if you could take a look at 400-44 on the right side

16  please.  If you could zoom-in on the message.

17          This is a message that Samia sent on October 12, 2011,

18  an e-mail account Krisha 79@GMail.com, subject, "keep this".

19          Now if you could bring up Government Exhibit 400-46 on

20  the right and please turn to page two in the exhibit and

21  zoom-in on the e-mail, "hey bro".

22          (Pause)

23          This is a message from Samia that reads:

24          Hey bro, it's not going to make my original flight.

25  Trying to sort it out ASAP.  Let me know how long the boss is

1    going to be there and if he still wants to be there or I can

2    change tickets to meet him somewhere else.  I would need to

3    have a sit-down before my guys come there.  Stay safe and watch

4    your six.

5         Now if you could on the left bring up page one of

6    Government Exhibit 400-46 and zoom-in on the bottom header.

7    And only page two let's take a look at the e-mail.

8         This is an e-mail response from Hunter to Samia dated

9    October 14, 2011 on the left side of the screen.  It begins,

10   "Adam".

11        And then on the right side of the screen if you can

12   move that into the main window please.  Hunter wrote to Samia

13   you fucked this up.  You didn't got your visa.  Now you read

14   every word I say carefully.  You get a refund on ticket.  If

15   there is no refund available, then you are expected to pay for

16   the cost of the ticket.  We are not paying for a ticket because

17   you did not get a visa.

18        The second thing is you and your guys work for me here

19   in PI or the states.  You do not work for the boss directly

20   unless he puts you on an independent job that does not involve

21   me.  Your job and one of your other guys is here in PI

22   following my order.  No negotiations.  No complaining.  No

23   bullshit.  You'll be paid to do a job with a result.  The key

24   word is "result".  We do not pay for thinking about it.  We do

25   not pay for trying.  We do not pay for your time.  We pay for

1    the end result.  Do you understand?

2              Ms. Shields, if you could now highlight the part of

3    the e-mail that says you and one other guy prepared to ninja

4    stuff.  Get your shit ready and stand by.  I will tell you when

5    to get on the plane.  No fucking delaying.  No availability

6    issues.  If you want to work do what I say.

7              Thank you, Ms. Shields.

8              Now on the left side of the screen could you please

9    bring up the first page of 400-46 and take a look at Samia's

10   response.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. BOVE:  If you can zoom in on the October 19, 2011

2     email at 12:45.  I'm sorry.  That's my mistake.  The one below

3     that.  This is from Adam Samia to Hunter, "I understand I can

4     transfer the ticket to PI.  I can leave whenever you want me

5     to.  The other guy is one month out.  He will meet me there, he

6     said."

7           Now on the right screen, Ms shields, can you please

8     bring up 414-9

9           THE COURT:  Just tell me when it would be a good time

10    to our midmorning break.

11          MR. BOVE:  This is a good time.

12          THE COURT:  Don't we do that please remember, ladies

13    and gentlemen, keep an open mind.  Don't discuss the case.

14          Let's come back in 15 minutes.

15          (Recess)

16          THE COURT:  Everyone can be seated.

17          MR. BOVE:  Thank you, your Honor.

18    BY MR. BOVE:

19    Q.  Mr. LeRoux, before the break, we were looking at documents

20    related to early October 2011.  Do you recall that?

21    A.  Yes, I do.

22    Q.  And do you recall being informed that Adam Samia failed to

23    travel to Brazil to meet with you?

24    A.  Yes.

25    Q.  What was the intended purpose, from your perspective, of

1   that planned trip?

2   A.  From my perspective, I understood it was about discussing

3   the upcoming murders, specifically how they were to be

4   conducted.

5           MR. BOVE:  Now, on the right side of the screen, if

6   you can put up Government Exhibit 414-9.

7   Q.  Mr. LeRoux, what is 414-9?

8   A.  It is an email from Joseph Hunter dated October 16, 2011,

9   to me.

10          MR. BOVE:  Ms. Shields, can you please highlight the

11  subject line of this email.

12          So the subject says, "Can you send me Adam's flight

13  details, please."

14          Do you see that?

15  A.  Yes.

16  Q.  Who wrote that text?

17  A.  I did.

18          MR. BOVE:  Now Ms. Shields, if you can zoom in on the

19  bottom email of 414-9.

20  Q.  This is dated October 15, 2011, at 11:06 a.m. Hunter

21  responded, "He won't be coming.  He did not get his visa."

22          Do you see that?

23  A.  Yes.

24  Q.  What did you understand Hunter to mean there?

25  A.  I understood he meant that Adam Samia won't be coming

1    because Adam Samia failed to get the visa.

2    Q.  Did you exchange other communications with Hunter about

3    this issue?

4    A.  I did, yes.

5    Q.  How did you exchange those communications?

6    A.  Using Blackberry messaging.

7    Q.  In those communications, did Hunter provide you with more

8    details about Samia's attempt to travel to Brazil?

9    A.  Yes, he did.

10   Q.  What did Hunter communicate to you about that topic?

11   A.  Hunter told me that he went to the airport, meaning Adam

12   Samia went to the airport without a visa and was denied

13   boarding the flight.

14   Q.  After it was clear that Samia wasn't going to travel to

15   Brazil, did you give Hunter any instructions?

16   A.  I did, yes.

17            MR. BOVE:  Let's take a look at the next email, at

18   414-9, please.  If you can zoom in on the three lines above the

19   October 15, 2011, date.

20   Q.  Mr. LeRoux, who wrote the text that's on the right side of

21   the screen from Government Exhibit 414-9?

22   A.  I did.

23   Q.  Who were you referring to when you wrote "he," in the first

24   line?

25   A.  I was referring to Adam Samia.

1          MR. BOVE:  Let's now take a look at Hunter's response.

2     You can zoom in on the top email.

3     Q.  Mr. LeRoux, what is this?

4     A.  It is an email from Joseph Hunter dated October 16, 2011,

5     to me.

6     Q.  This message starts, "The guy is crazy with attitude so I

7     had to set him straight.  He said he wanted a sitdown with you

8     before the other guys came on board and he explained to him

9     that he is hired to do a job with an end result.  I told him he

10    does what he is told and he gets paid.  I told him we are not

11    paying for him to think about doing stuff, we're not paying him

12    to try; we're not paying him for his time.  I told him we are

13    paying for the result, period."

14          Do you see that text?

15    A.  I do, yes.

16    Q.  When Hunter started that email with that guy, who did you

17    understand him to be referring to?

18    A.  Adam Samia.

19          MR. BOVE:  Ms. Shields, if you can highlight the text

20    "do a job with an end result" in the second line.

21    Q.  Do you see that, Mr. LeRoux?

22    A.  Yes, I do.

23    Q.  What did you understand Hunter to mean by "end result"?

24    A.  I understood he meant that since Adam Samia had already

25    agreed to be part of the upcoming murder team, he meant the

1   murders.

2          MR. BOVE:  Further down in this email there's a

3   sentence beginning, "Anyway."  Ms. Shields, can you highlight

4   that.

5   Q.  This sentence says, "Anyway, he said he understands and he

6   is ready to come here, but other guy cannot come for a month."

7          Do you see that text Mr. LeRoux?

8   A.  Yes.

9   Q.  What did you understand Hunter to mean when he wrote, "Come

10  here"?

11  A.  I understood he meant come to the Philippines.

12  Q.  In the part of the sentence that says, "But the other guy

13  cannot come for a month,"  What did you understand Hunter to

14  mean?

15  A.  I understood Hunter was referring to the other man who was

16  part of the kill team.  The other man who would agree to

17  conduct murders alongside Adam Samia.

18         MR. RAY:  Objection, your Honor.  Move to strike.

19  Lack of foundation.

20         THE COURT:  Hold on a second.

21         Overruled.

22  Q.  At the end of this email Hunter writes, "So Adam is ready

23  to come here but does not have a partner yet.  What do you want

24  to do with him, have him standby or come to PI?"

25         Do you see that?

1    A.  I see it.

2    Q.  What did you understand Hunter to mean when he wrote that

3    Adam did not have a partner yet?

4    A.  I understood he meant that the second person had agreed to

5    be part of the kill team for the upcoming murders, but that the

6    other person for the murders was currently unavailable.

7    Q.  So this email ends with a question from Hunter, "What do

8    you want to do with him, have him stand by or come to PI?"  Do

9    you see it?

10   A.  Yes, I do.

11   Q.  Did you communicate an answer to Hunter?

12   A.  Yes, I did.

13   Q.  What did you instruct Hunter to do?

14   A.  I instructed Hunter that since I didn't want to pay for the

15   kill team to be sitting in the Philippines doing nothing

16   waiting for me, that he should wait.

17   Q.  Who should wait?

18   A.  Adam Samia.

19   Q.  Wait for what?

20   A.  Adam Samia should wait until the second person for the kill

21   team for the upcoming murders in the Philippines is available

22   because I didn't want Adam Samia sitting in the Philippines

23   being paid for no reason.

24          MR. BOVE:  Ms. Shields, we still have 400-46 on the

25   left side of the screen.  Can you please zoom in on the email

dated October 19, 2011, 12:45. This is an email from Hunter to

Samia dated October 19, as I said.

          This one says, "Boss says you are on standby until the

other guy is ready and you guys will come here together for

ninja stuff. Your driving guy is on standby until we get a

modified vehicle for him to use in his thing. Should know more

about that next week. We want you guys, but are just waiting

until you and your partner can get on the same timetable. The

drive is definitely going to be used, as soon as we can make it

safe as possible for him."

          Ms. Shields, now on the main screen can you please

bring up 414-10.

Q. Mr. LeRoux, what is this?

A. This is an email from Joseph Hunter dated November 26,

2011, to me.

Q. And Hunter's email says, "Read message below."

          Do you see that?

A. Yes, I do.

Q. What is the message below?

A. The message below is a message from Tim Vamvakias dated

November 26, 2011 to Joseph Hunter.

          MR. BOVE: Ms. Shields, if you can zoom in on the

entire -- that will work. Thank you.

Q. The message from Vamvakias says, "Just got a call from your

Trams guy. He said that my organization is very disrespectful

1    and this isn't how things are conducted here and there are

2    consequences."

3            Do you see that?

4    A.  Yes.

5    Q.  What did you understand Vamvakias to mean by "Trams guy"?

6    A.  I understood he meant the member of the Mexican criminal

7    gang that was involved in moving illegally the Tramadol from

8    Mexico to Texas.

9    Q.  Was there an issue with the Tramadol smuggling from Mexico

10   to Texas during this time frame in late 2011?

11   A.  Yes.

12   Q.  What was the issue?

13   A.  The issue was that the east coast side was not ready,

14   meaning there was nobody on the east coast to receive the

15   Tramadol.  And for that reason, the illegal Tramadol shipments

16   from Mexico to Texas were halted.

17           MR. BOVE:  Ms. Shields, can you please bring up 402-4.

18   Zoom in on the header, please.  This is an email from Carl

19   David Stillwell to Adam Samia dated December 6, 2011, with

20   subject, "Your United flight confirmation, January 10, 2012,

21   Raleigh Durham to Manila."

22           Ms. Shields, if you can please bring up 414-11.

23   Q.  Mr. LeRoux, what is this?

24   A.  That is an email from Joseph Hunter dated December 6, 2011

25   to me.

1  Q.  This email says, "Need to WU $1,625 airfare for the other

2  guy coming with Adam in Jan.  Adam will be leaving on the 8th

3  and will be here on the 9th except the other guy will leave on

4  the 10th and will be here on the 11th."

5         Do you see that?

6  A.  Yes.

7  Q.  What did you understand Hunter to mean by "WU"?

8  A.  I understood he meant Western union.

9         MR. BOVE:  Ms. Shields, if you can move this to the

10  left, please, and on the right bring up 414-12.  You can just

11  zoom in on the email.

12  Q.  Mr. LeRoux, what is this?

13  A.  That is an email from me to Joseph Hunter dated December

14  12, 2011.

15  Q.  The email reads, "WU to Roxboro, North Carolina, U.S.A;

16  sender, hector Roche; destination, Roxboro, North Carolina,

17  U.S.A; amount, $1,625; receiver, Adam Samia, MTCA number," and

18  there's a number that follows.

19         What were you communicating?

20  A.  My communication here is about the money.  It's

21  specifically the Western Union information, which contains the

22  transaction number for Western Union.

23  Q.  The sender is listed as Hector Roche.  Do you see that?

24  A.  Yes.

25  Q.  Do you recognize that name?

1    A.  Yes, I do.

2    Q.  What is Hector Roche or who is Hector Roche?

3    A.  Hector Roche is a fake person that my staff in the

4    Philippines used at the time for sending Western Unions.

5          MR. BOVE:  Ms. Shields, can you please bring up in the

6    main window, 414-13. If you can zoom in on the message.

7    Q.  Mr. LeRoux, what is this?

8    A.  That is an email from Joseph Hunter dated December 12,

9    2011, to me.

10   Q.  What's in the subject line of this email?

11   A.  "Salaries."

12         MR. BOVE:  Ms. Shields, if you can please highlight

13   the fourth sentence in the email.  It reads, "I have had a

14   driver on standby for other two months and nothing has

15   happened."  It's in the second line.

16   Q.  What did you understand Hunter to mean when he wrote that?

17   A.  I understood he meant he has had a driver, meaning somebody

18   who was willing to ship the Tramadol from Texas to the east

19   coast on standby.  He's referring specifically here to John

20   Wilson.

21         MR. BOVE:  And in the line below Hunter writes, "I am

22   working for less pay than Dave."

23         Ms. Shields if you can highlight that, please.

24   Q.  What did you understand Hunter to mean by that?

25   A.  I understood he was complaining that he was earning less

1   money than Dave Smith.

2   Q.  Towards the ends of this email, starting at the third line

3   from the bottom, Hunter wrote, "As far as the PI guys go, I

4   cannot make them do it and I can't make them get here because

5   of other commitments.  Adam has been on standby and you

6   instructed to have him wait until his partner can come and that

7   was what was done.  Everyone needs to be paid immediately."

8            Do you see that part of the email?

9   A.  Yes, I do.

10           MR. BOVE:  Ms. Shields, if you can please

11  highlight "PI guys."

12  Q.  What did you understand Hunter to mean by the "PI guys"?

13  A.  I understood that he was referring to the kill team

14  consisting of Adam Samia and his partner.

15           MR. BOVE:  Ms. Shields, if you can please publish in

16  the main window 400-51 and if you can zoom in on the bottom

17  message from Samia to Hunter that begins, "Hey, bro."

18           So this message reads, "Hey, bro, hope you had a good

19  New Year.  I will need the contact info for when I get to PI,

20  address, location, EXT for me and the other guy.  Also, did you

21  get the email I sent last week about the driver?"

22           Let's take a look at Hunter's response, which was

23  dated January 2, 2012 at 9:20 a.m.  Hunter writes, "OK.  When

24  you arrive, go and change the money, then go outside and go to

25  the meter taxi line.  You will take the meter taxi to Burgos

1   Street and go to the Howzat Bar.  It is pronounced like 'how's

2   that.' It is on the same side of the street as the Ringside

3   Bar, the right of it about two hundred meters.  I will be

4   waiting for you there.  My number is 09 499 851 697.  That

5   number is to be used for emergencies only.  Do not call.  When

6   you get here, I will give you a work phone.  The boss will make

7   a decision on the driver this week and if all is good, we'll

8   send the 2K next week or the end of this week."

9           Now let's take a look at Samia's reply.  This is a

10  message in Government Exhibit 400-51 from Samia to Hunter dated

11  January 2, 2012, which reads, "Copy that. What do you need for

12  my banking info -- SWIFT number?  Routing number?  An account

13  number?  Anything else?"

14  Q.  Mr. LeRoux, do you see the reference to SWIFT numbers in at

15  that message?

16  A.  Yes.

17  Q.  Do you know what a SWIFT number is?

18  A.  Yes, I do.

19  Q.  What's a SWIFT number?

20  A.  It's a code that banks use to identify one another, which

21  is used for transferring money from one bank to another.

22          MR. BOVE:  Ms. Shields, can you please publish

23  Government Exhibit 401-7.  If you can zoom in on the message.

24          This is an email from Samia to Stillwell20@gmail.com

25  dated January 9, 2012.  This message reads, "Hey, bro, in

 1   Tokyo.  Local time is 1542.  All is well.  I will email or text

 2   you when I get there if anything changes.  If you are to meet

 3   at a different place, I will let you know, but as of now, we

 4   will go with that place I sent you."

 5          If you can bring up 401-8, please.  This is an email

 6   from Samia to Stillwell dated January 9, 2012.  It reads, "Hey,

 7   in PI.  All is well.  Do what the instructions say to do.  The

 8   taxi should cost like 220P with the tip.  I'm in the Howzat

 9   Hotel, room 3, but I will meet you in the bar in front."

10          Ms. Shields, can you please now publish just for the

11   Court and counsel, Government Exhibits 600-1 and 600-2.

12          Your Honor, these are the travel records that are the

13   subject of our motion and we move to admit them pursuant to

14   your ruling.

15          THE COURT:  They'll be admitted.

16          MR. BOVE:  Ms. Shields, can you please publish

17   Government Exhibit 600-2 and zoom in on the first two

18   paragraphs.

19          This document reads, "This is to certify that the name

20   Samia, Adam George appears in our available computer database

21   file with the following travel records as shown in the attached

22   list.  This certification is issued upon the request of the

23   Honorable Ricardo V. Paras, III, Chief State Counsel,

24   Department of Justice, Manila, for whatever legal purpose it

25   will serve."

1          Ms. Shields if can you zoom in on the letterhead,

2     please.  Ms. Shields, if you can bring up Government Exhibit

3     408-8 in the top of the screen and zoom in on the email,

4     please.  Then in the bottom of the screen, if you bring up page

5     2 of Government Exhibit 600-2 and please zoom in and highlight

6     the second row, which reflects an entry in the Philippines on

7     January 9 of 2012.

8          Now, Ms. Shields, if you can publish Government

9     Exhibit 401-9.  If you can zoom in on the message, please.

10    This is a message from Samia to Stillwell as well as

11    Andrea.stillwell@gmail.com, which is dated January 11, 2012.

12    The subject reads, "Hi, it is Adam."  The content of the

13    message says, "David is here safe and sound.  The Internet is

14    down at his hotel.  He will get in touch with me tomorrow.

15    Have a good day."

16         Ms. Shields if you can move that to the left, please.

17    In the right bring up Government Exhibit 600-1 and if you can

18    zoom in on the certification, please.

19         This certification reads:  This is to certify that the

20    name Stillwell Carl David appears in our available computer

21    database file with the following travel records.  If you can

22    zoom in on the left head, please in 600-1.  Now please zoom in

23    on the second of the two travel entries and highlight the date,

24    please.

25         You can take those down.  Thank you.

1  BY MR. BOVE:

2  Q.  Now, Mr. LeRoux, you testified yesterday that you had not

3  met Adam Samia in person; is that correct?

4  A.  Yes.

5  Q.  And you've testified a few times today about someone that

6  you had referred to as his partner; is that right?

7  A.  Yes.

8  Q.  Have you ever met the man you're referring to as Adam

9  Samia's partner?

10  A.  No.

11  Q.  Now, I'd like you to focus on January of 2012.  Did you

12  have any meetings with Hunter in the Philippines around that

13  time?

14  A.  Yes.

15  Q.  More than one?

16  A.  Yes.

17  Q.  Let's talk about the first one.  Did you discuss a murder

18  target at the first meeting?

19  A.  Yes.

20  Q.  Who?

21  A.  Dazl Silverio.

22  Q.  Why did you ask Hunter to have Dazl Silverio killed?

23  A.  I believed that Dazl Silverio was stealing money from me in

24  the past.

25  Q.  What did you communicate to Hunter at this meeting?

1    A.   That the kill team consisting of Adam Samia and his partner

2    should kill Dazl Silverio.

3          MR. BOVE:  Ms. Shields, if can you please bring up

4    four 414-14 and if you can zoom in on the header in the first

5    paragraph to start.

6    Q.   Mr. LeRoux, what is this?

7    A.   That is an email from Joseph Hunter dated January 15, 2012

8    to me.

9    Q.   The email starts, "Need another person."

10         Do you see that?

11   A.   Yes, I do.

12   Q.   What did you understand Hunter to mean when he wrote, "Need

13   another person"?

14   A.   I understood he meant that the kill team consisting of

15   Samia and his partner needed another person to kill.

16   Q.   The email continues, "The one you gave me is going to take

17   a long time.  She has four addresses, one which is an island

18   200 miles from here.  Her in-laws say she is in hiding and no

19   one has seen her including your guys.  Need someone we can find

20   now and get it done right away."

21         When Hunter wrote "she has four addresses," who did

22   you understand him to be referring to?

23   A.   I understood he was referring to Dazl Silverio.

24   Q.   And in the second line of the email there's a

25   sentence, "Her in-laws say she's in hiding and no one has seen

1    her including your guys."

2              Do you see that?

3    A.  Yes.

4    Q.  When Hunter wrote, "your guys," who did you understand him

5    to be referring to?

6    A.  I understood he was referring to the surveillance team

7    consisting of the Filipino Noyt and the rest of the Filipino

8    surveillance team assigned by Noyt.

9    Q.  When Hunter concluded that email, "Need someone we can find

10   now and get it done right away," what did you understand him to

11   mean?

12   A.  I understood he meant that at the needs a new victim

13   intended as soon as possible so he could get it done as soon as

14   possible.

15   Q.  Did Hunter make any comments to you in this time frame

16   about what was driving his sense of urgency about what was

17   communicated in this email?

18   A.  Yes, he did.

19   Q.  What did he tell you?

20   A.  Hunter told me that the kill team consisting of Samia and

21   his partner wanted to kill one person a month.

22   Q.  Did he say why?

23   A.  Hunter told me that they wanted to make money.

24             MR. BOVE:  Ms. Shields, if you can please zoom in on

25   the remainder of the email.

1    Q.  So this part of the message says, "Below is the links for

2    the things I talked to you about," and then there's an Internet

3    link and underneath that it says, "We need the mask above with

4    eyebrows added.  The base price is $810 plus $120 for the

5    eyebrows for a total of $930."  Then there's a second link and

6    the message continues.

7            "This mask we need, which is $810; plus the eyebrows,

8    $120; plus soul patch, $100; plus goatee, $220, for a total of

9    $1,250.  These masks take six weeks to make and are delivered

10   to a stateside address, so please order them now."

11   BY MR. BOVE:

12   Q.  Mr. LeRoux, there were references in this portion of the

13   email to masks.

14           Do you see those?

15   A.  Yes, I do.

16   Q.  Did you talk to Hunter in person about these masks?

17   A.  Yes, I did.

18   Q.  What were some of the things that were said during your

19   communication with Hunter about the masks that are being

20   referenced here?

21   A.  Hunter told me that he was concerned that the kill team

22   consisting of Samia and his partner might be identified, so

23   Hunter wanted to purchase masks so the kill team could sneak

24   around and conduct the murder without fear of any witnesses

25   being able to identify them.

1    Q.  Did you order the masks?

2    A.  Yes, I did.

3    Q.  Where did you have them shipped?

4    A.  I had the masks shipped to John Wall in Kentucky.

5    Q.  Who is John Wall?

6    A.  John Wall was a staff member working for me in Kentucky at

7    the time.

8    Q.  Why didn't you ship the masks to the Philippines?

9    A.  I understood that the website did not allow international

10   shipping.

11   Q.  Did you communicate any instructions to Wall about the

12   masks?

13   A.  Yes.

14   Q.  What did you instruct Wall to do?

15   A.  I instructed John Wall that when the masks would arrive in

16   Kentucky, he should ship them to me in the Philippines.

17   Q.  Do you know if that was completed by the end of February

18   2012?

19   A.  I believe it was not, no.

20          MR. BOVE:  Now, Ms. Shields, if we could focus back in

21   on the top of this email.

22   Q.  You testified a moment ago that you understood Hunter to be

23   referring to Dazl Silverio when he used the female pronoun in

24   the first line here, "she"?

25   A.  Yes.

1   Q.  Do you know if Silverio was killed by Hunter and his team?

2   A.  She was not.

3   Q.  And you said that this email ends with a request from

4   Hunter for a new murder target?

5   A.  Yes.

6   Q.  Did you identify a second murder target to Joseph Hunter in

7   January of 2012?

8   A.  Yes.

9   Q.  Who was the second target?

10  A.  Catherine Lee.

11  Q.  Did you talk to Hunter in person about Catherine Lee?

12  A.  Yes.

13  Q.  What were some of the things that you spoke about with

14  Hunter when you discussed Catherine Lee?

15          MR. RAY:  Objection to the form of the question.

16          THE COURT:  Can you rephrase that.

17  Q.  What was discussed when you talked to Hunter about

18  Catherine Lee?

19  A.  I, during the meeting with Joseph Hunter, said that

20  Catherine Lee was the next intended target, that Catherine Lee

21  was a real estate broker, and that since Catherine Lee was a

22  real estate broker, Catherine Lee could be killed in the same

23  method -- manner as Naomi Edillor, meaning the kill team

24  consisting of Adam and his partner can pretend to be real

25  estate buyers.

1    Q.  After you had this conversation with Hunter, did you

2    provide him with information about Catherine Lee?

3    A.  Yes.

4    Q.  What type of information?

5    A.  I provided to Hunter a set of information including

6    Catherine Lee's name and address.

7    Q.  How did you obtain that information?

8    A.  That information was obtained for me by the Filipino

9    surveillance team consisting of Noi and his staff.

10           MR. BOVE:  Ms. Shields, can you please publish

11   Government Exhibit 414-15.

12   Q.  Mr. LeRoux, what is this?

13   A.  That is an email from Joseph Hunter dated January 17, 2012,

14   to me.

15           MR. BOVE:  Ms. Shields, please highlight the subject

16   line.

17   Q.  The subject says "new subject."

18           Do you see that?

19   A.  Yes.

20   Q.  Who wrote that?

21   A.  I did.

22   Q.  Did you send the initial email in this communication?

23   A.  Yes.

24   Q.  What, if anything, did you send to Hunter in the initial

25   email?

1    A.  I sent the information of Catherine Lee such as her name

2    and her address.

3              MR. BOVE:  May I approach, your Honor?

4              THE COURT:  You may.

5    Q.  I'm showing you a document marked for identification marked

6    for identification as Government Exhibit N226A.  This is a

7    document contained on the document marked as Government Exhibit

8    N226.

9              Mr. LeRoux, do you recognize that?

10   A.  Yes, I do.

11   Q.  What is Government Exhibit N226A?

12   A.  This exhibit is the information that I sent consisting of

13   Catherine Lee's name and her address.

14   Q.  Is that the information that was in the attachment to the

15   email that is Government Exhibit 414-15?

16   A.  Yes.

17             MR. BOVE:  Your Honor, the government offers N226A.

18             THE COURT:  Any objection?

19             MR. RAY:  No objection.

20             THE COURT:  It will be admitted.

21             (Government Exhibit N226A received in evidence)

22             MR. BOVE:  Ms. Shields, if you can please move 414-15

23   to the left and on the right side bring up N226A.  If you can

24   zoom in on the text, please.

25   BY MR. BOVE:

1   Q.  Now, Mr. LeRoux I'd like you to focus on the left side of

2   the screen.  What was Joseph Hunter's response when you sent

3   him the information relating to Catherine Lee?

4   A.  Joseph Hunter asked if there is a picture of Catherine Lee.

5   Q.  Do you recall providing a photograph of Catherine Lee to

6   Joseph Hunter in response to this request?

7   A.  I did not provide a photograph.

8           MR. BOVE:  You can take that down, please.  If you can

9   bring up now Government Exhibit 414-16.  If you can zoom in on

10  the second email.  Thank you.

11  Q.  Mr. LeRoux, what is this?

12  A.  This is an email from Joseph Hunter dated January 23, 2012,

13  to me.

14  Q.  And the email starts, "Hey, I need the following things."

15          Do you see that?

16  A.  Yes.

17  Q.  Then there's a reference to "one MP5 SD."

18          Do you see that text?

19  A.  Yes.

20  Q.  What did you understand Hunter to be referring to when he

21  wrote that?

22  A.  I understood he meant an MP5 submachine gun with an

23  attached silencer.

24  Q.  Are you familiar with that type of firearm?

25  A.  Yes.

1          MR. BOVE:  May I approach, your Honor?

2          THE COURT:  You may.

3  Q.  I'm showing you what's been marked for identification as

4  Government Exhibit 131-3.

5          Do you recognize that?

6  A.  Yes, I do.

7  Q.  What is it?

8  A.  That is an MP5 submachine gun with an attached silencer.

9          MR. BOVE:  Your Honor, the government offers 131-3.

10         THE COURT:  Any objection?

11         MR. STERN:  No objection.

12         MR. RAY:

13  No objection.

14         THE COURT:  It will be admitted.

15         (Government Exhibit 131-3 received in evidence)

16         MR. BOVE:  Ms. Shields, if can you move to the email

17  to the left please and bring up 131-3 on the right.

18  BY MR. BOVE:

19  Q.  Is that the type of firearm that you understood Hunter to

20  be requesting in the first line of the email?

21  A.  Yes.

22  Q.  Now, I'll ask you to take a look at the left side of the

23  screen.  There's a second entry, and Ms. Shields if you can

24  highlight it, please.  It reads, "One rifle silenced with

25  optics."

1          Do you see that?

2    A.   Yes.

3    Q.   What did you understand Hunter to mean by that?

4    A.   I understood he meant a rifle with a silencer with a scope.

5    Q.   Below that there's a reference to "one .22 or .380 pistol

6    silenced."

7          Do you see that?

8    A.   Yes.

9    Q.   What did you understand him to be requesting there?

10   A.   I understood he was requesting either a .22 caliber pistol

11   or a .380 caliber pistol, both with a silencer.

12   Q.   You referred to a silencer a couple times.  What is that?

13   A.   A silencer is a device designed to reduce the amount of

14   noise that is caused by a bullet being fired from a gun.

15   Q.   Now, at the point you received this email, had you had

16   conversations with Hunter about his request for weapons for

17   this murder?

18   A.   Yes.

19   Q.   What, if anything, did Hunter say to you about why he

20   wanted both a pistol and a rifle?

21   A.   Hunter said to me that he wanted a pistol in case the

22   murders occur at close range and a rifle in case the murders

23   occur from a distance, a long-range shot.  And by "murders,"

24   I'm refer specifically here to the Catherine Lee murder.

25          MR. BOVE:  Ms. Shields, in the left window can you

1    please zoom in now on both messages.

2    Q.  So the first email that you were just referring to was sent

3    at 6:08 a.m.  Do you see that?  Excuse me.  6:00 a.m.

4    A.  Yes.

5    Q.  The second email in this thread was sent at 6:02 a.m.  Do

6    you see that?

7    A.  Yes.

8    Q.  Who sent that message?

9    A.  The message was sent by Joseph Hunter.

10   Q.  So in the second message that we're looking at, the top

11   message in the thread, what did Hunter write?

12   A.  In the second message he wrote that he needs the three

13   weapons.

14   Q.  And when Hunter wrote, "I need them ASAP," you understood

15   him to be referring to the firearms in the email below?

16   A.  Yes.

17   Q.  What, if anything, did you do based on the email from

18   Hunter?

19   A.  I instructed my staff member Tony to collect the necessary

20   firearms from the RWB warehouse and deliver them to Hunter.

21          MR. BOVE:  Ms. Shields, if we can take a look at

22   414-17 in the main window, please.  Let's start at the bottom

23   if you can zoom in.

24   Q.  This is a message from Hunter on January 23, 2012 at 7:00

25   p.m.  Do you see that?

1    A.   Yes.

2    Q.   And part of the text says, "one rifle silenced with

3    optics."  Is that Hunter's part of the message?

4    A.   Yes.

5    Q.   Then below that there's a question.  "What type?"  Do you

6    see it?

7    A.   Yes.

8    Q.   Who wrote "what type"?

9    A.   I did.

10   Q.   Let's take a look at the top message.

11             What is this?

12   A.   That is a message from Joseph Hunter dated January 24, 2012

13   to me.

14   Q.   This email says, "556 if you have one.  The stuff I

15   received today is good, but would like a bigger caliber rifle

16   to go along with the small caliber one I received today."

17             Do you see that?

18   A.   Yes.

19   Q.   When Hunter wrote "556," what did you understand him to

20   mean?

21   A.   I understood he meant a 5.56 caliber rifle.

22   Q.   Are you familiar with that type of firearm?

23   A.   Yes.

24             MR. BOVE:  May I approach, your Honor?

25             THE COURT:  You may.

1    Q.  I'm showing you a photograph marked for identification as

2    Government Exhibit 131-2.  What is that?

3    A.  That is a photograph of a 5.56 caliber rifle.

4            MR. BOVE:  Your Honor, the government offers 131-2.

5            THE COURT:  Any objection?

6            MR. STERN:  No.

7            MR. RAY:  No.

8            THE COURT:  It will be admitted.

9            (Government Exhibit 131-2 received in evidence)

10            MR. BOVE:  If you can move the email to the left and

11   bring up 131-2.

12   BY MR. BOVE:

13   Q.  Mr. LeRoux, back to the email on the left the second

14   sentence says, "The stuff I received today is good."

15            Do you see that text?

16   A.  Yes.

17   Q.  What did you understand Hunter to mean by that?

18   A.  I understood he meant that the weapons that had been

19   delivered by Tony to him were of good quality, acceptable.

20   Q.  Did you take any steps to -- in response to Hunter's

21   request for a 5.56 rifle?

22   A.  Yes, I did.

23   Q.  What did you do?

24   A.  I instructed my staff member Tony to collect the necessary

25   rifle from the RWB warehouse and deliver it to Joseph Hunter.

1          MR. BOVE:  Ms. Shields, can you please bring up

2    Government Exhibit 414-18 and zoom in on the message, please.

3    Q.   What is this?

4    A.   That is an email from Joseph Hunter dated January 24, 2012

5    to me.

6    Q.   What's written in the subject line?

7    A.   Salaries.

8    Q.   The email begins, "Salaries due for 1 February."  And the

9    then the first entry says, "Fernando 15,000."

10         Do you see that?

11   A.   Yes.

12   Q.   Who did you understand Hunter to be referring to when he

13   wrote "Fernando"?

14   A.   Himself.

15   Q.   And what was your understanding the basis for the $15,000

16   salary request in this email?

17   A.   I understood the basis was because Hunter had been

18   successful as the manager of the previous kill team that had

19   killed Edgar at my request and after that murder of Edgar,

20   Hunter requested the salary upgrade to 15,000.

21   Q.   The second entry in the email refers to "Tay."

22         Do you see that?

23   A.   Yes.

24   Q.   Who did you understand Hunter to be referring to?

25   A.   I understood he was referring to Tim Vamvakias.

1   Q.  What is your understanding of where Vamvakias was located

2   in approximately January 2012?

3   A.  My understanding was that he was located in Texas.

4   Q.  Doing what?

5   A.  Handling the Tramadol operation.

6           MR. BOVE:  Ms. Shields, if you can highlight the

7   bottom two entries, please.

8   Q.  These bottom two entries refer to "sound JT."

9           Do you see that?

10  A.  Yes, I do.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. BOVE:

2   Q.  Who did you understand Hunter to be referring to when he

3   wrote Sal JT?

4   A.  I always thought he is referring to the kill team

5   consisting of Adam Samia and his partner.

6   Q.  Did you know which code name Samia was using?

7          MR. RAY:  Objection to the form of the question.

8          THE COURT:  All right. rephrase that please.

9   Q.  Do you know specifically when Hunter wrote "Sal" who he was

10  referring to as between Samia and Stillwell?

11  A.  I did not.

12  Q.  Now, there are references here to 35,000 for each man; do

13  you see that?

14  A.  I do.

15  Q.  What did you understand the 35,000 to consist of?

16  A.  I understood it consisted of ten thousand salary and 25,000

17  for the murder.

18  Q.  Now both entries read "paid upon mission success", do you

19  see that?

20  A.  I do.

21  Q.  What did you understand Hunter to mean when you wrote

22  "mission success"?

23  A.  I understood he meant when Catherine Lee is dead, when the

24  kill team consisting of Samia and his partner have killed

25  Catherine Lee the mission is a success.

1          MR. BOVE:  If you could please bring up Government

2    Exhibit 414-19.

3          (Pause)

4    Q.  Mr. LeRoux, what is this?

5    A.  That is an e-mail from Joseph Hunter dated February 4,

6    2012, to me.

7    Q.  What's in the subject line?

8    A.  Funds.

9    Q.  Now this message begins:

10         Sir, I have all the receipts for the visas and I was

11   short 3500 pesos; do you see that?

12   A.  Yes, I do.

13   Q.  When Hunter referred to "visas", what did you understand

14   him to mean?

15   A.  I understood he meant that the kill team consisting of

16   Samia and his partner had overstayed their visa in the

17   Philippines.

18   Q.  There's a request here for funds in the subject line?

19   A.  Yes.

20   Q.  The first sentence it references Hunter being short 3500

21   pesos; do you see that?

22   A.  Yes.

23   Q.  What did you understand Hunter to mean?

24   A.  I understood he meant that an additional 3500 pesos was

25   paid for the visas extensions.

1    Q.   What is the currency that's used in the Philippines?

2    A.   Philippines peso.

3    Q.   Now the second sentence of this e-mail reads:

4             We need another 1400 for a laptop computer bag.  It'll

5    be modified to hold the tool for concealment.

6             Do you see that?

7    A.   I do, yes.

8    Q.   When Hunter wrote the term "we" who did you understand him

9    to be referring to?

10   A.   I understood he was referring to himself and the kill team

11   consisting of Adam Samia and his partner.

12   Q.   When Hunter wrote "we modified to hold the tool for

13   concealment", what did you understand him to mean?

14   A.   I understood he meant that modifications were made to the

15   laptop computer bag in order to hold the gun.

16   Q.   And based on the reference to a computer bag, what type of

17   firearm did you understand Hunter to be referring to?

18   A.   I understood that since the computer bag is smallest

19   referring to the .22 caliber firearm.

20   Q.   Now the e-mail continues:

21            Also the guys need more gas money, probably 8600 pesos

22   for gas and tolls for month; do you see that?

23   A.   I do, yes.

24   Q.   When Hunter wrote "the guys", who did you understand him to

25   be referring to?

1    A.   I understood he was referring to the kill team consisting

2    of Adam Samia and his partner.

3    Q.   The next sentence says:

4              They say this Las Pinas place is a two and a half hour

5    drive each way; do you see that?

6    A.   Yes, I do.

7    Q.   When Hunter wrote "they" who did you understand him to be

8    referring to?

9    A.   I understood everything still referring to the kill team

10   consisting of Adam Samia and his partner.

11             MR. BOVE:  My I approach, judge?

12             THE COURT:  You may.

13   Q.   I'm showing a document marked as Government Exhibit Five;

14   do you recognize this?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   It's a map of the area around Manila encompassing Las

18   Pinas.

19   Q.   Does that map fairly and accurately depict those portions

20   of the Philippines?

21   A.   Yes, it does.

22             MR. BOVE:  The government offers Exhibit Five.

23             THE COURT:  Any objection?

24             (No objection)

25             THE COURT:  It'll be admitted.

1          (Government's Exhibit 5 received in evidence)

2          MR. BOVE:  Bring that up on the right side of the

3   screen please.

4   Q.  Do you see the Las Pinas area on the map marked on Exhibit

5   5?

6          THE COURT:  Yes, I do.

7          MR. BOVE:  Ms. Shields, if you would draw a circle

8   around that.

9   Q.  Where is Manila relative to Las Pinas?

10  A.  Manila is approximately one hour's drive north of Las

11  Pinas.

12         MR. BOVE:  Now, on the right side if you'd please

13  bring up Government Exhibit 226A.  If you could zoom-in please.

14         (Pause)

15         MR. BOVE:  Ms. Shields, in 414-19 could you please

16  highlight the sentence "they say this Las Pinas place is a two

17  and a half hour drive each way".  And Government Exhibit N226A

18  could you please highlight the address.

19  Q.  Mr. LeRoux, is Las Pinas city in Las Pinas in the

20  Philippines?

21  A.  Yes, it is.

22  Q.  Government Exhibit N226A is the information you provided to

23  Joseph Hunter regarding Catherine Lee?

24  A.  Yes, it is.

25  Q.  Mr. LeRoux, did you identify a third murder target to

1    Joseph Hunter in early 2012?

2    A.  Yes, I did.

3    Q.  What was the name of this intended victim?

4    A.  Fitch.

5    Q.  Why did you want to have Fitch killed?

6    A.  I believed that Fitch was involved in stealing from me.

7          MR. BOVE:  Ms. Shields, could you please bring up

8    Government Exhibit 414-20.

9          (Pause)

10   Q.  Mr. LeRoux, what is this?

11   A.  It is an e-mail from Joseph Hunter dated February 6, 2012,

12   to me.

13   Q.  So this e-mail says we need a new subject.  We are checking

14   on the first subject you gave but they have not been seen.  In

15   one of the address is empty now and for sale.  We need a new

16   subject with a photo, address and car place.  If the guys don't

17   have a good photo everything is put at risk because they have

18   to inquire and find out about the subject and that makes people

19   suspicious.  All of these areas are gated and as soon as the

20   guys parked for surveillance, within a few minutes the roving

21   patrol comes by and asks what they're doing.  The guys already

22   draw attention and then sitting somewhere draws even more.

23          Mr. LeRoux, when Hunter wrote "need a subject" what

24   did you understand him to mean?

25   A.  I understood he meant a new person to kill.

1    Q.  When he wrote in "the guys don't have a good photo

2    everything is put at risk", what did you understand Hunter to

3    be referring to by "the guys"?

4    A.  I understood he was referring to the kill team consisting

5    of Samia and his partner.

6           MR. BOVE:  Ms. Shields, if you could highlight the

7    part of the e-mail that reads "all of these areas are gated".

8    Q.  Do you see that, Mr. LeRoux?

9    A.  Yes, I do.

10   Q.  Do you recall whether any of the three murder targets that

11   you communicated to Joseph Hunter you've testified about thus

12   far lived in a gated community?

13   A.  Yes, I do.

14   Q.  Which target?

15   A.  Fitch.

16   Q.  This e-mails and the guys already draw attention and then

17   sitting somewhere draws even more; do you see that?

18   A.  Yes, I do.

19   Q.  What did you understand Hunter to be communicating there?

20   A.  What I understood Hunter meant is that the kill team

21   consisting of Adam Samia and his partner already looked

22   suspicious because basically they're sitting doing surveillance

23   as part of their preparation work for killing the victim.

24   Q.  So based on this e-mail from Hunter requesting a, quote,

25   new subject, did you identify a fourth murder target to Hunter?

1    A.   Yes, I did.

2    Q.   Was this in the timeframe of approximately January or

3    February of 2012?

4    A.   Yes, it was.

5    Q.   What was the fourth target you identified to Joseph Hunter?

6    A.   Manuel Jalos.

7    Q.   Is that the man that you testified yesterday you believed

8    was involved in the seizure of weapons from the Ufuk?

9    A.   Yes.

10   Q.   Now you testified yesterday in the beginning that Catherine

11   Lee was murdered at some point, correct?

12   A.   Yes.

13   Q.   How did you first learn about that?

14   A.   I received a communication from Joseph Hunter and Joseph

15   Hunter told me that the kill team consisting of Adam Samia and

16   his partner had successfully killed Catherine Lee.

17   Q.   After you received that communication, did you meet with

18   Hunter?

19   A.   Yes.

20   Q.   Where was the meeting?

21   A.   In the Philippines.

22   Q.   Did you bring anything to the meeting with Hunter in the

23   Philippines?

24   A.   Yes.

25   Q.   What did you bring?

1   A.  I brought with me approximately 70,000 U.S. dollars.

2   Q.  Do you remember when approximately this meeting occurred?

3   A.  Approximately, the middle of February 2012.

4   Q.  Why did you bring cash to the meeting with Hunter?

5   A.  I brought cash to the meeting with Hunter because

6   previously I had received the e-mail stating that the cash was

7   needed on mission success and the mission was successful

8   according to Hunter since Catherine Lee was dead.  And I also

9   brought the cash in case the people leave the Philippines a

10  hurry.  And by "the people" I am referring to the kill team

11  consisting of Samia and his partner.

12  Q.  What had been communicated to you by Hunter prior to the

13  meeting that led you to think that the kill team might need to

14  leave the Philippines in a hurry?

15  A.  Joseph Hunter had told me the killing of Catherine Lee had

16  gone wrong.

17  Q.  Before the meeting did Hunter say anything about what he

18  meant by "gone wrong"?

19  A.  Hunter told me that there were witnesses, that the

20  individuals had been sketched and there was a sketch available

21  identifying the individuals, Adam Samia and his partner who had

22  conducted the murder.

23          MR. SCHNEIDER:  Your Honor, may we approach please?

24          THE COURT:  Yes.

25          (Continued on next page)

1          (side bar)

2          MR. SCHNEIDER:  You know why I'm here, right?

3          THE COURT:  I know why you are here.

4          MR. SCHNEIDER:  Seems to me now that the government

5    has opened the door, really wide open and we should now be

6    allowed to bring out the witness's lack of identification, the

7    witness's preparation of the sketches, the witness's looking at

8    photographs, the witness's identification or lack thereof.  How

9    much clearer could it be that the jurors have heard that

10   witnesses prepared sketches and that there is an issue of

11   identification?  Seems to me the government wants it both ways.

12   So now the jurors are going to speculate and guess that

13   witnesses have identified these defendants but they are not

14   going to get a chance to hear the truth, which is that the

15   witnesses prepared sketches.

16         THE COURT:  Can I stop you and let the jury go?

17         MR. SCHNEIDER:  Sure.

18         (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Ladies and gentlemen, why don't we take

3     our lunch break now and we'll meet again at two o'clock.

4     Please remember to keep an open mind.

5              (Jury not present)

6              THE COURT:  The witness may step down.

7              (Witness not present)

8              THE COURT:  Mr. Schneider, is there anything else you

9     want to add?

10             MR. SCHNEIDER:  I'm sorry?

11             THE COURT:  Just so you know that what we were talking

12    about is there is a speaker in the cell book block.  I don't

13    think it really matters the witness hears this discussion.  But

14    we're insuring that he wasn't in the cell block in which

15    there's a speaker.  He's not in there.

16             All right.  In any event, is there anything else you

17    want to say on this issue?

18             MR. SCHNEIDER:  I believe I said everything I need to

19    say.  They opened the door and if your Honor is not going to

20    allow us, then we move for a mistrial because the jurors have

21    now been left with a possible situation.  From the defense

22    point of view they have heard evidence that we can't now

23    contest which we told the government about this earlier that we

24    wanted to bring this stuff out.  So not only did they object to

25    bringing it out but they brought it out on direct-examination.

1    It wasn't like it came out on accident or cross or something I

2    said or did.  They brought it out and they have it clear.  This

3    witness has been prepared from day one till day a thousand.  So

4    they can't say he didn't know it was coming.  They can't say

5    they didn't prep him for this.  This wasn't something that just

6    came off the cuff.  They knew they were going to ask the

7    question.  He gave the answer and we've new been prejudiced

8    beyond any instruction.  And I don't know my motion to strike

9    beyond any charge to the charge.

10           Our request is that we not have a mistrial but that we

11   be allowed to bring out what we thought was reliable in the

12   evidence which they brought out the fact that there were

13   sketches made and sketches were obviously reliable based on

14   witness's testimony at that time when it was done.

15           So we want to bring out all the things we asked about

16   in our motion, the sketches, the lack of ID, the fact that

17   there was a positive ID of co-defendants, all of those things

18   in our motion is now fair game.  And if we could do that we

19   don't have a mistrial but if we can't do that, then we think a

20   mistrial is the only appropriate remedy.

21           MR. BOVE:  I think a lot of that is inaccurate.  There

22   is an exhibit in evidence that was stipulated to by all of the

23   defendants.  There's a video excerpt of a statement by Joseph

24   Hunter, Government Exhibit 104.  There's a transcript in

25   evidence, 104-T, at page seven of that transcript.  Joseph

1    Hunter describes the sketches and mocks them.  So his testimony

2    is it especially after this point, I don't expect him to say

3    much else about the sketches.  It's completely consistent with

4    what's already in evidence about the sketches which is that

5    Hunter saw them and was upset that they had been portrayed in

6    the media.  There's nothing new here.  And we're not going to

7    be suggesting that the sketches were accurate.  Just the

8    opposite.  We credit Hunter's assessment in his own words on

9    the video of the sketches.  So we're not saying that the

10   sketches aren't reliable.  Again, our position is to the

11   contrary.

12            To the extent that there are comments made about

13   preparing a witness, we've certainly endeavored to abide by the

14   Court's ruling.  The Court was aware it was my understanding

15   that the document was coming in in our opposition to the 807

16   motion referred to these comments by Hunter.  They haven't been

17   published yet.  I didn't remember.  But they are in evidence.

18   So I think we are within the confines of what is appropriately

19   in the record based on the Court's ruling.

20            I think certainly the extent there is concern based on

21   what he just said and I don't think there should be based on

22   the reference in it's more than a reference, a couple sentences

23   about these sketches in Government Exhibit 104.  But to the

24   extent they want a limiting instruction at this point about

25   there being no evidence as to the reliability of the

1  identifications or the sketches themselves about where the

2  evidence is, that's fine.  But this is pursuant to the Court's

3  ruling.  This issue that sketches existed is before.  That

4  testimony was already in evidence.  This is the passage, judge,

5  from -- I'm reading from the transcript of 104 T.

6              And I was like now this is Hunter:

7              Now a hundred people saw your face.  Then I was

8  watching the news and they the sketches but the sketches didn't

9  look like them, so everything was OK.  One guy kind of looked

10  like an Asian and the other guy looked like a cartoon

11  character.  So I got them on a plane.  They were Americans.

12  Got them back to America.

13             So this already in evidence, judge.  It's in evidence

14  without any objection on this issue and I don't think that the

15  testimony here changes what the record is at this point and I

16  don't think we've opened the door to anything.

17             MR. SCHNEIDER:  Let's remember, judge, we didn't want

18  the video in the first place.  Your Honor ruled that it was

19  admissible against our client for reasons that had nothing to

20  do with our objections.

21             Number two, just because a co-defendant said in a

22  video doesn't mean the government can bring it out again with a

23  live witness who is either supposedly corroborating that.

24             Number three, if there is going to be any regards

25  about it, we want there to be a stipulation that the witnesses

1    who were the basis of the sketch said that it was reliable and

2    that it was based on our observations of perpetrators at the

3    time and people they saw at the time that it was Bill Maxwell

4    Anthony that they looked at sketches and that they, the

5    witnesses said that those sketches fairly and accurately

6    represented the people who they observed with Catherine Lee

7    prior to her murder.

8                THE COURT:  I know you objected to the

9    in-admissibility of the video.  I don't recall you specifically

10   arguing -- tell me if I'm wrong -- that because there is

11   reference to the sketches if I don't let in the fact that there

12   was a failure to identify your client that that in particular

13   prejudiced them.

14               MR. SCHNEIDER:  You're right.  We did not address that

15   specific.

16               THE COURT:  Yes.  Now before me is why are you in the

17   worse position now?  Why is your client more prejudiced now in

18   light of the fact that there is testimony that sketches were

19   created?

20               MR. SCHNEIDER:  Couple things.  One, I think it is now

21   the government's going to argue that it corroborates, it

22   justifies each one.  Hunter justifies Mr. LeRoux and LeRoux

23   justifies Hunter.  Therefore it must be true.  Therefore LeRoux

24   must be credible.  Therefore you should believe what he is

25   saying.  That's a problem right there.  They can rely on the

1  corroborative nature of the coming from two different places.

2          I think the fact that when you have a video and people

3  are talking about not a witness that the government is

4  presenting, they're trying to use this video against Mr. Hunter

5  and the co-conspirators, right, that's different than having a

6  live witness presented by the government where they can then

7  argue on submission, you had a witness who came in and said

8  that there was sketches, that there were witnesses, that

9  witness has helped prepare sketches.  They can say that's

10  different than having that.  They're saying Mr. Hunter said it

11  on the video.  Just it's different.  It's qualitatively

12  different and the difference now quantitative because now you

13  have two as opposed to one.

14          MR. BOVE:  As a procedural matter at page 123 lines

15  one through four Mr. Schneider withdrew his objection to

16  Government Exhibit 104.  There is no objection in the record to

17  this exhibit from Mr. Samia.

18          Second --

19          MR. SCHNEIDER:  Well, there's no objection because it

20  had already been ruled admissible.  So, let's be clear.  He

21  knows that what we objected to in the beginning was part of in

22  limine motions, part of the motions before you began trial.  So

23  I can't object once your Honor rules -- so let's not say I

24  didn't object.

25          MR. BOVE:  Second, that was not the characterization

1   that was just made about what we intend to argue based upon the

2   references to sketches is not accurate.  We think Mr. Hunter is

3   right in the sketches were not accurate.  We are certainly now

4   based on this conversation can tow that line even more

5   carefully.

6         But I think the issue here is there is an exhibit in

7   evidence.  It referred to sketches.  We're talking about where

8   there's no specific objection about that.  And now we're

9   talking about opening a door that we couldn't have known

10  existed.  The testimony is completely consistent with what's

11  already in evidence.  As I said, if there's a limiting

12  instruction that's being requested about the state of the

13  record on these sketches, that's fine, but these are all things

14  that were before the Court.

15        THE COURT:  What would a limiting instruction like

16  that look like?  I understand what Mr. Schneider wants but from

17  your perspective what, if anything, do you think would be

18  helpful?

19        MR. BOVE:  I don't think that one is necessary but if

20  Mr. Schneider has an appropriate one we'd be amenable to

21  addressing that.  I don't think one is necessary because the

22  testimony is consistent with the state of the record.  We are

23  not going to be making arguments to this jury about things that

24  are not in the record.  So I don't think that's really a

25  credible basis for concern and it's certainly not a credible

1    basis to be talking about a mistrial in light of Government

2    Exhibit 104.

3              THE COURT:  All right.

4              MR. SCHNEIDER:  Put the sketches in evidence.  Let's

5    have the government or somebody put this in.  I don't care.

6    Let's have both sketches in evidence and let the jurors decide

7    if Mr. Hunter and Mr. LeRoux are correct about whether or not

8    they look like the perpetrators versus the defendants and see

9    what happens.

10             THE COURT:  All right.  Why don't we come back at five

11   to two.  OK?

12             MR. BOVE:  Thank you, judge.

13             THE COURT:  Thanks.

14             (Luncheon Recess)

15                          AFTERNOON SESSION

16                             2:00 p.m.

17             THE COURT:  Everyone be seated.

18             Just to confirm, the videos that have Mr. Hunter sort

19   of mocking the sketches or their likability have been admitted

20   into evidence but have not been shown to the jury.

21             MR. BOVE:  Yes, your Honor.

22             THE COURT:  All right.  So I'm going to deny your

23   request, Mr. Schneider, but what I am going to do if you want

24   me to is strike the testimony about the sketches from

25   Mr. LeRoux and require the government to redact from the video

1      the portion shown to the jury, the portion that references the

2      sketches.  I am willing to do that if you want me to.  If you

3      don't want me to, you can just make the arguments on summation.

4                 MR. SCHNEIDER:  No.  I want what I said before but if

5      I can't have that then I will accept the striking and I will

6      accept the redaction.

7                 THE COURT:  OK.  So, no, I'm not happy about it but I

8      will accept it.

9                 THE COURT:  I understand that and I'll interpret that

10     as a continued objection.

11                MR. SCHNEIDER:  Yes.

12                THE COURT:  But I understand it puts the government in

13     a difficult position.  Can you work around it?  I just don't

14     want to keep the jury waiting.

15                MR. BOVE:  Not a problem, judge.  If I could just ask

16     the Court's permission and the marshals' permission to confer

17     with Mr. LeRoux briefly before he resumes that testimony to

18     make sure that line is towed.

19                THE COURT:  Is everyone comfortable with that?

20                (Yes)

21                THE COURT:  Mr. Schneider, I don't want to highlight

22     the sketch but I also want to tell the jury what to disregard.

23     So is there a particular language you want me to use?

24                MR. SCHNEIDER:  If I remember correctly it was his

25     answer -- it was the last answer to the last question.  I don't

1    have it in front of me.

2              THE COURT:  I'll read from my rough transcript.

3              So before the meeting did Hunter say anything about

4    what he meant by "gone wrong".  Hunter told me that there were

5    witnesses that the individuals had been sketched and there was

6    a sketch available.

7              I -- actually, you know what, I'm going to ask the

8    court reporter just because I can't read the real time to read

9    the rest of that sentence, please.

10             MR. SCHNEIDER:  I have enough information.  My

11   suggestion would be to strike the last question and answer and

12   just tell the jurors there was an objection to the last

13   question and answer that's been stricken from the record,

14   please.

15             THE COURT:  OK all right.

16             You can go speak to Mr. LeRoux.

17             MR. BOVE:  I think we're waiting for him to be --

18             A MARSHAL:  He is coming down now.

19             (Pause)

20             MR. BOVE:  Just for the record, your Honor, I spoke to

21   Mr. LeRoux in the back and instructed him not to make reference

22   to any potential witnesses that -- described to him of the

23   murder of Catherine Lee.

24             THE COURT:  Can you come closer to the microphone.

25             MR. BOVE:  I instructed Mr. LeRoux not to make further

1   reference to the witnesses that Hunter described to him about

2   the murder of Catherine Lee, not to make further reference to

3   sketches that Mr. Hunter described to him.

4           As to the murder of Catherine Lee in the beginning of

5   his testimony there were additional statements by Hunter that

6   related to the manner in which the murder was conducted and in

7   the van used in the murder.  So that's where we begin.  So I

8   will read a bit to make sure we navigate this appropriately.

9           THE COURT:  All right.  Let's bring the jury in.

10          Thank you.

11          (Jury present)

12          (Witness present)

13          THE COURT:  Everyone can be seated.  Thank you.

14          You may proceed.

15          MR. BOVE:  Thank you, judge.

16  Q.  Mr. LeRoux, before the lunch break you were describing a

17  meeting that you had with Joseph Hunter in the Philippines,

18  correct?

19  A.  Yes.

20          MR. SCHNEIDER:  Your Honor, I think you are going to

21  have to probe --

22          THE COURT:  Ladies and gentlemen, there is an

23  objection to the last question and the answer before you took

24  your lunch break.  I have stricken both question and answer

25  from the record and you are to disregard it.  Thank you.

1        Please proceed.

2   Q.  Before the break you were testifying about a meeting with

3   Joseph Hunter in the Philippines, correct?

4   A.  Yes.

5   Q.  And I believe you said that that meeting took place in mid

6   February of 2012?

7   A.  Yes.

8   Q.  And this was a meeting where you and Hunter discussed the

9   murder of Catherine Lee, correct?

10  A.  Yes.

11  Q.  What, if anything, did Hunter say to you during that

12  meeting about the manner in which the murder was conducted?

13  A.  Joseph Hunter told me that the kill team consisting of Adam

14  Samia and his partner had killed Catherine Lee in the silver

15  Innova.  Additionally, Hunter told me that Catherine Lee had

16  been killed by the kill team with a .22 caliber pistol and that

17  Catherine Lee's dead body had been dumped in a pile of garbage

18  by the side of the road.

19  Q.  You just referenced a silver Innova?

20  A.  Yes.

21  Q.  When Hunter said that, what did you understand him to be

22  referring to?

23  A.  I understood everything referring to the silver Innova

24  which was one of the two vehicles that Hunter and the kill team

25  consisting of Samia and his partner had been assigned.

1    Q.  Isn't an Innova a van?

2    A.  The Innova is a Toyota van, yes.

3         MR. BOVE:  Ms. Shields, could you please publish

4    Government Exhibit 414-21 and zoom-in please.

5         (Pause)

6    Q.  Mr. LeRoux, what is this?

7    A.  This is an e-mail from Joseph Hunter dated February 13,

8    2012 to me.

9    Q.  So this e-mail says:

10        Need three new cheap phones for Commo and 1500 pesos

11   for the parking of the two vehicles that was paid today.  All

12   three of us need to go home in April to do our taxes.  Must be

13   done by 15 April.  So, they plan on doing one more and then go

14   and come back.  Tay and bird also want one month off after the

15   stuff is picked up there.  Also, need you to agree to buy my

16   desktop and laptop from me if it is not a problem when this a

17   all over.  They are compromised and can't be taken to the U.S.

18   with all the stuff that has been downloaded on them.

19        Mr. LeRoux, I'd like you to focus on the first

20   sentence, "need three new cheap phones for Commo"; do you see

21   that part of the sentence?

22   A.  Yes, I do.

23   Q.  What did you understand Hunter to mean by that?

24   A.  I understood Hunter meant that the team, the kill team

25   consisting of Adam Samia and his partner, as well as Hunter

1   needed new telephones for secure communication.

2   Q.  And that sentence continues with a reference to the parking

3   of the two vehicles that was paid today.  Do you see that?

4   A.  Yes, I do.

5   Q.  What did you understand that to be a reference to?

6   A.  I understood that was a reference to the silver Innova, the

7   Toyota silver Innova van and additional vehicle that the kill

8   team consisting of Samia and his partner were assigned.

9           MR. BOVE:  If you could highlight the sentence that

10  says "so they planed on doing one more and then go and come

11  back."

12  Q.  Mr. LeRoux, what did you understand Hunter to mean when he

13  wrote that?

14  A.  I understood he meant that the kill team consisting of

15  Samia and his partner wants to kill one more person and then go

16  home to the U.S. and then come back to kill more people.

17  Q.  I would like to talk about the reference in this e-mail to

18  the two vehicles.  Did you take any steps to recover the Toyota

19  Innova van in mid February of 2012?

20  A.  Yes, I did.

21  Q.  What did you do?

22  A.  I instructed my Philippine staff member, Tony, to collect

23  the vehicles from Hunter especially, the Toyota Innova van and

24  turn it over to my Israeli staff.

25  Q.  Why did you say "especially the Toyota Innova van"?

1   A.  I said "especially the Toyota Innova van" because in the

2   meeting with Joseph Hunter he had told me that the victim,

3   Catherine Lee, had been killed in the van and the van was full

4   of blood and debris from the murder.

5   Q.  You just made reference to Israeli staff; is that right?

6   A.  Yes.

7   Q.  What Israeli staff were you referring to?

8   A.  I had a number of Israeli individuals in the Philippines

9   working for me.  I'm referring to two of them named Nathan and

10  Daniel.

11  Q.  Why did you instruct that the van, the Toyota Innova be

12  turned over to these two Israelis?

13  A.  I instructed that the van be turned over to the two

14  Israelis because I wanted to personally oversee the cleaning of

15  the Toyota Innova van.

16  Q.  Did you see the Toyota Innova van before Catherine Lee was

17  murdered?

18  A.  Yes.

19  Q.  Where?

20  A.  I saw the Toyota Innova van outside my house in -- which is

21  south of Manila.

22  Q.  Was there anything being done to the van when you saw it?

23  A.  Yes.

24  Q.  What did you see?

25  A.  I saw the van, the Toyota Innova van being cleaned.  I saw

1    a huge amount of soapy water coming out of the side of the back

2    of the vehicle.

3    Q.  Where was the vehicle parked?

4    A.  The vehicle was parked out the front of my house.

5    Q.  After that cleaning process was completed did you give any

6    instructions about what should happen to the van?

7    A.  Yes, I did.

8    Q.  What were those instructions?

9    A.  I gave the instruction that the van should be taken to the

10   Cavite warehouse and put in normal use.

11   Q.  Where is Cavite?

12   A.  Cavite is an area south of Manila.  It's a province in the

13   Philippines.

14   Q.  You just referenced a Cavite warehouse; am I right?

15   A.  Yes.

16   Q.  What was the Cavite warehouse?

17   A.  This was a warehouse that was used for the missile project

18   for Iran.

19   Q.  And I think you said that you instructed that the van be

20   brought into personal use -- excuse me -- normal use?

21   A.  Yes.

22   Q.  What was your instruction on how the van should be used?

23   A.  My instruction was that the van should be put into normal

24   use.  And by that I mean just used as a regular van for moving

25   staff and equipment throughout at Cavite warehouse.

1           MR. BOVE:  Could you please bring up Government

2    Exhibit 400-61 and if you could zoom-in on the message please.

3    This is an e-mail from Samia to Hunter dated February 16th of

4    2012.  The subject "a new format".  And the message reads:

5           Let me know if you can open this.  There's an

6    attachment to the message titled ESPS.RTF.

7           Could you please bring up that attachment as page two

8    of the exhibit.  Please highlight the column labeled "tools".

9           Now, if you could bring up Government Exhibit 400-62

10   please and please zoom-in on the bottom.  This is the message

11   we were just looking at.

12          Let me know if you can open this and now if we could

13   look at next message in the thread.  This is an e-mail from

14   Hunter also on February 16, 2012 and it reads:

15          Yes, I can read this.  What is this?  Is this what you

16   are asking to be reimbursed for?

17          Now, if we could zoom-in on Samia's reply please.

18   This is a message from Samia to Hunter on February 16, 2012.

19   It reads:

20          This is what you asked for last week or so ago.

21          Yes, for reimbursement.

22   Q.  Now, going back to the meeting that you described with

23   Joseph Hunter in mid February of 2012 I believe you said before

24   the lunch break that you brought cash to the meeting?

25   A.  Yes.

1    Q.  What is the purpose of that cash?

2    A.  The purpose of the cash was to pay for the murder of

3    Catherine Lee and also to pay for the salaries of the kill team

4    consisting of Samia and his partner.

5    Q.  Did you give that cash to Hunter in the meeting?

6    A.  Yes, I did.

7    Q.  Do you recall whether you were also reimbursed expenses for

8    the kill team in February of 2012?

9    A.  Yes, I did.

10         MR. BOVE:  Ms. Shields, if you could please take a

11   look at Government Exhibit 414-22.

12   Q.  What is this?

13   A.  This is an e-mail from Joseph Hunter dated February 27,

14   2012 to me.

15         MR. BOVE:  Ms. Shields, could you please highlight the

16   subject of this e-mail.  The subject is "please update me".

17   Q.  Do you see that?

18   A.  Yes.

19   Q.  Who wrote that?

20   A.  I did.

21   Q.  And the bottom message in the thread reads:

22         How is the job progressing?  Did they cite the

23   contact?

24         Do you see that?

25   A.  Yes.

1    Q.   Who wrote that?

2    A.   I did.

3    Q.   What were you referring to?

4    A.   I was referring to the murder of the target, Fitch.

5              MR. BOVE:   Now, if we could take a look at Hunter's

6    response please.

7              Hunter writes:  They have been to his house for a

8    couple of days and are going to his office today.

9    Q.   Do you see that?

10   A.   Yes, I do.

11   Q.   When Hunter wrote "they" who did you understand him to be

12   referring to?

13   A.   I understood he was referring to the kill team consisting

14   of Samia and his partner.

15   Q.   Now you said a moment ago that in this timeframe the team

16   had been tasked with the murder of a man you have described as

17   "Fitch"?

18   A.   Yes.

19   Q.   Is there anything about this e-mail that leads you to that

20   belief?

21   A.   Yes.

22   Q.   What about this e-mail?

23   A.   First of all, the e-mail refers to his referring to a male

24   and the second word in this e-mail which makes me remember that

25   this was Fitch is that they referred "they" meaning Samia.

1    "They" meaning the kill team, Samia and his partner, were

2    basically at his office according to this e-mail.

3              MR. BOVE:  Ms. Shields, could you please bring up

4    Government Exhibit 400-65 and if you could zoom-in on the

5    message please.

6              This is an e-mail from Samia to Hunter dated

7    February 27, 2012, the subject is "info" and this reads:

8              Hey, just wanted to let you know JT is rolling State

9    side the 29th of February.  I am heading out the 6th of March.

10   I will drop off a car the 5th.

11             Ms. Shields, if you could bring up Government Exhibit

12   402-11 on the right.  If you could start by zooming-in on the

13   header.  So this is an e-mail from Stillwell to Samia dated

14   February 25, 2012, subject your e-mail confirmation from united

15   TFTK30.

16             Now Government Exhibit 400-65 if you could please

17   highlight is JT is rolling State side the 6th February.  And

18   then if you could zoom out and highlight the travel itinerary.

19   If you could please highlight the text February 29 of 402-11.

20             (Pause)

21             If could you put up in the main window please

22   Government Exhibit 414-23 and zoom-in on the message please.

23   Q.  Mr. LeRoux, what is this?

24   A.  This is an e-mail from Joseph Hunter dated February 29,

25   2012, to me.

1    Q.  This message says:

2              The guys are going home for tax filing.  One guy is

3    leaving today and the other guy on the 6th.  I don't think they

4    tried hard to get another job done before they left.  They said

5    they did but I find it hard to believe.  They say they're

6    definitely coming back.  I asked why they are not staying until

7    the other job is finished?  And they say they have to leave

8    before their visa expires because they don't want to be

9    fingerprinted for the immigration card.

10             Mr. LeRoux, let's start with the first sentence.  Who

11   did you understand Hunter to be referring to?

12   A.  I understood he was referring to the kill team consisting

13   of Samia and his partner.

14   Q.  Then skipping to the third sentence it says:

15             "I don't think they tried to hard to get another Job

16   done before they left."

17             Do you see that?

18   A.  Yes, I do.

19   Q.  What did you understand Hunter to mean by that?

20   A.  I understood Hunter was referring to they did not try to

21   get another murder done before they left.

22   Q.  Then there's a sentence in the third line, the beginning of

23   the line it says they're definitely coming back.  Do you see

24   that part of the e-mail?

25   A.  Yes.

1   Q.  What did you understand Hunter to mean by that?

2   A.  I understood Hunter meant that the kill team consisting of

3   Samia and his partner would be coming back to kill more people.

4           MR. BOVE:  OK.  Ms. Shields, if you could please bring

5   up Government Exhibit 414-24.

6           (Pause)

7   Q.  Mr. LeRoux, what is this?

8   A.  This is an e-mail from Joseph Hunter dated March 1, 2012,

9   to me.

10  Q.  There's a message at the bottom that says:

11          Please confirm your condo is cleaned.  I think we pull

12  out everything except the tools you were using for the

13  construction project.

14          Do you see that text?

15  A.  Yes, I do.

16  Q.  Who wrote that?

17  A.  I did.

18  Q.  What did you mean by "construction projects"?

19  A.  This was a code word I was using in this e-mail to mean the

20  murders .

21  Q.  What did you mean by "tools"?

22  A.  That is a code word that I was using to mean guns.

23  Q.  Now, Hunter responds, I am planning on going for taxes in

24  the beginning of April.  I only have my two tools here that I

25  use personally.  The other toolkit I will receive on the 5th.

1    When Hunter wrote that "I only have my two tools here that I

2    use personally" what did you understand it to me?

3    A.   I understood that he meant the two weapons that he kept for

4    his own personal use.

5    Q.   The last sentence of e-mail says the other toolkit I will

6    receive on the 5th.  Do you see that?

7    A.   Yes, I do.

8    Q.   What did you understand Hunter to mean when he wrote that?

9    A.   I understood that he was referring to the murder weapon,

10   the .22 caliber firearm that was used to kill Catherine Lee.

11            MR. BOVE:  Ms. Shields, if you could move this e-mail

12   over to the left please and highlight "toolkit I will receive

13   on the 5th."  And now on the right side of the screen if you

14   could bring up Government Exhibit 400-65.

15            (Pause)

16            Zoom-in on the e-mail.  If you could highlight the

17   last sentence "I will drop off the car the 5th".

18            Thanks.  You can take that down.

19   Q.   Now, if we could take a look at Government Exhibit 414-25.

20   What is this, Mr. LeRoux?

21   A.   This is an e-mail from Joseph Hunter dated March 6, 2012 to

22   me.

23   Q.   Do you see the part of the message that says, "please get

24   the .22 barrel changed.  Please handle that.  I sent you

25   arrange contacts"?

1    A.  Yes, I do.

2              MR. BOVE:  Highlight that please.

3    Q.  Who wrote that?

4    A.  I did.

5              (Continued on next page)

1    Q.  Who wrote that?

2    A.  I did.

3    Q.  When you wrote the ".22 barrel," what were you referring

4    to?

5    A.  I was referring to the murder weapon, the .22 caliber

6    firearm that was used by the kill team consisting of Samia and

7    his partner to kill Catherine Lee.

8    Q.  Then Hunter responded, "It is clean except for my two

9    personal tools."

10           Do you see that?

11   A.  Yes.

12   Q.  Why did you want Hunter to change the barrel on the .22

13   caliber pistol that had been used to murder Catherine Lee?

14   A.  I was attempting to destroy evidence.  I knew that when

15   bullets expired from a gun barrel, the gun barrel basically

16   leaves marks on the bullets, which allow the bullet and the gun

17   to be matched together.

18           THE COURT:  Do any of the jurors need to stand and

19   stretch?  Is everyone OK?

20           All right.  Please proceed.

21           MR. BOVE:  Ms. Shields, can you please bring up

22   Government 414-22.  Can you zoom in on the message, please.

23   Q.  Mr. LeRoux, what is this?

24   A.  This an email from Joseph Hunter dated March 8, 2012 to me.

25   Q.  So this email says, "Talked with the guys, Ban and Angeles.

They said they can't do it."  When Hunter referred to guys Ban,

parentheses, who did you understand him to be referring to?

A.  I understood he was referring to the gun club in Angeles

City and the man Ban is one of the staff there.

Q.  Do you see the reference to Angeles?

A.  Yes.

Q.  Is that the reference to Angeles City you just made?

A.  Yes.

Q.  You just also referenced a gun club.  Is that separate from

RWB?

A.  Yes, it is.

Q.  Why didn't you attempt to change the barrel of the .22

pistol at RWB?

A.  Previously after the murder of Naomi Edillor, I had

attempted to have the barrel changed on another .22 caliber

firearm, the one that had been used to kill Edillor and the

team at RWB said they couldn't do it.

Q.  Now Hunter writes in this email they said they couldn't do

it.  What did you understand him to mean in this email?

A.  I understood he meant that Ban and the rest of the team at

the gun club in Angeles couldn't change the barrel on that .22

caliber firearm.

          MR. BOVE:  Ms. Shields, could you please publish

Government Exhibit 414-27.

Q.  At the bottom of this document there's a message dated

1    March 20, 2012, at 12:09 a.m.  Do you see that?

2    A.  Yes.

3    Q.  This is a message from Hunter that says, "Hey, I've been

4    trying to call you in reference to getting the tool fixed.

5    What is wrong?"

6    A.  Yes.

7    Q.  Do you see the reference to getting the tool fixed?

8    A.  Yes.

9    Q.  What did you understand Hunter to mean by that?

10   A.  I understood he was referring to the project that changed

11   the barrel on the .22 caliber murder weapon.

12   Q.  And then at the top of the thread, there's another message

13   from Hunter, correct?

14   A.  Yes.

15   Q.  And this message states, "I called Ricky Chu yesterday and

16   he was asking a lot of questions.  He sounded really suspicious

17   and just said he will take a look at it and see what he can do.

18   I think it is better to send a flick with it because the serial

19   numbers are filed off and they will have a video camera at

20   their place of business."

21           Do you see the reference to Ricky Chu in that email?

22   A.  Yes, I do.

23   Q.  Who did you understand Hunter to be referring to?

24   A.  Ricky Chu was one of the people working at the Angeles Gun

25   Club.  So I understood Hunter was referring to Ricky Chu from

1   the Angeles Gun Club.

2   Q.  More generally, what did you understand Hunter to be

3   communicating in this message?

4   A.  I understood that Hunter basically did not want to take the

5   .22 caliber murder weapon to be changed at the gun club because

6   he was concerned that it looked suspicious.  It has no serial

7   numbers and they have video camera there so he doesn't want to

8   appear on CCTV.

9   Q.  Following Hunter's email, did you instruct anyone else to

10  try and have the barrel changed on the murder weapon?

11  A.  Yes.

12  Q.  Who?

13  A.  Tony.

14  Q.  What did you instruct Tony to do?

15  A.  I instructed Tony to take the .22 caliber firearm to the

16  gun club in Angeles and try to get the barrel changed.

17  Q.  Tony is one of the staff members that you've referred to

18  during your testimony?

19  A.  Yes.

20  Q.  Do you know if the barrel was changed on the murder weapon?

21  A.  The barrel was not changed.

22  Q.  What happened?

23  A.  The murder weapon was collected by Tony, taken to the gun

24  club, and they rejected changing the barrel.  They couldn't do

25  it and the murder weapon was returned to the RWB warehouse.

1          MR. BOVE:  Ms. Shields, could you please publish

2    Government Exhibit 400-71 and please bring up page 2 of the

3    exhibit.  Zoom in on the email that begins, "Hey, bro."

4          This is an email from Samia that reads, "Hey, bro

5    still on standby, will be is SC Myrtle next week.  If Benny

6    needed me to look into anything there.  Send it to me next

7    month.  How are things going with you?"

8          You can zoom out please, Ms. Shields.  If you can

9    bring up Government Exhibit 400-73.  If you can zoom in on the

10   header, please.

11         This is a message that Samia sent to himself on June

12   18 of 2012 with an attachment titled imag0292.jpg and,

13   Ms. Shields, if you can take a look at that attachment, which

14   is page 2 of the exhibit and if you can rotate that.

15         Thank you.

16   Q.  Did you learn at some point that Samia and his partner left

17   the Philippines?

18   A.  Yes, I did.

19   Q.  And after that, did you start to rely on someone else for

20   acts of violence?

21   A.  Yes, I did.

22   Q.  Who?

23   A.  John Nash.

24   Q.  You testified yesterday that John Nash killed Joe Frank

25   Zuniga?

1    A.  Yes.

2    Q.  And I'd like to direct your attention now to approximately

3    the middle of 2012.  Did you direct Nash to try to kill anyone

4    else?

5    A.  Yes.

6    Q.  Who?

7    A.  Manuel Jalos.

8    Q.  Jalos was one of the murder targets that you also provided

9    to Hunter early in 2012?

10   A.  Yes.

11   Q.  Yesterday you described a hit man named Marcus, correct?

12   A.  Yes.

13   Q.  I believe you said he was South African?

14   A.  Yes.

15           MR. BOVE:  Ms. Shields, can we take a look at

16   Government Exhibit 400-27.  If you can zoom in on the email

17   dated May 5, 2010 at 4:31 p.m.

18           This is an email from Samia with subject, "Hey, Dave,"

19   to prostreet60@yahoo.com and unrestthewolves@gmx.com.  It

20   reads, "Hey, dude, can you get me Paul's contact info number,

21   email extra.  Send some pics of the new ride.  Thanks, Adam."

22           Now if you can zoom in on an email dated May 5, 2010,

23   at 8:57.  This is a message from Dave Jones to Adam Samia.  It

24   reads, "Dude, I asked him.  He does not want to give it out as

25   he has his own SA working for him at a lot cheaper price, which

1    I understand."

2    Q.  How did you compensate Marcus for murders?

3    A.  Marcus was paid in cash.

4    Q.  Was he paid at the same $25,000 per murder bonus rate?

5    A.  Yes, he was.

6    Q.  You said Marcus was from South Africa?

7    A.  Yes.

8          MR. BOVE:  Now, Ms. Shields if you can zoom in on the

9    top email, please.  This is a message from Samia to Hunter

10   dated May 6, 2010, where Samia writes to Hunter, "Hey, bro,

11   this is what Dave wrote back."

12         You can take that down.

13   Q.  Mr. LeRoux, did you know a man named Henry Chu?

14   A.  Yes.

15   Q.  Who was Henry Chu?

16   A.  Henry Chu was a staff member of Dave Smith.

17   Q.  Where is Chu today?

18   A.  I had him killed.

19   Q.  Why?

20   A.  I believe that Henry Chu was involved in a plot to have me

21   killed and I also believed he was stealing money.

22   Q.  When was Chu killed?

23   A.  Approximately December 2010.

24   Q.  Were you present?

25   A.  Yes, I was.

1   Q.  Describe what happened?

2   A.  Henry Chu was lured to a piece of land in the south of the

3   Philippines.  He was loaded on to a boat.  The boat was taken

4   out on to the ocean.  I shot Henry Chu in the back with a

5   Taser.  Marcus threw Henry Chu into the water and shot Henry

6   Chu.

7   Q.  Did you know a man named Cheeto?

8   A.  Yes.

9   Q.  Where is Cheeto today?

10  A.  I had him killed.

11  Q.  Who did you instruct to murder Cheeto?

12  A.  Marcus.

13  Q.  When approximately did you do that?

14  A.  Approximately December 2010.

15  Q.  How was Cheeto murdered?

16  A.  Cheeto was lured to a piece of land in the south of the

17  Philippines.  He was loaded on to the boat.  The boat was taken

18  out into the ocean.  Cheeto jumped into the water, at which

19  point Marcus shot Cheeto.

20  Q.  Were you present for that?

21  A.  Yes, I was.

22  Q.  Did you know a woman named Men Chu?

23  A.  Yes.

24  Q.  What, if any, work did this woman do for you?

25  A.  Men Chu was involved in the project to get the boat back

1    from the Philippines customs.  The boat I'm referring to was

2    the Ufuk boat.

3    Q.  Why was the boat in the custody of the Philippines customs?

4    A.  It was in custody because the Ufuk had been seized as part

5    and parcel of the arms trafficking operation that had gone

6    wrong in approximately 2009.

7    Q.  Did you direct Marcus to engage in violence against Men

8    Chu?

9    A.  Yes.

10   Q.  What did you direct him to do?

11   A.  I told Marcus to kill Men Chu.

12   Q.  When, approximately?

13   A.  Approximately 2010, 2011.

14   Q.  What happened?

15   A.  I canceled the job.

16   Q.  Why?

17   A.  I believed that Marcus's plan to kill Men Chu was too

18   complicated.

19   Q.  Did Marcus return to South Africa after that?

20   A.  Yes, he did.

21   Q.  Was that in 2011?

22   A.  Approximately 2011, yes.

23   Q.  Now, you said yesterday you were arrested in September of

24   2012?

25   A.  Yes.

1  Q.  Did you start participating in meetings with DEA agents and

2  the government after that?

3  A.  Yes, I did.

4  Q.  During the initial meetings, did you admit that you had

5  tried to kill Dazl Silverio?

6  A.  No.

7  Q.  During those meetings, did you admit that you had tried to

8  kill Manuel Jalos?

9  A.  No.

10 Q.  What about Fitch?

11 A.  No.

12 Q.  Those were lies, correct?

13 A.  Yes.

14 Q.  Now, I'd like to direct your attention to 2015.  Did there

15 come a time when you were asked about Adam Samia and a man

16 named Carl David Stillwell?

17 A.  Yes.

18 Q.  Did you lie at first when you were asked about those men?

19 A.  Yes.

20 Q.  What did you say?

21 A.  I lied when I said I believed they did not know that they

22 were leaving the United States to conduct a murder and I also

23 lied when I said I believed that the initial job in the

24 Philippines was a surveillance job.

25 Q.  None of those things were true when you said them in 2015,

1   correct?

2   A.  Yes.

3   Q.  You testified earlier that you pleaded guilty to a crime

4   involving a fugitive?

5   A.  Yes.

6   Q.  Who was the fugitive?

7   A.  Jacob Alexander.

8   Q.  What did that crime entail?

9   A.  I traveled to South Africa with some money, a large amount

10  of money in cash with the intention of sending somebody to

11  Namibia to bribe his judge.

12  Q.  Bribe Alexander's judge to what end?

13  A.  In order to prevent his extradition to the United States.

14  Q.  What happened?

15  A.  As far as understood, the money was paid over and the judge

16  was bribed.

17  Q.  Now, you have described an extraordinary amount of

18  criminality during your testimony so far.

19  A.  Yes.

20  Q.  Did you pay bribes in connection with those crimes?

21  A.  I pay bribes everywhere, yes.

22  Q.  For what types of things?

23  A.  I paid bribes in order to get the Angeles the certificates

24  for the firearms.  I paid bribes in order to get information

25  from the Philippines police about U.S. investigations against

1   me.  I paid bribes to facilitate criminal conduct wherever I

2   worked in the world.

3   Q.  Do you know a man named Mir Islam?

4   A.  Yes.

5   Q.  Who is Mir Islam?

6   A.  Mir Islam is a person I was incarcerated with.

7   Q.  How did you meet Islam?

8   A.  I met him in jail.

9   Q.  When, approximately?

10  A.  Approximately 2015.

11  Q.  Was there a time when Mir Islam was moved to a different

12  facility?

13  A.  Yes.

14  Q.  Did you continue to communicate with him after that?

15  A.  Yes.

16  Q.  How did you do it?

17  A.  By phone.

18  Q.  How by phone?

19  A.  Sorry.  Please repeat.

20  Q.  How did you contact Mir Islam using the telephone, sir?

21  A.  I used the three-way call with my paralegal at the time.

22  Q.  And that was a violation of the regulations of the Bureau

23  of Prisons, correct?

24  A.  Yes, it was.

25  Q.  During these three-way calls, did you make any plans with

1  Mir Islam?

2  A.  Yes, I did.

3  Q.  What did you plan to do?

4  A.  I discussed opening a call center business.

5  Q.  What type of call center business?

6  A.  We discussed a variety of legal E-commerce businesses.

7  Q.  How were you going to fund this?

8  A.  I was going to fund it.

9  Q.  When, approximately, were these conversations?

10  A.  Approximately June, 2016.

11  Q.  And at that time did you conduct Mir Islam to be released

12  from custody in the near future?

13  A.  Yes, I did.

14  Q.  And what was the plan for Islam?

15  A.  I discussed with Islam, using Islam to assist me in legal

16  research and we also discussed opening a legal call center

17  business with legal E-commerce operation.

18  Q.  Did you take steps to provide funds to Mir Islam?

19  A.  Yes.

20  Q.  What did you do?

21  A.  I provided to Islam some money for his phone, some money

22  for his food, and money for a laptop.

23  Q.  That was also a violation of the regulations of the Bureau

24  of Prisons, correct?

25  A.  Yes.

1   Q.   I would like to direct your attention to mid 2012.  OK?

2   A.   Yes.

3   Q.   Did you have any activities in Peru in that time frame?

4   A.   Yes, I did.

5   Q.   What were you doing in Peru in mid 2012?

6   A.   Smuggling cocaine.

7   Q.   Where was the cocaine sourced from?

8   A.   Peru.

9   Q.   Who in particular in Peru?

10  A.   From a Serbian criminal gang.

11  Q.   And how much cocaine approximately was involved?

12  A.   Approximately 150 kilos.

13  Q.   What did you plan to do with those drugs?

14  A.   The plan was to load the drugs on to a boat and sail the

15  boat to the Philippines.

16  Q.   Who did you intend to sell that quantity of cocaine to?

17  A.   The customer in the Philippines was a Chinese triad

18  criminal group.

19  Q.   What do you mean by "Chinese triad criminal group"?

20  A.   The Chinese triads are a organized criminal group that

21  operate in Asia.

22  Q.   And you mentioned that the plan was to smuggle the cocaine

23  on a maritime route?

24  A.   Yes.

25  Q.   How many vessels did you plan to be involved?

1    A.   A total of two vessels.

2    Q.   What was the plan?

3    A.   The plan was to load the cocaine on the first vessel, sail

4    out into international waters, and then transfer the cocaine on

5    to a larger vessel, which would then make the trip to the

6    Philippines.

7    Q.   Did you give any instructions to Hunter in connection with

8    this plan?

9    A.   Yes, I did.

10   Q.   What did you instruct Hunter to do?

11   A.   I instructed Hunter to travel to the United States and work

12   on purchasing a larger vessel.

13        MR. BOVE:  Ms. Shields, can you please bring up

14   Government Exhibit 400-71.  And if you can please zoom in on

15   the email on the bottom of page 1.  Thank you.  This is a

16   message from Hunter to Samia dated May 17, 2012.

17        The first paragraph states, "Adam, I need you to go to

18   Miami ASAP.  I want you to look for a boat for sale.  Hire an

19   expert to make sure it is in good condition and has the right

20   equipment.  You must negotiate the price.  Try to arrange to

21   have the boat paid for by account transfer."

22        Now, if you can please zoom in, Ms. Shields, on the

23   email above that one.

24        This is an email signed by Samia.  It reads, "Got the

25   info and already started working on it.  Waiting to hear back

1   from three others I know.  Spoke to one captain I know he said

2   he would be willing and able to bring it to Panama.  He just

3   needs more info on the trip, vessel, EXT, you know, all the

4   little details.  He has experience there as well.  You should

5   have more info next week.  Do not know how long this will take

6   to put together, but will try to get it done ASAP.  If you want

7   me to move forward on this, I will need expense funds for all

8   this as well.  Miami is not a cheap city to be in.  What is my

9   pay and bonus for all this and how will I be getting it?"

10          Now if you can please zoom in on the next message.

11  This is a message from Hunter to Samia dated May 18, 2012.

12  "Adam I need to you get to Miami and start looking for the

13  boat.  I will get expense money to you by WU.  Use your own

14  money or credit card to get there and I will have it to you

15  next week.  We have to get this boat found and bought to meet

16  timetables.  Your pay is $166 a day, plus you still get a $40

17  per diem."

18          Ms. Shields, can you please bring up Government

19  Exhibit 400-17 now.  Turn to Page 3 of this exhibit, please.

20  And if you can please zoom in on an email that begins, "Bro."

21          "Bro, I have been in contact with several friends down

22  south setting things up for my arrival.  I know several people

23  down there that have their fingers in that stuff, plus a boat

24  captain, which I pasted in his email below, but I will not

25  finance the op until I get reimbursed and the daily salary is

not worth me dropping everything for $166.  That is a joke, and

plus, no monthly bonus?  I can't do it for that.

        "Let me know what you want me to do.  I will help you

in any way I can with contacts that I have and anything else

that I've already set up, but it's just not worth it for me for

that amount.  I will still keep working on things until I hear

from you."

        Now, Ms. Shields if we go to page 2 of this exhibit

and zoom in on the email dated May 18, 2012.

        This is an email from response from Hunter to Samia,

subject, "Bro."  This email starts, "Maybe there is some

miscommunication or something, because I sure do not

understand.  First, when I say I need you there ASAP, I meant

two days ago or yesterday.  I have been more than lenient with

you as far as your wishes.  Either you want a job or you do

not, but you seem to have it in your mind that you're going to

squeeze our balls on any issue you can find, but that's your

personality and I will put up with it to an extent.

        You are not answering my emails in a timely manner and

you are not answering my phone calls at all.  I need team

members that can get a job done, not someone who thinks they're

in a position or have the experience to fuck this up.

        "As far as financed this operation, that's total

bullshit.  All we are asking is for you to get on a flight to

Miami ASAP and a few days in a hotel, which in the meantime the

1    funds will be WUed to you.  We need to find this boat ASAP to

2    fit timetables fingerprint.  If you can't give us that much

3    support, you are really fucked up.

4           "In reference to the pay, $166 plus per diem a day, it

5    is more than enough.  All you are doing is going to Miami and

6    looking for a boat for sale.  This boat will not be your name

7    and no funds will be put in your name."

8           Ms. Shields, if can you zoom in on the remainder of

9    the email.

10          "Maybe there is another miscommunication there.  I had

11   you on this op, meaning that you would be one of the guys going

12   to the island, as you previously requested.  Then your salary

13   would be $5,000 a month, plus a 10K bonus for the monthly

14   delivery.  If you have it in your mind that you want more than

15   the combined total of 15K total per month, you are wasting my

16   time.  This is a good operation with no dangers other than the

17   ocean.

18          "Now I have had a 3K cut from salary because of you.

19   Let me explain.  You signed up for a job with JT, and which I

20   am responsible for both of you.  I am expected to get these

21   things done.  You said you wanted the job.  First, I waited a

22   year for you to be available because of your own plans.  Then,

23   you finally come on board, do one sloppy job, which could have

24   endangered everyone, and left.

25          "Now, two months ago, the boss cuts my pay because I'm

1    not getting anything done here.  Now, to top that off, you are

2    giving me problems again.  Dave would not have you back because

3    of this exact reason.  He told me about you and I still had

4    faith that you would do a good job because I worked with you

5    for a month and thought you were OK.

6            "So I will put it to you like this:  Either you are

7    with us or you are not.  Interested.  If you want a job, you

8    will answer your telephone whenever I call and you will answer

9    my email in a timely manner, because I have no time to waste

10   with you.  Your salary will be as stated above.  If you accept

11   this job, get your ass on the plane and quit fucking around.

12           "Let me know ASAP."

13           You can take that down, please.

14   BY MR. BOVE:

15   Q.  Mr. LeRoux, before we looked at these documents, you were

16   describing a plan to obtain a vessel in the United States for

17   the at-sea transfer of approximately 150 kilograms of cocaine.

18   A.  Yes.

19   Q.  What happened to that plan?

20   A.  It didn't go through.

21   Q.  What do you mean?

22   A.  I was arrested.

23   Q.  Do you know what happened with the cocaine?

24   A.  The cocaine was eventually seized.

25   Q.  Now, you testified earlier that you pleaded guilty to a

1    federal crime related to methamphetamine; is that right?

2    A.   Yes.

3    Q.   Have you ever participated in the manufacturing of

4    methamphetamine?

5    A.   Yes.

6    Q.   When, approximately?

7    A.   Approximately 2009 through 2012.

8    Q.   Where were some of the places that you did that?

9    A.   In the Philippines and there was a plan in Cambodia as

10   well.

11   Q.   What did you do in the Philippines?

12   A.   In the Philippines one of my staff members by the name of

13   Phil Shackels set up a small meth lab in his apartment.

14   Q.   Was methamphetamine ever produced in that laboratory?

15   A.   No.

16   Q.   Why not?

17   A.   Phil Shackels was unable to make the methamphetamine.

18   Q.   You mentioned Cambodia?

19   A.   Yes.

20   Q.   What happened in Cambodia?

21   A.   There was a plan to establish a meth lab in Cambodia with

22   the assistance of a Cambodian general.

23   Q.   What happened with that plan?

24   A.   That plan never went through.

25   Q.   Who were some of the people involved?

1  A.  The person behind that plan other than myself was Scott

2  Stammers.

3  Q.  Have you ever participated in efforts to distribute

4  methamphetamine?

5  A.  Yes.

6  Q.  When, approximately?

7  A.  Approximately 2011 through 2012.

8  Q.  How much methamphetamine?

9  A.  Approximately 40 kilograms.

10  Q.  Where did you get it?

11  A.  The 40 kilograms was purchased from the Chinese triad

12  criminal group.

13  Q.  Who managed this project for you?

14  A.  I was the person involved in managing the project.

15  Q.  Do you know a man named Kelly Peralta?

16  A.  Yes, I do.

17  Q.  What, if any, role did he play in this project?

18  A.  Kelly Peralta was one of the members of the Chinese triad

19  criminal group and he was one of the individuals responsible

20  for selling the methamphetamine.

21  Q.  What was your understanding of where the methamphetamine

22  was produced?

23  A.  The methamphetamine was produced in North Korea is my

24  understanding.

25  Q.  Other than methamphetamine, did you pursue anything else in

1    North Korea?

2    A.  Yes.

3    Q.  What else?

4    A.  I had discussions with the triad criminal group about

5    purchasing a submarine from North Korea as well as missile

6    technology.

7    Q.  Why did you want to obtain missile technology from the

8    triads in North Korea?

9    A.  My intention was to reverse engineer the technology so I

10   could sell it to Iran.

11   Q.  You mentioned a submarine?

12   A.  Yes.

13   Q.  What kind of submarine did you consider buying from North

14   Korea?

15   A.  A large diesel submarine.

16   Q.  For what purpose?

17   A.  For the purpose of smuggling chemicals, drugs, and

18   missile-related technology.

19   Q.  Did you end up buying that submarine?

20   A.  I did not, no.

21   Q.  Did you take any other steps to obtain a submarine?

22   A.  Yes, I did.

23   Q.  What did you do?

24   A.  I created a design for a small, one-man submarine with the

25   help of a small technical team.

1    Q.   Where did you create that design?

2    A.   In the Philippines.

3    Q.   Was the submarine that you designed ever produced?

4    A.   Sorry.  Say it again.

5    Q.   You said that you designed a submarine with help from a

6    technical team in the Philippines?

7    A.   Yes.

8    Q.   Was that submarine ever produced?

9    A.   It was not, no.

10   Q.   Did you try to develop any other technology for use in

11   smuggling?

12   A.   Yes, I did.

13   Q.   What else?

14   A.   A small, unmanned plane.

15   Q.   Was that small, unmanned plane ever produced?

16   A.   Yes, it was.

17   Q.   Was it used to smuggle?

18   A.   No, it was not.

19   Q.   Why not?

20   A.   It was never completed.

21   Q.   What do you mean by that?

22   A.   We built the -- we built the plane and flew, but the

23   project was never completed.  The design was never completed.

24   It was still in the testing phase.

25   Q.   In addition to Peru, have you participated in the

1    distribution of cocaine in other countries?

2    A.  Yes, I have.

3    Q.  Where else?

4    A.  In Thailand.

5    Q.  What did you do in Thailand?

6    A.  Approximately 20 kilos of cocaine were sent to Scott

7    Stammers' group in Thailand for sale.

8    Q.  When was that?

9    A.  Approximately 2010 through 2011.

10   Q.  Did you engage in any cocaine trafficking in the

11   Philippines?

12   A.  Yes, I did.

13   Q.  What did you do in the Philippines?

14   A.  I purchased cocaine for sale from John Nash and I purchased

15   also cocaine for sale from the Philippines National Police.

16   Q.  What was your understanding of the source of the cocaine

17   from the Philippines National Police?

18   A.  The source of the cocaine from the Philippines National

19   Police is typically seizures from other drug traffickers and

20   drug distributors.

21   Q.  Why were you buying cocaine in the Philippines?

22   A.  I was trying to make money.

23   Q.  Did you engage in cocaine trafficking in Ecuador?

24   A.  Yes, I did.

25   Q.  What happened in Ecuador?

1   A.   Approximately 50 kilos of cocaine was purchased.

2   Q.   What happened with those drugs?

3   A.   The 50 kilos of cocaine was loaded on to a small boat and

4   sailed out on to the ocean.

5   Q.   What happened to that vessel?

6   A.   The vessel was damaged in a storm and returned to Ecuador.

7   Q.   What happened to the drugs?

8   A.   I don't know exactly what happened to the drugs.  My

9   understanding was it should have been seized.

10  Q.   Let's talk for a bit about your arrest in Liberia.

11  A.   OK.

12  Q.   You said that happened in September of 2012?

13  A.   Yes.

14  Q.   Why did you travel to Liberia?

15  A.   I traveled to Liberia to meet individuals who I believed

16  were involved with me in the methamphetamine conspiracy to

17  manufacture and to export methamphetamine to the United States.

18  Q.   And you were arrested, where, in Liberia?

19  A.   I was arrested in a hotel in Monrovia in Liberia.

20  Q.   Did you start to cooperate at some point after that?

21  A.   I started to cooperate with the DEA on the aircraft on the

22  way to the United States.

23  Q.   Where did you arrive in the United States?

24  A.   I arrived in an airport, which I believe is in Upstate

25  New York.

1    Q.  After you arrived in Upstate New York, what were some of

2    the things that you did in connection with your cooperation?

3    A.  I started to provide information about myself and my

4    coconspirators and former associates.

5    Q.  Did you turn over any physical assets?

6    A.  Yes, I did.

7    Q.  What did you turn over?

8    A.  I turned over a small private jet.  I turned over a number

9    of boats.

10   Q.  To who?

11   A.  I turned over the boats to the DEA.

12   Q.  Did you make any disbursements of funds at the direction of

13   the DEA?

14   A.  Yes, I did.

15   Q.  Approximately how much money?

16   A.  Approximately 1 million U.S. dollars.

17   Q.  For what types of things?

18   A.  Principally, for the payment of salaries.

19   Q.  Salaries to who?

20   A.  To the new mercenary team that had been established by

21   Joseph Hunter and also to the team that had been established by

22   Scott Stammers.

23   Q.  We'll talk about those teams in a minute, but before we do,

24   did you continue to maintain a staff following your arrest?

25   A.  Yes, I did.

1   Q.  Approximately how many people did you keep on staff?

2   A.  Approximately five to ten.

3   Q.  What were some of the things that the staff did following

4   your arrest?

5   A.  The staff helped me with my own expenses and also sending

6   money to my family members and sending money to my legal team.

7   Q.  Did you have a source of revenue following your arrest?

8   A.  Yes, I did.

9   Q.  What was it?

10  A.  The source of revenue is the legal boat repair business in

11  Manila.

12  Q.  What goes on in the boat repair business?

13  A.  The repair of boats.

14  Q.  Thank you.

15          What types of vessels?

16  A.  The types of vessels are small fishing boats and small

17  personal water craft.

18  Q.  Now, you testified yesterday that the pharmacy with the

19  websites that you managed generated about $300,000,000 in

20  revenue?

21  A.  Yes.

22  Q.  Are you familiar with the concept of asset forfeiture?

23  A.  Yes, I am.

24  Q.  What, if any, undertakings have you made with respect to

25  asset forfeiture in your case?

1   A.  I understand at the time of my sentencing, the sentencing

2   judge will issue an order that I forfeit all of those assets to

3   the government.

4   Q.  And you mentioned a moment ago that Joseph Hunter recruited

5   a new team of mercenaries at some point after your arrest?

6   A.  Yes.

7   Q.  Did you receive instructions from the DEA agents about

8   that?

9   A.  Yes, I did.

10  Q.  What did the agents instruct you to do?

11  A.  Under the agent's supervision and direction, I've placed a

12  number of calls to Joseph Hunter and I requested that Joseph

13  Hunter establish a new mercenary team consisting of

14  approximately five individuals.

15  Q.  After you started to cooperate, did the agents give you any

16  instructions regarding a Toyota Innova van that you've

17  testified about?

18  A.  Yes, they did.

19  Q.  What did they instruct you to do?

20  A.  They instructed me regarding the Innova van to make any

21  efforts possible to ensure that the van was handed over to

22  them.

23  Q.  Did you take steps to recover the van?

24  A.  Yes, I did.

25  Q.  What types of things did you do?

1    A.  I communicated with my staff and asked questions about

2    where the van was, where it was being kept, what the address

3    was, and so on.

4    Q.  Did you eventually get in contact with someone in the

5    Philippines about the Toyota Innova van that Hunter told you

6    was used to murder Catherine Lee?

7    A.  Yes, eventually I was able to reach an individual there.

8    Q.  How long did that take?

9    A.  I started the process approximately 2015.  It was

10   approximately two years, year and a half.

11   Q.  Who did you get in touch with about the van?

12   A.  I was eventually able to reach a Philippines driver by the

13   name of Arthur Abong.

14   Q.  Did the DEA agents give you any instructions regarding

15   Arthur Abong?

16   A.  Yes.

17   Q.  What were you instructed to do?

18   A.  I was instructed to tell Arthur to prepare the van and make

19   it ready to be handed over to people who would pick it up.

20   Q.  When you were arrested in Liberia, how many charges did you

21   face in the United States?

22   A.  That I'm aware of, one charge.

23   Q.  What was the charge?

24   A.  A methamphetamine conspiracy.

25   Q.  How many charges did you plead guilty to?

1    A.   I pled guilty to a total of seven felonies.

2    Q.   What are those felonies?

3    A.   Methamphetamine drug conspiracy, money laundering, wire

4    fraud, computer hacking, a food and drug violation, a sanctions

5    violation, and aiding and abetting a felon.

6    Q.   Have you been sentenced yet?

7    A.   No, I have not.

8    Q.   As you sit here today, how much jail time are you facing?

9    A.   My maximum sentence is life.

10   Q.   Do you have a mandatory minimum sentence right now?

11   A.   Yes.

12   Q.   What is it?

13   A.   The mandatory minimum in my case is ten years.

14   Q.   You said earlier that you entered into a cooperation

15   agreement with the government?

16   A.   Yes.

17   Q.   What are some of the things that that agreement requires

18   you to do?

19   A.   The agreement requires me to tell the truth, not commit any

20   more crimes, and testify if asked.

21   Q.   And if you do those things, what is your understanding of

22   what the government will do for you?

23   A.   My understanding is if I do those things and if the

24   government believes I rendered substantial assistance, a letter

25   will be sent to my judge.

1  Q.  Has anybody guaranteed you that letter is going to be

2  written?

3  A.  No.

4  Q.  If the letter is written, what is your understanding of

5  what the government will include in it?

6  A.  If the letter is written, my understanding is the

7  government will include all the bad things I've done, all the

8  criminal conduct, and also any acts or activities for which --

9  or testimony and so on, which the government believes is of

10 substantial assistance.

11 Q.  In your plea agreement, were you required to plead guilty

12 to a murder offense relating to the murder of Catherine Lee?

13 A.  I was not.

14 Q.  What is your understanding of why not?

15 A.  My understanding is that as far as myself, there is no

16 jurisdiction.

17 Q.  Prior to your arrest in this case, when was the last time

18 you had been in the United States?

19 A.  Approximately 2004.

20 Q.  Now, you testified about a letter that the government may

21 or may not write for you at the end of your cooperation.  Is

22 that your understanding?

23 A.  Yes.

24 Q.  And I believe you said that no one has guaranteed you that

25 letter yet?

1    A.   No one has guaranteed me the letter.

2    Q.   If that letter is written at the time you're sentenced, how

3    would it impact the potential penalties associated with your

4    crimes?

5    A.   If the letter is written, the judge has the discretion to

6    take the letter into account or not and it's entirely at the

7    judge's discretion.

8    Q.   If that letter is written, will the judge be required to

9    give you less jail time?

10   A.   The judge is under no obligation to give me less jail time.

11   Q.   Has anyone made any promises to you about what sentence

12   you're going to receive?

13   A.   No one has promised me anything.

14   Q.   Sir, who's going to decide your sentence?

15   A.   My judge.

16           MR. BOVE:  No further questions.

17           THE COURT:  All right.  Thank you.  Why don't we take

18   our afternoon break now.  We'll resume in approximately 15

19   minutes.

20           Please remember, don't discuss the case.  Keep an open

21   mind.

22           (Recess)

23           THE COURT:  You can be seated.

24           Everyone can be seated.

25   CROSS-EXAMINATION

1    BY MR. DE CASTRO:

2    Q.  Mr. LeRoux, you were born --

3                MR. DE CASTRO:  May I, Judge?  My apologies.

4                THE COURT:  Yes, please proceed.

5    Q.  You were born in Rhodesia, right?

6    A.  I was born in Rhodesia, which is now the country of

7    Zimbabwe.

8    Q.  Which is in Africa, correct?

9    A.  Yes.

10   Q.  Then your family moved to South Africa, right?

11   A.  Yes.

12   Q.  When you were around 20, did you move to London?

13   A.  Approximately, yes.

14   Q.  Shortly thereafter, you then moved to Australia, as well?

15   A.  Yes.

16   Q.  And somewhere in there you lived for about six months in

17   Virginia in the United States, correct?

18   A.  Yes.

19                (Continued on next page)

20

21

22

23

24

25

BY MR. DECASTRO:

Q.  Then you lived and you worked in Sydney, Australia after

that?

A.  I don't recall the exact sequence but yes, I did work in

Sydney Australia.

Q.  Then at some point, Hong Kong and then the U.K. as well,

right?

A.  Yes.

Q.  In fact, you spent another six months in the United States

when you lived in Seattle Washington as well, right?

A.  Sorry.  Please repeat the question.

Q.  At some point you lived in the U.S. again in Seattle,

Washington, right?

A.  I spent approximately one month in Seattle, yes.

Q.  And then you lived in Rotterdam in the Netherlands,

correct?

A.  As I stated before, I don't remember the exact sequence but

I did live at one point in Rotterdam in the Netherlands.

Q.  But in 2005 you then moved to Philippines?

A.  Approximately, 2005, yes.

Q.  That's when you sort of, when you moved your operations to

the Philippines.  Would you agree with me that's when you

started getting warmed up and committing a lot of crimes?

A.  I would not agree with that.

Q.  Were you committing crimes before that?

1  A.  The dates that you gave was wrong.  The online pharmacy

2  criminal operation was not started in 2005.

3  Q.  But were you committing crimes in 2005 when you moved to

4  the Philippines?

5  A.  The crime that I committed was running the online pharmacy

6  operation.

7  Q.  That was your first -- you are saying that is your first

8  crime?

9  A.  The online pharmacy operation started in 2004.  I believe

10  that was the first crime, yes.

11  Q.  Now, when you moved to the Philippines that's when you

12  hired David Smith to head your security, right?

13  A.  Approximately 2005, yes.

14  Q.  And you testified that Mr. Smith committed numerous acts of

15  violence for you, right?

16  A.  Yes.

17  Q.  But you learned that he double-crossed you, right?

18  A.  I learned later on, yes.

19  Q.  He cheated you?

20  A.  Yes.

21  Q.  So you killed him?

22  A.  Yes.

23  Q.  And at that time you were doing your own investigation to

24  determine whether others had sort of crossed you as well,

25  right?

1    A.   Yes.

2    Q.   Fair to say that you were planning on murdering anyone that

3    you had determined had double-crossed you?

4    A.   That's fair to say, yes.

5    Q.   And you determined that you wanted Ms. Lee and Ms. Edillor

6    killed as well as part of that investigation, right?

7    A.   No.

8    Q.   That wasn't part of you having people killed that had

9    crossed you?

10   A.   You asked if it was part of the Dave Smith double cross or

11   issue with Dave Smith and I said "no".

12   Q.   OK.  But at this time it's part of your goal which was to

13   eliminate anybody who had been crossing you or cheating you?

14   A.   Approximately 2010 the murders began where I eliminated

15   people who double-crossed me, yes, or cheated me, yes.

16   Q.   And you did that by turning to one aspect of it, your

17   Philippine team to gather surveillance on people, right?

18   A.   No.

19   Q.   Well, you testified that you had a team of Filipinos that

20   gathered information or certain targets, right?

21   A.   Yes.

22   Q.   You didn't do that for everybody but just certain targets,

23   right?

24   A.   Certain targets, yes.

25   Q.   And you testified that you met with Mr. Hunter and provided

1    information regarding some of those targets, correct?

2    A.   Yes.

3    Q.   And I think your direct testimony was that in early 2011 is

4    when you began meeting with Mr. Hunter in the Philippines

5    regarding him taking over Mr. Smith's job, right?

6    A.   In 2011, yes.

7    Q.   And that you had a series of meetings with him in person in

8    the Philippines, correct?

9    A.   Yes.

10   Q.   I think you testified that there was the original early

11   2011 meeting where you offered him a job, right?

12   A.   Yes.

13   Q.   Then there was, I think you had phrased this somewhere

14   towards the end of the first quarter a meeting regarding one of

15   the victims, right?

16   A.   Approximately, yes.

17   Q.   That was also in the Philippines, correct?

18   A.   Yes.

19   Q.   Then in January or so around 2012 you met with him

20   regarding a different victim, right?

21   A.   Yes, correct.

22   Q.   That was also in the Philippines, right?

23   A.   Yes.

24   Q.   And then there was a meeting regarding Ms. Lee that

25   occurred also in the Philippines, right?

1    A.  Yes.

2    Q.  And I think you also mentioned there was a meeting

3    regarding Mr. Fitch in the Philippines, right?

4    A.  Yes.

5    Q.  Now you testified at the end of your direct about your

6    understanding of your agreement with the United States

7    government, right?

8    A.  Yes.

9    Q.  And it's called a "cooperation agreement", right?

10   A.  Yes.

11   Q.  And your understanding isn't just verbal.  It's a written

12   agreement, right?

13   A.  Yes.

14   Q.  It lays out your requirements under that agreement and any

15   promises that the government has made to you, correct?

16   A.  No.

17   Q.  Is it your testimony that the government has not made you

18   any promises at all?

19   A.  The government has not made me any promises.

20   Q.  If you are determined to tell the truth by this government,

21   these prosecutors, didn't they promise they'd write you that

22   letter?

23   A.  No, they did not.

24   Q.  OK.  So let's just look at the agreement.

25            MR. DECASTRO:  Judge, how would you like me to --

1          THE COURT:  I think you can keep the 3500 number.

2    That's fine.

3          MR. DECASTRO:  OK.

4          (Pause)

5          MR. DECASTRO:  May I approach the witness, judge?

6          THE COURT:  You may.

7    Q.  I am going to hand you what's been marked as Government

8    Exhibit 3500-28.  Look at that and tell me if you recognize it?

9    A.  This appears to be a copy of the cooperation agreement.

10         MR. DECASTRO:  Judge, I'm going to offer that into

11   evidence.

12         THE COURT:  Any objection?

13         MR. BOVE:  No, your Honor.

14         THE COURT:  It'll be admitted.

15         (Government's Exhibit 3500-28 received in evidence)

16         MR. DECASTRO:  I understand that the government is

17   able to publish this document; is that right?

18   Q.  You can use the paper or the screen whichever is easier for

19   you.

20         So this is the first page of the agreement, correct?

21   A.  Yes.

22   Q.  And you can see there's a header there that's United States

23   Department of Justice, United States Attorney, Southern

24   District of New York, correct?

25   A.  Yes.

1   Q.  And it's addressed to your counsel, right?

2   A.  Yes.

3   Q.  And it's regarding a line there is United States v. Paul

4   Calder LeRoux and it has a couple different case numbers,

5   right?

6   A.  Yes.

7   Q.  The reason there's two case numbers is because you have the

8   online pharmacy piece which is in Minnesota and then have you

9   the Southern District of New York aspects of your case as well,

10  right?

11  A.  Yes.

12  Q.  Now, the first part of your agreement lays out the

13  different counts to which they are offering for you to plead

14  guilty, correct?

15  A.  That appears to be the case, yes.

16  Q.  So it reads in the first paragraph that you would plead

17  guilty to Counts One through Four of the information and it has

18  a number there which is S2 CR 489 and Counts One through Three

19  of a different information that relates to Minnesota, right?

20  A.  Yes.

21  Q.  And then in the following pages it lists each particular

22  count.  So on the first page it says "Count One" and that's the

23  conspiracy to distribute 500 grams and more of a mixture and

24  substance containing a detectable amount of methamphetamine.

25  Correct?

1    A.   Yes.

2    Q.   And it then proceeds to say that under that count you're

3    facing a mandatory minimum term of imprisonment of ten years,

4    correct?

5    A.   Yes.

6    Q.   And if we could turn to page two, the next paragraph says

7    "Count Two" and it then describes that you would be pleading

8    guilty to the unlicensed exportation of goods and technology

9    from the United States to a person in a third country with

10   knowledge that goods and technology were intended for use in

11   the production of or incorporation into technology and services

12   to be supplied to the government of Iran from 2009 through

13   2012, correct?

14   A.   Yes.

15   Q.   OK.  And Count Three then lays out the crime of computer

16   hacking that you described that you were pleading guilty to as

17   well, right?

18   A.   Yes.

19   Q.   Then the third paragraph on that page lays out Count Four

20   which is assisting an offender knowing that an offense against

21   the United States has been committed in order to hinder or

22   prevent the offender's apprehension, trial or punishment in

23   about 2008, right?

24   A.   Yes.

25   Q.   And that relates to you paying a bribe to try to block

1    someone's extradition here, correct?

2    A.   Yes.

3    Q.   Incidentally, was that person ever extradited to your

4    knowledge?

5    A.   I don't know what the final outcome was.

6    Q.   Then there's a reference in the fourth paragraph to Count

7    One.  The reason it's restarting is because now we're talking

8    about the Minnesota piece, right?

9    A.   Yes.

10   Q.   So Count One is the conspiracy to introduce misbranded

11   drugs and deliver those intrastate commerce from 2004 to 2012,

12   right?

13   A.   Yes.

14   Q.   And that's a Minnesota count that is going to be

15   transferred here for the purpose of your sentencing, correct?

16   A.   Yes.

17   Q.   And that is you're not going to Minnesota to be sentenced

18   separately, right?  You will be sentenced in one proceeding

19   here in New York?

20   A.   I can't answer legal questions.  I'm not a lawyer.

21   Q.   Well, what is your understanding, will you be sentenced

22   here only or here and in Minnesota?

23   A.   My understanding is I will be sentenced here.

24   Q.   Then at the bottom of page two onto the top of page three

25   is your, you will be pleading guilty to conspiracy to commit

1    mail and wire fraud in connection with the online pharmacy,

2    right?

3    A.   That is Count Two, yes.

4    Q.   And then the last count is on page three, conspiracy to

5    launder money is the three hundred million dollars that you

6    were discussing that you had engaged that you were laundering,

7    right?

8    A.   The conspiracy to launder money relates to the proceeds

9    from the criminal online pharmacy operation.

10   Q.   Which you've approximated at around three hundred million

11   dollars, right?

12   A.   Yes.

13   Q.   The paragraph below that in the middle of the page is what

14   you had testified to which is the total maximum sentence of

15   incarceration you're facing is life imprisonment with mandatory

16   minimum sentence of ten years, right?

17   A.   Can you repeat?  Where is that?

18   Q.   Sure.  It's the second full paragraph and it says,

19   accordingly, the total maximum sentence of incarceration.  Do

20   you see that?

21   A.   Yes.

22   Q.   Skip ahead for a minute and move to page four, if we could.

23   And at the bottom of page four and on top of page five is a

24   very, very long paragraph, right?

25   A.   Yes.

1    Q.  And that is the paragraph that essentially lays out what

2    you're not going to be prosecuted for further, right?  There's

3    going to be no more prosecution than what you are already

4    facing, right?

5    A.  That is on my understanding that I will not be prosecuted

6    only if the agreement is not violated.

7    Q.  Right.  So other than tax violations, right, there's a

8    little exception there that doesn't relate to taxes, right?

9    A.  It states basically that it doesn't include tax violations.

10   However, my understanding is this paragraph applies only if the

11   agreement is not violated.

12   Q.  So let's just take a look at everything you're getting

13   covered for in your plea agreement, OK.

14          MR. BOVE:  Objection to "coverage", judge.

15          THE COURT:  I'll allow it.  Overruled.

16   Q.  So right in the middle of that last paragraph --

17          MR. DECASTRO:  Would you pull it out please and

18   zoom-in.

19   Q.  So number one is as we already discussed, your

20   participation in the methamphetamine conspiracy from April 2012

21   to September 2012, right?  That's your arrest in Liberia,

22   correct?

23   A.  The arrest in Liberia was in September 2012, yes.

24   Q.  Right.  So this first number, the first number of this is

25   your participation in the conspiracy from April until your

1    arrest in September of 2012 to import methamphetamine into the

2    United States, correct?

3    A.  Yes.

4    Q.  Two, is the sanctions violation, right, exportation of

5    goods and technology to the government of Iran, correct?

6    A.  Yes.

7    Q.  Then three is your participation in a conspiracy to commit

8    hacking, right, from 2008 to 2011, right?

9    A.  Yes.

10   Q.  Now, that hacking was -- did you say on your

11   direct-examination that you had obtained consumer information?

12   A.  Yes.

13   Q.  That's United States consumers?

14   A.  Yes.

15   Q.  Number four is your assisting somebody to avoid

16   extradition, right?

17   A.  Yes.

18   Q.  Then five and six and seven going onto the next page relate

19   to the Minnesota case and the online pharmacy, right?

20   A.  Sorry.  Please repeat the numbers.

21   Q.  No problem.  Number five, the conspiracy distributing

22   misbranded drugs; number six the mail and wire fraud; and

23   number seven the money laundering is all related to the

24   Minnesota case?

25   A.  Yes.

1          MR. DECASTRO:  Now, number eight, if we could pull out

2     this paragraph again.

3     Q.   Number eight there towards the top says his discussions in

4     or about 2012 about possessing with intent to distribute

5     carisoprodol, a contributed substance.  What is that substance?

6     A.   Carisoprodol is medicine.

7     Q.   What is it for?

8     A.   I am not a doctor, so I can't say exactly what it is for.

9     Q.   Well, you were going to purchase it and distribute it.  Who

10    would buy it?

11    A.   U.S. consumers.

12    Q.   For what purpose?

13    A.   It's medicine that they would be looking to purchase since

14    it's a medicine.

15    Q.   It's not a recreational drug.  It's medicine to treat some

16    type of illness?

17    A.   That's my understanding, yes.

18    Q.   Number nine, your participation in a conspiracy with intent

19    to distribute cocaine and methamphetamine in the Philippines,

20    Hong Kong, Thailand, Peru, Ecuador from 2010 to 2012 for which

21    there is no federal jurisdiction, right?

22    A.   Yes.

23    Q.   Number ten reads:  His participation in the murders for

24    hire of Bruce Jones, Herbert Chu, David Smith, FNU/LNU which

25    stands for "first name unknown/last name unknown", a/k/a

1    "Chito" Naomi Edillor, Catherine Lee and Joe Frank Zuniga in

2    the Philippines in or about 2010 through in or about 2012 for

3    which there is no federal jurisdiction, right?

4    A.  That appears to be what it says, yes.

5    Q.  Well, you know it says that because this is your plea

6    agreement and you've read it many times, correct?

7    A.  I have read my agreement.  I can't say for certain that

8    this text exactly matches the agreement that I have.

9    Q.  OK.  Well, let's look at the last page of this agreement.

10   Is that your signature on the last page of the agreement?

11   A.  That is a photocopy of my signature.

12   Q.  Does it look like your signature?

13   A.  It does, yes, but as I said it's a photocopy.

14   Q.  OK.  Do you have any reason to doubt this is not the actual

15   agreement that you have agreed to?

16   A.  I'm not saying I doubt it's the agreement.  I just -- I

17   can't be certain that the text matches the agreement I have.

18           MR. DECASTRO:  OK.  Does the government want to

19   stipulate that this is the agreement that is in effect?

20           MR. BOVE:  Yes.

21           MR. DECASTRO:  Thank you.

22   Q.  OK.  So that was number 10.  Number 11, his participation

23   in a conspiracy to commit assault and arson against Moran Oz in

24   the Philippines, Steve Hahn and Andrew Hahn in Zimbabwe and the

25   Philippines, Gary Smith and Matthew Smith in South Africa

1    FNU/LNU, a/k/a "Joseph" in the Philippines from in or about

2    2008 through in or about 2011 for which there is no federal

3    jurisdiction.

4            That's what it says, right?

5    A.  Yes.

6    Q.  Number 12, his participation in the bribery of foreign

7    government officials in the Philippines, China, Laos, Africa

8    and Brazil from in or about 2005 through 2012 for which there

9    is no federal jurisdiction, correct?

10   A.  Yes.

11   Q.  Thirteen, his discussions in or about 2012 about acquiring

12   surface-to-air missiles in or about 2012, right?

13   A.  Yes.

14   Q.  Will not be further prosecuted for that, correct?

15   A.  Yes.

16   Q.  And 14, his conspiring to distribute prescription

17   medications controlled by state law without a valid

18   prescription from in or about 2004 through 2012 for which there

19   is no federal jurisdiction, right?

20   A.  Yes.

21   Q.  Now, part of your agreement also is that --

22           MR. DECASTRO:  If you could zoom-out the paragraph

23   that says "it is understood".  The one below that.  Thank you.

24   Q.  It's also your understanding that should you fear for your

25   safety or your family's safety that the United States

1    government will take whatever proper steps to protect you,

2    correct?

3    A.   Yes.

4    Q.   And that may include, if appropriate, the Witness

5    Protection Program of the United States, right?

6    A.   If the government deems my family to be at risk then at

7    their discretion they may decide to include me in the Witness

8    Protection Program.

9    Q.   Now, if we can go to page six in the second full paragraph

10   we can pull that out.

11          So on this page it reads or this paragraph on page six

12   it says what you said on direct, right?  You understand that

13   you're sentence is at the sole discretion of the judge who

14   sentences you, right?

15   A.   Yes.

16   Q.   And the government is not making any promise or

17   representation as to what sentence you will actually get,

18   right?

19   A.   Yes.

20   Q.   But towards the middle of the paragraph the sentence that

21   reads:

22          In addition, if the United States Attorney's Office,

23   prosecutors from the United States Attorney's Office determines

24   that you have complied with this agreement, the office will

25   file a motion pursuant to Section 5K1.1 of the Sentencing

1   Guidelines and a provision of the U.S.C. as well, requesting

2   that the Court sentence you in light of the certain factors

3   under the 5K, right?

4   A.  That is what the text says.

5   Q.  Very confusing legal language, right?

6   A.  It's not confusing at all.

7   Q.  Well, you understand it now.  Did you understand it before

8   you got on that plane in Liberia to come to the United States?

9   A.  I understood that I had committed a lot of crimes and I

10   needed to cooperate and I was in a bad situation in Liberia.

11   That's all I understood.

12   Q.  Right.  So what this is saying is that the government, as

13   long as you abide by this agreement will tell your sentencing

14   judge and make a motion to that judge about your cooperation,

15   right?

16   A.  What this is saying is at the government's option if the

17   government believes that I provided substantial assistance,

18   then only at the government's discretion will a letter be sent

19   to my judge.

20   Q.  And what's really important about that sentence, right, is

21   that if the judge grants that motion the judge does not have to

22   sentence you to the mandatory minimum of ten years, correct?

23   A.  What the judge does or does not do with the letter, if the

24   letter is actually filed with my judge, it's up to my judge's

25   discretion.

1    Q.  But as you understand it, if the government files a 5K

2    motion for you, your sentencing judge will not have to impose a

3    minimum sentence.  There is no floor to your sentence, right?

4    A.  Yes.

5           MR. DECASTRO:  Now, on page seven the top, zoom-out

6    and just pull that up, please.

7    Q.  The first paragraph on page seven, this relates to one of

8    the ways in which you can violate this agreement, right?

9    A.  I need a moment to read it.

10   Q.  Sure.  Go ahead.

11          (Pause)

12   A.  This refers to consequences for violating the agreement,

13   yes.

14   Q.  And one of the ways it references to commit further crimes

15   or give false, incomplete or misleading testimony, right?

16   A.  Yes.

17   Q.  For example, if you were determined to be conspiring while

18   in jail to commit any further crimes you could be in violation

19   of the agreement, right?

20   A.  At the prosecutors' discretion, yes, it's possible.

21   Q.  Now, I want to go back to your arrest for a second and ask

22   you about your cooperation, that decision that you said you

23   made, OK.  You were arrested in 2012, right?

24   A.  Yes.

25   Q.  And you quickly realized because you were arrested in

1    Liberia but you quickly realized that United States law

2    enforcement was involved in the investigation, right?

3    A.  Yes.

4    Q.  And you quickly realized that you would be facing United

5    States narcotics charges?

6    A.  Yes.

7    Q.  And understandably, you immediately feared lengthy

8    imprisonment?

9    A.  Yes.

10   Q.  And so the minute you were on that plane or shortly

11   thereafter on your way to the United States you expressed a

12   desire to cooperate with the United States agents?

13   A.  Yes.

14   Q.  But at that time I think as you mentioned you didn't

15   understand what the process of cooperation in the United States

16   really meant, right?

17   A.  I understood that I would need to provide information.

18   That is what I understood.

19   Q.  But that process of cooperating is not as simple as just

20   coming in having a meeting, right?  It's a pretty lengthy

21   process, right?

22   A.  What do you mean by "lengthy process"?

23   Q.  Well, it's not as simple as negotiating a deal and telling

24   them what they need to hear, right?

25   A.  The agreement lays out what the process entails.

1  Q.  Well, the agreement is the result of the process, right?

2  A.  The agreement is the result of a number of proffer

3  sessions.  However, at every proffer session there are separate

4  agreements that are signed.

5  Q.  Right, there are separate agreements called "proffer

6  agreements", right?

7  A.  Yes.

8  Q.  And what the government agrees is that they won't use your

9  statements against you directly in their case in chief when

10 you're proffering, right?

11 A.  No.

12 Q.  That's not what they agree or what is your understanding?

13 A.  It's not precise.

14 Q.  OK.  Be more precise and you can tell me then.

15 A.  The proffer agreement states that any statements given can

16 be used against a person whose proffering in the event that

17 certain circumstances are met.

18 Q.  Correct.  There are exceptions to that general blanket what

19 seems like a protection, right?

20 A.  The agreement is the proffer agreement is detailed.  I

21 don't recall everything it says.

22 Q.  One big thing it does say all bold and all caps is that

23 this is not a cooperation agreement, right?

24 A.  I don't recall exactly what it says.

25 Q.  Do you want me to show you one; would that help?

1    A.   Sure.

2    Q.   I am going to show you 3507-03.  Just take a look and read

3    it to yourself the and then you're done.  Tell me if that

4    refreshes your recollection that it's very clear that what that

5    document is is not a cooperation agreement?

6    A.   Yes, it states that this is not a cooperation agreement.

7    Q.   All I'm getting at here is that you are going to meet with

8    them and the government is not making you any promises in those

9    early sessions, right?

10   A.   No promises have been made at any time.

11   Q.   Well, they are going to hear your information and they are

12   going to make a decision whether to offer you that cooperation

13   agreement that we looked at, right?

14   A.   It's the government's discretion when or if to grant a

15   cooperation agreement.

16   Q.   Right.  In this particular case it took a lot of proffer

17   sessions before that decision was made, right?

18   A.   I don't recall how many proffer sessions there were.

19   Q.   Well, would this surprise you that you met more than 20

20   times between September of 2012 and November of 2013?

21   A.   I don't recall how many proffer sessions there were.  There

22   were a number of sessions but I don't remember how many.

23   Q.   Well, would it surprise you that it would be more than 20?

24   A.   It might be 20.  It might be more.  It might be less.  I

25   don't know.

1    Q.  So after your arrival in the United States you learned

2    about that this is a process, that it's going to take a lot of

3    time before the government will determine whether they're going

4    to make you an offer, correct?

5    A.  I wasn't told it would take a lot of time, no.

6    Q.  You were probably told, we don't know how much time it

7    would take, right?

8    A.  I wasn't told anything about how much time it would take.

9    I was just attending proffer sessions when called.

10   Q.  But you did meet with the government from September 2012

11   through November 2013; does that sound about right?

12   A.  Since I was arrested in September of 2012, that's when the

13   proffer sessions began, yes.  I don't know when it ended.

14   Q.  OK.  So for about a year and then you pled guilty to in

15   December of 2013, right?

16   A.  I don't recall the exact dates.

17   Q.  Could you take a look at the plea agreement.  It's dated.

18   So you can look at your signature and next to it is a date,

19   right, you signed it in court?

20   A.  The agreement is dated 30th of December 2013.

21   Q.  Do you remember signing that in court before you pled

22   guilty?

23   A.  I did not sign the agreement in court.

24   Q.  OK.  Now, obviously, you met and you proffered with the

25   government many times, correct?

1    A.  As I stated previously, I don't recall the number of

2    proffer sessions.

3    Q.  OK.  You met with them a number of times and you provided

4    them with a lot of the information you've testified about,

5    right?

6    A.  I met with them on various occasions.  I can't say it was a

7    lot.

8    Q.  Would you agree with me that you were nervous going into

9    that process?

10   A.  I was not nervous.

11   Q.  Did you want to go to jail?  Why did you want to cooperate?

12   A.  As I mentioned previously, I wanted to cooperate because

13   when I was on a plane in Liberia I knew I was in trouble.  I

14   was facing some time and I wanted to cooperate to help myself.

15   Q.  So you needed to make a good impression so that you could

16   get an agreement, right?

17   A.  That's not true.

18   Q.  Well, did you want the government to use you as a witness?

19   A.  It's not what I want.  It's what the government decides to

20   do.

21   Q.  But are you saying that you were not nervous that the

22   government might reject your attempts at cooperation and then

23   you would be facing a lot of time in prison?

24   A.  I was not nervous.

25   Q.  But did you not know that with the history of your crimes

1    that there was a risk that the government could take your

2    information and not give you a deal?

3    A.  I was not concerned about that.

4    Q.  But you knew that that was a risk, correct?

5    A.  That's what the proffer -- in fact the proffer agreement

6    says if for some reason I don't get a cooperation agreement I

7    can be prosecuted in the event, for example, I lied.

8    Q.  So there was a pretty big risk in you going in and

9    providing all that information, right?

10   A.  I didn't consider it a risk.

11   Q.  But you had to think that it would be pretty unlikely that

12   you would get a deal based on the types of crimes you had

13   committed your whole life, right?

14   A.  I didn't consider it unlikely.

15   Q.  You didn't think it was unlikely that the United States

16   government given your criminal history would give you a deal?

17   A.  I didn't think it was unlikely.

18   Q.  You laundered hundreds of millions of dollars, right?

19   A.  Yes.

20   Q.  You made hundreds of millions of dollars from your illegal

21   online pharmacy, right?

22   A.  The revenues for the online pharmacy was approximately

23   three hundred million U.S. dollars.  That does not mean that

24   that was profits.  It was revenues.

25   Q.  That was not net; that was your gross?

1    A.  The revenues the gross revenues were approximately three

2    hundred million U.S. dollars from the criminal online pharmacy

3    sale operation, yes.

4    Q.  Now you purchased and sold intelligence in your life,

5    right?

6    A.  Can you be specific?

7    Q.  Well, you actually bought United States CIA intelligence

8    documents before, right?

9    A.  That's now true.

10   Q.  We'll get back to that in a second.  Did you tell the

11   government that you did?

12   A.  I did not tell the government that I bought CIA

13   intelligence at any time.

14   Q.  Did you say you tried to?

15   A.  Not that I recall.

16   Q.  But you have purchased intelligence documents before from

17   law enforcement agencies?

18   A.  I have purchased information that came from the law

19   enforcement agencies, yes.

20   Q.  I think on your direct you said you've paid bribes all over

21   the world, right?

22   A.  Yes.

23   Q.  Some of these bribes was for intelligence information,

24   correct?

25   A.  I would need for you to tell me what exactly you mean by

1   "intelligence information".

2   Q.  Well, what do you mean by "intelligence information"?

3   A.  I bought and received documents from law enforcement

4   agencies.

5   Q.  About their investigations?

6   A.  About investigations.

7   Q.  In fact, I think you said about investigations into you by

8   the United States government, right?

9   A.  Yes.

10  Q.  You sold arms to Iran, correct?

11  A.  I sold missile technology consisting of a guidance system,

12  plus explosives technology to Iran.

13  Q.  Right.  You sold an explosives formula to Iran for about

14  five million dollars, correct?

15  A.  Yes.

16  Q.  And Iran is an enemy of the United States, right?

17  A.  Yes.

18  Q.  But you did not think it was unlikely when you began

19  proffering that the United States government would give you a

20  deal?

21  A.  I did not think it was unlikely.

22  Q.  You that explosive formula that you sold to Iran could be

23  set off using a cellphone and could be used in a pipe bomb,

24  correct?

25  A.  Any explosives can be used in any type of bomb.

1   Q.  Well, that particular one, your formula that you developed

2   could be used in a pipe bomb, correct?

3   A.  Any explosive can be used in a pipe bomb.

4   Q.  Can any explosive be detonated but a cellphone, as well?

5   A.  Not only by a cellphone but a cellphone can be involved in

6   the detonation, yes.

7   Q.  Well, you also purchased weapons from Iran as well,

8   correct?

9   A.  No weapons were purchased from Iran.

10  Q.  You didn't buy any weapons from Iran?

11  A.  No.

12  Q.  You tried to develop missiles for Iran based on U.S.

13  Tomahawk missiles, right, sort of tried to develop something

14  like a U.S. Tomahawk missile?

15  A.  That was part of the project, yes.

16  Q.  You tracked weapons in Philippines and elsewhere through

17  your company, RWB, and another front company, right?

18  A.  I'm not sure what you mean by "another front company".  The

19  only company that was used in the Philippines for tracking

20  weapons was RWB.

21  Q.  I said "Philippines and elsewhere".  I think I said you

22  used a fishing company to do it in one other instance?

23  A.  The fishing company was a front company, yes.

24  Q.  You tried to reverse engineer a predator drone, right?

25  That's what you were talking about toward the end of your

1   testimony, right?

2   A.   That's two questions.  Can you rephrase?

3   Q.   Sure.  You tried to reverse engineer a predator drone,

4   correct?

5   A.   Yes.

6   Q.   You wanted to get Chinese weapons to try and reverse

7   engineer the aerodynamic controls systems for Iran, correct?

8   A.   Not the aerodynamics control system, no.

9   Q.   What exactly did you mean by reverse engineer --

10  A.   The guidance system.

11  Q.   You were designing a submarine to smuggle methamphetamine,

12  chemicals and weapons technology from North Korea, correct?

13  A.   Sorry.  Please repeat.

14  Q.   You were designing a submarine which you intended to use to

15  smuggle methamphetamine, chemicals and weapons technology from

16  North Korea, correct?

17  A.   Not necessarily from North Korea.  From anywhere.  I was

18  doing business but, yes, I was designing a submarine.

19  Q.   You engaged in narcotics tracking including cocaine,

20  methamphetamine.  And did you also engage in heroin tracking,

21  as well?

22  A.   I did not buy and sell heroin.

23  Q.   Just methamphetamine and cocaine?

24  A.   The only drugs I bought and sold were cocaine and

25  methamphetamine that I recall.

1  Q.  You planned a possible coup in the Seychelles as well,

2  right?

3  A.  Yes.

4  Q.  You armed around 200 men in hopes of becoming a Somalia

5  warlord, correct?

6  A.  Approximately, 200, yes.

7  Q.  And again, you didn't think it was unlikely that the United

8  States government would give you a deal with this criminal

9  history?

10  A.  I didn't see a problem.

11  Q.  You as you've testified bribed countless government

12  officials, right?

13  A.  I never said "countless".

14  Q.  OK.  Do you know how many people you actually bribed?

15  A.  I don't, no.

16  Q.  But it's a lot; would you agree with me?

17  A.  I wouldn't say it's a lot.

18  Q.  How many is not a lot?  More than 20?

19  A.  I can't give you exact numbers.

20  Q.  Can you give me a ballpark at all?

21  A.  I don't know.  What I said and what I testified to was that

22  bribes were paid every where I worked but I can't tell you how

23  many people were bribed.

24  Q.  OK.  You also planted evidence on people that were arrested

25  and jailed as a result, correct?

1    A.   I planted evidence.  I planted drugs as I testified on one

2    individual who was jailed.

3    Q.   How long was that person jailed for?

4    A.   Approximately, two years.

5    Q.   You made I think as you already testified, you hacked and

6    stole thousands of customer data of U.S. customer data,

7    correct?

8    A.   I don't believe I gave any exact number of how much data

9    was stolen.

10   Q.   Do you have an approximation of how much data was stolen?

11   A.   No, I don't.

12   Q.   And you've ordered that numerous people be assaulted,

13   threatened and intimidated, right?

14   A.   Can you define "numerous"?

15   Q.   We'll just take that part out.  You've order people to be

16   assaulted, threatened and intimidated?

17   A.   Yes.

18   Q.   And you've ordered people murdered, as well?

19   A.   Yes.

20   Q.   You in fact have also participated in murder yourself?

21   A.   Yes.

22   Q.   And it's your testimony that you were not surprised or even

23   shocked when the United States government said that you had

24   made it through this process and they were going to offer you a

25   cooperation agreement?

1   A.  I was not surprised.

2   Q.  Even after the fact that you'd done business with this

3   country's enemies?

4   A.  I already testified I was not surprised.

5   Q.  Well, you certainly were relieved, right, that you were

6   getting a deal?

7   A.  I was trying to go through the process.  I can't describe

8   any emotions at the time.  I'm not saying I was surprised.  I'm

9   not saying I was relieved.  I simply went through the proffer

10  sessions and continued the process on the advise of my lawyer.

11  Q.  But after you pled guilty the process isn't over, right?

12  A.  Can you define what you mean by "the process isn't over"?

13  It's very vague.

14  Q.  Well, you sitting here testifying is also part of the

15  process, right, the cooperation process that would culminate in

16  your sentence, right?

17  A.  As per the agreement, I'm required to testify if asked and

18  I have been asked and that's why I'm here today.

19  Q.  You are not sure as you sit here today when you're going to

20  be sentenced, correct?

21  A.  Correct.

22  Q.  But you are hoping that when you are sentenced you will

23  receive a sentence of time-served, right?

24  A.  I'm hoping that when I eventually am sentenced I will

25  receive a decent sentence.

1    Q.  Well, you would want a sentence of time-served, right?

2    That would be a very good sentence.

3    A.  I don't know whether I've done enough to warrant

4    time-served sentence given the horrific nature of my criminal

5    activity.

6    Q.  Well, you've certainly spoken to people about what your

7    hopes for your sentencing are, right?

8    A.  Yes, I have.

9    Q.  For example, the government asked you questions about the

10   individual that you were serving time with that was about to be

11   released, right?

12   A.  Yes.

13   Q.  What's his name again?

14   A.  Mir Islam.

15   Q.  And you've certainly spoken to him about your desire to get

16   time-served, right?

17   A.  I don't recall exactly what was said.

18   Q.  Well, you hoped to be sentenced relatively soon, correct?

19   A.  I hoped to be sentenced whenever the process is complete.

20   I'm not sure if that will be soon.

21   Q.  Well, you're hoping that when this case is over that you

22   could be sentenced, right?

23   A.  I'm not sure exactly when I'll be sentenced.  Of course I

24   am hoping to be sentenced at some point in the future.

25   Q.  As of today, how long have you been in jail?

1    A.  I've been in jail approximately five and a half years.

2    Q.  You believe that you've spent enough time in prison, don't

3    you?

4    A.  I never said that.

5    Q.  I'm asking you what you believe.

6    A.  I believe that I have a horrific criminal history and I'm

7    likely to face additional time at sentencing although,

8    obviously, I hope to receive as low or as decent a sentence as

9    possible.

10   Q.  You want as close to a time-served sentence as you can get

11   so you can go back to your family, right?

12   A.  I want a sentence which is as low as possible.  That is

13   what I'm hoping for.

14   Q.  The lowest possible sentence could be time-served at the

15   date of your sentence, right?

16   A.  That is the possible sentence the judge could give me, yes.

17   Q.  Now, that potential would certainly be in jeopardy if you

18   are you were found to have violated your cooperation agreement,

19   right?

20   A.  If I was found to have violated my cooperation agreement,

21   then at the discretion of the government there would be serious

22   consequences.

23   Q.  For example, if your business venture that you were

24   discussing with Mr. Islam was determined to be a criminal

25   venture, that would be a problem for you, correct?

1    A.   The business venture I was discussing with Islam was not a

2    criminal venture.

3    Q.   If the government determined that you were conspiring to

4    commit a crime, you would have a potential problem, right?

5    A.   The repercussions for any conduct is totally at the

6    discretion of the government.  I'm not in the government's

7    shoes.  I can't say how the government will react in any

8    situation.

9    Q.   So let's just refresh on what we're talking about with

10   respect to this business you were going to set up.

11              So, you have been sending money to an inmate that you

12   used to be incarcerated with, right?

13   A.   Yes.

14   Q.   You were sending him money for commissary while he was in

15   jail, right?

16   A.   Yes.

17   Q.   Money for phones and for a laptop, right?

18   A.   That is what I recall, yes.

19   Q.   The money for when he is released so that he would have

20   some money in his pocket, right?

21   A.   The money was so that he could use the laptop to help me

22   with principally with legal research.

23   Q.   To create another call center in the United States, right?

24   A.   No.

25   Q.   Where will that call center be located?

1    A.   In the Philippines.

2    Q.   And your hope would be that it would net or at least your

3    estimate could be about $100,000 a month, right?

4    A.   I don't recall the exact amount.  I believe I said

5    approximately 50,000.

6    Q.   A month?

7    A.   Per month, yes.

8    Q.   You were doing this and you were using the phones while you

9    were at the jail, right?

10   A.   Yes.

11   Q.   And you weren't just calling people directly.  You had

12   somebody helping you with three-way calls, right?

13   A.   Yes.

14   Q.   And as the government brought out, that violates the rules

15   of the jail, right?

16   A.   I already admitted that I violated the BOP policy.

17   Q.   But you're doing that because you also don't necessarily

18   want these calls to come back to you, right?

19   A.   That's not true.

20   Q.   No.  Or you just were unable to communicate directly with

21   another inmate at a different facility?

22   A.   I knew the calls were monitored.  I didn't see any problem

23   because I was not discussing anything illegal.

24   Q.   And because you were setting up a call center that would

25   not be in the United States, right?

1    A.  As I said, I was not doing anything illegal.  I had a call

2    with my paralegal and the call was a third-party call with

3    Islam.

4    Q.  So you generated hundreds of millions of dollars not in

5    profit but gross from online pharmacies using call centers and

6    you want us to believe that you were about to set up a

7    legitimate call center, right?

8    A.  The online pharmacy operation involved call centers but

9    that was a small part of the overall process.

10   Q.  But your only legitimate business you ever operated was a

11   boat repair business in the Philippines, right?

12   A.  That's not true.

13   Q.  At the time of your arrest, that was your only legitimate

14   business, correct?

15   A.  At the time of my arrest the only legitimate business was

16   the boat repair business.

17   Q.  Now, when the government discovered that you were making

18   these calls, they brought you in for a meeting, right?

19   A.  Yes.

20   Q.  And they confronted you with it, right?

21   A.  They asked me questions about it, yes.

22   Q.  And they have not found that you violated your agreement,

23   right?

24   A.  As I mentioned before, there was nothing illegal on those

25   calls.

1    Q.  They haven't ripped up your agreement?

2    A.  What the government does is up to the government.  I don't

3    know what will happen.  No promises have been made to me that

4    related to anything including that incident.

5              MR. DECASTRO:  Nothing further, judge.

6              THE COURT:  All right.  Mr. Schneider?

7              MR. RAY:  I am going.

8              THE COURT:  All right.  Mr. Ray.

9              MR. RAY:  Thank you.

10   CROSS-EXAMINATION

11   BY MR. DE CASTRO:

12   Q.  Good afternoon, Mr. LeRoux.

13             My name is Robert Ray.  I represent Mr. Stillwell who

14   is a defendant in this case.

15             I just want to first confirm with you as you testified

16   on direct-examination that you do not have any prior meetings

17   with Mr. Stillwell.  You have not met Mr. Stillwell and you

18   have never spoken to Mr. Stillwell; is that correct?

19   A.  That is my recollection.

20   Q.  Now, counsel on cross-examination has just covered with you

21   in some detail the agreement that you have with the government.

22   I want to focus on that as well.  I will try not to be

23   repetitive.  But as you sit here today, whatever the government

24   may do in connection with your agreement, you know that you

25   have already violated that agreement, right?

A.   What do you mean by violated the agreement?

          (Continued on next page)

1    Q.  The agreement sets forth, as has been reviewed on

2    cross-examination with you, certain obligations that you have.

3            Do you recall that testimony?

4    A.  Yes.

5    Q.  And one of those obligations is to tell the truth, right?

6    A.  Yes.

7    Q.  By your own admission, on direct examination you have

8    already lied to the government in connection with meetings that

9    you had in the U.S. Attorney's office during various proffer

10   sessions, right?

11   A.  I already testified that there were certain lies.

12   Q.  Those certain lies, you would agree with me, constitute a

13   violation of the terms of the agreement, right?

14   A.  I would not agree with you.

15   Q.  Well, which part would you not agree with?

16   A.  First of all, I'm not the one who determines whether or not

17   a particular act or an omission or a lie or anything else

18   constitutes a violation of the agreement.

19   Q.  Referring to 350728, defense exhibit, which is in evidence,

20   and I'll just read from page 4, "It is understood that LeRoux

21   subparagraph A shall truthfully and completely disclose all

22   information with respect to the activities of himself and

23   others, concerning all matters about which the U.S. Attorney's

24   office inquires of him."

25           Do you see that?

1    A.   Which paragraph was that, sorry?

2    Q.   First paragraph on page 4, first full paragraph on page 4.

3    It's the first sentence.

4    A.   That is what the text says.

5    Q.   And you understand from that text, which is the agreement

6    that you signed by your own admission that you have not

7    truthfully and completely disclosed all information to the U.S.

8    Attorney's office at various times, correct?

9    A.   What I already testified to is that I lied at certain

10   points.  However, it is at the discretion of the United States

11   Attorney's office and not me whether the omissions constitute a

12   violation under this paragraph or any of the other paragraphs.

13   Q.   Well, let me ask it this way, would you would agree with

14   me, would you not, that you have not been at all times truthful

15   with the United States government and the prosecutors on behalf

16   of the government that you have met with in the U.S. Attorney's

17   office in the Southern District of New York?

18   A.   I have already testified that there were certain lies in

19   the previous testimony.

20   Q.   Which means that you were not truthful, correct?

21   A.   That's what the word "lie" means, yes.

22   Q.   So we're now in agreement you have not been truthful with

23   the U.S. Attorney's office at all times, right?

24   A.   I have been truthful at all times, except for the incidents

25   that I already testified about.

1   Q.  So not at all times, right?  Not always just one, some of

2   the time?

3   A.  I have been truthful at all times, except for the incidents

4   I already testified about.

5   Q.  Which would not be all of the time, correct?

6   A.  Not all of the time, correct.

7   Q.  Thank you.

8         The agreement that you signed further indicates that

9   you will not be prosecuted in any event for certain crimes as

10  you understand them because of the fact that there exist no

11  federal jurisdiction for them.

12        Is that your understanding?

13  A.  That's what the text says.

14  Q.  Among those, in the paragraph on page 5 of your agreement

15  is subparagraph 10, which is numbered, it's in the top of page

16  5, and it's about one, two, three, four, five, six -- seven

17  lines down.

18        I guess it's the sentence that is numbered No. 10.  Do

19  you see sentence No. 10?

20  A.  I do, yes.

21  Q.  And in that sentence, it refers to the murders-for-hire

22  among others of Catherine Lee, correct?

23  A.  Yes.

24  Q.  And as you have testified, you were aware of the fact that

25  that death, the killing was done in the Philippines in or about

1    2012, correct?

2    A.  Yes.

3    Q.  And as a consequence, you will not be prosecuted for that

4    offense because you were not within the federal jurisdiction of

5    the United States.  That's your understanding, isn't it?

6    A.  No, it's not.

7    Q.  Well, haven't you testified previously in connection with

8    your understanding of this agreement?

9    A.  I have, but you did not give a correct interpretation of

10   the agreement.

11   Q.  Well, is it not your understanding that you will not be

12   prosecuted with regard to the death -- causing the death of

13   Catherine Lee as a result of the fact that there is no federal

14   jurisdiction over you?

15   A.  The death of Catherine Lee is included in Count Two, so I

16   have been prosecuted for the death of Catherine Lee, just not

17   as a murder counter.

18   Q.  Let's take a look at that.  In your information, which is

19   the charge to which you pleaded guilty to and it appears as

20   3507-29.  I believe you are referring to -- I'm sorry.  That's

21   wrong.  Let me get the New York one.

22        The New York one is 3507-67.  And you pleaded guilty,

23   as you testified on direct examination, to, among other

24   charges, the charge of exporting technology from the United

25   States during the period between in or about 2009 and September

1    of 2012.

2              Do you recall pleading guilty to that charge?

3    A.   I'm sorry.  Say that again, please.

4    Q.   In connection with your guilty plea in this case, in this

5    district, you pleaded guilty to the charge of, between the

6    period in or about 2009 and including in or about September of

7    2012, you pleaded guilty to causing or exporting technology

8    from the United States?

9    A.   You're referring to Count Two?

10   Q.   Yes, I am.

11   A.   Yes, that's --

12   Q.   What you pleaded guilty to was that technology was supplied

13   to an enemy of the United States, namely Iran, correct?

14   A.   I can't support the characterization that Iran is an enemy.

15   That's a political issue.  What I can testify about is that I

16   pleaded guilty to violating sanctions.

17   Q.   The sanctions come from the United States Department of

18   Treasury, as you understand it, the Office of Foreign Assets

19   Control, right?

20   A.   I don't know which department governs the regulation.  I'm

21   not a lawyer.

22   Q.   But you were generally familiar with the fact that you were

23   avoiding the sanctions regime that was imposed by the United

24   States Government against transactions involving the government

25   of Iran, right?

1  A.  I was aware that I was violating the law, yes, but I could

2  not testify as to which law and which department governed the

3  law.

4  Q.  And in connection with that count, it goes on to list the

5  following:  "In furtherance of and as part of committing the

6  offense, Paul Calder LeRoux, the defendant," that's you, "among

7  other things, caused the murder of Catherine Lee in a country

8  outside of the United States," correct?

9  A.  I don't have the documents in front of me, so I can't tell

10 you.  The agreement doesn't include that.

11 Q.  Well, you indicated, though, that you are familiar with the

12 fact that it was in that count that the death of Catherine Lee

13 was referenced, right?

14 A.  What I said was that I have been prosecuted in the United

15 States for that murder, but not as a murder count.

16 Q.  You didn't plead guilty to murder in a foreign country,

17 namely, the Philippines, right?

18 A.  I have not been charged with murder, nor have I pled guilty

19 to murder.

20 Q.  By the way, on cross-examination, you mentioned an

21 individual that you met while in custody in the Bureau of

22 Prisons system.  You identified that individual by the last

23 name of Islam, correct?

24 A.  Yes.

25 Q.  His first name, Mir?

1    A.  Yes.

2    Q.  And you've had a number of conversations with Mr. Islam

3    that have been recorded in which you're discussing, not just

4    your case, but this case currently on trial, right?

5    A.  Yes.

6    Q.  And you're well aware of the defenses involved in

7    connection with this matter before this jury, aren't you?

8              MR. BOVE:  Objection.

9              THE COURT:  Sustained.

10   Q.  Well, you have become familiar, have you not, that one of

11   the issues in this case --

12             MR. BOVE:  Objection.

13             THE COURT:  Sustained.

14   Q.  Did you have conversations with Mr. Islam concerning

15   whether or not federal jurisdiction --

16             MR. BOVE:  Objection.

17   Q.  -- existed?

18             THE COURT:  Sustained.

19   Q.  In any event, you followed this case quite closely and you

20   know what the issues are, don't you?

21             MR. BOVE:  Objection, Judge.

22             THE COURT:  Sustained.

23   Q.  Mr. LeRoux, you have followed the docket in this case

24   because you had Mr. Islam research on the public docket

25   electronically the case filings in this case, among other

1    things, right?

2    A.   What I was interested in was the adjournments in this case,

3    not specifically any specific documents in this case.

4    Q.   But Mr. Islam did discuss with you not just the scheduling

5    with regard to this case, but the substance as well, without

6    getting into what the substance was, he discussed substance

7    with you?

8    A.   Mr. Islam had various comments regarding this case, yes.

9    Q.   And those comments, without getting into what they were,

10   they did involve the substance of this case, it wasn't just

11   about procedural dates?

12   A.   What do you mean by the "substance of the case"?

13   Q.   I mean something beyond just simply scheduling.

14   A.   Mr. Islam had various comments about the case.  That's what

15   I can say.

16   Q.   And it was beyond just scheduling?  That's all I'm asking.

17   A.   It was about other matters other than scheduling.  Yes,

18   some of the comments.

19   Q.   Thank you.

20            I want to invite your attention to meetings that you

21   had with the United States Government that preceded the entry

22   of your guilty plea, but before I do that, you were arrested in

23   September of 2012, right?

24   A.   Yes.

25   Q.   And you were arrested, so that the record is clear, after

1    the murder of Catherine Lee occurred, correct?

2    A.  Yes.

3    Q.  And you met with the government a number of times as was

4    brought out on cross-examination in proffer sessions leading up

5    to your signing a cooperation agreement and entering a guilty

6    plea in your case in New York, correct?

7    A.  Sorry.  Repeat the question.

8    Q.  Did you have a number of meetings leading up to your

9    signing a cooperation agreement with the government and

10   entering a guilty plea in your case here in New York?

11   A.  I had a number of meetings, yes.

12   Q.  And thereafter you entered a guilty plea, you continued to

13   meet with the government on a number of occasions following

14   your plea to the charges in your case here in New York?

15   A.  I meet with the government whenever they request to meet

16   with me as per my agreement.

17   Q.  Let me invite your attention to the period in 2015.  Do you

18   recall meeting with the government during a period of time when

19   the government discussed with you the murder of Catherine Lee

20   in the Philippines?

21   A.  In 2015, yes, it was discussed.

22   Q.  You were asked a number of questions in connection with the

23   events that transpired three years prior in calendar year 2012,

24   correct?

25   A.  Yes.

1  Q.  During the course of your meetings with the government, you

2  were asked about a particular email that I believed you

3  testified about on direct examination.  If I can pull it up,

4  let me see if I can find it here. Just bear with me one moment

5  until I find the exhibit number that I'm looking for.  This is

6  Government Exhibit 414-18.  With the government's assistance,

7  since it's in evidence, if I can just have that one for the

8  witness and the jury.

9          Now, do you recall a meeting in approximately 2015

10  which you were asked about this particular email, which is

11  dated January 24, 2012?

12  A.  I was asked about a lot of emails.  I can't recall if this

13  is the email I was asked about.

14  Q.  Do you recall during your testimony on direct examination

15  here today being asked about this particular email, Government

16  Exhibit 414-18?

17  A.  Yes, I recall.

18  Q.  And your testimony on direct examination is that you were

19  not able to identify who "Sal" or "JT" references, but you did

20  identify that your understanding was that this related to

21  salaries due in connection with what you have referred to your

22  testimony as the kill team, right?

23  A.  I stated that this is related to the bonus for the murder

24  and salaries, yes.

25  Q.  And this email, as you know, from January of 2012, came at

1   a time that you knew from Joseph Hunter that the individuals

2   involved were located in the Philippines?

3   A.   Sorry.  Say that again.

4   Q.   That the members of the team were located in the

5   Philippines in January of 2012?

6   A.   It's my understanding that the entire kill team consisting

7   of Samia and his partner was in the Philippines in January

8   2012.

9   Q.   You had a number of meetings, did you not, in January 2012

10  with Mr. Hunter?

11  A.   I met several times with Hunter, yes.

12  Q.   During the time that you were in the Philippines and

13  Mr. Hunter was in the Philippines, you had no meetings,

14  however, with Mr. Samia, did you?

15  A.   I did not meet Samia.

16  Q.   And you never met Mr. Stillwell either?

17  A.   I did not meet Stillwell.

18  Q.   So you did not meet either of them in the Philippines or

19  any other time?

20  A.   I already testified that I did not meet Samia or Stillwell.

21  Q.   In connection with this particular email, did there come a

22  time in 2015 when the government asked you about what you knew

23  about the two members of the kill team that you have described?

24  A.   I don't recall exactly what was asked.

25  Q.   Do you recall a time when they asked if you were aware of

1    whether those individuals who were hired to be members of that

2    team were aware of the nature of their assignment prior to

3    traveling from the United States to the Philippines?  In other

4    words, before they left the United States, were you asked that

5    question?

6    A.  I already testified on direct that I lied about that.

7    Q.  I'm just asking before we get to your lie, I want to know

8    whether or not you were asked a question.  Were you asked that

9    question?

10   A.  At some point -- I can't tell you in what specific meeting,

11   but at some point in 2015, I was asked, yes.

12   Q.  And that question was posed to you by a prosecutor?

13   A.  I don't recall who was at the meeting.

14   Q.  Do you recall whether Agent Stouch was at the meeting when

15   you made that statement in response to that question?

16   A.  As Agent Stouch is the case agent, it's possible he was

17   there, but I don't recall.

18   Q.  Do you recall whether or not prosecutors were present in

19   the room when that question was asked?

20   A.  I don't recall who was in the room.  I already stated that.

21   Q.  You're aware, however, that when you make statements to

22   prosecutors and/or agents, that when you make those statements,

23   they are under penalty of prosecution for false statements,

24   correct?

25   A.  I'm aware that if false statements are made, I can be

1    prosecuted, yes.

2    Q.  Your testimony on direct examination according to you was

3    that on that particular occasion in 2015, you did not tell

4    truth to the government?

5    A.  That's what I already testified to.

6    Q.  In connection with your knowledge about the knowledge of

7    two people that you do not know?

8    A.  I testified that at the time I lied about what the

9    individuals knew when they left the United States and also

10   about the first job that was done in the Philippines.

11   Q.  Just so it's clear, again, you don't have any idea what

12   Mr. Stillwell knew or didn't know?  You've never met the man,

13   correct?

14   A.  I did not testify what Stillwell knew or didn't know.  I

15   was just asked to give my opinions both on direct and at every

16   other time.

17   Q.  And so the question I have for you, Mr. LeRoux, is were you

18   testifying truthfully earlier today or were you testifying

19   truthfully sometime in 2015 when the government asked you this

20   question and you gave the answer that you've said?

21   A.  I already stated that I lied in 2015 on direct and I'm

22   testifying truthfully today.

23   Q.  You understand as we have already covered that a lie to the

24   government puts you in breach of your agreement?

25   A.  I already testified that what exactly constitutes a breach

1  is not for me to say.

2  Q.  You're certainly concerned about the fact that the

3  government might conclude that you breached the agreement by

4  not telling the truth, correct?

5  A.  I already stated that I don't have an opinion on the matter

6  because I'm not a lawyer.  I don't need to tell you legal

7  advice.

8  Q.  With regard to the balance of your agreement, you're

9  certainly aware that any further crimes you may commit after

10  you've signed the cooperation agreement puts you at

11  considerable risk that the government may decide that you are

12  in violation of your agreement with the government, right?

13  A.  I have not committed any further crimes, but if there was a

14  further crime, then, yes that would be something that may put

15  me at risk based on the government's discretion.

16  Q.  Well, among other things, you didn't tell the government

17  initially, did you, about cocaine trafficking in connection

18  with the movement of cocaine into Miami, Florida, right?

19  A.  I don't recall anything about cocaine trafficking into

20  Miami.

21  Q.  Wasn't there a load that you said was destined for Miami,

22  but the deal never actually went down?  In other words, it

23  wasn't concluded?

24  A.  No, I think you're mistaken.

25  Q.  Wasn't that the whole purpose of securing boats in that

1   location?

2   A.  The purpose of securing a boat in Florida had nothing to do

3   with trafficking cocaine into Florida.

4   Q.  What was the purpose of securing boats in Miami, Florida?

5   A.  The boats are cheap in Miami.

6   Q.  What were you going to do with the boats?

7   A.  The boat was supposed to intercept the boat coming from

8   Peru and the drugs would be transferred on to that boat and

9   sent to the Philippines.

10  Q.  But in any event, you didn't disclose that to the

11  government, didn't you, at least not initially?

12  A.  As far as I recall, that was disclosed.

13  Q.  Well, you didn't disclose it back in the period shortly

14  after you entered into the cooperation agreement, did you?

15  A.  I don't recall the exact timing of the disclosure, but I

16  did disclose the mission from Peru and the government was well

17  aware that I had purchased boats in Florida in relation to my

18  drug trafficking activities.

19  Q.  Now, your crimes have also included, by your own

20  acknowledgment, efforts to bribe public officials, right?

21  A.  Yes.

22  Q.  Including public officials in connection with the

23  enforcement of the criminal justice system in other countries,

24  right?

25  A.  I have bribed public officials related to the criminal

1   justice system in other countries, yes.

2   Q.  With regard to specifically your conduct as it relates to

3   the United States, it certainly was something you were prepared

4   to engage in where you would interfere with the extradition of

5   an individual to the United States by bribery if necessary,

6   right?

7   A.  I already pled guilty to paying bribes to prevent an

8   individual from being extradited the United States.

9   Q.  You understand that that conduct interferes with the

10  criminal justice process in the United States, don't you?

11  A.  Yes, I do.  And that's why I was charged with a charge and

12  that's why I pled guilty to the crime.

13  Q.  Which would include the fact that you intended to obstruct

14  justice here in the United States, right?

15  A.  It's not my decision what my crime could -- that's up to

16  the prosecutor.  I pled guilty to a crime related to that

17  conduct.  As to what charges are filed and what I plead guilty

18  to, that's something for the government to decide.

19  Q.  I understand charges aside, but I'm asking you your

20  understanding, the conduct which you engaged in, the purpose of

21  which was to obstruct proceedings in the United States, right?

22  A.  The conduct that I engaged in was for the purpose of

23  preventing the extradition of an individual from Namibia to the

24  U.S.

25  Q.  And that would interfere with the enforcement of the law in

1  the United States, wouldn't it?

2  A.  It's not my determination what the conduct refers to.  I

3  simply pled guilty to aiding and abetting a felon.

4  Q.  And that felony was, among other things, designed to

5  obstruct the extradition into the United States of someone who

6  was sought by the criminal justice process here in this

7  country, right?

8  A.  I've already stated, I've pled guilty to aiding and

9  abetting a felon, which involved paying bribes to prevent his

10  extradition from Namibia to the United States.

11  Q.  In other words, Mr. LeRoux, based on your past, you have

12  shown a willingness, whether by engaging in lawful or unlawful

13  conduct, to do whatever best suits you; isn't that so?

14  A.  That question is very broad.  Can you be more specific.

15  Q.  You have an extensive criminal history, don't you sir?

16  A.  I already testified to extensive criminal conduct.

17  Q.  And that criminal conduct continued after you entered into

18  a cooperation agreement, didn't it?

19  A.  No, it did not.

20  Q.  Well, nobody's formally charged you, but you understand

21  you're in violation of that agreement already, don't you?

22  A.  I haven't committed any further crimes and what constitutes

23  a violation of the agreement is not for me to decide.

24  Q.  But your efforts to obstruct justice when necessary, to

25  delay or impair or impede an extradition process, to bribe

1   public officials, to lie, to traffic in narcotics, to kill

2   people, to trade weapons with the enemy, to be engaged in the

3   interference of the lawful processes of the United States

4   Government, to violate the sanctions regime --

5              MR. BOVE:  Objection to form, judge.

6   Q.  -- all of these things you did in order to further your own

7   interest; isn't that true?

8   A.  Could you break the question down into smaller parts,

9   because I can't even remember what you said.  The question was

10  far too long.

11  Q.  Well, your testimony has been far too long already, so let

12  me try this.

13             MR. BOVE:  Objection.

14             THE COURT:  Sustained.

15  Q.  My question to you is in light of all of the crimes that

16  you have committed, isn't it true that you act according to

17  Paul LeRoux's best interest at all times and that includes

18  whatever it may take, whether lawful or unlawful, to accomplish

19  what you set out to achieve; isn't that true?

20  A.  I can't answer yes or no to that.  All I can say is I

21  committed serious crimes.  I came to the United States.  I told

22  the truth except for the incidents I already testified about,

23  and I'm trying to turn over a new leaf.

24             MR. RAY:  Your Honor, with that I have more, but I

25  think that's enough for today.

1          THE COURT:  So ladies and gentlemen, we will resume on

2    Monday morning.  Please be here again at 9:30.  We'll start

3    promptly at 10:00.

4          Remember, don't discuss the case.  Don't try and

5    research the case?  If you happen to see anything about this

6    case or anything similar, please don't read it, and if you do

7    inadvertently, let Ms. Cavale know, but have a nice weekend,

8    keep an open mind, and take care.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (Jury not present)

2                  THE COURT:  Is there anything we need to talk about

3      before the weekend?

4                  MS. DONALESKI:  Judge, we have an application to make.

5      The government intends or expects to rest, either late Tuesday

6      or early Wednesday, at which time the defense will put on its

7      case.

8                  It's clear from Mr. Ray's comment this morning and his

9      opening that he intends to put on some evidence.  He referred

10     to IP logins and email logins.  Your honor, we have made a

11     reciprocal discovery demand in August 2015.  We are entitled

12     under Rule 16(b) to any evidence in the defense's possession

13     that they intend to introduce at trial.  We are now mid-trial.

14     Mr. Ray referenced evidence this morning that we do not have

15     and are entitled to under the rules.  We are asking that the

16     Court direct all of the defendants to hand over any evidence

17     that they have under Rule 16(b) and which they intend to rely

18     upon at trial beginning as early as Tuesday.  We're asking for

19     that information tomorrow.

20                 MR. RAY:  Your Honor, we're basing what we have, and

21     what we essentially turned back over to the government is

22     essentially turning back over to them the same thing that they

23     gave to us.  It's not anything now.  It's their own evidence.

24                 THE COURT:  So if you don't have anything.

25                 MR. RAY:  I don't have anything further to provide,

1   no.

2              THE COURT:  All right.

3              MR. RAY:  Just so it's clear, I made briefly a *Brady*

4    demand.  I understand that the government --

5              THE COURT:  Is this with respect to the Korean

6    Airlines?

7              MR. RAY:  My *Brady* demand was with regard to records

8    in the Homeland Security.  The government responded to that by

9    producing records from Korean Airlines.  In my judgment, that's

10   not going to do it.  Homeland Security is the repository for

11   all airline information at or around the time that it is fed

12   into the system to indicate whether or not there's been a

13   border crossing.

14             Since the government is in control of that

15   information, and those witnesses, I would ask the government to

16   be in a position to produce an appropriate witness to be able

17   to determine based upon what is within the records of the

18   Department of Homeland Security whether Mr. Hunter was on that

19   Korean aircraft on December 10, 2011.

20             They ought to be able to figure that out.  This is a

21   post-9/11 environment.  If it's important enough to the

22   government for other reasons to find out that information, they

23   well have the ability to do so.  This has now become a central

24   issue in the case and the government should be compelled to

25   produce an appropriate witness.

1      I don't want to hear from some person, "flunky" from

2   Korean Airlines.  I want somebody from Homeland Security in a

3   position with knowledge to explain and determine whether or not

4   Mr. Hunter was on that aircraft.  If I don't get it in a timely

5   fashion, I will move for a continuance until such time as we do

6   get it, but they're in a position to produce that information.

7      MS. DONALESKI:  Your Honor, first of all, the

8   Department of Homeland Security is not on the prosecution team,

9   so it is not within our obligation.

10      MR. RAY:  Last time I checked, it's still part of the

11   government.

12      THE COURT:  Have you been in touch with someone from

13   the Department of Homeland Security about this issue?

14      MS. DONALESKI:  Yes, and they have provided the

15   records that we provided to your Honor.

16      THE COURT:  I think you should make a witness

17   available to Mr. Ray and who is available to testify next week.

18      MS. DONALESKI:  Your Honor, I just want to know,

19   Mr. Ray needs to go through the *Touhy* process if he want this

20   to happen.  He is talking about a defense witness.  He needs to

21   go through the proper process to make that happen.

22      THE COURT:  So start the process.

23      I'm just going to remind all defense counsel that

24   there are reciprocal discovery obligations.  Keep me posted on

25   this if you can, so that we don't have a continuance, which I

1   don't think would be fair to the jury.  Try and work together

2   as best you can to accomplish this.

3           I'm sure you're familiar with the process, but to the

4   extent you're not, just please coordinate so we can make this

5   happen as quickly as possible.

6           MR. RAY:  I'm actually not.  I'm happy to be familiar.

7   My colleagues have informed me that it's not as simple as one

8   might otherwise think.  I do know from experience dealing with

9   the government, if I have the government's assistance, meaning

10  the government that's at this table, I am far more likely to

11  get it in a hurry than I am to get a slow drag, we'll see it

12  sometime when spring arrives.

13          THE COURT:  I'm directing the government as much as

14  they can, to assist you in ensuring that you know exactly what

15  you need to do so that we can -- we don't have a situation

16  where we have to do that.

17          MS. DONALESKI:  Understood, your Honor.

18          We also want to note for the record, we haven't

19  received competent expert disclosure.  We are now talking about

20  an expert who may testify as soon as Tuesday or Wednesday.  We

21  need that information, your Honor, under the rules in order to

22  make the appropriate motion practice.

23          THE COURT:  Where are we on that?

24          MR. RAY:  Your Honor, that's fair and I apologize.  We

25  were just able to arrange the travel of my expert so that I

1  could do what I need to do to prepare.  I am meeting with my

2  expert tomorrow morning.  Thank you again for your gracious

3  assistance in making the travel possible, but if I could have

4  just until Saturday morning to do that, I have got to meet with

5  her tomorrow.

6           THE COURT:  Get it together by the end of the day

7  tomorrow.  OK?

8           MR. RAY:  We can do that.

9           THE COURT:  You said you're meeting tomorrow?

10           MR. RAY:  We can do that.

11           THE COURT:  Get it to the government by the end of the

12  day tomorrow.

13           Thank you all.  Have a nice weekend.

14           (Adjourned to April 9, 2018 at 9:30 a.m.)

1                     INDEX OF EXAMINATION

2    Examination of:                          Page

3    Direct By Mr. Bove . . . . . . . . . . . . . . 396

4    Cross By Mr. De Castro . . . . . . . . . . . 545

5    Cross By Mr. De Castro . . . . . . . . . . . 582

6                    GOVERNMENT EXHIBITS

7    Exhibit No.                            Received

8     403-14   . . . . . . . . . . . . . . . . . . 396

9     414-1 - 414-28   . . . . . . . . . . . . . 418

10    N226A   . . . . . . . . . . . . . . . . . . 470

11    131-3   . . . . . . . . . . . . . . . . . . 472

12    131-2   . . . . . . . . . . . . . . . . . . 476

13    5   . . . . . . . . . . . . . . . . . . . . 483

14    3500-28   . . . . . . . . . . . . . . . . . 551

15

16

17

18

19

20

21

22

23

24

25