ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

Franklin A. Rothman
Jeremy Schneider
Robert A. Soloway
David Stern

Rachel Perillo

Tel: (212) 571-5500
Fax: (212) 571-5507

April 29, 2024

**By ECF & Email**
The Honorable Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: United States v. Hunter, et al,.
Including ADAM SAMIA
13 Cr. 521 (RA)

Dear Judge Abrams:

Jeremy Schneider and I are the attorneys for Adam Samia, the defendant in the above-named matter, having been appointed pursuant to the Criminal Justice Act. This letter is respectfully submitted in advance of Mr. Samia's re-sentencing, presently scheduled for May 13, 2024 at 1:00 p.m.

On November 14, 2018, the Court sentenced Mr. Samia to a mandatory term of life imprisonment based upon his conviction at trial on Counts 1 (Conspiracy to Commit Murder-For-Hire) and 2 (Murder for Hire), life imprisonment on Count 3 (Conspiracy to Kidnap and Murder in a Foreign Country), and 20 years on Count 4 (Conspiracy to Commit Money Laundering), to run concurrently, and 20 years' imprisonment on Count 5 (Murder Through Use of a Firearm), to run consecutively.

In *United States v. Davis*, the U.S. Supreme Court held that the residual clause of 18 U.S.C. § 924(c)(3)(B) is void for vagueness, and that a conviction under 924(c) that is based on a predicate "crime of violence" as defined under that clause cannot be sustained. 139 S. Ct. 2319 (2019). In light of the Supreme Court's decision in *Davis*, the Court of Appeals for the Second Circuit held that Mr. Samia's convictions under Counts One, Two and Four must be vacated and Mr. Samia must be re-sentenced on Counts Three and Five. Mr. Samia will now stand before the Court for re-sentencing on the two remaining counts of conviction Count Three, Conspiring to Murder and Kidnap abroad, in violation of 18 U.S.C. § 956(a), and Count Five, Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h), and the Court is no longer bound by a statutory mandate to impose a life sentence.

It is respectfully submitted that a sentence of life imprisonment is greater than necessary to achieve the federal goals of sentencing, and for the reasons discussed herein, it is respectfully requested that the Court impose a sentence of 120 months.

**The "Supplemental Presentence Report"**

In advance of re-sentencing, Probation filed a "Supplemental Presentence Report" ("PSR") dated September 9, 2022, which, for unknown reasons, does not revise or amend, and hardly supplements the original report, even though Counts One, Two and Four have been vacated by the Second Circuit Court of Appeals, and a statutory mandatory life sentence is no longer applicable.

Mr. Samia objects to the Supplemental PSR's failure to adequately reflect the vacated counts of conviction and its failure to conduct a new Guidelines analysis on the remaining counts. Instead, the PSR briefly summarizes the Supreme Court's holding in *Davis*, and states, "[r]esentencing called for in light of [the decision in *Davis*] requires an updated Guidelines calculation to factor in the firearm conduct which had previously been accounted for by the now-vacated 18 U.S.C. § 924(c) count." PSR at 1. However, no guidelines calculation is conducted. The PSR simply concludes, "[t]he Guidelines remain the same", assessing Mr. Samia's Offense Level as 43 and a Criminal History Category of I, which yields a Guidelines range of life imprisonment. PSR at 2.

Mr. Samia respectfully submits that the Supplemental PSR should specifically and clearly state that he is no longer convicted of Counts One, Two and Four, as these counts of conviction have been vacated by the Second Circuit. Additionally, Probation should conduct a new Guidelines analysis, specifically calculating the Guidelines on the remaining Counts Three and Five. Mr. Samia understands that Probation calculates a life guideline based on an offense level of 43 and criminal history category of I, but the PSR should nonetheless reflect how Probation reaches that conclusion.

Counsel made these objections directly to Probation, asking for a revised Presentence Report that conducted a new Guidelines analysis and explicitly indicted that Counts One, Two and Four had been vacated. Counsel also requested that Probation interview Mr. Samia's family and include updated information regarding Mr. Samia's conduct in prison. Probation's response to the objections was that it is the policy of U.S. Probation "that only supplemental reports are to be completed in regard to resentencing for Davis cases," and that "defense counsel is free to provide any additional and updated information regarding the defendant in your re-sentencing submission, and orally to the Court."

Mr. Samia also wishes to clarify certain factual recitations that were included in the original PSR. Specifically, Paragraph 90 should include that Mr. Samia suffered from chronic migraines prior to his arrest. According to Mr. Samia, he suffered from migraines for many years before he was arrested in this case. He was previously told by doctors that the migraines are caused by a misaligned bone in his neck that places pressure on a nerve, resulting in the migraine. Prior to his arrest, Mr. Samia received regular chiropractic adjustments, which were the only treatment that adequately provided him relief from the migraines.

## Argument

Mr. Samia has been incarcerated since his arrest on July 22, 2015. By the time of his re-sentencing he will have served approximately 8 years and 10 months in prison (a total of 106 months). Several changed circumstances have arisen since Mr. Samia's sentencing in 2018 which constitute factors to be considered under 18 U.S.C. § 3553(a) in support of the requested sentence of 120 months. Such factors include Mr. Samia's exemplary rehabilitative efforts and accomplishments while in prison, his continued family support as well as the declining health of his father, his many medical conditions, the need to avoid unwarranted sentence disparities, as well as the egregiously harsh conditions of incarceration that he has endured throughout much of his time in custody, all of which come together to support the requested sentence of 120 months.

### 1. Mr. Samia Does Not Pose a Risk of Recidivism and Does not Pose a Danger to the Public

At the outset, it should be noted that the Bureau of Prisons has deemed Mr. Samia a minimum risk level under "PATTERN." *See* Exhibit A, Mr. Samia's PATTERN score. PATTERN, the Prisoner Assessment Tool Targeting Estimated Risk and Needs, is a system employed by the Federal Bureau of Prisons ("BOP") which "accurately measures an inmate's change during incarceration." *See* https://www.bop.gov/inmates/fsa/pattern.jsp. This system was mandated by the First Step Act ("FSA") of 2018 "to develop and implement a risk and needs assessment system for use with each person in the custody in the Federal Bureau of Prisons," and uses a variety of factors, such as age, offense conduct, criminal history, history of violence, education history, substance abuse history, and conduct in prison, to determine a prisoner's recidivism risk level. *See* https://www.ojp.gov/pdffiles1/nij/303859.pdf. PATTERN's calculation provides a general recidivism risk level and a recidivism risk level for violence. Mr. Samia's PATTERN sheet indicates his "general score" is a negative 2, and his "violent score" is a 4. This score establishes a "minimum risk category", the lowest recidivism risk classification. Notably, the National Institute of Justice for the U.S. Department of Justice declares that the current PATTERN system "displays a high level of predictive accuracy[.]" *Id*. Therefore, pursuant to the federal government's own prisoner recidivism risk evaluation system, Mr. Samia has been deemed the least likely to recidivate with respect to general criminal conduct as well as violent conduct.

### 2. Mr. Samia's Demonstrated Rehabilitation and Impeccable Behavior in Prison

Attached as Exhibit B are Mr. Samia's updated BOP educational and work history records, all of which reflect his excellent behavior and many accomplishments in prison.

Importantly, these records show that Mr. Samia has not had a single disciplinary infraction in his eight years and ten months in federal custody. This is a remarkable accomplishment in light of the everyday pressures on prison inmates to engage in criminal activity. Violence and intra-prison crime is rampant at USP McCreary and MDC Brooklyn, as it also was at the now-closed Manhattan MCC. Many inmates join gangs and are forced to engage in criminal conduct, including violence, for their own protection. Moreover, the restrictive nature of the penitentiary, in combination with the potential of violence looming around every corner, makes for a high-stress environment that often causes inmates to act out and engage in illegal conduct. While these pressures are real for all inmates, it is especially high for inmates like Mr. Samia, who is currently serving a life sentence, since he essentially has nothing to lose

by getting into trouble. He could have easily given up and engaged in violence or other illegal conduct, which might have made his time in custody easier, but instead, he has stayed out of trouble, has not joined any gangs, he has not committed any crimes or committed even the slightest infraction, which is extraordinary in light of his surrounding environment. As one inmate, Levaughn Neal, wrote in their letter of support, "I can truthfully say that Adam has not allowed a hostile [prison] environment to alter his behavior to be consistent with the nature of a U.S.P." *See* Exhibit C, Letters from Inmates.

To the contrary, throughout his incarceration, Mr. Samia has done only positive things, making the best use of his time by engaging in every possible opportunity to better himself and to help better the lives of others. Mr. Samia has completed several educational courses and participated in continued work assignments throughout his time at USP McCreary and has earned numerous certificates, which are also attached with Exhibit B. He completed pre-GED courses in August 14, 2019[1], and the report reflects 38 education courses taken by Mr. Samia between May 8, 2019 and June 21, 2022[2]. Mr. Samia paid his court ordered special assessments through the Financial Responsibility Program. The Re-Entry report attached to the Supplemental PSR emphasizes that "Mr. Samia has a continuous record of programming and continues to enroll in available course." PSR at 37. Mr. Samia availed himself of all of these opportunities even though he was facing a life sentence and ineligible for FSA credits.

Mr. Samia has also worked as a Reentry Unit Tutor and as a librarian, through which he has helped over 250 inmates receive course certificates and helped approximately 20 inmates obtain their GED's. As a reentry program tutor, Mr. Samia has helped many inmates develop the skills and tools needed to re-enter public society, including helping them meet educational goals, helping them to complete life skills courses, as well as helping them obtain government ID's and social security cards. He has offered motivation and encouragement to numerous inmates, as evidenced by more than fifty letters submitted to the Court, attached hereto as Exhibit C. These letters from fellow inmates describe Mr. Samia as someone that has always maintained a positive attitude despite the difficult circumstances of incarceration, who has served as a positive influence and role model, teaching and encouraging others how to make improvements in their lives, and as someone who helps deter violence and resolve conflicts, among many other positive qualities. The following quotes are just a sample of the many statements received from inmates in support of Mr. Samia:

> Since I arrived to this unit (3A) [Adam] has help[ed] me with my reading and spelling. Mr. Adam also bought me a book called Chambers Adult Learner's Guide to Spelling by Anne Betteridge. Mr. Adam has taken the time to help me with my reading & spelling since I have problems in those areas. Mr. Adam gives me good advi[ce] here and there about always staying positive and helping contact with my family and loved ones. He always encourage me to be a better person and to strive in life for whatever I want. And to always think positive and always move forward. With these tools Mr. Adam has taught me to use I feel like

[1] Mr. Samia completed high school prior to his arrest in this case and has taken GED courses in prison to assist with his work as a GED tutor.

[2] Mr. Samia has taken courses in a wide variety of subjects including history, geometry, finance, health and nutrition, fitness, philosophy, anger management, parenting, science, music, writing, resume writing, and more.

> I will be a more productive person in society to help me in every life situations when I come home one day.

Exhibit C, Letter from Alexander Rivera.

> Adam has guided me toward making the choices in my life to get me in the direction that I both want and need. He has always encouraged me to want better for myself, make better choices, and to find a better overall way to live. He pushed me to enroll in the challenge program that teaches all of those things. I did and it is a decision I'm glad I made.

Exhibit C, Letter from Richard Potter.

> I was sentenced to 300 months which to me seemed like a life sentence. I was to the point of giving up. The glass was always half empty. Then I met Adam. At first I couldn't comprehend why anyone, especially another inmate, would try to help me. From the first day I met Adam Samia he gave me positive reinforcement. Going out of his way to ensure my attitude was good every day. […] He has helped me build my confidence, gotten me to start eating healthy and exercising, helped me reach out to my family and is still helping me with my education. All of this with no expectation. He has truly changed the way I think. He has changed my life in such a drastic way. I am a better man because of him.

Exhibit C, Letter from Chad R. Weiss.

> I was 56 years of age when I met Adam, and I never learned to read or write my entire life. I had a 3rd grade reading level at best. During the Covid-19 pandemic Adam spent his mornings tutoring me on how to read and write. Monday through Friday, "without pay" he took his time and demonstrated so much patience with me and there were times I wanted to quit when he first started tutoring me because I was ashamed that I couldn't read. But he wouldn't let me quit. He generously gave his time to me until not only I learned to read, but until I learned to read on the level I'm supposed to. I could never send my family letters. But now I frequently send letters to my children, my grandchildren, and it's a beautiful feeling. […] On February 25, 2022 I received my G.E.D. and with that I feel as if the sky is the limit. I spend my days reading a lot now, and I thought it necessary to let you know it was because Adam who I now consider my friend took the time and believed in me even when I wasn't so sure of myself.

Exhibit C, Letter from Kevin Small

Mr. Samia has also earned the praises of McCreary's staff members, as evidenced by the letters submitted from his counselors, case manager, and the prison chaplain, attached hereto as Exhibit D.

It is clear from Mr. Samia's achievements, service to others, and his impeccable behavior as an inmate in a high security federal penitentiary, that he continues to evolve from the person that he was when the Court sentenced him in 2018, that he is not a threat to society, and in fact would positively contribute to society if he is ultimately released from prison.

**3. Mr. Samia Maintains the Unwavering Support from Loved Ones, Including his Elderly Parents, Who Have Suffered Greatly from his Life Sentence**

As evidenced by the many letters submitted to the Court, attached hereto as Exhibit E, Mr. Samia maintains the love and support from many family members and friends who have been greatly impacted by his incarceration. These writers know Mr. Samia as a loving son, brother, uncle and friend, a man who grew up working on his father's farm, a longtime public servant (serving as a mason and Shriner), and someone who could be relied on in times of need and in everyday life.

Mr. Samia's incarceration has been especially hard on his aging parents his father, Richard Samia Sr., age 77 and his step-mother Cheryl Mercadante, age 72.[3] As explained in a letter from Ms. Mercadante dated October 2022, Adam has not seen any of his family members since he began serving his sentence, and he has not seen his father since he was arrested in North Carolina in 2015. Cheryl writes, "Kentucky may be 500 miles from us but it might as well be 1,000[,]" as many obstacles stand in the way of being able to travel to see Adam. Primarily, Cheryl and Richard Samia own and operate a farm in Roxboro, North Carolina which consumes most of their time as they have nobody else helping them to run it. Richard Samia is in poor health and cannot travel in 2021, he suffered a heart attack, underwent triple bypass surgery, and now suffers from diabetes. Cheryl cannot leave because she takes care of Adam's father and also manages the farm when he is unable. Cheryl's mother, Adam's grandmother with whom Adam was very close, was also living with the Samias for many years and required constant medical care, further preventing Cheryl form making the trip to Kentucky. Adam's grandmother passed away in June 2023 at the age of 98, a tremendous loss for Adam who was unable to say goodbye to his grandmother or attend her funeral. Cheryl writes that Adam has also lost "his Uncle Eddie, his Aunt Rose, his dad's best friend … and several extremely good friends" since he was sentenced in 2018.

In their updated letters to the Court, Cheryl and Richard plead for Adam's eventual return home. Richard writes, "Adam has lived with me all his life, no one knows this good young man as well as I do. He is very much loved and desperately needed here to help me on the farm. Age has a way of catching up to all of us does it not. […] Your Honor, Adam is needed at home. I do not know how much longer I have, nor do I know [how] much longer I can run this farm alone." Exhibit E. Cheryl further states, "[t]his incarceration remains a very difficult hardship on this entire family. We may have freedoms that he does not, but we are serving this sentence with him every single day. […] [W]ith respect please consider our family, our situation, our health concerns, Adam's health concerns, along with the positive influence Adam has had on inmates and continues to have good behavior under the worst of circumstances while incarcerated." *Id*.

Also included with Exhibit E are statements from several family and friends, including letters from Adam's brothers, uncles, aunts, nieces, nephews and family friends, all of whom paint a positive picture of the type of person they know Adam to be, as they offer their continued support to him with the hope that he will one day return home.

---

[3] They each wrote letters in 2022 when Mr. Samia was originally scheduled to be re-sentenced , and have each submitted updated letters from March 2024. Both of their letters have been submitted to the Court.

4. **<u>Mr. Samia Suffers from Several Medical Conditions and has Received Inadequate Medical Treatment While in BOP Custody</u>**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]







***

Mr. Samia's medical and mental health conditions, all of which he developed while in custody of the BOP, have made his incarceration more difficult than if he were an ordinarily healthy inmate. Suffering from these ailments without receiving the proper care or treatment, which in some cases has worsened his conditions, makes his time in custody even harsher, which should be considered an important factor in support of the requested sentence. At 49 years old, it is also likely that these conditions will worsen as Mr. Samia ages and will require more specialized treatment in the future.

Furthermore, Mr. Samia should be incarcerated at an institution that is capable of meeting his medical needs. It is therefore respectfully requested that that the Court recommend to the Bureau of Prisons that Mr. Samia be designated to Camp Butner in North Carolina, which has an adjacent medical facility and would most likely ensure his receipt of proper medical care and treatment.

It is also respectfully requested that the Court direct the Bureau of Prisons to place a "medical hold" on Mr. Samia so that he is not removed from the MDC until he receives his scheduled appointments with specialists, as his transfer to another facility will only further delay his receipt of such treatment.

**5. <u>The Need to Avoid Unwarranted Sentencing Disparities</u>**

In fashioning the appropriate sentence the Court must also consider the need to avoid unwarranted sentencing disparities. The most analogous defendant to Mr. Samia is his co-defendant, Carl David Stillwell. The Court re-sentenced Mr. Stillwell to 240 months in prison. However, it is respectfully submitted that Mr. Samia's impeccable behavior in prison, combined with and his numerous health conditions and the time served under harsh conditions at the MDC warrant a sentence of 120 months' imprisonment.[8]

[8] Mr. Stillwell has not been subject to the harsh conditions at the MDC as Mr. Samia has in the last two years.

Additionally, the Court sentenced Mr. Samia's co-defendant and leader of the overarching conspiracy, Paul Calder Le Roux, a criminal mastermind, to 300 months' imprisonment. The Court of Appeals for the Second Circuit characterized Mr. Le Roux's criminal conduct as follows:

> Paul Calder Le Roux ("Le Roux") ran a transnational criminal organization engaged in money laundering, drug and weapons trafficking, and various acts of violence, including murder. The scale and variety of his outrageous criminal conduct defies an easy summary, and includes arms and technology dealings with Iran and North Korea, attempts at minor warlordism in Africa, and the plotting of a coup d'etat in the Seychelles. As the District Court has aptly characterized it, he committed 'an array of crimes worthy of a James Bond villain.'

*United States v. Hunter, et al*, Nos. 18-3074-cr (L), 18-3489 (CON), 19-790 (CON) (2nd. Cir. April 20, 2022), ECF 3300180, at 6-7 (quoting the Court's Rule 33 Order, No. 13-cr-521 (RA), ECF 796, at 22).

While Mr. Le Roux's cooperation with the government resulted in him receiving a reduced sentence, the breadth of his crimes, including having admitted to multiple murders, exceed that of Mr. Samia's single crime in scope and sophistication, let alone those of most criminal defendants that have become before this Court. Accordingly, the requested sentence of 120 months would be appropriate in comparison to the sentence of 300 months imposed on Mr. Le Roux.

Another case that may guide the Court in reaching an appropriate sentence that would not create an unwarranted sentencing disparity is *United States v. Georgescu*, 14 Cr. 799 (RA), in which defendant Flaviu Virgil Georgescu was convicted at trial before your Honor of one count of conspiracy to kill officers and employees of the United States and one count of conspiracy to provide material support or resources to foreign terrorist organization the FARC. According to the government, Mr. Georgescu "worked tirelessly to broker a multi-million dollar weapons deal [aimed at] killing American servicemen in Colombia", he was a "leader and driver of the conspiracy" and "had a very active role in making the objective of this conspiracy come true," ultimately obtaining a contract form a Belgium weapons supplier "for weapons that he was prepared to deliver to people he believed to be members of the FARC, ready and willing to use those weapons to kill Americans." *See* Sentencing Transcript, 14 Cr. 799 (RA), ECF 139, at 14-15. At sentencing the Court found that Mr. Georgescu committed perjury when he testified in his defense at trial, and that he threatened or intimidated his co-defendants into committing perjury, resulting in an obstruction of justice enhancement. *Id.* at 6-8.

Mr. Georgescu had an offense level of 43 and criminal history score of VI (due to the terrorism enhancement under 3A1.4(b)), resulting in a Guidelines sentence of life imprisonment. The Court applied a substantial downward variance and sentenced Mr. Georgescu to 120 months' imprisonment on both counts to be served concurrently. *See* Judgement, 14 Cr. 799 (RA), ECF 135. In imposing sentence, the Court considered the great severity of the defendant's conduct, his perjury, as well mitigating factors, such that the offense was the result of a sting operation, and that the defendant was 44 years old and had no prior criminal history, and that there was no evidence that he had engaged in any conduct similar to the offense before.

The conduct for which Mr. Samia has been convicted is undoubtedly serious, and although Mr. Georgescu's case does not involve any actual victims, leading a plot to provide weapons to a terrorist organization for purposes of killing several Americans is indeed a serious offense that could have resulted in multiple victims. Like Mr. Georgescu, Mr. Samia has no prior criminal history and there is no evidence that he committed similar conduct before.

Accordingly, it is respectfully submitted that a sentence of 120 months would provide just punishment for the instant offense while appropriately serving the need to avoid unwarranted sentencing disparities.

**6. <u>Mr. Samia Has Suffered Overly Harsh and Inhumane Conditions of Incarceration Throughout Most of his 8 Years in Custody</u>**

Mr. Samia has been in federal custody since his arrest on July 22, 2015 and has spent most of his time held at three federal institutions known for abominable, inhumane conditions the Manhattan Metropolitan Correctional Center ("MCC)", USP McCreary, and the Brooklyn Metropolitan Detention Center ("MDC").

Mr. Samia was held at the MCC from 2015 to April 2018, just three years before the Department of Justice decided to "temporarily" close the facility because the conditions were so poor.[9] The closure came two years after the death of Jeffrey Epstein, who committed suicide by hanging while under the watch of correctional officers in the Segregated Housing Unit in 2019. The abysmal conditions at the MCC had been longstanding, but became more publicly exposed following Epstein's death and throughout the COVID-19 pandemic. In 2021, the Honorable Colleen McMahon stated at a sentencing hearing, "the single thing in the five years that I was chief judge of this court that made me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC and the MDC, […] especially at the MCC," calling the conditions there "inhumane, cruel and harsh and unreasonably unjust," *United States v. Days*, 19 Cr. 619 (CM), Sentencing Transcript, ECF Doc. 35, at 11, 19.

Following his sentencing, Mr. Samia was designated to USP McCreary, a high-security U.S. Penitentiary located in Pine Knot, Kentucky. As discussed in a recent article published in a local Washington newspaper, McCreary is also a facility with grave conditions.[10] Fights and assaults between inmates occur regularly. An inmate recently died in his cell and was not discovered by officers until 72 hours later. Gang activity and intra-prison crime is rampant. Inmates complain of extreme hunger due to poor food quality and frequent bans on commissary for entire housing units as collective punishment for individual acts of violence. Once again, Mr. Samia refrained from engaging in any violence or any criminal activity despite that being the norm at USP McCreary, and despite the harsh and overly punitive conditions at the facility.

The physical conditions at McCreary are also atrocious. For example, the facility often loses electricity, or rather, the electricity is intentionally shut off in the cells, which is required

---

[9] *See* Noah Goldberg and Stephen Rex Brown, NYC Jail where Jeffrey Epstein killed himself to close, New York Daily News (August 26, 2021), available at https://www.nydailynews.com/new-york/ny-manhattan-federal-jail-mcc-closing-gun-troubled-jefrrey-epstein-20210826-uncwx3dddja6vjqjovnrfegumi-story.html; *see also*, Benjamin Weiser, Justice Dept. to Close Troubled Jail Where Jeffrey Epstein died (August 26, 2021), available at https://www.nytimes.com/2021/08/26/nyregion/MCC-epstein-jail-closed.html

[10] *See* https://washingtoncitypaper.com/article/660142/hunger-and-violence-dominate-daily-life-at-usp-mccreary-where-d-c-men-are-incarcerated/

for operation of the toilets in the cells. Without electricity the toilets cannot flush. At one point Mr. Samia went without electricity in his cell for a month. During those periods Mr. Samia was forced to urinate and defecate in his sink the same sink that would be used for washing hands and brushing his teeth which he would then have to clean himself, a highly dehumanizing and dangerously unsanitary practice which Mr. Samia (and his cell mate) had no choice but to employ. Additionally, Mr. Samia was incarcerated at McCreary throughout the height of the COVID-19 pandemic, and was confined to a cell for almost two years straight.

Mr. Samia was first held at the MDC from May of 2018 to January 2019 prior to being designated to USP McCreary. In December 2022, he was brought on a writ to the Southern District of New York for purposes of resentencing in the instant case and has been detained at the MDC since then.[11] As the Court is well-aware, the deplorable living conditions at the MDC have become more widely acknowledged since the COVID-19 pandemic. On August 16, 2022 local officials in Brooklyn criticized the facility's longstanding "systemic dysfunction" which "has resulted in years of unacceptable conditions of confinement for detainees, denial of basic necessities, and inadequate access to counsel and legal materials," calling the situation a "humanitarian crisis [that] must be addressed now."[12] Making matters worse, following the closure of MCC, most of those inmates were transferred to MDC Brooklyn, which was already suffering due to overcrowding and understaffing.

In *Unied States v. Days*, Judge McMahon stated that the conditions at the MDC (and the MCC) "are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Days*, 19 Cr. 619 (CM), April 29, 2021, Sentencing Transcript, ECF Dkt. 35 at 19. While Judge McMahon's remarks were made during the peak of the COVID-19 pandemic, the conditions have not changed, and in fact appear to be worse. An Opinion and Order by the Honorable Jesse M. Furman dated January 2, 2024 highlights the MDC's many documented problems in recent months (long after COVID-19 concerns have subsided), which include "perpetual lockdowns [..] [,] dreadful conditions, and lengthy delays in getting medical care," all of which can be attributed to various causes, the most apparent cause being "a severe staffing shortage." *See United States v. Gustavo Chavez*, 22 Cr. 303 (JMF) (ECF Dkt. 31, January 4, 2024) at 3. Judge Furman's Opinion explains:

> Data provided by the Government (at the Court's direction) confirms that there have been severe staffing shortages at the MDC for years. As of November 2023, only 200 of 301 'authorized, non-supervisory correctional officer positions' at the MDC were filled and, of those 200 officers, thirty-four were either on extended leave or about to transferred. In other words, as of November 2023, *the MDC was operating at only about 55% of its full correctional officer staffing level.*

*Id.* (internal citations omitted) (emphasis in original).

---

[11] Mr. Samia was sent back to McCreary on one occasion for approximately one month. He arrived amidst a prison riot and was held on lockdown for that entire month. He was also unnecessarily transferred out of the MDC to the Oklahoma City transfer for facility on approximately three occasions, each time lasting approximately several weeks before being transferred back to the MDC. Each time that Mr. Samia was moved, he would lose his personal property and legal documents, and was denied necessary medical needs, such as the need for his C-PAP machine, while waiting for transfer in Oklahoma.

[12] *See* https://www.brooklynpaper.com/detainees-report-inhumane-conditions-at-brooklyns-metropolitan-detention-center/

Regarding the conditions, the court further explained:

> The conditions at the MDC are dreadful in many respects, but three warrant particular emphasis. First, inmates at the MDC spend an inordinate amount of time on 'lockdown' that is, locked in their cells, prohibited from leaving for visit, calls, showers, classes, or exercise. [At the date of the Court's Opinion and Order], inmates at the MDC have reportedly been on lockdown for much or all of the last three weeks following an assault on staff, with a maximum of 'two hours outside their cells each day' during a short reprieve. […] For far longer, lockdowns have been especially common on weekends and holidays […] confining inmates to their cells is, for at least some inmates, tantamount to near-solitary confinement, a practice that is increasingly viewed as inhumane.

*Id*. at 9 10.

Indeed, Mr. Samia has spent the majority of his time at the MDC living under lockdown, through no fault of his own, but because the MDC is short-staffed or because other inmates are committing acts of violence. Mr. Samia has been confined to his cell for days and sometimes weeks at a time (and nearly every weekend for the last several months). He has maintained written logs tracking his days on lockdown, which counsel has reviewed, which show that on most "ordinary" days he is only out of his cell for a few hours. When the facility is on "lockdown", he will not be let of his cell for days at a time, and if so, only for about an hour. Most recently inmates were locked down for over three weeks straight (with about an hour out of the cell every few days) from March 21 to April 8, 2024, and as of this writing, another lockdown commenced over this past weekend. During lockdowns inmates lack access to showers, making for unsanitary conditions, medical treatment is delayed or nonexistent, and they are prohibited from making phone calls to family. There are no corrections officers in the units during lockdowns, leaving inmates vulnerable in the case of an emergency. Food is brought to the cells and the trays, filled with garbage and uneaten food, are left inside the cell for hours or days until staff are able to return to pick them up. If a toilet becomes clogged during a lockdown (which it often does), it will remain that way until the lockdown is lifted.

Dangerous and unsanitary physical conditions at the MDC have included "visible mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches in flies in the showers," as well as repeated electrical and plumbing issues. *See United States v. Gustavo Chavez*, 22 Cr. 303 (JMF) (ECF Dkt. 31, January 4, 2024) at 12-13 (citations and internal quotations omitted). Most recently, it was publicly reported that weevil or maggot-infested food was being served to inmates, and Mr. Samia has also personally witnessed cockroaches and inspect parts on food trays when working in the kitchen.

The MDC is also "notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates especially where such requires the attention of outside providers" and "denials or delays of needed care have reportedly become commonplace." *Id*. at 10 12 (internal citations omitted). Judge Furman cites to numerous cases (noting "there are far too many cases to cite") where the MDC has failed to provide urgent medical care, and in some instances, where MDC staff have defied court orders to provide inmates with the necessary care. *See e.g. Id*. at 11 (citing Dec. 15, 2023 Hr'g Tr. at 3-5, 17,

*United States v. Young*, No. 22-CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023); Dec. 20, 2023 Hr'g Tr. at 5, 9, *Young*, No. 23-CR-475 (DLI) (E.D.N.Y. Dec. 20, 2023); *Id.* at 12, n.5.



Finally, as previously discussed, Mr. Samia has spent his entire incarceration post-sentencing without any visits from family members due to his designation at McCreary. His communication with them has also been severely restricted as a result of the lockdowns. At sentencing the Court recommended that Mr. Samia be housed at a facility as close as possible to North Carolina to facilitate family visits; however, the BOP ignored that recommendation. Not being able to see his parents in over eight years has indeed made Mr. Samia's time in custody much harsher.

It is respectfully submitted that the conditions which Mr. Samia has endured throughout most of his incarceration, especially at the MCC and MDC, has been excessively punitive, which the Court should consider as warranting a downward sentencing variance. Many courts in this District have recognized the same. In *United States v. Gonzalez,* 18 Cr. 669 (JPO), the Hon. J. Paul Oetken varied downward at sentencing, stating that the time served under harsh conditions at the MDC was equivalent to approximately double the time served under ordinary conditions, stating:

> Now, the defendant has already served 24 months of detention and that really has been under conditions that have been extraordinarily harsh. Most of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming. And I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think having served 24 months is equivalent to having served three years ... [T]hat is significantly below the guidelines ... but I think that's a long period of time.

*United States v. Gonzalez*, 18 Cr. 669, April 22, 2021, Sentence Transcript, ECF Dkt. 250, pp. 17-18. It is respectfully submitted that Mr. Samia be afforded, at the very least, day for day credit for the time served at the MDC and MCC.

As Your Honor stated at a sentencing hearing in *United States v. Jose Rosario Tavarez*, 11 Cr. 430 (RA), "we have to take a minute and remember how long five years is in someone's life." *See* 11 Cr. 430 (RA), ECF Dkt. 31. In that case, the Court varied downward from a guidelines range of 188 to 235 months, and imposed a 60-month sentence, recognizing that five years in prison is a long sentence, especially for someone like the defendant, who was 70-years-old and suffered from several medical problems, including dementia. That defendant also had a very lengthy criminal history. While recognizing that Mr. Samia's case differs factually from

*Rosario*, the Court's views regarding the impact of even just five years in prison on an individual life remains applicable here. Mr. Samia has already served almost nine years in what are possibly the three worst federal jails in the country, while also suffering from several medical problems, receiving abysmal medical treatment, confined to his cell throughout continuous institutional lockdowns, and isolated from his family, which has amounted to a very difficult nine years in custody.

Indeed, Mr. Samia's offenses of conviction are serious and deserving of significant punishment. However, it is respectfully submitted that a sentence of 120 months would constitute sufficient punishment while appropriately accounting for time served under these harsh conditions of incarceration.

**Conclusion**

Accordingly, for all of the reasons discussed herein, as well as the arguments to be made at the time of Mr. Samia's re-sentencing, it is respectfully requested that the Court re-sentence Mr. Samia to 120 months' imprisonment and a reasonable period of supervised release.

It is also respectfully requested that the Court recommend to the Bureau of Prisons that Mr. Samia be designated to the Butner Camp in North Carolina, which is approximately twenty miles from his family's home, in order to facilitate visits with his family whom he has not seen in person in almost nine years, as well as to accommodate his medical needs.

Respectfully submitted,

/s/

David Stern